

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARIA DEL SOCORRO QUINTERO PEREZ;
BRIANDA ARACELY YANEZ QUINTERO;
CAMELIA ITZAYANA YANEZ QUINTERO;
and J.Y., a minor,
406 5th St. NW, Suite 100
Washington, DC 20001,

Petitioners,

vs.

U.S. DEPARTMENT OF HOMELAND
SECURITY; U.S. CUSTOMS AND BORDER
PROTECTION,
1300 Pennsylvania Ave. NW
Washington, DC 20229,

Respondents.

Case: 1:16-mc-00939
Assigned To : Bates, John D.
Assign. Date : 4/29/2016
Description: Miscellaneous

Related to:

Case No. 3:13-cv-1417 (S.D. Cal.)

## MOTION TO COMPEL U.S. DEPARTMENT OF
## HOMELAND SECURITY AND U.S. CUSTOMS AND
## BORDER PROTECTION TO COMPLY WITH
## SUBPOENAS, AND FOR CONTEMPT SANCTIONS,
## AND INCORPORATED MEMORANDUM OF LAW

**RECEIVED**

APR 2 9 2016

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Petitioners Maria Del Socorro Quintero; Brianda Aracely Yañez Quintero; Camelia Itzayana Yanez Quintero; and J.Y., a minor ("Petitioners" or "Plaintiffs") hereby move, pursuant to Federal Rule of Civil Procedure 45 ("Rule 45"), for an order that:

1) compels the United States Department of Homeland Security ("DHS") and United States Customs and Border Protection ("CBP") to comply with subpoenas served on March 1, 2016 (the "March Subpoenas") and to produce all documents within their possession, custody, control responsive to request numbers 1-10 and the specific documents identified in Exhibit C;

2) rules all objections to the March Subpoenas waived;

3) holds DHS and CBP in contempt and awards Plaintiffs attorney's fees and costs relating to the enforcement of the March Subpoenas;

4) compels DHS to comply with the subpoena dated December 8, 2015 and served on December 11, 2015 (the "December Subpoena") and produce documents responsive to request numbers 9, 17-20 and the specific documents identified in Exhibit C.

The March Subpoenas, with proofs of service and accompanying exhibits, are attached as Exhibit A. The December Subpoena, with accompanying exhibits, is attached as Exhibit B.[1] All subpoenas were issued from and are in connection with ongoing litigation in *Perez et al. v. United States et al.*, No. 3:13-cv-1417-WQH-BGS (S.D. Cal.) ("issuing court").[2]

---

[1] The December Subpoena was also accompanied with a subpoena for deposition testimony, which is not at issue here.

[2] In connection with the same litigation, Petitioners also filed in this Court a motion to compel compliance with a deposition subpoena dated December 22, 2015 and directed to CBP. *See* Case No. 1:16-mc-00480-JDB. On April 18, 2016, that proceeding was transferred to the issuing court under Rule 45(f) to the United States District Court for the Southern District of California. *Id.* at ECF No. 5.

## INTRODUCTION

For more than six months Plaintiffs have been actively trying to obtain documents that are relevant and essential to their civil rights case against the now ex-Chief of Border Patrol, Michael Fisher. Plaintiffs' case alleges that Fisher perpetuated an unconstitutional use of deadly force practice by Border Patrol agents along the U.S.-Mexico border that resulted in the June 2011 death of Plaintiffs' husband/father. Fisher repeatedly denied the existence of any pattern and practice, as well his knowledge about *any* of the facts or circumstances underlying all relevant use of force incidents. Yet a whistleblowing former senior official, public sources, and limited discovery all point to many documents within the possession, custody, or control of DHS and CBP that prove Plaintiffs' claims and disprove Fisher's defenses—documents which Plaintiffs' subpoenas request.

On February 23, 2016, the issuing court favorably ruled on the substance of Plaintiffs' discovery requests. Magistrate Judge Skomal of the Southern District of California granted Plaintiffs' motion to compel discovery against Fisher. Fisher's intervening retirement would have frustrated compliance with that order, so the issuing court extended fact discovery deadlines for Plaintiffs to subpoena that same discovery on the government instead. In doing so, the issuing court also specifically ensured that the March Subpoenas' request numbers 1-9, precisely as written, seek relevant information, are narrowly tailored, and do not impose any undue burden. DHS and CBP are now willfully shirking their discovery obligations, necessitating the intervention of this Court to compel compliance to the same discovery demands that were already authorized by the issuing court.

Plaintiffs' counsel actively worked with DHS and CBP to avoid motion practice regarding the March Subpoenas and the similar December Subpoena, assisting them as much as possible and extending their deadlines to comply based on the incorrect belief that they would

produce documents promptly. Having still not received a single document or objection pursuant to the March Subpoenas, and virtually no documents and a belated and meritless objection by DHS pursuant to the December Subpoena, it is now abundantly clear that DHS and CBP have no interest in complying with any subpoena. DHS and CBP leave Plaintiffs no choice but to seek assistance again from a court.

This Court should grant Plaintiffs' motion to compel compliance with the March Subpoenas and order specific production of documents outlined below that are in DHS and CBP's possession, custody, and control. The Court should find all objections to the March Subpoenas waived, and also reimburse Plaintiffs for the costs expended in compelling DHS and CBP's compliance with the March Subpoenas, including attorney's fees. As to the December Subpoena, this Court should compel DHS to produce a small subset of requested documents and the specific documents outlined below that DHS has obtained but is now apparently withholding.

## FACTS

### A. **Plaintiffs' Lawsuit**

Plaintiffs seek redress against the former U.S. Border Patrol Chief, Michael Fisher, for violating the civil rights of their husband/father, Jesus Alfredo Yañez Reyes ("Yañez"). *See generally* Plaintiffs' Third Amended Complaint, attached as Exhibit E. On June 21, 2011, a Border Patrol agent shot and killed Yañez near San Diego, California, acting consistent with an unlawful pattern and practice that Plaintiffs refer to in shorthand as the "Rocking Policy." Pursuant to the Rocking Policy, Border Patrol agents deemed a suspect's throwing of a rock as per se lethal force, to which agents then could justify responding with gunfire—in disregard to well established rules of engagement imposed on law enforcement officers under the Fourth Amendment. Fisher condoned and perpetuated the Rocking Policy during his tenure as Deputy Chief Patrol Agent of San Diego Sector (2006-2008), Chief Patrol Agent of San Diego Sector

(2008-2010), and Chief of Border Patrol (2010-2015), causing the agent to "justify" shooting and killing Yañez—while he was hanging on the Mexican side of an 11-foot U.S./Mexico border fence with nothing in his hands—by claiming Yañez had previously thrown two rocks and table leg (which Plaintiffs deny).

As relevant here, Plaintiffs claim that Fisher violated Yañez's right to be free from excessive use of force under the Fourth Amendment to the United States Constitution, as made actionable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Under Ninth Circuit law, a supervisor such as Fisher is subject to liability under the Fourth Amendment when "it would be clear to a reasonable [supervisor] that his conduct was unlawful in the situation he confronted." *Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012). To meet this standard, Plaintiffs must show, at a minimum, a "factual basis for imputing . . . knowledge" to Fisher of an unconstitutional practice undertaken by subordinates, coupled with culpable action or inaction. *Chavez*, 683 F.3d at 1111. Moreover, Fisher can be held liable if it is shown that he was "on actual or constructive notice that a particular omission in [CBP's] training program cause[d] [subordinates] to violate citizens' constitutional rights." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

## B.    Fisher's Inadequate Compliance to Requests for Production of Documents

Since the very beginning of Plaintiffs' lawsuit, Fisher has emphatically denied the existence of a de facto rocking policy and has further claimed that he has no knowledge about any incidents that involve Border Patrol agents' shooting at alleged rock throwers. After the

4

district court twice denied Fisher's motion to dismiss,[3] Plaintiffs propounded requests for production on Fisher in September ("RFP 1") and again in October ("RFP 2"). But he produced only a sliver of documents in response to RFP 1—most of which concerned only Yañez's incident—and refused to produce any documents in response to RFP 2. His grounds for not producing relied primarily on the belief that Plaintiffs should issue a subpoena to the government instead, given the DHS/CBP "*Touhy* regulations," which require Fisher to obtain permission from general counsel before producing. *See* Ex. A, at 24-25.

### C. Plaintiffs' December Subpoena and the Issuing Court's Granting of Plaintiffs' Motion to Compel Fisher

On December 8, 2015, Plaintiffs issued the December subpoena to DHS, which was served on its general counsel on December 11, 2015. *See* Ex. B. Later that month Plaintiffs filed a motion to compel Fisher to produce documents in response to RFP 2.

On February 22, 2016, the issuing court granted Plaintiffs' motion to compel Fisher, criticizing Fisher's "interpretation of possession, custody or control that creates opportunities for a party to manipulate the discovery process" and holding that he had failed in his duty to seek permission from the relevant general counsel to produce the responsive documents. Ex. A, at 24. The issuing court further ruled that Plaintiffs' requested documents in RFP 2 were relevant to the claims against Fisher and proportionate to the needs of the case, after narrowing some of the requests' language to ensure that the responsive documents comprise those relating to the use of force in response to the throwing of rocks along the U.S./Mexico border, and that some of the requested documents comprise those that Fisher created, received, or reviewed. Ex. A, at 35-37.

---

[3] *Perez v. United States*, 103 F. Supp. 3d 1180, 1212 (S.D. Cal. 2015) (denying Fisher qualified immunity and holding applicable standard of supervisor liability clearly established at the time of Yañez's death); *Perez v. United States*, 2014 WL 4385473, at *11-12 (S.D. Cal. Sept. 3, 2014) (holding Plaintiffs' complaint adequately alleges facts establishing Fisher's knowledge of the Rocking Policy and his personal responsibility for perpetuating it).

Fisher, however, retired on November 30, 2015. So rather than have Fisher attempt to obtain the documents, the court extended fact discovery to permit Plaintiffs to issue to the government a subpoena that would mirror RFP 2 (with the court's minor alterations to the language, and the omission of request number 8).

**D.     The March Subpoenas and DHS and CBP's Failures to Object or Produce**

In accordance with the issuing court's order granting Plaintiffs' motion to compel, Plaintiffs issued and served identical subpoenas, with several attachments, to DHS and CBP on March 1, 2016. *See* Ex. A, at 1-2, 4-5. The March Subpoenas' request numbers 1-9 tracked exactly the language approved by the issuing court. *See* Ex. A, 7-8, 35-37. Generally, the requests seek documents that evidence either (i) the facts underlying dozens of incidents  where agents, under Fisher's command, invoked the same, highly suspect "justification" to shoot at Mexican citizens,[4] (ii) Fisher's thorough knowledge of those incidents, and/or (iii) Fisher's refusal to correct the agents' use of force tactics and training to comport with the same constitutional rules of engagement that apply to every police department in this country.  Request number 10 seeks documents related to compliance with the subpoena itself, specifically any communications between DHS/CBP and Fisher's attorneys relating to the subpoena.

Before the court granted Plaintiffs' motion to compel Fisher, Plaintiffs were already in the process of meeting and conferring with DHS general counsel regarding the December Subpoena. On December 29, 2015—one day after briefing closed on Plaintiffs' motion to compel—DHS emailed a response to Plaintiffs' counsel stating it will not be complying with the December Subpoena. Attached here as Exhibit H. The response was not provided within 14 days of service on December 11, 2015. Counsel for both parties began engaging in a thorough meet-and-confer

---

[4] In his Directive, which is defined and provided in the attachments to the March Subpoenas, Fisher identified 43 incidents between 2010 and March 2014 involving an agent shooting at an alleged rock thrower. Ex. A, at 47.

process beginning on January 22, 2016. *See generally* Exhibit J.

On February 2, 2016, Plaintiffs sent a detailed letter to DHS counsel, with several attachments, to establish the existence and relevance of the documents sought pursuant to the December Subpoena. Attached here as Exhibit I. Among the attachments was a sworn declaration, dated December 23, 2015, that was provided to Plaintiffs by the former Assistant Commissioner of CBP Internal Affairs ("IA"), James F. Tomsheck, which was also attached to the March Subpoenas. *See* Ex. A, at 39-45. Tomsheck provided that declaration for Plaintiffs to use to establish the existence and relevance of documents in support of Plaintiffs' motion to compel Fisher, and thus is applicable to Plaintiffs' March Subpoenas. After receiving and reviewing the letter, DHS agreed to search for documents and also include counsel from CBP on further meet and confer sessions. After receiving the March Subpoenas, counsel for Plaintiffs continued to meet with both counsel for DHS and eventually CBP.

Plaintiffs' counsel expended tremendous effort to assist in every way possible DHS and CBP's compliance. *See generally* Exs. J & I. For example, counsel identified exactly which documents are responsive to Plaintiffs' requests using information that became available after serving the December Subpoena and RFP 2 (from which the March Subpoenas are based). These documents include, among other things, the documents Fisher would create, receive, or review after every use of deadly force incident. *See* Ex. J, at 10. Moreover, Plaintiffs' counsel compiled and sent a list of every known rocking incident where an agent used a firearm between 2006 through 2015, and identified each by date of occurrence, and, if known, the names of the victim and Border Patrol agent involved. *See* Ex. J, at 2-3. Knowing each incident's date and the documents contemporaneously generated should have substantially aided efforts to obtain responsive documents relating to the 43 deadly force incidents identified in the March

Subpoenas' request number 1.[5]

DHS and CBP started obtaining and reviewing responsive documents in March. See Ex. J, at 10. DHS then produced a small, but inadequate, set of documents pursuant to the December Subpoena, and informed Plaintiffs' counsel that more are coming. *See* Ex. J, at 1, 13.[6]  DHS counsel then proceeded to ask whether Plaintiffs would be willing to have CBP's production governed by a protective order. *See* Ex. J, at 13.  Plaintiffs previously obtained many of the same categories of documents concerning the Yañez incident without the need for a protective order. In any event, counsel for Plaintiffs tentatively agreed—on the belief that doing so would result in obtaining documents promptly. *See* Ex. J, at 5-6.  But despite requests to see a proposed protective order (*see, e.g.*, Ex. J, at 7, 10), CBP never provided one, nor did it specify any objection or even provide any basis why a protective order would be necessary.

By early April, Plaintiffs' counsel extended the deadline one last time to April 13, 2016. *See* Ex. J, at 5.  To date, DHS and CBP have neither objected nor produced any documents pursuant to the March Subpoenas.  Moreover, DHS has not offered any additional production pursuant to the December Subpoena, despite claiming it has obtained more responsive documents. *See* Ex. J, at 1. Plaintiffs accordingly file this motion under Rule 45 to compel compliance with the March Subpoenas and certain requests in the December Subpoena.

---

[5] Request number 1 of the March Subpoena seeks: "All BP Daily Briefs, IA Daily Briefs, and Daily Brief Notes for the seven days following each of the 43 rocking cases Defendant Fisher identified in his Directive that involved an agent using deadly force."  All terms are defined in the definitions section attached to the March Subpoena. *See* Ex. A, at 14-17.  Fisher's Directive was also attached to the Subpoena. *See* Ex. A, at 47-50.

[6] Specifically, DHS produced documents in response to the December Subpoena's request number 18—communications to and from the Government of Mexico relating to Border Patrol agents' use of deadly force in response to rock throwing.  Of the 42 pages produced, much contained either blank or duplicative information, and many of the letters were duplicates of the letters attached to Plaintiffs complaint and provided to DHS as examples of responsive material. After further meeting and conferring, DHS general counsel confirmed receipt of more responsive communications but has not yet produced any additional documents.  See Ex. J, at 1.

In this regard, Plaintiffs attach as Exhibit C a list of all documents Plaintiffs identified as within the scope of either the March or December Subpoenas that Plaintiffs now seek to compel from DHS and CBP.

Plaintiffs also attach as Exhibit D a chart that identifies 40 of the 43 incidents that occurred over the same period identified in Fisher's Directive, and therefore are also within the scope of information sought under request number 1 of the March Subpoenas. For each incident identified in Exhibit D, Plaintiffs seek the specific documents identified in Exhibit C that are generated after every incident. The chart in Exhibit D also indicates which documents were previously produced by Fisher before he retired—showing not only the paucity of documents received to date, but also the proof that the type of documents sought exist and are in DHS/CBP's possession, custody, or control.

## ARGUMENT

Rule 45(d)(2)(B)(i) provides that the "serving party may move the court for the district where compliance is required for an order compelling production" of documents requested in the subpoena. Furthermore, Rule 45(g) provides that the court where compliance is sought or the issuing court (if transferred there) "may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it." The court may sanction the subpoenaed person to coerce compliance and reimburse the prevailing party its costs and attorney's fees relating its enforcement. *Walker v. Ctr. for Food Safety*, 667 F. Supp. 2d 133, 136 (D.D.C. 2009) ("Courts employ civil contempt sanctions 'for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.'" (quoting *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 443 (1986))).

On March 1, 2016, Plaintiffs' counsel issued and served the March Subpoenas on both DHS and CBP. The March Subpoenas' compliance date was March 16, 2016, which Plaintiffs'

counsel extended to April 13, 2016. *See* Ex. A, at 1-2, 4-5; Ex. J, at 5. To date, neither DHS nor

CBP objected or produced any documents pursuant to these subpoenas. The Court should

therefore rule all objections waived and compel DHS and CBP to produce all documents

responsive to requests 1-10 of the March Subpoenas, including the specific documents listed in

Exhibit C concerning any of the 40 incidents identified in Exhibit D. The Court should also hold

DHS and CBP in contempt for their inexcusable failure to obey the March Subpoenas, which

were issued in conjunction with a court order granting Plaintiffs' motion to compel Fisher, and

award attorney's fees and costs to Plaintiffs related to the enforcement of the March Subpoenas.

On December 11, 2016, the December Subpoena was served on DHS, which provided

untimely objections on December 29, 2016 that should also not be considered. See Ex. H, at 1.

In any event, DHS's objections are irrelevant or baseless and do not preclude production of the

narrowly tailored requests at issue here.   The Court should therefore find that DHS's objections

are waived or overruled and compel DHS to produce documents responsive to certain requests in

the December Subpoena, numbers 9, 17-20 and the DHS Office of Inspector General ("OIG")

"Source Documents," which DHS already obtained, pursuant to request numbers 6-7.

## I.   THE COURT SHOULD RULE ALL OBJECTIONS WAIVED, COMPEL COMPLIANCE WITH THE MARCH SUBPOENAS, AND AWARD ATTORNEY'S FEES AND COSTS.

### A.   DHS and CBP Waived All Objections

DHS and CBP each failed to provide an objection within the time required under Rule 45

and thus any objections to the March Subpoenas are waived.

When subpoenaed, the government, no different than any subpoenaed party, must comply

with Rule 45, which provides that an "objection *must* be served before the earlier of the time

specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B)

(emphasis added); *see also Yousuf v. Samantar*, 451 F.3d 248, 254 (D.C. Cir. 2006) ("the

Government has no established prerogative not to respond when subpoenaed") (internal quotations omitted). "It is well established that a failure to object to discovery requests within the time required constitutes a waiver of any objection." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992).

Courts routinely hold that a subpoenaed party waives its rights to object by failing to comply with Rule 45's time limits. *See, e.g.*, *In re DG Acquisition Corp.*, 151 F.3d 75, 81 (2d Cir. 1998) (holding untimely privilege objection resulted in waiver; "Rule 45 contemplates assertion of all objections to document production within 14 days, including those based on the act of production privilege."); *Rich v. Kirkland*, 11-cv-4272, 2015 WL 7185390, at *4 (C.D. Cal. Nov. 13, 2015) (ordering that "third parties at issue here have waived all objections to plaintiff's document subpoenas" for failure to timely respond); *Baker v. Ensign*, No. 11-CV-2060-BAS WVG, 2014 WL 3058323, at *6 (S.D. Cal. July 3, 2014) (ordering government attorney's office to unredact documents, finding privilege objections waived due to failure to serve timely written objection); *Wellin v. Wellin*, No. 2:13-CV-1831-DCN, 2014 WL 3496514, at *4 (D.S.C. July 14, 2014) (subpoenaed party waived right to object to producing documents in native format with included metadata).

Here, the March Subpoenas were properly issued and served on DHS and CBP on March 1, 2016 and sought compliance by March 16, 2016. Thus in order for CBP and DHS to preserve their rights to object to a subpoena, they must have served written objections by March 15, 2016—14 days after service of the subpoenas. Fed. R. Civ. P. 45(d)(2)(B). Yet neither DHS nor CBP served any objections on Plaintiffs by that deadline. Nor has DHS or CBP served any objections to date, even after Plaintiffs' counsel informed DHS and CBP on April 14, 2016 that

their noncompliance will result in Plaintiffs' filing a motion to enforce the subpoenas. *See* Ex. J, at 1.

DHS and CBP cannot make the necessary showing of "unusual circumstances" and "good cause" to warrant an exception to waiver. *Alexander v. Federal Bureau of Investigation*, 186 F.R.D. 21, 34 (D.D.C. 1998). To do so requires, among other things, that a subpoena be "overbroad on its face and exceeds the bounds of fair discovery." *Id.* The issuing court already affirmatively ruled that the requested documents, as specifically written, are *not* overbroad, *do not* exceed the bounds of fair discovery, and that they are relevant, proportionate to the needs of the case, avoid imposing an undue burden, and may be propounded by a subpoena to the government.[7] *See* Ex. A, at 27 n.10, 30-37. The issuing court even went so far as to fine-tune the language itself to ensure against any such objections delaying discovery. *Id.*

What is more, there has been no objection raised despite Plaintiffs' counsel contacting DHS and CBP counsel after service of the subpoenas and making it crystal clear exactly what documents the March Subpoenas request. And after the 14 day time limit, DHS and CBP still failed to offer any objection even after obtaining and reviewing responsive documents for production, which they are now apparently withholding. At best, counsel for *DHS,* 2 weeks past the objection deadline, mentioned that *CBP* "may" have "non-disclosure privileges" that might require a protective order. Ex. J, at 13. But CBP failed to give any more detail, and even ignored counsel's requests to see a proposed protective order. Ex. J, at 7, 10.

---

[7] The issuing court ruled on the March Subpoenas' requests numbers 1-9 but not 10. But request 10 merely seeks communications between DHS/CBP and Fisher or his attorneys relating to the March Subpoenas. It is a standard, narrow request for documents aimed at finding information regarding the extent a non-party has complied with Plaintiffs' discovery demands, which Plaintiffs certainly have the right to know.

The time has now come and passed for DHS and CBP to object. Plaintiffs' subpoenas are clearly valid. And given that Plaintiffs already obtained discovery relating to the Yañez incident without the need for a protective order, there should not be any legitimate need to protect or withhold the same discovery concerning the other 42 incidents. The Court should order full production without any redaction to or withholding of documents.

**B.      This Court Should Further Order the Production of the Specifically Identified Documents That Are Responsive to the March Subpoenas.**

To ensure that Plaintiffs obtain the necessary materials, this Court should order that DHS and CBP produce the specified documents described below and listed in Exhibit C. These documents and categories of documents are relevant, responsive, and, by every indication, within the possession, custody, or control of DHS/CBP.

*Initial Significant Incident Reports*

Within an hour of the incident occurring, either the Border Patrol agent, a supervisor, or both, would make a call from the field to the CBP's situation room in Washington D.C. *See* Deposition Transcript of Michael Fisher, January 15, 2016, at 24 attached here as Exhibit K (hereinafter "Fisher Tr."). The call would then be transcribed by staff and emailed to Fisher, "basically putting the leadership on notice that an event took place." Fisher Tr., at 25:3-5. Receipt of this email is then followed by further reporting and discussion during the next day's Commissioner's Daily Brief meeting. *Id.* at 26:21-27:16.[8]

These emails exist and are in the possession of CBP, an example of which is attached as Exhibit L. Pursuant to the March Subpoenas' request numbers 1 and/or 3, the Court should compel DHS/CBP to provide every email sent to the situation room that reports one of the 43

---

[8] The Commissioner's Daily Brief is defined in Exhibit B to Plaintiffs' March Subpoenas as "the daily meeting held each morning among every office within CBP and specifically relates to the portion of the meeting dedicated to CBP operations of OBP," a meeting confirmed to exist by Tomsheck and eventually Fisher. *See* Ex. A, at 14, 42; Fisher Tr., at 26:21-29:10.

Rocking Cases identified in Fisher's March 2014 Directive, 40 of which Plaintiffs identified in Exhibit D.

### Written Significant Incident Reports

According to Fisher, within three to four hours of the incident, a supervisor would prepare a written significant incident report relating to the incident. Fisher Tr., at 25:6-17. Apparently there was one significant incident report that would be sent to CBP's situation room that Fisher would receive as a matter of course, and a different significant incident report that Fisher "frequently ... would ask for" and receive to prepare for discussion at a meeting such as the Commissioner's Daily Brief. Fisher Tr., at 26:21-29:10, 180:2-181:8. An example of the latter is included among the materials attached in Exhibit M, at 18-28. Pursuant to the March Subpoenas' request numbers 1 and/or 3, the Court should compel DHS/CBP to provide all significant incident reports for the 43 Rocking Cases identified in Fisher's March 2014 Directive, 40 of which Plaintiffs identified in Exhibit D.

### Incident Update Emails

Before or following the significant incident report is emailed to the situation room, Border Patrol agents would, on occasion, collect, send, or discuss information with Fisher and others within Border Patrol regarding an incident and ultimately for use during the Commissioner's Morning Brief or other meetings. Fisher Tr., at 151:13-152:6.

These emails exist and are in the possession of CBP, two examples of which are included in Exhibit N, at 1-4 & 5-6. Pursuant to the March Subpoenas' request numbers 1 and/or 3, the Court should compel DHS/CBP to produce any emails discussing any of the 43 Rocking Cases identified in Fisher's March 2014 Directive, 40 of which Plaintiffs identified in Exhibit D.

***Border Patrol Briefing Reports***

After an incident occurs, investigative agents and their supervisors "would prepare for me [Fisher] any additional information that I would require to be able to take to the meeting in the event that there were questions about the incident." Fisher Tr. 29:11-30:13. That information would be put together in what Fisher refers to generally as an Issue Paper, though it may not have formally been given that title until 2011. Fisher Tr. 30:14-32:16. If the reporting continued, the information would be further collected and compiled into a document generally called an Evolving Situation Report, which also was used during the Commissioner's Morning Brief. Fisher Tr. 32:5-16; 179:18-180:1.

These briefing documents exist, are highly relevant, and are in the possession of CBP. Included within Exhibit M is an assortment of briefing documents that Border Patrol generated for a single incident. *See e.g.*, Ex. M, at 12-16, 30-32. In March, CBP indicated that it has obtained Border Patrol's briefing documents but has yet to produce any of them to Plaintiffs. *See* Ex. J, at 10. Pursuant to the March Subpoenas' request numbers 1 and/or 3, DHS/CBP should be compelled to provide the briefing documents for the 43 Rocking Cases identified in Fisher's March 2014 Directive, 40 of which Plaintiffs identified in Exhibit D.

***Internal Affairs Daily Briefs***

CBP's Office of Internal Affairs would also generate briefs after an incident and provide them to Tomsheck (or another representative of Internal Affairs) for discussion with Fisher and others during the Commissioner's Morning Brief. Ex. A, at 42-43. These are not duplicative of the Border Patrol's briefing documents. According to Tomsheck, Internal Affairs' briefs would often have more thorough and accurate information that supplemented the discussion during the Commissioner's Daily Brief. *Id.*

15

Plaintiffs have not obtained any IA Daily Briefs and so do not have a sample to provide. In March, CBP counsel stated that it had located and obtained Internal Affairs' briefing documents, but CBP has still not produced anything to Plaintiffs. *See* Ex. J, at 10. Pursuant to the March Subpoenas' request numbers 1 and/or 3, DHS/CBP should be compelled to provide Internal Affairs' documents for the 43 Rocking Cases identified in Fisher's March 2014 Directive, including the 40 incidents Plaintiffs identified in Exhibit D.

### *Incident Summary Reports*

Fisher testified that he would have his staff prepare a report for him so he understands and can send to CBP information concerning the background of the incident, the status or result of investigations, and the investigative key facts. Fisher Tr. 101:9-104:14. He further testified that it was customary to receive one of these reports for a majority of deadly force incidents during the time he was Chief of Border Patrol. Fisher Tr. 102:7-12.

These summary reports exist and are in the possession of CBP, an example of which is attached as Exhibit O. Pursuant to the March Subpoenas' request numbers 1 and/or 3, DHS/CBP should be compelled to provide the summary report for the 43 Rocking Cases identified in Fisher's March 2014 Directive, including the 40 incidents Plaintiffs identified in Exhibit D.

### *Video of the Sergio Hernandez Shooting*

On June 7, 2010, a Border Patrol agent in El Paso, Texas "justified" shooting and killing 15-year-old Sergio Adrian Hernandez-Guereca by claiming rocks were thrown, invoking international outrage. Ex. E, 29-31 ¶¶90-102. Unlike most incidents, the entire incident was captured clearly on video; indeed, three cameras recorded the incident, at least one of which was

CBP's.[9]  *Id.*  Tomsheck testified that a video of the shooting "became available to us early on

that clearly demonstrated Sergio Hernandez was not throwing rocks at the time he was shot." *See*

Tomsheck Transcript of Deposition on January 12, 2016, at 304:15-305:7, attached here as

Exhibit P (hereinafter "Tomsheck Tr."). Fisher testified that he is familiar with the incident and

remembers that he saw a video of an incident in El Paso, and is nearly certain that it was

regarding the Hernandez incident. Fisher Tr. 139:8-140:8. The Department of Justice reviewed

the videos as part of its investigation and found that the "the agent did not act inconsistently with

[Border Patrol] policy or training regarding use of force." *See* Department of Justice, Press

Release, Federal Officials Close Investigation into the Death of Sergio Hernandez-Guereca (Apr.

27, 2012), attached here as Exhibit Q. Tomsheck testified that "the Sergio Hernandez case and

the events surrounding it and the outcome of the investigation was something that was widely

known throughout all of CBP" and is one of several "highly suspect" Border Patrol shootings

that he can recall. *See* Tomsheck Tr., at 34:23-35:10, 211:13-25, 309:16-20.

CBP has still not produced anything to Plaintiffs, despite CBP counsel inquiring into

obtaining all 3 videos. *See* Ex. J, at 10, 15-16. Fisher was able to produce CBP video of the

Yanez incident, so CBP should have in its possession and be able to produce CBP videos from

the Hernandez incident as well. And if the videos somehow were not in CBP's possession, they

may very well be in the possession of DHS, as DHS OIG assumed responsibility for

investigating all of Border Patrol's fatal use of force incidents. Tomsheck Tr., at 70:16-20. This

---

[9] One of the three videos was captured by a passerby and is accessible on the Internet. *See, e.g.*, https://www.youtube.com/watch?v=mzFqhSkQpFo&feature=youtu.be (lasted visited April 25, 2016). But it does not show a clear image or complete portrayal of the scene.

Court should therefore compel DHS/CBP's production of all videos of the Hernandez incident pursuant to the March Subpoenas' request number 1 and/or 3.[10]

### Review of CBP Use of Deadly Force

Tomsheck stated that he authored and produced to Fisher and several other officials within CBP a document called "Review of CBP Use of Deadly Force," which is continually updated. Ex. A, at 44-45. According to Tomsheck, the document "captured in a condensed manner (i) the salient facts of each fatal incident as we within CBP knew them to exist at that time and (ii) the status of each incident in terms of prosecution." *Id.* According to Tomsheck there were approximately 27 fatal incidents captured in that document, with more added before he left office, and a significant number of those incidents involved deadly force in response to rock throwing. *Id.*

CBP counsel obtained this document in March and even indicated it would soon be ready to be produced. Ex. J, at 10. CBP, however, has not produced the document. This court should therefore compel production of that document and every version of "Review of CBP Use of Deadly Force" that is within CBP's possession, custody, or control pursuant to request number 8 of the March Subpoenas.

### Harper's Ferry Meeting Documents

According to Tomsheck, in late 2012, Fisher, all the Border Patrol sector chiefs, Tomsheck, and others within CBP leadership were summoned to a meeting at a Border Patrol training facility in Harper's Ferry, West Virginia. *See* Ex A, at 44. This was when Tomsheck provided to everyone the first iteration of the aforementioned document, Review of CBP Use of

---

[10] DHS/CBP never represented that the videos were not responsive to the March Subpoenas, but for the sake of caution, and in the alternative, Plaintiffs hereby move to compel the videos pursuant to the December Subpoena's request number 6, to which they are clearly responsive.

Force. *Id.*  Tomsheck also gave a presentation that discussed through a series of Power Point slides the fatal Border Patrol shootings that involved alleged rock throwers and the constitutional restraints placed on all law enforcement officers.  *Id.* Tomsheck testified that he was "interrupted during that presentation and told 'We're not cops, we don't have to respond like they do.'  Border patrol leadership also claimed during that meeting that 'We're now the premier paramilitary homeland security agency.'"  *Id.*

This Court should compel CBP to search for and produce that Power Point presentation, as well as any other notes, emails, and other responsive documents that relate to the Harper's Ferry Meeting pursuant to March Subpoenas' request number 4.

### *Leadership Conferences*

Tomsheck states that Fisher, Tomsheck, and others within CBP leadership attended three leadership conferences, at the date and locations defined in Plaintiffs' March subpoenas.  *See* Ex. A, at 16, 43.  CBP recorded each of those leadership conferences, during which Tomsheck states there was a consistent "drum beat" of promoting military rules of engagement that are inconsistent with U.S. law enforcement rules of engagement.  Ex. A, at 43.  Given that the quantity of "rocking" assaults reported by Border Patrol agents (*see, e.g.*, Ex. A, at 47), one cannot imagine discussing Border Patrol rules of engagement during these three conferences without even mentioning rock throwing.

It is not clear whether CBP has made any effort to obtain responsive documents relating to these leadership conferences.  *See* Ex. J, at 10.  This Court should compel DHS/CBP to produce the videos of all three conferences and all other responsive documents pursuant to the March Subpoenas' request number 2.

*PERF Review Documents*

In 2012, CBP retained a neutral third party, the Police Executive Research Forum ("PERF"), to review CBP policy and certain use of deadly force incidents that occurred under Fisher's watch as Chief. *See* Ex. A, at 45. PERF conducted its review using only CBP-furnished documents, providing its report to CBP in February 2013, which is attached here as Exhibit R. PERF stated that there were 29 cases involving shots fired at suspects throwing rocks at agents on either land (25) or boats (4), and based on its review of the documents, it concluded that "[t]oo many cases do not appear to meet the test of objective reasonableness with regard to the use of deadly force." Ex. R, at 6-7. PERF implored that agents "should be prohibited from using deadly force against subjects throwing objects not capable of causing serious physical injury or death"—a change that would require "significant departures from current practice." Ex. R, at 2-3.

The March Subpoenas' request number 8 seeks these very same government-furnished documents that PERF considered in its review and, pursuant to the issuing court's order, that Fisher created or received relating to rocking cases. Ex. A, at 36. CBP has not even hinted that Fisher never created or received the 29 rocking "case files" reviewed by PERF, and any attempt to oppose production on that ground now should be rejected. Given the extensive reporting, briefing, and discussion that Fisher engaged in for every incident, it is a reasonable and compelling inference that Fisher was aware of the same *information*, if not the same documents, that CBP provided to PERF. Pursuant to the March Subpoenas' request number 8, this Court should therefore compel DHS and CBP to produce documents relating to the 29 rocking cases PERF reviewed.

## C.    DHS and CBP Should Be Ordered to Pay Attorney's Fees and Costs.

Under Rule 45(g), the Court should sanction DHS and CBP for their inexcusable failure to comply with a specific, definite court order—affirmatively authorized by the issuing court—and award sanctions against DHS and CBP to include payment of attorney's fees and costs incurred in seeking the Court's assistance on the matter.

The exclusive authority in the Federal Rules of Civil Procedure for the imposition of sanctions against a non-party for failure to comply with a subpoena is under Rule 45(g), which enables a court to hold a non-party in contempt for their inexcusable noncompliance. *See, e.g.*, *Martinez v. Antique & Salvage Liquidators, Inc.*, 2011 WL 798707, at *4 (N.D.Cal. Feb. 8, 2011). A party moving for civil contempt must prove that the non-moving party violated a court order by clear and convincing evidence. *See FTC v. Enforma Natural Prods., Inc.*, 362 F.3d 1204,1211 (9th Cir. 2004); *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F.Supp.2d 35, 38 (D.D.C.2010) (citing *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993)). "A leading federal practice treatise explains that because a subpoena is an order of the court, 'contempt sanctions are available merely for the initial disobedience of the subpoena, and a prior court order compelling compliance with the subpoena is not invariably required.'" *Baranski v. United States*, 11-cv-0123, 2014 WL 7335151, at *8 (E.D. Mo. Dec. 19, 2014) (quoting 9 Moore's Federal Practice § 45.62[3]); *see also* Adv. Comm. Note to 2013 Amendments to FRCP 45(g) ("contempt sanctions may be applied to a person who disobeys a subpoena-related order, as well as one who fails entirely to obey a subpoena"). Thus, the failure of a subpoenaed party to produce according to the terms of a subpoena is prima facie evidence of contempt, and the intent of the subpoenaed party is irrelevant. *See Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, AFL-CIO-CLC*, 103 F.3d 1007, 1016 (D.C. Cir. 1997).

Here, the evidence is quite clear and convincing that DHS and CBP—who produced zero documents and served no objections—violated the terms of the March Subpoenas. Furthermore, the evidence overwhelmingly shows that responsive documents do exist, and are in the possession, custody, and control of DHS and CBP.[11] DHS and CBP are willfully shirking their discovery obligations, all in the face of a subpoena whose requests were specifically crafted and authorized by the issuing court.

To overcome Plaintiffs' prima facie showing, DHS and CBP must demonstrate that they took "every reasonable step to comply with the subpoena and explain why compliance was not possible." *Food Lion*, 103 F.3d at 1017 (successful defense to contempt requires that party "must demonstrate that it took all reasonable steps within its power to comply with the court's order.") (internal citations and quotations omitted). DHS and CBP can make no such demonstration here. DHS and CBP have been long aware of exactly what documents are responsive, for exactly what use of force incidents, and therefore understood fully what is needed of them to ensure adequate compliance. Plaintiffs' counsel even extended the deadline by one month to give DHS and CBP more than enough time to comply. But given the impending discovery deadlines, DHS and CBP's failure to produce gave Plaintiffs no choice but to proceed in filing this motion. And even after explaining that Plaintiffs will have to move to enforce the subpoenas, DHS and CBP have yet to produce anything, *despite obtaining much of the responsive documents. See, e.g.*, Ex. J, at 10.

---

[11] While many of the documents may be in the possession of CBP, such documents are still in the control of DHS, which controls CBP. *See Soto v. City of Concord*, 162 F.R.D. 603, 619 (S.D. Cal. July 17, 1995) (A party may be ordered to produce a document in the possession of a non-party entity if that party has control over the entity who is in possession of the document.); *see also Rogers v. Giurbino*, 288 F.R.D. 469, 485 (S.D. Cal. 2012) (A party responding to a document request has an "affirmative duty to seek that information reasonably available to him from his employees, agents, or others subject to his control.").

This Court should award attorney's fees and costs because DHS and CBP's failure to comply is inexcusable.

## II. THE COURT SHOULD COMPEL DHS TO PRODUCE DOCUMENTS PURSUANT TO CERTAIN REQUESTS IN THE DECEMBER SUBPOENA.

Plaintiffs also seek an order compelling DHS to produce pursuant to certain requests in the December Subpoena. Specifically, Plaintiffs seek to compel DHS to produce documents responsive to request numbers 9, 17-20, as well as specific production already obtained by DHS—certain communications with the Mexican Government and the DHS OIG "Source Documents" responsive to request numbers 6-7.

### A. DHS's Untimely Objections Are Waived and, in Any Event, Should Be Overruled as Irrelevant or Baseless.

On December 29, 2015, DHS emailed Plaintiffs' counsel with 5 general objections in a response to the December Subpoena.[12] *See* Ex. J, at 32; Ex. H, at 1. These objections are waived as well because they were served more than 14 days after the December 11, 2015 service on DHS general counsel. In any event, the objections are either not applicable to the document requests at issue here or are otherwise meritless and therefore should be overruled.

---

[12] DHS's letter provided the following objections: (I) an "Objection to Subpoenaing a Senior DHS Official," (II) an "Objection to Subpoenaing a Federal Department General Counsel," (III) an "Objection to Serving DHS for [CBP] documents," (IV) an "Objection to Seeking 30(b)(6) Witnesses," and (V) "DHS Touhy Objections." *See generally* Ex. H.

First, Objections 1, 2, and 4 concern Plaintiffs' subpoena for deposition testimony, not the production of documents; not only were those objections baseless, they are irrelevant to this motion to compel.[13]

Second, Objection number 3 is an objection to producing documents that are in the possession of CBP—an entity controlled by DHS—because DHS must obtain approval from CBP Chief Counsel in order to produce those documents. Ex. H, at 3. But many of the responsive documents are within the possession of DHS, not CBP, as shown in Plaintiffs' letter. *See* Ex. I, at 6-8. And to the extent documents are within the possession of CBP, that objection should still be overruled, because the control DHS has over CBP and especially given the issuing court's decision granting Plaintiffs' motion to compel, which overruled Fisher's exact same objection. *See* Ex. A, at 26-27 (holding *Touhy* regulations do not automatically strip possession, custody, or control from person who has the ability to obtain the documents on demand).

Finally, DHS stated it has "broad discretion" under its *Touhy* regulations to reject discovery requests from cases in which it is not a party (Ex. H, at 1), and under objection number 5, states that DHS will refuse to comply pursuant to the *Touhy* regulations because "the subpoenas do not describe the relevance of the information sought." Ex. H, at 4. That objection is obviated by Plaintiffs' letter and subsequent communications that explain in pain-staking detail the relevance of every request. *See* Ex. I at 5-8; Ex. J, at 24-25. In addition, Plaintiffs also note

---

[13] Plaintiffs sought a 30(b)(6) deposition of the custodian of records so Plaintiffs may authenticate the documents produced and ensure adequate searches were performed, which is unnecessary now that Plaintiffs seek a narrower set of documents for which Plaintiffs do not expect to have any issue authenticating. This obviates the need to consider objections 1 and 2, which concerned DHS's objections to Plaintiffs taking depositions of high ranking officials or attorneys within DHS—despite the subpoena plainly and unambiguously *not* requesting anything of the sort—and objection number 4, which makes the puzzling objection that Plaintiffs have not named an organization to designate a witness. See Ex. B, at 10 (stating "that DHS and/or CBP shall designate and prepare a witness" to testify at a deposition pursuant to "Rules 30(b)(6) and 45" regarding subpoena compliance and document authenticity).

that objection number 5 is meritless because the *Touhy* regulations themselves do not "authorize[] federal agencies to refuse to comply with proper discovery requests." *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 780 (9th Cir. 1994). Rather, "the federal rules of discovery" govern "discovery requests made against government agencies, whether or not the United States is a party to the underlying action." *Id.*; *see also Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007). And no federal rules of discovery require that Plaintiffs describe the relevance of the document requests to the satisfaction of DHS as a condition to obtaining documents in its possession, custody, and control.

This Court should therefore compel DHS to comply with request number 9, 17-20, which are narrowly tailored and relevant to Plaintiffs' claims.[14]

### B. The Court Should Compel Production of Specific Documents Responsive to the December Subpoena, Many of Which Have Been Already Obtained.

In addition to compelling compliance with the request numbers 9, 17-20, this court should order the specific production of the following documents that DHS has already obtained pursuant to the December Subpoena.

*Communications with Mexico*

Request number 18 seeks communications to and from the government of Mexico. Following deadly force incidents, the government of Mexico expressed "outrage[]" in what Fisher refers to as "form letters" that were sent to him and other members of DHS or CBP. Fisher Tr. 155. The Ambassador would send letters to the Secretary of DHS, complaining of the pattern

---

[14] Request 9 seeks documents relating to whether, and to what extent, Border Patrol agents were disciplined for their use of deadly force in response to rock throwing, plainly relevant to a pattern and practice lawsuit. Request numbers 17-18 seek communications by or to specific people or entities alleged in Plaintiffs' Complaint relating to use of force in response to rock throwing. *See, e.g.*, Ex. E, at 26-28, 63-64. And requests 19-20 seek communications relating to this lawsuit (e.g., DHS communications with Fisher or his attorneys about Plaintiffs' claims or subpoenas) and documents produced to Defendants relating to this lawsuit (to ensure Plaintiffs receive everything Defendants receive).

and practice of agents shooting at rock throwers, and he even meet with Fisher in Mexico to discuss Border Patrol's use of force practices. *See, e.g.*, Ex. E, at 63-64; Fisher Tr. 160:11-22. In addition, the Mexican Government sent letters to DHS's Office of Inspector General, or straight to Fisher himself, demanding updates on investigations of agents' shootings of alleged rock throwers. Examples of responsive communications are attached as Exhibit G.

DHS's production pursuant to this request was woefully inadequate.[15] After communicating this issue to DHS, DHS then obtained more responsive letters, but has yet to produce anything. The Court should order DHS to produce them—in addition to ordering full compliance with request number 18. The Court should further order DHS to search for and produce responsive government communications regarding any of the incidents identified in Exhibit D.

***OIG Report Source Documents***

In light of "concerns regarding use of force training and accountability within DHS and CBP," 16 members of Congress requested that DHS's Office of Inspector General review the use of force within CBP, which resulted in the issuance of a September 2013 report entitled "CBP Use of Force Training and Actions To Address Use of Force Incidents." *See* Exhibit F. After analyzing information contained in databases, the OIG reports that "[o]f 339 reported rock assaults in FY 2011, agents did not respond with force to 188 (or 55 percent), responded with a firearm to 33 (or 10 percent), and used less-lethal force in response to 118 (or 35 percent) of the rocking assaults, respectively. Of 185 rocking assaults in FY 2012, agents did not use force to

---

[15] Indeed, the earliest dated letter DHS provided was April 2012, and all the letters were months, if not years after the incident being discussed. Yet even Plaintiffs have a 2011 letter sent by Mexico to DHS OIG regarding the Yañez incident soon after it occurred, as well as other Mexican Government communications contemporaneous with the occurrence of earlier incidents. *See generally* Ex. G.

respond to 121 (or 65 percent), responded with a firearm to 22 (or 12 percent), and used less-lethal force in response to 42 (or 23 percent)." Ex. F, at 5-6.

Pursuant to a compromise struck with Plaintiffs' counsel, DHS agreed that if it provides OIG's "Source Documents" underlying this report, Plaintiffs might deem sufficient DHS's responses to the December Subpoena's request numbers 6 and 7—which seek all documents relating to the reporting, investigating, or reviewing, of all incidents where an agent responded to a thrown rock with a firearm. DHS counsel obtained and reviewed the documents, apparently signing off on their production but then provided them to CBP, where they still sit today. *See* Ex. J, at 1. These documents are responsive to the December Subpoena, and may very well be responsive to the March Subpoenas' request number 3 as well, and are clearly relevant to Plaintiffs' claims against Fisher. As such, this Court should compel DHS/CBP to produce it.

## IV.    CONCLUSION

For the foregoing reasons, and as further specified in the enclosed proposed order, the Court should grant Petitioners' motion to compel DHS and CBP to comply with the March Subpoenas and certain requests in the December Subpoena, and award Plaintiffs attorney's fees and expenses incurred relating to the enforcement of the March Subpoenas.

Dated: April 29, 2016

/s/ _____
Joseph Scrofano, Esq.
Scrofano Law, PC
406 5th St. NW, Suite 100
Washington, DC 20001
Tel: (202) 870-0889
Email: jas@scrofanolaw.com

*Local Counsel for Petitioners*

/s/ Matthew C. Weiner
Matthew C. Weiner
Hilliard & Shadowen LLP
919 Congress Ave., Suite 1325
Austin, TX  78701
Tel: 855-344-3298
Email: matt@hilliardshadowenlaw.com

*Counsel for Petitioners*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARIA DEL SOCORRO QUINTERO PEREZ;
BRIANDA ARACELY YANEZ QUINTERO;
CAMELIA ITZAYANA YANEZ QUINTERO;
and J.Y., a minor,
406 5th St. NW, Suite 100
Washington, DC 20001,

Petitioners,

vs.

U.S. DEPARTMENT OF HOMELAND
SECURITY; U.S. CUSTOMS AND BORDER
PROTECTION,
1300 Pennsylvania Ave. NW
Washington, DC 20229,

Respondents.

Misc. Action No. _____

Related to:

Case No. 3:13-cv-1417 (S.D. Cal.)

## DECLARATION OF MATTHEW C. WEINER
## IN SUPPORT OF PETITIONERS' MOTION TO
## COMPEL U.S. DEPARTMENT OF HOMELAND SECURITY
## AND U.S. CUSTOMS AND BORDER PROTECTION TO COMPLY
## WITH SUBPOENAS, AND FOR CONTEMPT SANCTIONS

Pursuant to Local Civil Rule 83.2(d) of this Court, I, Matthew C. Weiner, Esq., hereby swear the following to be true:

1.     My full name is Matthew Charles Weiner.  I am an associate at the law firm Hilliard & Shadowen LLP, located at 919 Congress Ave., Suite 1325 Austin, TX  78701.  I represent Petitioners Maria Del Socorro Quintero, Brianda Aracely Yañez Quintero, Camelia Itzayana Yanez Quintero, and J.Y., a minor ("Petitioners" or "Plaintiffs") in the matter of *Perez et al. v. United States et al.*, No. 3:13-cv-1417-WQH-BGS (S.D. Cal.), the court from which I issued the three subpoenas subject to this motion.

2.     I have been admitted to the State Bar of Pennsylvania (SBN 314453), the U.S.

1

Court of Appeals for the Second Circuit, and the U.S. District Court for the Middle District of Pennsylvania. I was admitted *pro hac vice* in the matter of *Perez et al. v. United States et al.*, No. 3:13-cv-1417-WQH-BGS (S.D. Cal.).

3.      As relevant here, two identical subpoenas to produce documents, information, or objects were served on March 1, 2016, one directed to DHS and the other directed to CBP (the "March Subpoenas"). Previously, a subpoena to produce documents, information, or objects was served on DHS on December 11, 2015 (the "December Subpoena").

4.      Counsel for Plaintiffs and U.S. Department of Homeland Security ("DHS") and U.S. Customs and Border Protection ("CBP") exchanged emails, letters, and phone calls, discussing the subpoenas.

5.      On March 25, 2016, pursuant to the December Subpoena request number 18, DHS produced a small, but inadequate, set of documents. Of the 42 pages of material produced, many were blank or duplicative of one another, and several letters were duplicates of the letters attached to Plaintiffs' complaint and provided to DHS as examples of responsive material.

6.      DHS counsel then proceeded to ask whether Plaintiffs would be willing to have CBP's production under the March Subpoenas governed by a protective order. However, Fisher, with the consent of CBP Chief Counsel, previously produced many of the same categories of documents concerning the Yañez incident without the need for a protective order. In any event, I tentatively agreed to the proposal—on the belief that doing so would result in obtaining documents promptly. But despite requests to see a proposed protective order, CBP never provided one, nor did it specify any objection or even provide any basis why a protective order would be necessary.

7.      In early April, counsel for Plaintiffs extended the DHS and CBP's subpoena

deadline to April 13, 2016. DHS and CBP understood that Plaintiffs will not be providing another extension.

8.      To date, DHS and CBP have neither produced any documents pursuant to the March Subpoenas nor objected, despite CBP counsel acknowledging receipt and review of many responsive documents.  Moreover, DHS has not provided any additional documents pursuant to the December Subpoena, despite admitting that it obtained additional responsive documents.

9.      The documents or information previously obtained in discovery reveal the existence of documents responsive to Plaintiffs' March and December Subpoenas in the possession, custody, or control of DHS and CBP.

10.      Attached hereto as **Exhibit A** is a true and correct copy of Petitioners' March Subpoenas, with accompanying proofs of service and exhibits that include (A) the requests, (B) instructions and definitions, (C) Magistrate Judge Skomal's order dated February 23, 2016, granting in part and denying in part Plaintiffs' second motion to compel production of documents, (D) Declaration of James F. Tomsheck, and (E) Fisher's March 7, 2014 Directive.

11.      Attached hereto as **Exhibit B** is a true and correct copy of Petitioners' December Subpoena, with accompanying exhibits that include the requests, instructions and definitions.

12.      Attached hereto as **Exhibit C** is a demonstrative chart containing a summary of specific documents or categories of documents that Plaintiffs' counsel identified to DHS/CBP as responsive to requests in either the March Subpoenas or December Subpoena and have not yet been produced.  The chart also indicates which documents should be generated for the incidents identified in Exhibit D, and which exhibit attached herein contains a sample of or reference to the documents.

13.      Attached hereto as **Exhibit D** is a demonstrative chart that, based on disclosed

material, shows 40 of the 43 incidents for which the March Subpoenas' request number 1 seeks documents. Documents marked with a "Y" have previously been obtained through discovery.

14.     Attached hereto as **Exhibit E** is a true and correct copy of Plaintiffs' Third Amended Complaint.

15.     Attached hereto as **Exhibit F** is a true and correct excerpt of DHS Office of Inspector General's September 2013 Report, CBP Use of Force Training and Actions to Address Use of Force Incidents.

16.     Attached hereto as **Exhibit G** are true and correct copies of documents obtained through discovery and are examples of DHS/CBP letters to or from the Government of Mexico.

17.     Attached hereto as **Exhibit H** is a true and correct copy of DHS's response to Petitioners' December Subpoena, dated December 29, 2015.

18.     Attached hereto as **Exhibit I** is a true and correct copy of a letter from Matthew C. Weiner, counsel for Plaintiffs, to DHS Assistant General Counsel, Chip Boucher, dated February 2, 2016.

19.     Attached hereto as **Exhibit J** are true and correct copies of email communications between Matthew C. Weiner, counsel for Petitioners, Chip Boucher, DHS Assistant General Counsel, and Molly Thebes, CBP Attorney.

20.     Attached hereto as **Exhibit K** is a true and correct excerpt of the deposition of Defendant Michael Fisher taken on January 15, 2016.

21.     Attached hereto as **Exhibit L** is a true and correct copy of a document Plaintiffs obtained through discovery and is an example of an initial significant incident report email.

22.     Attached hereto as **Exhibit M** are true and correct copies of documents Plaintiffs obtained through discovery and are an example of both a written significant incident report and

Border Patrol briefing documents.

23.     Attached hereto as **Exhibit N** are true and correct copies of documents Plaintiffs obtained through discovery and are examples of incident update emails.

24.     Attached hereto as **Exhibit O** is a true and correct copy of a document Plaintiffs obtained through discovery and is an example of an incident summary report.

25.     Attached hereto as **Exhibit P** is a true and correct excerpt of the deposition of Defendant James Tomsheck taken on January 12, 2016.

26.     Attached hereto as **Exhibit Q** is a true and correct copy of a Press Release by the Department of Justice, Federal Officials Close Investigation into the Death of Sergio Hernandez-Guereca, dated April 27, 2012.

27.     Attached hereto as **Exhibit R** is a true and correct excerpt of the report by the Police Executive Research Forum, dated February 2013.

28.     I declare under penalty of perjury that the foregoing matters are true and correct.

Dated: April 29, 2016

/s/ Matthew C. Weiner
Matthew C. Weiner
Hilliard & Shadowen LLP
919 Congress Ave., Suite 1325
Austin, TX  78701
Tel: 855-344-3298
Email: matt@hilliardshadowenlaw.com

# Exhibit A

AO 88B  (Rev  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| Perez, et. al | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) |
| Fisher et. el. | ) |
| | ) |
| _____ | ) |
| *Defendant* | ) |

Civil Action No.   13-cv-1417-WQH (BGS)

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    U.S. Department of Homeland Security

_____

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Exhibits A - requests, B - instructions/definitions, C - Court order, D - Tomsheck declaration, E - Fisher Directive

| Place: No appearance is required.  Please deliver documents to issuing attorney by any form of mail.  If you require, a place within 100 miles of your location will be supplied. | Date and Time:  03/16/2016 10:00 am |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    03/01/2016

|  *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Matthew C. Weiner |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*      Plaintiffs
_____ , who issues or requests this subpoena, are:
Matthew C. Weiner, 919 Congress Ave., Suite 1325, Austin, TX 78701, matt@hilliardshadowenlaw.com, 845-323-8036

## Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Ex. A - pg 1

# AFFIDAVIT OF PROCESS SERVER

### United States District Court for the Southern District of California

**Perez, et al**

        Plaintiff(s),

vs.

**Fisher, et al**

        Defendant(s).

Attorney: Matthew C. Weiner

Singleton Law Firm
115 W. Plaza Street
Solana Beach CA 92075



*200055*

**Case Number: 13-CV-1417-WQH (BGS)**

Legal documents received by Same Day Process Service, Inc. on **03/01/2016** at **7:15 PM** to be served upon **U.S. Department of Homeland Security**, at 3801 Nebraska Avenue NW, Washington, DC, 20016

I, **Robert Briggs-Snodgrass**, swear and affirm that on **March 01, 2016** at **2:54 PM**, I did the following:

Served **Government Agency** by delivering a conformed copy of this **Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action; Exhibits** to Peter Suh as **Attorney Advisor & Authorized Agent** at 3801 Nebraska Avenue NW , Washington, DC 20016 of the government agency and informing that person of the contents of the documents.

**Description of Person Accepting Service:**
Sex: Male Age: 35 Height: 5ft4in-5ft8in Weight: 161-200 lbs Skin Color: Asian Hair Color: Black

**Supplemental Data Appropriate to this Service:**

I declare under penalty of perjury that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.

_Robert B-N_

**Robert Briggs-Snodgrass**
Process Server

**Same Day Process Service, Inc.**
**1413 K St., NW, 7th Floor**
**Washington DC 20005**

**(202)-398-4200**

Internal Job ID:200055



District of Columbia: SS
Subscribed and Sworn to before me
this 3 day of March , 2016

_____
Tyler Walker, Notary Public, D.C.
My commission expires February 14, 2021



Ex. A - pg 2

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person, or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer, or
    **(ii)** is commanded to attend a trial and would not incur substantial expense

**(2)** *For Other Discovery.* A subpoena may command
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena  The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial
  **(B)** *Objections* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested  The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served  If an objection is made, the following rules apply·
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that
    **(i)** fails to allow a reasonable time to comply,
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c),
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies, or
    **(iv)** subjects a person to undue burden
  **(B)** *When Permitted* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information, or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party
  **(C)** *Specifying Conditions as an Alternative* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship, and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information
  **(A)** *Documents* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand
  **(B)** *Form for Producing Electronically Stored Information Not Specified* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms
  **(C)** *Electronically Stored Information Produced in Only One Form* The person responding need not produce the same electronically stored information in more than one form
  **(D)** *Inaccessible Electronically Stored Information* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost  On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost  If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C)  The court may specify conditions for the discovery

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must.
    **(i)** expressly make the claim, and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim
  **(B)** *Information Produced* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has, must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified, and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

Ex. A - pg 3

AO 88B (Rev 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| Perez, et. al | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   13-cv-1417-WQH (BGS) |
| Fisher et. el. | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:           U.S. Customs and Border Protection

_____

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Exhibits A - requests, B - instructions/definitions, C - Court order, D - Tomsheck declaration, E - Fisher Directive.

| Place: No appearance is required.  Please deliver documents to issuing attorney by any form of mail.  If you require, a place within 100 miles of your location will be supplied. | Date and Time:<br><br>03/16/2016 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    03/01/2016

           *CLERK OF COURT*

                                   OR

| | /s/ Matthew C. Weiner |
|---|---|
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Plaintiffs

_____ , who issues or requests this subpoena, are:

Matthew C. Weiner, 919 Congress Ave., Suite 1325, Austin, TX 78701, matt@hilliardshadowenlaw.com, 845-323-8036

### Notice to the person who issues or requests this subpoena

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Ex. A - pg 4

# AFFIDAVIT OF PROCESS SERVER

### United States District Court for the Southern District of California

**Perez, et al**

Plaintiff(s),

vs.

**Fisher, et al**

Defendant(s).

Attorney: Matthew C. Weiner

Singleton Law Firm
115 W. Plaza Street
Solana Beach CA 92075

*200054*

**Case Number: 13-CV-1417-WQH (BGS)**

Legal documents received by Same Day Process Service, Inc. on **03/01/2016** at **7:13 PM** to be served upon **U.S. Customs and Border Protection, at 3801 Nebraska Avenue NW, Washington, DC, 20016**

I, **Robert Briggs-Snodgrass**, swear and affirm that on **March 01, 2016** at **2:54 PM**, I did the following:

Served **Government Agency** by delivering a conformed copy of this **Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action; Exhibits** to Peter Suh as **Attorney Advisor & Authorized Agent** at **3801 Nebraska Avenue NW , Washington, DC 20016** of the government agency and informing that person of the contents of the documents.

**Description of Person Accepting Service:**
Sex: Male Age: 35 Height: 5ft4in-5ft8in Weight: 161-200 lbs Skin Color: Asian Hair Color: Black

**Supplemental Data Appropriate to this Service:**

I declare under penalty of perjury that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.

**Robert Briggs-Snodgrass**
Process Server

**Same Day Process Service, Inc.**
**1413 K St., NW, 7th Floor**
**Washington DC 20005**

(202)-398-4200

Internal Job ID:200054

District of Columbia: SS
Subscribed and Sworn to before me
this __3__ day of _March_____, 2016

Tyler Walker, Notary Public, D.C.
My commission expires February 14, 2021



## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person, or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer, or
    **(ii)** is commanded to attend a trial and would not incur substantial expense

**(2) *For Other Discovery.*** A subpoena may command
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person, and
  **(B)** inspection of premises at the premises to be inspected

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial
  **(B)** *Objections* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served If an objection is made, the following rules apply
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that
    **(i)** fails to allow a reasonable time to comply,
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c),
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies, or
    **(iv)** subjects a person to undue burden
  **(B)** *When Permitted* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information, or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party
  **(C)** *Specifying Conditions as an Alternative* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship, and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information
  **(A)** *Documents* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand
  **(B)** *Form for Producing Electronically Stored Information Not Specified* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms
  **(C)** *Electronically Stored Information Produced in Only One Form* The person responding need not produce the same electronically stored information in more than one form
  **(D)** *Inaccessible Electronically Stored Information* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C) The court may specify conditions for the discovery

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must
    **(i)** expressly make the claim, and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim
  **(B)** *Information Produced* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has, must not use or disclose the information until the claim is resolved, must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim The person who produced the information must preserve the information until the claim is resolved

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

For access to subpoena materials, see Fed R Civ P 45(a) Committee Note (2013)

**Exhibit A**
**Attachment to Subpoena**
*Requests for Documents*

Perez et al. v. Fisher et al.
Southern District of California Case No.: 13-cv-1417-WQH (BGS)

Pursuant to the Federal Rules of Civil Procedure, Plaintiffs, through counsel, request by the enclosed subpoena that DHS and/or the CBP produce all documents responsive to Plaintiffs' requests contained in Exhibit A, per the instructions and definitions provided in Exhibit B. Each of DHS and CBP are being served with identical subpoenas and attachments.

1.  All BP Daily Briefs, IA Daily Briefs, and Daily Brief Notes for the seven days following each of the 43 rocking cases Defendant Fisher identified in his Directive that involved an agent using deadly force.

2.  All documents, including but not limited to, video recordings, minutes, transcripts, notes, and presentations, referring or relating to any discussions or presentations that took place at a Leadership Conference regarding the use of force in response to the throwing of rocks along the U.S./Mexico border.

3.  Any documents referring or relating to any discussions of the use of force policy or practice in response to rock throwing along the U.S./Mexico border that took place during any meetings.

4.  All documents, including but not limited to, video recordings, minutes, transcripts, notes, and presentations, referring or relating to any discussions of the use of force policy or practice in response to rock throwing along the U.S./Mexico border that took place at the Harper's Ferry Meeting.

5.  The original and all updated versions through present day of the document entitled "Review of CBP Use of Deadly Force."

6.  All documents relating to James F. Tomsheck's November 2011 or June 2014 filings with CBP's Office of Special Counsel regarding the use of force by border patrol agents in response to the throwing of rocks along the U.S./Mexico border.

7.    All documents referring or relating to any statements made by Defendant Fisher concerning the response of Border Patrol agents to the alleged throwing of rocks by individuals along the U.S./Mexico border.

8.    All files that Defendant Fisher created or received and that were also reviewed by PERF in connection with the issuance of the PERF Report and involve the use of force in response to the throwing of rocks along the U.S./Mexico border.

9.    All documents referring or relating to IA's suggested revisions to the CBP's Use of Force Policy regarding the use of force in response to the throwing of rocks along the U.S./Mexico border, that Defendant Fisher created, received or reviewed.

10.   All documents evidencing any communication between or among any DHS/CBP general counsel and Fisher or his attorney(s) relating to this subpoena.

**Exhibit B**
**Attachment to Subpoena**
*Instructions and Definitions*

Perez et al. v. Fisher et al.
Southern District of California Case No.: 13-cv-1417-WQH (BGS)

**Instructions**

All responses to requests for production provided in Exhibit A are governed by the Federal Rules of Civil Procedure and the following instructions:

1.    Unless otherwise stated, these requests cover the period of January 1, 2006, to the present.

2.    These discovery requests shall be deemed continuing, requiring You to produce supplemental answers and documents and things promptly in accordance with Rule 26 of the Federal Rules of Civil Procedure. Such documents and things are to be produced as soon as is reasonably possible after they are located or obtained and no later than thirty (30) days after the discovery of the further information.

3.    These document requests request documents in DHS or CBP's possession, custody, or control, including documents of DHS or CBP's agencies, subdivisions, offices, components, sectors, stations, officials, supervisors, officers, directors, employees, agents, and unless privileged, their attorneys.

4.    You are to produce entire documents including all attachments, cover letters, memoranda, and appendices, as well as the file, folder tabs, and labels appended to or containing any documents. Copies which differ in any respect from an original (because, by way of example only, handwritten or printed notations have been added) should be produced separately. Each document requested herein must be produced in its entirety and without deletion, abbreviation, redaction, expurgation, or excisions, regardless of whether you consider the entire document to be relevant or responsive to these requests.

5.    **You shall not redact any names, titles, offices, or "entered on duty" dates.  If you have redacted any portion of a document, stamp the word "redacted" on each page of the document which**

**you have redacted. Privileged redactions must be included in a privilege log; any non-privileged redactions must also be included in a log describing the basis for the redaction**.

6.    Form. You shall submit all documents as instructed below absent written agreement or court order stating otherwise:

a.   Any request herein includes and requires production of all ESI.  All ESI is to be produced in Native Format, i.e., in the format in which the item was originally created, with internal metadata intact (for example, the native format of a Microsoft Office Word document is as a .doc or .docx file). Embedded files and email attachments shall be produced as separate documents with family relationships preserved via sequentially marked Bates numbers. In instances in which ESI exists in or as a proprietary database, application-specific format, or as structured data, you shall export from the original database, application, or structured data store all producible information in a format where the individual records and fields can be parsed and which includes field names, e.g., as one or more csv files, or Excel worksheets, where the first row contains field names.

b.   Submit redacted documents in PDF format accompanied by optical character recognition (OCR) with the metadata and information required below.

c.   For each ESI document, the following will also be produced:

i.   a Bates-stamped placeholder TIFF stating that the document has been produced in native format;

ii.   the metadata fields set out below in either an industry standard load file such as .dat, or in any other accessible format where the individual records and fields can be parsed and

which includes field names (e.g., .csv).  The following metadata fields must be included:

| Metadata Field | Description |
| --- | --- |
| Beginning Bates number | The beginning bates number of the document. |
| Ending Bates number | The last bates number of the document |
| Custodian | The name of the original custodian of the file |
| Filename with extension | The name of the file including the extension |
| Originating Path | File path of the file as it resided in its original environment |
| NativeLinkPath | Relative file path to the Production Media |
| Hash | SHA-1 or MD5 hash value for the original email or native file |

d. Documents that exist only in paper form shall be scanned and produced as TIFFs with the same load files and metadata fields as provided for ESI, with OCR'ed text in a .txt file. Hard copy documents shall be physically unitized, with parent/child relationships preserved.

e. TIFFs will be created as single page Group IV TIFF format, with 300 dpi quality or better. Image file names will be identical to the corresponding bates numbered images, with a ".tif" file extension.  All TIFFs will be branded with their corresponding Bates numbers in the lower right-hand corner, using a consistent font type and size.  The Bates number must not obscure any part of the underlying image.  If the placement in the lower right-hand corner will result in obscuring the underlying image, the Bates number should be placed as near to that position as possible while preserving the underlying image. All bates numbers will consist of a three digit Alpha Prefix, followed immediately by an 8 digit numeric:

AAA########.  There must be no spaces in the bates number.  Any numbers with less than 8 digits will be front padded with zeros to reach the required 8 digits. Image load data for all TIFFs will be provided in an image load file in an industry standard format such as .lfp.

f. Documents shall be produced on CD-ROM, DVD, external hard drive (with standard PC compatible interface), via secure FTP site, or such other readily accessible computer or electronic media as we may hereafter agree upon (the "Production Media"). Each item of Production Media or an accompanying cover letter shall include: (1) the type of materials on the media, (2) the production date, and (3) the Bates number range of the materials contained on such Production Media item.

7.  If you are unable to respond fully to any Request, explain why your response is incomplete, the efforts you have made to obtain the information, and the source from which all responsive information may be obtained to the best of your knowledge or belief.

8.  If you object to any part of a Request, set forth the basis for your objection and respond to all parts of the Request to which you do not object. If You have any good faith objections to any request or any part thereof, the specific nature of the objection and whether it applies to the entire request or to a part of the request shall be stated. If there is an objection to any part of a request, then the part objected to should be identified and documents responsive to the remaining unobjectionable part should be timely produced.  Under the newly amended Federal Rule of Civil Procedure 34, an "**objection must state whether any responsive materials are being withheld on the basis of that objection**." FRCP 34(b)(2)(C) (emphasis added)

9.  If any privilege is claimed as a ground for redacting or not producing a document or tangible thing, provide a privilege log describing the basis for the claim of privilege and all information necessary for Defendants and the Court to assess the claim of privilege, in accordance with FED. R. CIV. P. 26(b)(5). Separately, for each

document and attachment withheld or redacted, the log shall include the following: (i) specific grounds for the claim of privilege; (ii) the title of the document or attachment; (iii) the date of the document or attachment; (iv) the author of the document or attachment; (v) the addressees and recipients of the document or attachment or any copy thereof (including persons "cc'd," "bcc'd" or "blind cc'd"); (vi) a description of the subject matter of the document or attachment in sufficient detail to assess the claim of privilege; (vii) the bates range or page length of the document or attachment; and (viii) the Requests to which the document or attachment are responsive.

10.  Any privilege log or list shall be produced in a "live" Excel spreadsheet or other similar, searchable electronic format.

11.  Whenever necessary to bring within the scope of a Request a response that might otherwise be construed to be outside its scope, the following constructions should be applied:

   a. Construing the terms "and" and "or" in the disjunctive or conjunctive, as necessary, to make the Request more inclusive;

   b. Construing the singular form of any word to include the plural and the plural form to include the singular;

   c. Construing the past tense of the verb to include the present tense and the present tense to include the past tense;

   d. Construing the masculine form to include the feminine form;

   e. Construing negative terms to include the positive and vice versa;

   f. Construing "include" to mean include or including "without limitation."

**Definitions**

Unless stated otherwise, the following definitions shall apply to the terms in Exhibits A, B, and C of this subpoena:

1. "Administrative review" refers to all documents relating to any internal investigation or review by any DHS, CBP, IA, or OBP employee or entity for the purpose of ascertaining information regarding an incident or determining whether an Agent's conduct during an incident is in compliance with DHS and/or CBP policy or training, or otherwise subject to disciplinary action.

2. "Agent" refers to a United States Border Patrol agent.

3. "BP Daily Brief" refers to any document generated or provided by a representative for OBP for use during the Commissioner's Daily Brief.

4. "Commissioner's Daily Brief" refers to the daily meeting held each morning among every office within CBP and specifically relates to the portion of the meeting dedicated to CBP operations of OBP.

5. "Communication" is used in the broadest possible sense and means every conceivable manner or means of disclosure, transfer or exchange of oral or written information between one or more persons or entities.

6. "CBP" means United States Customs and Border Protection and includes any of its agencies, subdivisions, offices, sectors, stations, or components, as well as any officials, supervisors, officers, employees, agents, representatives, or other persons acting or purporting to act on the behalf of CBP.

7. "Daily Brief Notes" refers to any recording or documentation made by a representative of OBP or IA during the Commissioner's Daily Brief.

8. "Defendants" refers to Michael J. Fisher, Chad Michael Nelson, and Dorian Diaz and their attorneys or representatives relating to this lawsuit.

9. "DHS" or "You" refers to the United States Department of Homeland Security and includes any of its agencies, subdivisions, offices, sectors, stations, or components, as well as any officials, supervisors,

officers, employees, agents, representatives, or other persons acting or purporting to act on the behalf of DHS.

10. The "Directive" refers to the 4-page March 7, 2014 Memorandum authored by Fisher to all personnel with the subject of "Use of Safe Tactics and Techniques." Attached here as Exhibit E.

11. "Document" and/or "documents" is used broadly to mean anything which may be considered to be a document or tangible thing within the meaning of Rule 34 of the Federal Rules of Civil Procedure.

12. "ESI" shall mean and refer to all electronically stored information, including all writings, drawings, graphs, charts, photographs, sound recordings, images, email, source code, software, databases, phone messages and recordings, operating systems and software applications, backup tapes, metadata, voicemail messages, text messages, instant messages, and other data or data compilations stored in any medium from which the information can be obtained.

13. "Fisher" refers to Michael J. Fisher, currently the Chief of OBP and party-defendant in this lawsuit.

14. "Harper's Ferry Meeting" refers to the meeting arranged by David Aguilar and attended by at least Fisher and James F. Tomsheck in late 2012 at or near CBP's Advanced Training Center near or in Harpers Ferry, West Virginia, relating to the use of force by border patrol agents.

15. "IA Daily Brief" refers to any document generated or provided by a representative of IA for use during the Commissioner's Daily Brief.

16. "Internal Affairs" or "IA" refers to CBP's Office of Internal Affairs and includes any of its agencies, subdivisions, offices, sectors, stations, or components, as well as any officials, supervisors, officers, employees, agents, representatives, or other persons acting or purporting to act on the behalf of IA.

17. "Investigation" refers to, unless stated otherwise, all documents relating to any inquiry conducted by federal, state, or local law enforcement agencies for the purpose of determining whether there was a violation of applicable law or policy.

18.  "Leadership Conference" refers to any of the three conferences attended by at least Fisher, David Aguilar, and James F. Tomsheck that occurred on or around (1) June 2010 at or near Washington Dulles International Airport; (2) January 13-14, 2011 at or near Crown Plaza National Airport, Crystal City, VA; and (3) June 13-16, 2011 in Gettysburg, PA.

19.  "Native Format" means and refers to the format of ESI in which it was generated and/or as used in the usual course of regularly conducted activities.

20.  "OBP" refers to the Office of Border Patrol and includes any of its agencies, subdivisions, offices, sectors, stations, or components, as well as any officials, supervisors, officers, employees, agents, representatives, or other persons acting or purporting to act on the behalf of OBP.

21.  "Relating to" is used in the broadest possible sense and means, in whole or in part, addressing, analyzing, concerning, constituting, containing, commenting, in connection with, dealing, discussing, describing, embodying, evidencing, identifying, pertaining, referring, reflecting, reporting, stating, or summarizing.

22.  "Report" refers to all documents reduced to writing that relate to an oral or written account of something that one has observed, heard, done, or investigated, including, by way of example and not by limitation, Significant Incident Reports or all written reports made pursuant to CBP's Use of Force Policy, Guidelines and Procedures Handbook.

23.  "Rocking" or "Rocking Case" refers to any reported event that involves an agent claiming to have been assaulted with a rock.  For example, and not by way of limitation, in the Directive Fisher stated "[s]ince 2010, agents have been assaulted with rocks 1,713 times"; each of those "1,713 times" shall be considered a rocking case.

24.  "PERF" is used to mean the Police Executive Research Forum and specifically with regards to its engagement with DHS or CBP relating to the PERF Report.

25. "PERF Report" means the February 2013 publication by PERF entitled "U.S. Customs and Border Protection Use of Force Review: Cases and Policies."

26. "Possession" means your immediate possession, including items held by agents, employees, officers, directors and any and all other principals or assigns, as well as constructive possession by virtue of your ability to retrieve, request, order, copy, borrow, purchase or locate the aforesaid document or information.

# EXHIBIT C

1
2
3
4
5
6   ·'
7
8                    UNITED STATES DISTRICT COURT
9                  SOUTHERN DISTRICT OF CALIFORNIA
10

11   Maria Del Socorro Quintero Perez, CY, a       Case No.:  13cv1417-WQH-BGS
     Minor, and BY, a Minor,
12                                                 **ORDER GRANTING IN PART AND**
                                       Plaintiffs,  **DENYING IN PART PLAINTIFFS'**
13                                                 **SECOND MOTION TO COMPEL**
     v.                                            **PRODUCTION OF DOCUMENTS**
14

15   UNITED STATES OF AMERICA,
     UNITED STATES DEPARTMENT OF
16   HOMELAND SECURITY, UNITED
     STATES CUSTOMS AND BORDER
17   PROTECTION OFFICE OF BORDER
     PATROL, JANET NAPOLITANO,
18
     THOMAS S. WINKOWSKI, DAVID
19   AGUILAR, ALAN BERSIN, KEVIN K.
     McALLEENAN, MICHAEL J. FISHER,
20   PAUL A. BEESON, RICHARD
21   BARLOW, RODNEY S. SCOTT, CHAD
     MICHAEL NELSON, AND DORIAN
22   DIAZ, AND DOES 1 - 50,,
23                                      Defendants.
24

25

26   **I.    BACKGROUND**

27        On December 7, 2015 and December 8, 2015, counsel for Plaintiffs, Mr. McBride,

28   and counsel for Defendants, Ms. Schweiner, jointly called the Court regarding a

1   discovery dispute in compliance with the Court's Chambers' Rules. (ECF No. 110 at 1-

2   2.) This dispute centers around the sufficiency of Defendant Fisher's responses to

3   Plaintiffs' Requests for Production of Documents (Set Two), which were propounded on

4   October 9, 2015. (ECF No. 114 at 2.) Defendant Fisher responded to these requests on

5   November 12, 2015, wherein he "object[ed] to the request[s] because, although

6   Defendant is sued individually, and not in his official capacity, the request[s] seek[]

7   documents not within his personal possession, custody or control."[1] (ECF No. 114-3 at

8   3.) Defendant Fisher also objected to the requests as "overbroad, burdensome and

9   oppressive." (*Id.*)

10   On December 15, 2015, based on discussions with the parties, the Court instructed

11   Plaintiffs to file a motion to compel regarding the extent to which the requested

12   documents are in Defendant Fisher's possession, custody or control. (ECF No. 110 at 2.)

13   Because Defendants maintained their objections to the relevance and scope of the

14   requested documents, the Court also instructed them, in their opposition, to identify "any

15   objections they maintain to each request for production, including but not limited to

16   relevance, scope and undue burden." (*Id.* at 3.)

17   Plaintiffs filed their motion to compel on December 18, 2015. (ECF No. 114.) On

18   December 23, 2015, Plaintiffs filed a declaration by third party witness James Tomsheck,

19   in support of their motion to compel.[2] (ECF No. 116.) Defendants filed their opposition

20

21

---

22   [1] In response to RFP No. 8, Defendant Fisher only objects to the request on the basis that it is
     unintelligible. (ECF No. 114-3 at 7.) Defendant Fisher states that he will not produce any documents
23   in response to this request. (*Id.*) This response to RFP No. 8 is not disputed by Plaintiffs in their motion
     to compel, and, therefore, will not be addressed in this order.
24   [2] Plaintiffs filed a declaration by James Tomsheck five days after they filed their motion to compel.
25   (ECF No. 116.) This declaration is untimely. Plaintiffs provided no explanation for the delay—only
     that "Plaintiffs are providing this now because it was signed and obtained today, on December 23, 2015,
26   and is directly relevant to the issues on which the Court directed briefing." (*Id.* at 2.) Mr. Tomsheck's
     declaration reviews Plaintiffs' requests for documents and provides his opinion on what types of
27   government documents would be responsive to each request. Per Local Rule 7.1(e)(7), the Court is not
     obligated to consider untimely motions or responses. Therefore, the Court will not consider the contents
28   of Mr. Tomsheck's declaration in deciding this motion to compel. Notwithstanding, the Court finds that

1   on December 24, 2015. (ECF No. 118.)  On December 29, 2015, Defendants filed a

2   supplemental brief in support of their opposition to Plaintiffs' motion to compel.[3]  (ECF

3   No. 119.)  Plaintiffs filed their reply on December 29, 2015.  (ECF No. 121.)

4   **II.   ANALYSIS OF DEFENDANT FISHER'S POSSESSION, CUSTODY OR**

5           **CONTROL OVER THE REQUESTED DOCUMENTS**

6           Plaintiffs move to compel the production of documents responsive to Requests for

7   Production of Documents (Set Two) propounded on Defendant Michael Fisher. (ECF

8   No. 114 at 2.)  Defendant Fisher's responses to these requests included an objection that,

9   "because, although Defendant is sued individually, and not in his official capacity, the

10  request seeks documents not within his personal possession, custody or control." (*See*,

11  *e.g.*, ECF No. 114-3 at 3.)

12          **a. Parties' Arguments**

13          Plaintiffs and Defendants disagree about whether Defendant Fisher has

14  "possession, custody or control," over the requested documents under Fed. R. Civ. P.

15  ("Federal Rule") 34(a)(1).  Defendants argue that Defendant Fisher does not have

16  possession, custody or control over the requested documents because he has retired from

17  his position as Chief of U.S. Customs and Border Protection ("CBP"). (ECF No. 118 at

18  2.)  Moreover, according to Defendants, prior to Defendant Fisher's retirement, he did

19  not have control over the requested documents because Department of Homeland

20  Security ("DHS") regulation 6 C.F.R. § 5.44(b) requires current and former employees to

21  _____

22  Mr. Tomsheck's opinion regarding the existence and relevance of the requested documents is not
    required to resolve this discovery dispute.
23  [3] Defendants' supplemental brief was filed four days after its opposition to Plaintiffs' motion to compel,
    and was therefore untimely.  In this supplemental brief, Defendants bring to the Court's attention a
24  second statute which they argue supports their contention that Defendant Fisher does not have
    possession, custody or control over the requested documents. (ECF No. 119 at 2.)  As Defendants
25  acknowledge in their supplemental brief, "it makes no difference" which statute governs the analysis of
    whether Defendant Fisher has possession, custody or control over the requested documents. (*Id.*)  The
26  Court agrees. Per Local Rule 7.1(e)(7), the Court is not obligated to consider untimely motions or
    responses.  Because Defendants' supplemental motion is untimely, and the additional information
27  provided "makes no difference" to the ultimate resolution of the issue, the Court will not consider the
28  contents of Defendants' supplemental motion in deciding this motion to compel.

1   obtain authorization from the Office of General Counsel prior to producing government
2   documents. (ECF No. 118 at 4.)  Defendants argue that Defendant Fisher did not have
3   possession, custody or control over the requested documents because he did not have a
4   "unilateral right to produce" them. (*Id.*)

5     According to Plaintiffs, "even though Fisher is sued in his personal capacity, he
6   does not lose possession, custody, or control over documents he otherwise can obtain by
7   virtue of being head of Border Patrol." (ECF No. 114 at 3.)  Moreover, Plaintiffs argue
8   that retirement does not strip Defendant Fisher of his possession, custody or control under
9   Federal Rule 34 because he was Chief of Border Patrol when they propounded the
10   discovery in dispute. (*Id.* at 2.)  Additionally, Plaintiffs contend that DHS regulation 6
11   C.F.R. § 5.44(b) has "no effect on Fisher's possession, custody and control" because it
12   "do[es] not affect (sic) Fisher's legal right to obtain documents." (ECF No. 121 at 3-4.)

13     **b. Relevant Law**

14     Under Federal Rule 34, any party may serve on any other party a request to
15   produce documents which are in the "possession, custody or control" of the party upon
16   whom the request is served.  Fed. R. Civ. P. 34(a)(1).  "The phrase 'possession, custody
17   or control' is in the disjunctive and only one of the numerated requirements need be met."
18   *Soto v. City of Concord*, 162 F.R.D. 603, 619 (S.D. Cal. July 17, 1995) citing *Cumis Ins.*
19   *Society, Inc. v. South-Coast Bank*, 610 F.Supp.193, 196 (N.D. Ind. 1985).  Because
20   control is defined as the legal right to obtain documents upon demand (*United States v.*
21   *Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir.
22   1989) citing *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984)), actual possession
23   of the requested document is not required.

24     A party responding to a document request has an "affirmative duty to seek that
25   information reasonably available to him from his employees, agents, or others subject to
26   his control." *Rogers v. Giurbino*, 288 F.R.D. 469, 485 (S.D. Cal. 2012) citing *Meeks v.*
27   *Parsons*, 2009 WL 3003718 *4 (E.D. Cal. Sept. 18, 2009).  A party may be ordered to
28   produce a document in the possession of a non-party entity if that party has a legal right

1  to obtain the document or has control over the entity who is in possession of the

2  document. *Soto*, 162 F.R.D. at 619 citing *Buckley v. Vidal*, 50 F.R.D. 271, 274 (S.D.N.Y.

3  1970). The party seeking production of documents has the burden of proving the

4  opposing party has control under the meaning of Federal Rule 34. *Int'l Union of*

5  *Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d at 1452 citing *Norman v. Young*, 422

6  F.2d 470, 472-73 (10th Cir. 1970).

7      **c. Analysis**

8          **i. Effect of Defendant Fisher's Retirement**

9      Defendants argue that because Defendant Fisher is retired from CBP, "he has no

10  legal right to obtain any documents and cannot be compelled to produce additional

11  documents." (ECF No. 118 at 6.) Plaintiffs counter that Defendant Fisher's retirement is

12  irrelevant because he held the position of Chief of Border Patrol at the time they served

13  him with these requests for production of documents. (ECF No. 114 at 2.)

14      Plaintiffs have the burden of proving that Defendant Fisher has control of the

15  requested documents under Federal Rule 34. *Int'l Union of Petroleum & Indus. Workers,*

16  *AFL-CIO*, 870 F.2d at 1452 citing *Norman*, 422 F.2d at 472-73 (10th Cir. 1970). In

17  support of their argument, Plaintiffs assert that Defendant Fisher held the position of

18  Chief of Border Patrol not only when he received the discovery requests on October 9,

19  2015, but up to thirty days after.[4] Neither party establishes the employment status of

20  Defendant Fisher on November 12, 2015, when he responded to Plaintiffs' discovery

21  requests.[5] In that the date of Defendant Fisher's retirement is not in the record, the Court

22  will analyze whether Defendant Fisher maintained possession, custody or control over the

23

24  _____

[4] Defendant Fisher signed a verification in his responses to interrogatories in which he acknowledges

25  that he was the Chief of Border Patrol as of November 9, 2015. (ECF No. 114-4 at 10.)

[5] If Defendant Fisher retired after he responded to Plaintiffs' discovery requests, he could not have

26  raised his retirement as a basis for his objection, because it had not yet happened. A failure to object to

discovery requests within the time required constitutes a waiver of any objection. *Richmark Corp. v.*

27  *Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir.), cert. dismissed, 506 U.S. 948, 113 S.Ct.

454, 121 L.Ed.2d 325 (1992). To the extent Defendant Fisher retired after he responded to Plaintiffs'

28  discovery requests, any objection on the basis of his retirement has been waived.

1   requested documents if he had retired *before* he responded to Plaintiffs' discovery on

2   November 12, 2015.

3        Defendants cite two cases for the proposition that a party does not have possession,

4   custody or control over documents from his or her former employer once he or she has

5   retired. (*See* ECF No. 118 at 4-5 citing *Pupo-Leyvas v. Bezy*, 2009 WL 1810337, at *1

6   (S.D. Ind. June 24, 2009) and *Wayson v. Rundell*, 2008 WL 819014, D. Alaska Mar. 24,

7   2008).) However, these cases are not applicable to the current analysis because in both

8   cases the parties were retired at the time they *received* the discovery requests. In this

9   case, it is undisputed that Defendant Fisher had not retired from his position as Chief of

10  Border Patrol when he received Plaintiffs' discovery requests on October 9, 2015.

11       Defendants would have this Court measure possession, custody or control under

12  Federal Rule 34 from the date on which a party responds to discovery. Yet, Defendants

13  provide no authority for their position. Such a reading of Federal Rule 34 would allow a

14  party to evade his obligations in discovery as long as he retired before the deadline to

15  respond. This Court does not endorse an interpretation of possession, custody or control

16  that creates opportunities for a party to manipulate the discovery process. Accordingly,

17  the Court finds that possession, custody and control under Federal Rule 34 is measured at

18  the time the party receives a discovery request, not at the time the party decides to

19  respond. Because Defendant Fisher had not retired until after Plaintiffs propounded the

20  discovery requests, his objection regarding possession, custody or control is

21  **OVERRULED**.

22              ## ii. Effect of 6 C.F.R. § 5.44(b)

23              ### 1. Parties' Arguments

24       Defendants also argue that Defendant Fisher lacks possession, custody or control

25  of the requested documents because of regulations promulgated under 5 U.S.C. § 301,[6]

26  _____

27  [6] The head of an executive department may prescribe regulations governing "the custody, use, and

28  preservation of its records, papers, and property." 5 U.S.C.A. § 301. These regulations are referred to
    as *Touhy* regulations. *See U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951).

1  which provide that current or former employees of DHS may not produce government

2  documents in litigation unless given permission by the Office of General Counsel.[7]

3  Defendants assert that under this regulation, Defendant Fisher does not have a "unilateral

4  right to produce Border Patrol and CBP documents[,]" and thus, cannot be deemed to

5  have possession, custody or control of any CBP documents.  (ECF No. 118 at 4.)

6  Plaintiffs contend that DHS regulation 6 C.F.R. § 5.44(b) has "no effect on Fisher's

7  possession, custody and control" because it "do[es] not affect (sic) Fisher's legal right to

8  obtain documents."  (ECF No. 121 at 3-4.)

9                                  **2. Discussion**

10        In support of their argument, Defendants cite *Johnson v. Santini* for the proposition

11  that a *Bivens* defendant such as Fisher cannot be compelled to produce agency documents

12  over which regulations deprive them of control.  2015 WL 1806328 at *6 (D. Colo. April

13  17, 2015).  In *Johnson*, the defendants represented that, pursuant to 28 C.F.R. § 16.22,[8]

14  they could not disclose information "relating to or based upon material contained in the

15  files of the [Federal Bureau of Prisons]," without prior authorization.  *Johnson*, 2015 WL

16  1806328, at *5.  The *Johnson* Court concluded that, because neither the Federal Bureau

17  of Prisons, nor the United States were parties to the litigation, defendants could not be

18  required to release information without authorization from their superiors.  *Id.* at *6.  The

19  holding in *Johnson* is not helpful to the current analysis because it does not address

20  whether a federal employee has a duty to ask for permission to produce government

21

22  _____

23  [7] 6 C.F.R. § 5.44(b) reads: No employee, or former employee, shall, in response to a demand or request, including in connection with any litigation, produce any document or any material acquired as part of the performance of that employee's duties or by virtue of that employee's official status, unless authorized to do so by the Office of the General Counsel or the delegates thereof, as appropriate.

24

25  [8] 28 C.F.R. § 16.22 states in pertinent part: "In any federal or state case or matter in which the United States is not a party, no employee or former employee of the Department of Justice shall, in response to a demand, produce any material contained in the files of the Department, or disclose any information relating to or based upon material contained in the files of the Department, or disclose any information or produce any material acquired as part of the performance of that person's official duties or because of that person's official status without prior approval of the proper Department official in accordance with §§ 16.24 and 16.25 of this part. 28 C.F.R. § 16.22(a)

26

27

28

1    documents, before he can be said to lack possession, custody or control.

2       When faced with comparable facts, however, courts in this circuit have interpreted

3    possession, custody and control under Federal Rule 34 broadly.  *Mitchell v. Adams*, 2009

4    WL 674348 (E.D. Cal. Mar. 6, 2009) ("While the defendant warden in his personal or

5    individual capacity may not have custody of the documents at issue, because 'control' is

6    determined by authority, he has constructive possession, custody or control.");  *Cooper v.*

7    *Sely*, 2013 WL 146428 (E.D. Cal. Jan. 14, 2013)(citing *Mitchell*, 2009 WL 674348 for

8    proposition that, because the defendant can obtain the requested document from non-

9    party California Department of Corrections and Rehabilitation, he has constructive

10   control and the documents must be produced.);  *Ochotorena v. Adams*, 2010 WL 1035774

11   (E.D. Cal. Mar. 19, 2010)(Because the defendants were employed by non-party

12   California Department of Corrections and Rehabilitation, and represented by the Attorney

13   General, they have constructive control and the documents must be produced.)

14      Defendants argument that 6 C.F.R. § 5.44(b) automatically strips Defendant Fisher

15   of possession, custody or control over the requested documents is unsupported.  While

16   the Court acknowledges that the DHS regulation creates a procedure by which

17   government documents must be requested before they are produced in litigation, the

18   regulation does not prevent Defendant Fisher from making such a request.  Accordingly,

19   the Court finds that Defendant Fisher had a duty to make a request of the Office of

20   General Counsel pursuant to DHS regulation 6 C.F.R. § 5.44(b) before stating that he

21   lacked possession, custody or control over the requested documents.  *See Herbst v. Able*,

22   63 F.R.D. 135, 138 (S.D.N.Y. 1972) (requiring company to contact former employee to

23   obtain SEC testimony in response to discovery request in litigation where company is a

24   party); *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co*., 233 F.R.D. 338, 341-42

25   (S.D.N.Y. 2005)(finding that company must exhaust all practical means at its disposal to

26   obtain a personal journal entry from a former employee in response to request for

27   production of documents to which the journal was responsive, including contacting that

28   former employee and asking for cooperation).

1   Defendant Fisher has not offered evidence that he made a request of CBP's Office

2   of General Counsel to produce responsive documents, or that CBP's Office of General

3   Counsel refused his request. Notably, Defendant Fisher has produced documents in this

4   litigation (*see e.g.*, ECF No. 99-3 and ECF No. 114-3 at 9), *with the consent of CBP*.

5   (ECF No. 118 at 5.) Defendant Fisher states that his objections to Plaintiffs' requests are

6   his attempt to "balance his discovery obligations with the DHS regulations." (*Id.*) Any

7   such balancing is the responsibility of the court, not Defendant Fisher.

8   The Court finds that 6 C.F.R. § 5.44(b) does not automatically preclude Defendant

9   Fisher from having possession, custody or control over requested documents. Instead,

10   Defendant Fisher was required to request permission from the Office of General Counsel

11   before he could determine whether or not he had possession, custody or control.

12   Notwithstanding, requiring Defendant Fisher to seek permission from the Office of

13   General Counsel to produce the requested documents at this juncture would only create

14   more delay.[9] Therefore, in the interest of efficiency, the Court will allow Plaintiffs to

15   subpoena the relevant government agencies, subject to this Court's additional rulings

16   explained below.[10] (*See* Fed. R. Civ. P. 1 (stating that the Federal Rules should be

17   construed to "secure the just, speedy, and inexpensive determination" of the action.))

18   **III.   ANALYSIS OF DEFENDANTS' ADDITIONAL OBJECTIONS**

19   **a. Parties' Arguments**

20   Defendants argue that, even if Defendant Fisher had possession, custody or control

21   over the documents requested by Plaintiffs, the requests are still objectionable on the

22   basis that they are overbroad, burdensome and oppressive. (ECF No. 118 at 6.)

23

24   [9] The Office of General Counsel applies the same factors in considering whether or not to comply with a

25   subpoena under Federal Rule 45, or a request for documents under Federal Rule 34. (*See* 5 C.F.R. § 5.48(a).)

26   [10] The Court finds that Plaintiffs' Request for Production of Documents (Set Two) seeks materials

27   relevant to the claims and defenses in this lawsuit. Given the relevance, the Court will extend the fact discovery deadline to allow Plaintiffs to serve a subpoena *duces tecum* on the appropriate government

28   agencies.

1    According to Defendants, any information regarding an alleged rocking policy is only

2    relevant to Plaintiffs' claims if it shows what Defendants Nelson and Diaz knew of

3    Border Patrol's use of force policy in response to rock throwing.  (*Id.*)

4        Plaintiffs respond that their requests are relevant to establishing "(1) a consistent

5    pattern of border patrol agents' using deadly force whenever a rock was thrown, despite

6    agents being able to take cover or resort to other non-deadly means and/or (2) Fisher's

7    knowledge, support, and/or approval of Border Patrol practices, procedures, and policies

8    that encouraged Border Patrol agents to use lethal force in response to rock throwing."

9    (ECF No. 114 at 5.)  The Court will address Defendants' objections to each request in

10   turn.[11]

11       **b. Relevant Law**

12           **i.  Scope of Discovery**

13       The recently revised Federal Rules provide:

14           "Parties may obtain discovery regarding any nonprivileged matter that is

15       relevant to any party's claim or defense and proportional to the needs of the case,

16       considering the importance of the issues at stake in the action, the amount in

17       controversy, the parties' relative access to relevant information, the parties'

18       resources, the importance of the discovery in resolving the issues, and whether the

19       burden or expense of the proposed discovery outweighs its likely benefit."

20

21   (Fed. R. Civ. P. 26(b)(1).)  The party seeking to compel discovery has the burden of

22   establishing that its request satisfies the relevancy requirements of Federal Rule 26(b)(1).

23   *Soto*, 162 F.R.D. at 610.  In turn, the party opposing discovery has the burden to show

24   that discovery should not be allowed, and has the burden of clarifying, explaining, and

25   supporting its objections. *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002)

26

27   ───────────────

28   [11] Defendants' response to RFP No. 8 is not disputed in Plaintiffs' motion to compel, and therefore, will not be addressed by the Court.

1  citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir.1975). The opposing

2  party may satisfy their burden by demonstrating how the discovery request is irrelevant,

3  overly broad, burdensome, or oppressive. *Khalilpour v. CELLCO P'ship*, 2010 WL

4  1267749, at *3 (N.D. Cal. Apr.1, 2010); *see also Oppenheimer Fund, Inc. v. Sanders*, 437

5  U.S. 340, 353 fn. 17, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978).

6      Federal Rule 26(b)(2)(C) also requires the court, on motion or on its own, to limit

7  the frequency or extent of discovery otherwise allowed by the rules if it determines that

8  (1) "the discovery sought is unreasonably cumulative or duplicative, or can be obtained

9  from some other source that is more convenient, less burdensome, or less expensive;" (2)

10  the party seeking discovery has had ample opportunity to obtain the information by

11  discovery in the action;" or (3) "the proposed discovery is outside the scope permitted by

12  Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(i)-26(b)(2)(C)(iii). The Court must also limit

13  discovery when "the burden or expense of the proposed discovery outweighs its likely

14  benefit." Fed. R. Civ. P. 26(b)(1).

15                    **ii. Supervisory Liability**

16      An analysis of the relevancy of Plaintiffs' requests first requires an understanding

17  of the claims against Defendant Fisher which revolve around his conduct as a supervisor.

18  In the Ninth Circuit, a supervisor faces liability under the Fourth Amendment only where

19  "it would be clear to a reasonable [supervisor] that his conduct was unlawful in the

20  situation he confronted." *Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012)

21  citing *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001),

22  overruled in part on other grounds by *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808,

23  172 L.Ed.2d 565 (2009). To meet this standard, a plaintiff must allege, at a minimum, a

24  "factual basis for imputing . . . knowledge" of an unconstitutional practice undertaken by

25  subordinates, coupled with culpable action or inaction. *Chavez*, 683 F.3d at 1111.

26  Moreover, Defendant Fisher can be held liable if it is shown that he was "on actual or

27  constructive notice that a particular omission in [CBP's] training program cause[d]

28  [subordinates] to violate citizens' constitutional rights." *Connick v. Thompson*, 131 S. Ct.

1  1350, 1359 (2011).[12]  With this in mind, the Court will now analyze Defendants'
2  objections to Plaintiffs' requests for production.

3       **c.  Analysis**

4       In their opposition to Plaintiffs' motion to compel, Defendants limit their

5  objections to Plaintiffs' requests as overbroad, burdensome and oppressive.  (ECF No.

6  118 at 6.)  The Court will likewise limit its analysis to those three objections.  Each

7  disputed request for production is addressed in turn.

8

9  **RFP No. 1:**  All BP Daily Briefs, IA Daily Briefs, and Daily Brief Notes for the seven

10 days following each of the 43 rocking cases you [Defendant Fisher] identified in your

11 Directive[13] that involved an agent using deadly force.

12       **Court's Response:**  Plaintiffs' posit that an alleged rocking policy in existence at

13            the time of the June 21, 2011 incident led to the alleged constitutional violations by

14            Defendants.  The Court finds that the requested documents are relevant to the

15            claims against Defendant Fisher and proportional to the needs of the case because

16            the contents of the requested documents could support the existence of a de facto

17            rocking policy.   Accordingly, the Court **OVERRULES** Defendants' objections to

18            this request as overbroad, unduly burdensome and oppressive.

19 **RFP No. 2:**  All documents, including but not limited to, video recordings, minutes,

20 transcripts, notes, and presentations, referring or relating to any Leadership

21

22

23

---

24 [12] Although *Connick* analyzed a claim against a governmental official in his official capacity, *Connick* is
   equally applicable to claims against government supervisors in their individual capacity.  *See Flores v.*
25 *Cnty. of L.A.,* 758 F.3d 1154, 1158-59 (9th Cir. 2014) ("As to an official in his individual capacity, the
   same standard applies—[a plaintiff] must show that [a supervisor defendant] was deliberately indifferent
26 to the need to train subordinates, and the lack of training actually caused the constitutional harm or
   deprivation of rights.").
27 [13] Plaintiffs' instructions for this document request define "Directive" as the March 2014 Memorandum
   authored by [Defendant Fisher] to all personnel, as also described in Plaintiffs' Complaint."  (ECF No.
28 114-2 at 2.)

1 Conference.[14]

2    **Court's Response:** Although the requested information regarding the June 2010,

3    January 2011, and June 2011 conferences could show whether or not a rocking

4    policy existed and the extent to which Defendant Fisher had knowledge of this

5    alleged policy, the Court finds that this request is not proportional to the issues in

6    this case. The Request is not limited to issues of alleged rockings, or the use of

7    force in response to the throwing of rocks along the U.S./Mexico border.

8    Accordingly, Defendants' objection that this request is overbroad, unduly

9    burdensome and oppressive is **SUSTAINED**. Plaintiffs can request: <u>All</u>

10   <u>documents, including but not limited to, video recordings, minutes, transcripts,</u>

11   <u>notes, and presentations, referring or relating to any discussions or presentations</u>

12   <u>that took place at a Leadership Conference regarding the use of force in response</u>

13   <u>to the throwing of rocks along the U.S./Mexico border.</u>

14 **RFP No. 3:** All documents referring or relating to any meetings that you [Defendant

15 Fisher] attended in 2013 relating to PERF or the PERF Report.

16   **Court's Response:** The PERF report was the result of research and analysis of the

17   use of force employed by the Border Patrol and resulted in a series of

18   recommended revisions to the use of force policy in place at the time of the 2011

19   incident. The Court finds that the requested documents are relevant because they

20   could show what information was discussed in response to the PERF report.

21   However, the request is not proportional to the needs of the case. Accordingly,

22   Defendants' objection that this request is overbroad, unduly burdensome and

23   oppressive is **SUSTAINED**. Plaintiffs can request: <u>Any documents referring or</u>

24   <u>relating to any discussions of the use of force policy or practice in response to rock</u>

25

26   ───────────────

27   [14] Plaintiffs' instructions for this document request define "Leadership Conference" as "any of the three conferences attended by [Defendant Fisher] that occurred on or around (1) June 2010 at or near

28   Washington Dulles International Airport; (2) January 13-14, 2011 at or near Crown Plaza National Airport Crystal City, VA; and (3) June 13-16, 2011 in Gettysburg, PA." (ECF No. 114-2 at 3.)

1   throwing along the U.S./Mexico border that took place during any meetings

2   attended in 2013 discussing the PERF report.

3   **RFP No. 4:** All documents, including but not limited to, video recordings, minutes,

4   transcripts, notes, and presentations, referring or relating to the Harper's Ferry Meeting.[15]

5   **Court's Response:** Plaintiffs' state in their motion to compel that Request No. 4

6   "relates to specific meetings and/or reports regarding a review or implementation

7   of border patrol use of force tactics and techniques in response to rock throwing."

8   This request seeks all documents from the Harper's Ferry Meeting, regardless of

9   whether the documents relate the throwing of rocks at agents or the use of force by

10   border patrol agents in response to rock throwing. Accordingly, the Court

11   **SUSTAINS** Defendants' objections to this request as overbroad, unduly

12   burdensome and oppressive. Plaintiffs can request: All documents, including but

13   not limited to, video recordings, minutes, transcripts, notes, and presentations,

14   referring or relating to any discussions of the use of force policy or practice in

15   response to rock throwing along the U.S./Mexico border that took place at the

16   Harper's Ferry Meeting.

17   **RFP No. 5:** The original and all updated versions through present day of the document

18   entitled "Review of CBP Use of Deadly Force."

19   **Court's Response:** Defendants state in their response that they were unable to

20   identify any document called "Review of CBP Use of Deadly Force." (ECF No.

21   114-3 at 5.) Instead, Defendants believe that Plaintiffs intended to identify the Use

22   of Force Review Report, which was listed in their privilege log. (*Id.*) The Court

23   has already ordered the production of that document, subject to a protective order.

24   (*See* ECF No. 130.) The Court has no reason to believe that any updated versions

25   of this document exist, because no such revisions were listed in Defendants'

26

27   _____

   [15] Plaintiffs' instructions for this document request define Harper's Ferry Meeting as "the meeting
28   [Defendant Fisher] attended in late 2012 at or near CBP's Advanced Training Center near or in Harpers
   Ferry, West Virginia." (ECF No. 114-2 at 2.)

1    privilege log.  However, to the extent that updated versions exist or become

2    available, the Court reminds Defendants of their duty to supplement discovery

3    responses.  *See* Fed. R. Civ. P. 26 (a party "must supplement or correct its

4    disclosure or response . . . in a timely manner if the party learns that in some

5    material respect the disclosure or response is incomplete or incorrect, and if the

6    additional or corrective information has not otherwise been made known to the

7    other parties during the discovery process or in writing.")  Accordingly, the Court

8    **OVERRULES** Defendants' objection that the request is overbroad, unduly

9    burdensome and oppressive.

10   **RFP No. 6:**  All documents relating to James F. Tomsheck's[16] filings with CBP's Office

11   of Special Counsel in either November 2011 or June 2014.

12       **Court's Response:** This request seeks relevant information to the extent Mr.

13       Tomsheck's filings with CBP's Office of Special Counsel related to the use of

14       force in response to the throwing of rocks along the U.S./Mexico border.

15       However, as currently written, this request is not proportional to the issues in this

16       case.  Responsive documents could include filings with CBP's Office of Special

17       Counsel regarding any grievances or issues within CBP, beyond the alleged

18       rocking policy.  Accordingly, the Court **SUSTAINS** Defendants' objection to this

19       request as overbroad, unduly burdensome and oppressive.  Plaintiffs can request:

20       All documents relating to James F. Tomsheck's November 2011 or June 2014

21       filings with CBP's Office of Special Counsel regarding the use of force by border

22       patrol agents in response to the throwing of rocks along the U.S./Mexico border.

23   **RFP No. 7:**  All documents referring or relating to any statements made by you

24   [Defendant Fisher] concerning the alleged throwing of rocks at border patrol agents.

25       **Court's Response:** Plaintiffs' posit that a policy existed at the time of the 2011

26   _____

27   [16] According to Plaintiffs' complaint, James Tomsheck is the former Assistant Commissioner for
     Internal Affairs at CBP and recently acknowledged the existence and unlawfulness of the rocking
28   policy.  (ECF No. 61 at 37 citing a news article published on revealnews.org.)

1   incident at issue in this case which led to the alleged constitutional violations by

2   Defendants.  However, this request is not proportional to the issues in this case

3   because it does not limit the responsive documents to those involving the use of

4   force by Border Patrol agents in response to the throwing of rocks.  Accordingly,

5   the Court **SUSTAINS** Defendants' objection to this request as overbroad, unduly

6   burdensome and oppressive.  Plaintiffs can request: <u>All documents referring or</u>

7   <u>relating to any statements made by you [Defendant Fisher] concerning the response</u>

8   <u>of Border Patrol agents to the alleged throwing of rocks by individuals along the</u>

9   <u>U.S./Mexico border.</u>

10  **RFP No. 9:**  All of the files that PERF reviewed in connection with the issuance of the

11  PERF Report.

12      **Court's Response:** Defendant Fisher's supervisory liability hinges on his

13      knowledge of, and responsibility for, a de facto "rocking policy" by which agents

14      respond with deadly force to the throwing of rocks by Mexican nationals,

15      regardless of whether other, non-lethal means are available to avert any such risk.

16      (*See* ECF No. 61 at 1-2.)  Plaintiffs' claims require more than a showing that a

17      rocking policy existed—Plaintiffs must show Defendant Fisher's knowledge of, or

18      perpetuation of, a rocking policy.  Therefore, the Court **SUSTAINS** Defendants'

19      objection to this request as overbroad, unduly burdensome and oppressive.

20      Plaintiffs can request: <u>All files that Defendant Fisher created or received and that</u>

21      <u>were also reviewed by PERF in connection with the issuance of the PERF Report</u>

22      <u>and involve the use of force in response to the throwing of rocks along the</u>

23      <u>U.S./Mexico border.</u>

24  **RFP No. 10:**  All documents referring or relating to IA's suggested revisions to the

25  CBP's Use of Force Policy.

26      **Court's Response:** Defendant Fisher's supervisory liability hinges on his

27      knowledge of, and responsibility for, a de facto "rocking policy" by which agents

28      respond with deadly force to the throwing of rocks by Mexican nationals,

1    regardless of whether other, non-lethal means are available to avert any such risk.

2    (*See* ECF No. 61 at 1-2; *see also Chavez*, 683 F.3d at 1110 overruled in part on

3    other grounds by *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d

4    565 (2009).)  Plaintiffs' must show more than the mere existence of a rocking

5    policy.  Therefore, the Court **SUSTAINS** Defendants' objection to this request as

6    overbroad, unduly burdensome and oppressive.  Plaintiffs can request: <u>All</u>

7    <u>documents referring or relating to IA's suggested revisions to the CBP's Use of</u>

8    <u>Force Policy regarding the use of force in response to the throwing of rocks along</u>

9    <u>the U.S./Mexico border, that Defendant Fisher created, received or reviewed</u>.

10   **IV.    CONCLUSION**

11   1.  The Court **OVERRULES** Defendants' objection on the basis of Defendant

12       Fisher's retirement.  The Court further finds that Defendant Fisher had a duty to

13       request permission to produce the requested documents from the Office of General

14       Counsel.  However, in the interest of efficiency, the Court declines to order him to

15       make such a request at this time.  Instead, Plaintiffs are granted an extension of the

16       fact discovery deadline for the limited purpose of serving a subpoena *duces tecum*

17       on the appropriate government agency, subject to the Court's additional rulings

18       summarized below.  Plaintiffs must serve the subpoena within **one week** of this

19       order.

20   2.  Defendants' objections to RFP No. 1 as overbroad, unduly burdensome and

21       oppressive are **OVERRULED**.

22   3.  Defendants' objections to RFP No. 2 as overbroad, unduly burdensome and

23       oppressive are **SUSTAINED**.  Instead, Plaintiffs can request: <u>All documents,</u>

24       <u>including but not limited to, video recordings, minutes, transcripts, notes, and</u>

25       <u>presentations, referring or relating to any discussions or presentations that took</u>

26       <u>place at a Leadership Conference regarding the use of force in response to the</u>

27       <u>throwing of rocks along the U.S./Mexico border</u>.

28   **4.**  Defendants' objections to RFP No. 3 as overbroad, unduly burdensome and

1  oppressive are **SUSTAINED.** Instead, Plaintiffs can request: <u>Any documents</u>

2  <u>referring or relating to any discussions of the use of force policy or practice in</u>

3  <u>response to rock throwing along the U.S./Mexico border that took place during any</u>

4  <u>meetings attended in 2013 discussing the PERF report.</u>

5  **5.** Defendants' objections to RFP No. 4 as overbroad, unduly burdensome and

6  oppressive are **SUSTAINED**. Instead, Plaintiffs can request: <u>All documents,</u>

7  <u>including but not limited to, video recordings, minutes, transcripts, notes, and</u>

8  <u>presentations, referring or relating to any discussions of use of force policy or</u>

9  <u>practice in response to rock throwing along the U.S./Mexico border that took place</u>

10  <u>at the Harper's Ferry Meeting.</u>

11  **6.** Defendants' objections to RFP No. 5 as overbroad, unduly burdensome and

12  oppressive are **OVERRULED**.

13  **7.** Defendants' objections RFP No. 6 as overbroad, unduly burdensome and

14  oppressive are **SUSTAINED**. Instead, Plaintiffs can request: <u>All documents</u>

15  <u>relating to James F. Tomsheck's November 2011 or June 2014 filings with CBP's</u>

16  <u>Office of Special Counsel regarding the use of force by border patrol agents in</u>

17  <u>response to the throwing of rocks along the U.S./Mexico border.</u>

18  **8.** Defendants' objections to RFP No. 7 as overbroad, unduly burdensome and

19  oppressive are **SUSTAINED**. Instead, Plaintiffs can request: <u>All documents</u>

20  <u>referring or relating to any statements made by you [Defendant Fisher] concerning</u>

21  <u>the response of Border Patrol agents to the alleged throwing of rocks by</u>

22  <u>individuals along the U.S./Mexico border.</u>

23  **9.** Defendants' objections to RFP No. 9 as overbroad, unduly burdensome and

24  oppressive are **SUSTAINED**. Instead, Plaintiffs can request: <u>All files that</u>

25  <u>Defendant Fisher created or received and that were also reviewed by PERF in</u>

26  <u>connection with the issuance of the PERF Report and involve the use of force in</u>

27  <u>response to the throwing of rocks along the U.S./Mexico border.</u>

28  **10.**Defendants' objections to RFP No. 10 as overbroad, unduly burdensome and

1    oppressive are **SUSTAINED**.  Instead, Plaintiffs can request:  <u>All documents</u>

2    <u>referring or relating to IA's suggested revisions to the CBP's Use of Force Policy</u>

3    <u>regarding the use of force in response to the throwing of rocks along the</u>

4    <u>U.S./Mexico border, that Defendant Fisher created, received or reviewed</u>.

5

6    IT IS SO ORDERED.

7    Dated:  February 23, 2016

8                                                             Hon. Bernard G. Skomal

9                                                             United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

MARIA DEL SOCORRO QUINTERO PEREZ, BRIANDA ARACELY YANEZ QUINTERO, CAMELIA ITZAYANA YANEZ QUINTERO, and J.Y., a minor,

Plaintiffs,

vs.

UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES CUSTOMS AND BORDER PROTECTION OFFICE OF BORDER PATROL, JANET NAPOLITANO, THOMAS S. WINKOWSKI, DAVID AGUILAR, ALAN BERSIN, KEVIN K. McALLEENAN, MICHAEL J. FISHER, PAUL A. BEESON, RICHARD BARLOW, RODNEY S. SCOTT, CHAD MICHAEL NELSON, and DORIAN DIAZ, and DOES 1 – 50

Defendants.

Case No. 3:13-cv-01417-WQH (BGS)

**DECLARATION OF JAMES F. TOMSHECK IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DOCUMENTS IN FISHER'S POSSESSION, CUSTODY, AND CONTROL**

1  GERALD SINGLETON, State Bar No. 208783
2  BRODY McBRIDE State Bar No. 270852
   SINGLETON LAW FIRM, APC
3  115 West Plaza Street
   Solana Beach, CA  92075
4  Tel:  (760) 697-1330
5  Fax:  (760) 697-1329
6  Emails: gerald@geraldsingleton.com
            brody@geraldsingleton.com
7
8  ROBERT C. HILLIARD, TX State Bar No. 09677700
   *Admitted Pro Hac Vice*
9  MARION REILLY, TX State Bar No. 24079195
   *Admitted Pro Hac Vice*
10 HILLIARD MUNOZ GONZALES, LLP
11 719 S. Shoreline Blvd, Ste. 500
   Corpus Christi, Texas 78260
12 Tel:   (361) 882-1612
13 Emails: bobh@hmglawfirm.com
            marion@hmglawfirm.com
14

15 STEVE D. SHADOWEN, PA State Bar No. 41953
16 *Admitted Pro Hac Vice*
   MATTHEW C.  WEINER, PA State Bar No. 314453
17 *Admitted Pro Hac Vice*
18 HILLIARD & SHADOWEN LLP
19 919 Congress Ave., Suite 1325
   Austin, TX  78701
20 Tel:   (855) 344-3298
21 Emails: steve@hilliardshadowenlaw.com
            matt@hilliardshadowenlaw.com
22
23 MARK FLEMING, State Bar No. 165770
   LAW OFFICE OF MARK FLEMING
24 1350 Columbia Street, Suite 600
25 San Diego, CA 92101
   Tel: (619) 794-0220
26 Email: mark@markfleminglaw.com
   Attorneys for Plaintiffs
27
28

1        I, James F. Tomsheck, declare as follows:

2        1.    In 2006 I was appointed Assistant Commissioner, Office of

3    Internal Affairs ("IA"), for Customs and Border Protection Agency ("CBP"). I

4    headed the Office of Internal Affairs from 2006-2014.

5        2.    This declaration is made upon my personal knowledge gained

6    during the course of employment with CBP and my personal review of the

7    information contained in the documents filed with this motion. Except as to matters

8    that are on information and belief, I have personal knowledge of the following, and

9    if called upon to testify to any of these matters, I could and would competently do

10   so.

11       3.    The categories of documents described and requested in

12   Request Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 in Plaintiffs Request for Production to

13   Fisher set 2 ("RFP 2") capture documents that affirm the Border Patrol practices,

14   procedures, and policies that encouraged Border Patrol Agents to utilize lethal

15   force in response to rock throwing.

16       4.    The categories of documents described and requested in

17   Request Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 in RFP 2 affirm that the practice of

18   using lethal force against rock throwers was well-known by Fisher, his

19   subordinates, and other officials within CBP.

20       5.    The Office of Border Patrol is an operational component of

21   CBP that is headed by the Chief of Border Patrol. Under CBP Policy, the Chief of

22   Border Patrol is responsible for properly implementing a use of force program as it

23   relates to the Office of Border Patrol and its personnel and for ensuring compliance

24   with the CBP Use of Force Policy by all Border Patrol agents.   The Chief of

25   Border Patrol is responsible for assessing the need for operational adjustments and

26   providing operational guidance to border patrol agents and their supervisors in

27

28   Dec. of James F. Tomsheck

Ex. A - pg 41                                                   13cv1417-WQH (BGS)

1    order to lessen the likelihood of deadly force situations and reduce the risk of
2    injury or death that results therefrom.

3         6.    Under the then extant Use of Force Policy, whether IA could
4    conduct a review of a use of deadly force incident was contingent on border patrol
5    management first making a determination of wrongdoing on behalf of the border
6    patrol agent.   The Chief of Border Patrol directed that local Border Patrol
7    management take control of deadly force investigations before the internal affairs
8    department could review them.

9         7.    Throughout the 8 years of my tenure with CBP, the Chief of
10   Border Patrol consistently supported and permitted agents' use deadly force
11   whenever a rock was thrown. The mantra from Border Patrol management was that
12   rocking is lethal force. Requests Nos. 7 and 8, as well as others mentioned below,
13   should capture documents reflecting that.

14        8.    Request No. 1 appears to seek briefing documents and notes
15   relating to the Commissioner's Morning Brief. The Commissioner's Morning Brief
16   was a daily meeting attended by many CBP offices, including all operational CBP
17   offices.   The Chief of Border Patrol frequently served as Border Patrol's
18   representative, and I frequently served as IA's.

19        9.    Whenever there was a use of force incident by a border patrol
20   agent, the next morning, and sometimes for a week thereafter, the incident was
21   discussed during the portion of the Commissioner's Daily Brief dedicated to CBP
22   operations. Every morning, I would have an IA Summary briefed to me in a daily
23   document that Plaintiffs' RFP describes as the "IA Daily Brief." The IA Daily
24   brief would capture what IA would come to know of the shooting incident.
25   Border Patrol would generate a daily briefing document as well. Fisher and I (or a
26   representative from our respective Offices) took extensive notes during this portion
27
28   Dec. of James F. Tomsheck

2

1   of the meeting.  The IA Daily Brief became a single, structured document around
2   2010 or 2011.  Prior to 2010 or 2011, each of the IA Divisions provided their own
3   respective reports.

4        10.   Starting in 2006, I would consistently witness during the
5   Commissioner's Morning Brief the then-Chief of Border Patrol David Aguilar
6   consistently describe any shooting incident of a rock thrower as a "good shoot."
7   When Fisher became Chief of Border Patrol in 2010, he continued this practice of
8   defending and encouraging the use of deadly force against rock throwers.

9        11.   For the 7 days following an agent's use of deadly force against
10  a rock thrower, a side by side comparison of the IA daily briefing documents with
11  the Border Patrol daily briefing documents will clearly show three facts: (1) the IA
12  daily briefing documents were later confirmed to be an accurate description of
13  events that clearly implicated excessive use of force by Border Patrol Agents; (2)
14  the Border Patrol daily briefing documents for these same events were later
15  confirmed to be inaccurate and can be clearly seen as an effort to skew information
16  to make the incident appear to those outside the Office of Border Patrol to be an
17  appropriate use of force; and (3) when viewing the totality of these events there is
18  clearly a protracted pattern and practice of distorting use of force incidents to make
19  them appear to be justified.

20       12.   Request No. 2 appears to relate to "Leadership Conferences"
21  that Fisher and I attended. Those leadership conferences were recorded and will
22  demonstrate a consistent "drum beat" of promoting military rules of engagement
23  that are inconsistent with U.S. Law Enforcement rules of engagement. There are
24  many statements made during those conferences that reveal an effort to militarize
25  the Border Patrol—from the way Border Patrol agents are hired to the operational
26  tactics Border Patrol agents were encouraged to take to the field.

27

28  Dec. of James F. Tomsheck

Ex. A - pg 43                                              13cv1417-WQH (BGS)

13.   Request No. 3 appears to relate to meetings regarding the PERF Report. These were scheduled official meetings that Fisher and I attended. Fisher took major umbrage to PERFs recommendations that whenever the circumstances allow agents need to take cover instead of employing deadly force across the border.

14.   Request No. 4 appears to relate to the "Harper's Ferry Meeting" that Fisher, all the border patrol sector chiefs, and I personally attended. The Commissioner of CBP summoned the meeting in light of a Los Angeles Times article that addressed a large number of fatal incidents caused by Border Patrol agents. During the Harper's Ferry Meeting I gave a presentation to border patrol leadership discussing the fatal shootings by border patrol agents and the constitutional restraints that are placed on all law enforcement officers. I was interrupted during that presentation and told "We're not cops, we don't have to respond like they do." Border patrol leadership also claimed during that meeting that "We're now the premier paramilitary homeland security agency."

15.   Request No. 5 appears to relate to a document entitled "Review of CBP Use of Deadly Force." For the Harper's Ferry Meeting I was directed to produce a document that captured in a condensed manner (i) the salient facts of each fatal incident as we within CBP knew them to exist at that time and (ii) the status of each incident in terms of prosecution. The title of the document was "Review of CBP Use of Deadly Force," which was the first of a series of documents generated for the Harper's Ferry Meeting. I produced that document to Fisher and several other officials within CBP. The report was updated periodically to reflect the increased number of incidents. Between January 2010 and October 2012, the report contained about 21 incidents where lethal force resulted in death. By June 2014, there were approximately 27 or 28 fatal incidents captured in that

Dec. of James F. Tomsheck

Ex. A - pg 44                                                          13cv1417-WQH (BGS)

1  document.  A significant number of those incidents involved deadly force in
2  response to rock throwing.  Each of those incidents were also depicted in a series
3  of PowerPoint slides during the meeting.

4  16.  Request No. 6 appears to relate to my filings with the Office of
5  Special Counsel. Documents responsive to this request will show a concerted effort
6  on behalf of border patrol leadership to engage in a pattern and practice of
7  distorting use of force incidents to make them appear to be justified.

8  17.  Request No. 9 appears to relate to the the files reviewed by
9  PERF. PERF reviewed CBP's case files of use of force incidents that occurred
10 when Fisher was Chief of Border Patrol.  These documents will show the then-
11 extant use of force policy permitted agents' use of deadly force whenever a rock
12 was thrown - as was also found by the PERF Report.

13 18.  Request No. 10 appears to relate to CBP's Use of Force Policy
14 and IA's suggested revisions thereto. These documents should reflect Border Patrol
15 management's control over practices, procedures, and policies that prevented IA
16 from conducting a genuine, appropriate review of the information and the facts at
17 hand, effectively enabling Border Patrol agents to continue using lethal force in
18 response to rock throwing without any meaningful disciplinary repercussions.

19 I declare the following to be true under the penalty of perjury under the laws
20 of the United States of America that the foregoing is true and correct.

21
22
23
24 Dated: 12/23/15

                                             James F. Tomsheck
                                             James Tomsheck
25
26
27
28 Dec. of James F. Tomsheck

5

# EXHIBIT E

1300 Pennsylvania Avenue NW
Washington, DC 20229

OBP 80/9

MAR **7 2014**


**U.S. Customs and
Border Protection**

MEMORANDUM FOR:      All Personnel

FROM:                Michael J. Fisher
                     Chief
                     U.S. Border Patrol

SUBJECT:             Use of Safe Tactics and Techniques

As Chief of the United States Border Patrol, our border security mission and your safety are my highest priorities and ultimate responsibility. The dangerous situations you encounter require you to make split-second decisions in circumstances that are tense, uncertain, and rapidly evolving. U.S. Border Patrol agents are among the most frequently assaulted law enforcement personnel in the country.  Since 2007, there have been over 6,000 assaults against Border Patrol agents resulting in numerous injuries to our agents and the tragic death of three agents. In the face of these dangers, Border Patrol agents continue to show exemplary restraint and professionalism. Since 2010, agents have been assaulted with rocks 1,713 times.  In these situations, agents responded and used deadly force 43 times which regrettably resulted in the death of 10 individuals.

While these risks exist, we need to ensure that some of the tactics being employed do not place agents in undue danger resulting in violent confrontations where the use of force became necessary. While you should never have reservations about performing your duties or using the appropriate level of force when necessary, the level of force applied must reflect the totality of the circumstances surrounding each situation.

Background

Over the last decade, the U.S. Border Patrol has benefited exponentially from substantial gains in personnel, technology, and infrastructure. It is essential that you leverage the additional resources to reduce unnecessary risk to yourself, fellow agents, and the public. Duties should be performed in a deliberate manner with agents seeking tactical advantage in each situation and avoiding actions that place themselves or others at unnecessary risk.

The position you hold is one of great responsibility and trust.  The public expects, and our honor and oath demands, that we use all of our abilities, training and tools to accomplish our mission safely.

CBP's policy on the use of deadly force is that deadly force may only be used if an agent has a reasonable belief, based on the totality of the circumstances, that the subject of such force poses an imminent danger of death or serious physical injury to the agent or another person. This

Use of Safe Tactics and Techniques
Page 2

policy is constitutionally derived and meets a standard that has repeatedly been upheld by the
Supreme Court. It is consistent with the policies of the Department of Homeland Security and the
Department of Justice, as well as major law enforcement organizations around the country.

During the past year, I have asked Chief Patrol Agents (CPAs) to identify the high risk zones
within their respective areas of responsibility in order to develop operational plans to address
these risks. Additionally, my staff and I work closely with the Office of Training and
Development and through the Centers of Excellence, to further enhance our training and
preparedness. We will continue to review training and equipment requirements for the U.S.
Border Patrol and our intermediate force instruction to ensure that we are incorporating best
practices, the most effective tools, and appropriate training. As part of these ongoing efforts,
CBP is in the final stages of developing an update to the CBP Use of Force Handbook and we
will begin negotiations with the bargaining units in the near future.

In addition, we have worked with the Office of Training and Development to design and
implement new training scenarios at the Border Patrol Academy and we are testing new
equipment for operational use. The proposed changes in policy seek, among other things, to
make you safer and better prepared to confront and minimize your risk of vehicular assault and
criminal assault by individuals throwing rocks or other projectiles.

As our operational environment changes, we too must change, adapting our methods in
executing our border security mission while minimizing risk to ourselves and others. We must
continually assess our policies, tactics, procedures, training and equipment available to our
agents to appropriately mitigate risk.

Directive

In order to lessen the likelihood of deadly force situations and reduce the risk of injury or death
to agents and others, I am implementing the following directive effective immediately, which
clarifies existing guidelines contained in the CBP Use of Force Policy:

(1) In accordance with CBP's current Use of Force policy, agents shall not discharge their
firearms at a moving vehicle unless the agent has a reasonable belief, based on the totality
of the circumstances that deadly force is being used against an agent or another person
present; such deadly force may include a moving vehicle aimed at agents or others
present, but would not include a moving vehicle merely fleeing from agents. Further,
agents should not place themselves in the path of a moving vehicle or use their body to
block a vehicle's path.

(2) Agents should continue, whenever possible, to avoid placing themselves in positions
where they have no alternative to using deadly force. Agents shall not discharge firearms
in response to thrown or hurled projectiles unless the agent has a reasonable belief, based
on the totality of the circumstances, to include the size and nature of the projectiles, that

Ex. A - pg 48

Use of Safe Tactics and Techniques
Page 3

> the subject of such force poses an imminent danger of death or serious injury. Agents
> should obtain a tactical advantage in these situations, such as seeking cover or distancing
> themselves from the immediate area of danger.

Supervisors are instructed to address this directive at musters, to include using alternative
methodologies, such as setting up controlled tire deflation devices, acquiring additional back-up,
utilizing technology and less-than-lethal equipment, taking appropriate cover, and recognizing
when to engage or subsequently disengage. Additionally, agents and supervisors will use this
memorandum when planning field operations. To promote safety, it is imperative that agents and
supervisors conduct contingency planning prior to deployment and adjust plans as situations on
the ground evolve.

Responsibilities

CPAs will use risk assessments and identify their respective violence prone areas and develop
appropriate deployment of assets and personnel. CPAs will periodically reassess deployment
strategies to determine whether they are still effective responses to the evolving threat and will
identify equipment requirements for use in potentially high-risk situations and violence prone
areas.

Supervisors will ensure all available weapons systems and equipment will be made accessible to
agents in violent prone areas for appropriate responses to safely mitigate incidents they may be
likely to encounter. Supervisors are instructed to address training on use of force at musters, to
include using alternative methodologies, such as setting up controlled tire deflation devices,
acquiring additional back-up, utilizing technology and less-than-lethal equipment, cover and
concealment, and recognizing appropriate tactics for engagement.

Agents will use this directive and continue to employ enforcement tactics and techniques that
effectively bring an incident under control, while promoting the safety of the agent and the
public. In all cases, Agents will continue to seek to maintain their safety without unnecessarily
placing themselves or others at risk.

I encourage you to have discussions with your peers and supervisors, and if you need
clarification on policies or procedures, do not hesitate to ask. I cannot stress enough how
important it is to physically and mentally prepare yourselves, so that when dangerous situations
arise, you increase your chances of survivability while limiting unnecessary risk to others. It is
anticipated that these initial steps will help reduce the likelihood of assaults against our agents.

For my part, and with your assistance, I will continue to assess the need for operational
adjustments, dictated by situations in the field. As you are keenly aware, our border security
mission is not static and we must forever remain vigilant against those seeking entry into our
country to do us harm.

Use of Safe Tactics and Techniques
Page 4

Something that has resonated with me since becoming a Border Patrol agent 26 years ago is remembering that an important part of our job in the course of securing the homeland is to make it home every day at the end of each shift.   Honor First!

# Exhibit B

AO 88B (Rev 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

| | | |
|---|---|---|
| Perez, et al | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   13-cv-1417-WQH (BGS) |
| Fisher, et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    Mr. Stevan E. Bunnell, Office of the General Counsel, U.S. Department of Homeland Security, Mail Stop 3650
Washington, DC 20528

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

     Please see attached Exhibits A and C

| Place:    Cohen Milstein Sellers & Toll PLLC, 1100 New York Ave NW, Suite 500, Washington, DC 20005 | Date and Time: <br>      January 7, 2015 10:00am |
|---|---|

     ☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

     The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   December 8, 2015

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | s/ Matthew C. Weiner |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    **Plaintiffs:**
Maria Del Socorro Quintero Perez, Brianda Aracely Yanez Quintero, and Camelia Itzayana
Yanez Quintero                            , who issues or requests this subpoena, are:

Matthew C. Weiner, Hilliard & Shadowen LLP, 919 Congress Ave., Suite 1325, Austin, TX 78701,
matt@hilliardshadowenlaw.com, 855-344-3298

### Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

     Ex B - pg 1

AO 88B (Rev  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 13-cv-1417-WQH (BGS)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*                              .

❏ I served the subpoena by delivering a copy to the named person as follows:

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person, or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer, or
    **(ii)** is commanded to attend a trial and would not incur substantial expense

**(2)** *For Other Discovery.* A subpoena may command
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person, and
  **(B)** inspection of premises at the premises to be inspected

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial
  **(B)** *Objections* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served If an objection is made, the following rules apply
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that
    **(i)** fails to allow a reasonable time to comply,
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c),
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies, or
    **(iv)** subjects a person to undue burden
  **(B)** *When Permitted* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information, or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party
  **(C)** *Specifying Conditions as an Alternative* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party·
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship, and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information
  **(A)** *Documents* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand
  **(B)** *Form for Producing Electronically Stored Information Not Specified* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms
  **(C)** *Electronically Stored Information Produced in Only One Form* The person responding need not produce the same electronically stored information in more than one form
  **(D)** *Inaccessible Electronically Stored Information* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C) The court may specify conditions for the discovery

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must
    **(i)** expressly make the claim, and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim
  **(B)** *Information Produced* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has, must not use or disclose the information until the claim is resolved, must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim The person who produced the information must preserve the information until the claim is resolved

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

---

For access to subpoena materials, see Fed R Civ P 45(a) Committee Note (2013)

AO 88A  (Rev  12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

| | |
|---|---|
| Perez, et al. | ) |
| *Plaintiff* | ) |
| v. | ) |
| | ) |
| Fisher, et al. | ) |
| *Defendant* | ) |

Civil Action No.  13-cv-1417-WQH (BGS)

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:   Mr. Stevan E. Bunnell, Office of the General Counsel, U.S. Department of Homeland Security, Mail Stop 3650
Washington, DC 20528

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a
deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors,
or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or
those set forth in an attachment:

Please see attached Exhibits A, B, C

| Place: Cohen Milstein Sellers & Toll PLLC, 1100 New York Ave NW, Suite 500, Washington, DC 20005 | Date and Time: January 13, 2015 10:00am |
|---|---|

The deposition will be recorded by this method:   Stenographic and/or Videographic

❑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents,
electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the
material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance;
Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to
respond to this subpoena and the potential consequences of not doing so.

Date: December 8, 2015

*CLERK OF COURT*

OR

s/ Matthew C. Weiner

| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |
|---|---|

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Plaintiffs:
Maria Del Socorro Quintero Perez, Brianda Aracely Yanez Quintero, and Camelia Itzayana
Yanez Quintero                                                      , who issues or requests this subpoena, are:
Matthew C. Weiner, Hilliard & Shadowen LLP, 919 Congress Ave., Suite 1325, Austin, TX  78701,
matt@hilliardshadowenlaw.com, 855-344-3298

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice
and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is
directed. Fed. R. Civ. P. 45(a)(4).

Ex B - pg 4

AO 88A  (Rev  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 13-cv-1417-WQH (BGS)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____
on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0   .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                *Server's signature*

                               _____
                                                *Printed name and title*


                               _____
                                                *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person, or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer, or
(ii) is commanded to attend a trial and would not incur substantial expense

**(2)** *For Other Discovery.* A subpoena may command
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person, and
(B) inspection of premises at the premises to be inspected

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply

**(2)** *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial
(B) *Objections* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served If an objection is made, the following rules apply
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance

**(3)** *Quashing or Modifying a Subpoena.*
(A) *When Required* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that

(i) fails to allow a reasonable time to comply,
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c),
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies, or
(iv) subjects a person to undue burden
(B) *When Permitted* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires

(i) disclosing a trade secret or other confidential research, development, or commercial information, or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship, and
(ii) ensures that the subpoenaed person will be reasonably compensated

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms
(C) *Electronically Stored Information Produced in Only One Form* The person responding need not produce the same electronically stored information in more than one form
(D) *Inaccessible Electronically Stored Information* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C) The court may specify conditions for the discovery

**(2)** *Claiming Privilege or Protection.*
(A) *Information Withheld* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must
(i) expressly make the claim, and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim
(B) *Information Produced* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has, must not use or disclose the information until the claim is resolved, must take reasonable steps to retrieve the information if the party disclosed it before being notified, and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim The person who produced the information must preserve the information until the claim is resolved

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

For access to subpoena materials, see Fed R Civ P 45(a) Committee Note (2013)

**Exhibit A**
**Attachment to Subpoena**
*Requests for Documents*

Perez et al. v. Fisher et al.
Southern District of California Case No.: 13-cv-1417-WQH (BGS)

Pursuant to the Federal Rules of Civil Procedure, Plaintiffs, through counsel, request by the enclosed subpoena that DHS and/or the CBP produce all documents responsive to Plaintiffs' requests contained in Exhibit A, per the instructions and definitions provided in Exhibit C.

1.  The original and all updated versions through present day of the document entitled "Review of CBP Use of Deadly Force."

2.  All documents provided to PERF relating to the PERF Report, absent any redactions that may have been applied in anticipation of PERF's receipt.

3.  All documents relating to any communications to PERF.

4.  All documents relating to the scheduled meetings that Fisher attended in 2013 relating to PERF or the PERF Report.

5.  All BP Daily Briefs, IA Daily Briefs, and Daily Brief Notes for the seven days following each of the 10 rocking cases identified in the Directive that involved an Agent using deadly force that resulted in the death of an individual, or otherwise the seven days following such incidents that occurred on:

    a.  January 4, 2010

    b.  June 7, 2010

    c.  January 5, 2011

    d.  March 21, 2011

    e.  June 21, 2011

    f.  July 7, 2012

    g.  September 3, 2012

   h. October 10, 2012

   i. December 2, 2012

   j. February 18, 2014

6. All Reports, Investigations, and Administrative Reviews relating to the 43 Rocking Cases identified in the Directive that involve an Agent using deadly force.

7. All Reports, Investigations, and Administrative Reviews relating to any and all Rocking Cases, not otherwise included in Request 6, that involve both (i) an Agent's use of deadly or non-deadly force and (ii) a death of any person.

8. During the time in which Fisher was Deputy Chief Patrol Agent or Chief Patrol Agent for San Diego Sector (2006-2009), all Reports, Investigations, and Administrative Reviews relating to any and all incidents involving an Agent in San Diego Sector using deadly force.

9. All documents located in CBP's Office of Human Resources relating to an Agent's use of deadly force that resulted in any disciplinary action.

10. All videos of each Leadership Conference recorded by CBP's Office of Public Affairs, as well as any minutes, transcripts, or notes relating thereto.

11. All documents evidencing any and all presentations made during a Leadership Conference by David Aguilar, Fisher, or James F. Tomsheck, as well as any minutes, transcripts, or notes relating thereto.

12. All documents evidencing any email, audio or video recordings, minutes, transcripts, notes, or presentations, relating to the Harper's Ferry Meeting.

13. All documents filed by James F. Tomsheck with CBP's Office of Special Counsel in either November 2011 or June 2014.

14. All documents reflecting any communication, either directly or indirectly, made by or to Fisher relating to the use of a firearm in response to a thrown rock.

15. All documents evidencing any communication relating to IA's suggested revisions to a use of force policy governing Border Patrol agents.

16. Since the time Fisher became Chief of Border Patrol, all documents reflecting any communication by James F. Tomsheck, Robert Timmel, or James Wong relating in any way to any fatal shooting by an Agent.

17. All documents that evidence any communication, either directly or indirectly, between or among (i) Fisher and (ii) T.J. Bonner, Shawn Moran, or any other high ranking official from the National Border Patrol Council of the American Federation of Government Employees and relates in any way to using a firearm in response to a thrown rock.

18. All documents reflecting an official communication by or to the Government of Mexico regarding any rocking case in which an agent used deadly force.

19. All documents evidencing any communication between or among You and any Defendant relating to this lawsuit.

20. All documents You produce to Defendants relating to this lawsuit.

**Exhibit B**
**Attachment to Subpoena**
*Deposition Topics*
Deponent: DHS / CBP

<u>Perez et al. v. Fisher et al.</u>
Southern District of California Case No.: 13-cv-1417-WQH (BGS)

Pursuant to Rules 30(b)(6) and 45 of the Federal Rules of Civil Procedure, Plaintiffs, through counsel, request by the enclosed subpoena that DHS and/or CBP shall designate and prepare a witness or witnesses to testify regarding any and all facts known or reasonably available to DHS and/or CBP regarding the following topics. DHS and/or CBP shall set out the matters on which each person designated will testify.

1.    The authenticity of any document produced in response to this Subpoena.

2.    The steps taken to comply with this Subpoena, including without limitation:

      a.  The source and location of documents responsive to the requests included in Exhibit A;

      b.  The document retention and destruction policies that applied or apply to the documents and other materials produced in response to this Subpoena, including documents responsive to the requests included in Exhibit A;

      c.  The basis for withholding from production any documents that are responsive to the requests included in Exhibit A; and

      d.  Whether, as of the date of the deposition, all documents responsive to the requests included in Exhibit A that are in Your possession, custody, and/or control have been produced.

**Exhibit C**
**Attachment to Subpoena**
*Instructions and Definitions*

Perez et al. v. Fisher et al.
Southern District of California Case No.: 13-cv-1417-WQH (BGS)

**Instructions**

All responses to requests for production provided in Exhibit A are governed by the Federal Rules of Civil Procedure and the following instructions:

1.  Unless otherwise stated, these requests cover the period of January 1, 2006, to the present.

2.  These discovery requests shall be deemed continuing, requiring You to produce supplemental answers and documents and things promptly in accordance with Rule 26 of the Federal Rules of Civil Procedure. Such documents and things are to be produced as soon as is reasonably possible after they are located or obtained and no later than thirty (30) days after the discovery of the further information.

3.  These document requests request documents in DHS or CBP's possession, custody, or control, including documents of DHS or CBP's agencies, subdivisions, offices, components, sectors, stations, officials, supervisors, officers, directors, employees, agents, and unless privileged, their attorneys.

4.  You are to produce entire documents including all attachments, cover letters, memoranda, and appendices, as well as the file, folder tabs, and labels appended to or containing any documents. Copies which differ in any respect from an original (because, by way of example only, handwritten or printed notations have been added) should be produced separately. Each document requested herein must be produced in its entirety and without deletion, abbreviation, redaction, expurgation, or excisions, regardless of whether you consider the entire document to be relevant or responsive to these requests.

5.  If you have redacted any portion of a document, stamp the word "redacted" on each page of the document which you have redacted. Privileged redactions must be included in a privilege log; any non-

privileged redactions must also be included in a log describing the basis for the redaction.

6.    Form. You shall submit all documents as instructed below absent written agreement or court order stating otherwise:

a. Any request herein includes and requires production of all ESI. All ESI is to be produced in Native Format, i.e., in the format in which the item was originally created, with internal metadata intact (for example, the native format of a Microsoft Office Word document is as a .doc or .docx file). Embedded files and email attachments shall be produced as separate documents with family relationships preserved via sequentially marked Bates numbers. In instances in which ESI exists in or as a proprietary database, application-specific format, or as structured data, you shall export from the original database, application, or structured data store all producible information in a format where the individual records and fields can be parsed and which includes field names, e.g., as one or more csv files, or Excel worksheets, where the first row contains field names.

b. Submit redacted documents in PDF format accompanied by optical character recognition (OCR) with the metadata and information required below.

c. For each ESI document, the following will also be produced:

i. a Bates-stamped placeholder TIFF stating that the document has been produced in native format;

ii. the metadata fields set out below in either an industry standard load file such as .dat, or in any other accessible format where the individual records and fields can be parsed and which includes field names (e.g., .csv). The following metadata fields must be included:

| Metadata Field | Description |
|---|---|
| Beginning Bates number | The beginning bates number of the document. |
| Ending Bates number | The last bates number of the document |
| Custodian | The name of the original custodian of the file |
| Filename with extension | The name of the file including the extension |
| Originating Path | File path of the file as it resided in its original environment |
| NativeLinkPath | Relative file path to the Production Media |
| Hash | SHA-1 or MD5 hash value for the original email or native file |

d. Documents that exist only in paper form shall be scanned and produced as TIFFs with the same load files and metadata fields as provided for ESI, with OCR'ed text in a .txt file. Hard copy documents shall be physically unitized, with parent/child relationships preserved.

e. TIFFs will be created as single page Group IV TIFF format, with 300 dpi quality or better. Image file names will be identical to the corresponding bates numbered images, with a ".tif" file extension. All TIFFs will be branded with their corresponding Bates numbers in the lower right-hand corner, using a consistent font type and size. The Bates number must not obscure any part of the underlying image. If the placement in the lower right-hand corner will result in obscuring the underlying image, the Bates number should be placed as near to that position as possible while preserving the underlying image. All bates numbers will consist of a three digit Alpha Prefix, followed immediately by an 8 digit numeric: AAA########. There must be no spaces in the bates number. Any numbers with less than 8 digits will be front padded with zeros to reach the required 8 digits.

Image load data for all TIFFs will be provided in an image load file in an industry standard format such as .lfp.

f. Documents shall be produced on CD-ROM, DVD, external hard drive (with standard PC compatible interface), via secure FTP site, or such other readily accessible computer or electronic media as we may hereafter agree upon (the "Production Media"). Each item of Production Media or an accompanying cover letter shall include: (1) the type of materials on the media, (2) the production date, and (3) the Bates number range of the materials contained on such Production Media item.

7. If you are unable to respond fully to any Request, explain why your response is incomplete, the efforts you have made to obtain the information, and the source from which all responsive information may be obtained to the best of your knowledge or belief.

8. If you object to any part of a Request, set forth the basis for your objection and respond to all parts of the Request to which you do not object. If You have any good faith objections to any request or any part thereof, the specific nature of the objection and whether it applies to the entire request or to a part of the request shall be stated. If there is an objection to any part of a request, then the part objected to should be identified and documents responsive to the remaining unobjectionable part should be timely produced.

9. If any privilege is claimed as a ground for redacting or not producing a document or tangible thing, provide a privilege log describing the basis for the claim of privilege and all information necessary for Defendants and the Court to assess the claim of privilege, in accordance with FED. R. CIV. P. 26(b)(5). Separately, for each document and attachment withheld or redacted, the log shall include the following: (i) specific grounds for the claim of privilege; (ii) the title of the document or attachment; (iii) the date of the document or attachment; (iv) the author of the document or attachment; (v) the addressees and recipients of the document or attachment or any copy thereof (including persons "cc'd," "bcc'd" or "blind cc'd"); (vi) a

description of the subject matter of the document or attachment in sufficient detail to assess the claim of privilege; (vii) the bates range or page length of the document or attachment; and (viii) the Requests to which the document or attachment are responsive.

10.   Any privilege log or list shall be produced in a "live" Excel spreadsheet or other similar, searchable electronic format.

11.   Whenever necessary to bring within the scope of a Request a response that might otherwise be construed to be outside its scope, the following constructions should be applied:

a. Construing the terms "and" and "or" in the disjunctive or conjunctive, as necessary, to make the Request more inclusive;

b. Construing the singular form of any word to include the plural and the plural form to include the singular;

c. Construing the past tense of the verb to include the present tense and the present tense to include the past tense;

d. Construing the masculine form to include the feminine form;

e. Construing negative terms to include the positive and vice versa;

f. Construing "include" to mean include or including "without limitation."

## Definitions

Unless stated otherwise, the following definitions shall apply to the terms in Exhibits A, B, and C of this subpoena:

1.   "Administrative review" refers to all documents relating to any internal investigation or review by any DHS, CBP, IA, or OBP employee or entity for the purpose of ascertaining information regarding an incident or determining whether an Agent's conduct

during an incident is in compliance with DHS and/or CBP policy or training, or otherwise subject to disciplinary action.

2.     "Agent" refers to a United States Border Patrol agent.

3.     "BP Daily Brief" refers to any document generated or provided by a representative for OBP for use during the Commissioner's Daily Brief.

4.     "Commissioner's Daily Brief" refers to the daily meeting held each morning among every office within CBP and specifically relates to the portion of the meeting dedicated to CBP operations of OBP.

5.     "Communication" is used in the broadest possible sense and means every conceivable manner or means of disclosure, transfer or exchange of oral or written information between one or more persons or entities.

6.     "CBP" means United States Customs and Border Protection and includes any of its agencies, subdivisions, offices, sectors, stations, or components, as well as any officials, supervisors, officers, employees, agents, representatives, or other persons acting or purporting to act on the behalf of CBP.

7.     "Daily Brief Notes" refers to any recording or documentation made by a representative of OBP or IA during the Commissioner's Daily Brief.

8.     "Defendants" refers to Michael J. Fisher, Chad Michael Nelson, and Dorian Diaz and their attorneys or representatives relating to this lawsuit.

9.     "DHS" or "You" refers to the United States Department of Homeland Security and includes any of its agencies, subdivisions, offices, sectors, stations, or components, as well as any officials, supervisors, officers, employees, agents, representatives, or other persons acting or purporting to act on the behalf of DHS.

10.    The "Directive" refers to the 4-page March 7, 2014 Memorandum authored by Fisher to all personnel with the subject of "Use of Safe Tactics and Techniques."

11.     "Document" and/or "documents" is used broadly to mean anything which may be considered to be a document or tangible thing within the meaning of Rule 34 of the Federal Rules of Civil Procedure.

12.     "ESI" shall mean and refer to all electronically stored information, including all writings, drawings, graphs, charts, photographs, sound recordings, images, email, source code, software, databases, phone messages and recordings, operating systems and software applications, backup tapes, metadata, voicemail messages, text messages, instant messages, and other data or data compilations stored in any medium from which the information can be obtained.

13.     "Fisher" refers to Michael J. Fisher, currently the Chief of OBP and party-defendant in this lawsuit.

14.     "Harper's Ferry Meeting" refers to the meeting arranged by David Aguilar and attended by at least Fisher and James F. Tomsheck in late 2012 at or near CBP's Advanced Training Center near or in Harpers Ferry, West Virginia, relating to the use of force by border patrol agents.

15.     "IA Daily Brief" refers to any document generated or provided by a representative of IA for use during the Commissioner's Daily Brief.

16.     "Internal Affairs" or "IA" refers to CBP's Office of Internal Affairs and includes any of its agencies, subdivisions, offices, sectors, stations, or components, as well as any officials, supervisors, officers, employees, agents, representatives, or other persons acting or purporting to act on the behalf of IA.

17.     "Investigation" refers to, unless stated otherwise, all documents relating to any inquiry conducted by federal, state, or local law enforcement agencies for the purpose of determining whether there was a violation of applicable law or policy.

18.     "Leadership Conference" refers to any of the three conferences attended by at least Fisher, David Aguilar, and James F. Tomsheck that occurred on or around (1) June 2010 at or near Washington Dulles International Airport; (2) January 13-14, 2011 at or near Crown Plaza National Airport, Crystal City, VA; and (3) June 13-16, 2011 in Gettysburg, PA.

19.   "Native Format" means and refers to the format of ESI in which it was generated and/or as used in the usual course of regularly conducted activities.

20.   "OBP" refers to the Office of Border Patrol and includes any of its agencies, subdivisions, offices, sectors, stations, or components, as well as any officials, supervisors, officers, employees, agents, representatives, or other persons acting or purporting to act on the behalf of OBP.

21.   "Relating to" is used in the broadest possible sense and means, in whole or in part, addressing, analyzing, concerning, constituting, containing, commenting, in connection with, dealing, discussing, describing, embodying, evidencing, identifying, pertaining, referring, reflecting, reporting, stating, or summarizing.

22.   "Report" refers to all documents reduced to writing that relate to an oral or written account of something that one has observed, heard, done, or investigated, including, by way of example and not by limitation, Significant Incident Reports or all written reports made pursuant to CBP's Use of Force Policy, Guidelines and Procedures Handbook.

23.   "Rocking" or "Rocking Case" refers to any reported event that involves an agent claiming to have been assaulted with a rock.  For example, and not by way of limitation, in the Directive Fisher stated "[s]ince 2010, agents have been assaulted with rocks 1,713 times"; each of those "1,713 times" shall be considered a rocking case.

24.   "PERF" is used to mean the Police Executive Research Forum and specifically with regards to its engagement with DHS or CBP relating to the PERF Report.

25.   "PERF Report" means the February 2013 publication by PERF entitled "U.S. Customs and Border Protection Use of Force Review: Cases and Policies."

26.   "Possession" means your immediate possession, including items held by agents, employees, officers, directors and any and all other principals or assigns, as well as constructive possession by virtue of your ability to retrieve, request, order, copy, borrow, purchase or locate the aforesaid document or information.

# Exhibit C

Following is a summary of specific documents or categories of documents that Plaintiffs identified to DHS/CBP as responsive to requests in either the March Subpoenas or December Subpoena and have not yet been produced.  The chart also indicates which documents should be generated for the incidents identified in Exhibit D, and which exhibit attached herein contains a sample of or reference to the documents.

| Specific Documents Demanded | March Subpoenas | December Subpoena | For Every Incident in Exhibit D | Sample or Reference |
|---|---|---|---|---|
| Initial Significant Incident Reports | X | | X | Ex. L |
| Written Significant Incident Reports | X | | X | Ex. M |
| Incident Update Emails | X | | X | Ex. N |
| Border Patrol Briefing Reports | X | | X | Ex. M |
| Internal Affairs Daily Briefs | X | | X | |
| Incident Summary Reports | X | | X | Ex. O |
| Video(s) of the Sergio Hernandez Shooting | X | X | | Ex. Q |
| Review of CBP Use of Deadly Force | X | | | |
| Harper's Ferry Meeting Presentation by Tomsheck | X | | | |
| Leadership Conference Videos | X | | | |
| 29 Rocking-Case Files Furnished to PERF | X | | | Ex. R |
| Letters to or from Government of Mexico | | X | X | Ex. G |
| DHS OIG September 2013 Report Source Documents | | X | | Ex. F |

π

# Exhibit D

Based on disclosed material, following is a table showing 40 of the 43 incidents for which information is requested pursuant to Request 1 of the March Subpoenas.  Documents marked with a "Y" have previously been obtained through discovery.

| # | Incident Date | Victim Name | Victim Injury | Agent Name | Initial SIR | Written SIR | Incident Update Emails | BP Briefing Reports | IA Briefing Reports | Incident Summary Report | GOM Letter |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Incident Information** | | | **Responsive Documents to Subpoenas** | | | | | |
| 1 | 1/4/10 | Solis-Palma | Death | Vasquez | | | | | | | |
| 2 | 1/18/10 | | | | Y | | | | | | |
| 3 | 2/8/10 | | | | Y | | | | | | |
| 4 | 2/19/10 | | | | | | | | | | |
| 5 | 3/31/10 | | | | Y | | | | | | |
| 6 | 5/4/10 | | | | Y | | | | | | |
| 7 | 5/21/10 | | Shot in Arm | | | | Y | | | | |
| 8 | 5/31/10 | | | | Y | | | | | | |
| 9 | 6/5/10 | | | | | | | | | | |
| 10 | 6/7/10 | Hernandez-Guereca | Death | Mesa | | | | | | | Y |
| 11 | 6/18/10 | | | | Y | | | | | | |
| 12 | 8/31/10 | | | | Y | | | | | | |
| 13 | 11/5/10 | | | | | | | | | | |
| 14 | 11/8/10 | | | | | | | | | | |
| 15 | 11/16/10 | | Shot/Hospitalized | | | | | | | | Y |
| 16 | 1/5/11 | Torres | Death | | | | | | | | Y |
| 17 | 2/8/11 | | | | | | | | | | |
| 18 | 2/15/11 | | | | | | | | | | |
| 19 | 3/21/11 | La Madrid | Death | Tidwell | | | | | | | |
| 20 | 5/1/11 | | | | Y | | Y | | | | |
| 21 | 6/21/11 | Yañez | Death | Diaz | Y | Y | Y | Y | | Y | Y |
| 22 | 8/24/11 | | | | | | | | | | |
| 23 | 10/27/11 | | | | | | | | | | |
| 24 | 12/19/11 | | | | | | | | | | |
| 25 | 1/30/12 | | | | | | | | | | |
| 26 | 3/5/12 | | | | | | | | | | |
| 27 | 3/26/12 | | | | | | | | | | |
| 28 | 4/4/12 | | | | | | | | | | |
| 29 | 5/5/12 | | | | | | | | | | |
| 30 | 5/7/12 | | | | | | | | | | |
| 31 | 7/7/12 | Santillan | Death | | | | | | | | Y |
| 32 | 8/5/12 | | | | | | | | | | |
| 33 | 9/3/12 | Arévalo Pedroza | Death | Boatwright | | | | | | | Y |
| 34 | 10/10/12 | Rodriguez | Death | Swartz | | Y | Y | Y | | | Y |
| 35 | 10/17/12 | | | | | | | | | | |
| 36 | 12/2/12 | Morelos | Death | | | | | | | | |
| 37 | 5/3/13 | | | | | | | | | | |
| 38 | 6/10/13 | | | | | | | | | | |
| 39 | 7/31/13 | | | | | | | | | | |
| 40 | 2/18/14 | | Death | | | | | | | | |

# Exhibit E

1   GERALD SINGLETON, State Bar No. 208783
2   BRODY McBRIDE State Bar No. 270852
    SINGLETON LAW FIRM, APC
3   115 West Plaza Street
    Solana Beach, CA 92075
4   Tel:   (760) 697-1330
5   Fax:   (760) 697-1329
    Emails: gerald@geraldsingleton.com
6          brody@geraldsingleton.com
7
8   ROBERT C. HILLIARD, TX State Bar No. 09677700
    *Admitted Pro Hac Vice*
9   MARION REILLY, TX State Bar No. 24079195
    *Admitted Pro Hac Vice*
10  HILLIARD MUNOZ GONZALES, LLP
11  719 S. Shoreline Blvd, Ste. 500
    Corpus Christi, Texas 78260
12  Tel:   (361) 882-1612
13  Emails: bobh@hmglawfirm.com
           marion@hmglawfirm.com
14
15  STEVE SHADOWEN, PA State Bar No. 41953
    *Admitted Pro Hac Vice*
16  MATTHEW WEINER, PA State Bar No. 314453
17  *Admitted Pro Hac Vice*
    HILLIARD & SHADOWEN LLP
18  919 Congress Ave., Suite 1325
19  Austin, TX 78701
    Tel:   (855) 344-3298
20  Emails: steve@hilliardshadowenlaw.com
21         matt@hilliardshadowenlaw.com

22
23
24
25
26
27
28

Third Amended Complaint
13cv1417-WQH (BGS)

Ex. E - pg 1

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA DEL SOCORRO QUINTERO PEREZ, BRIANDA ARACELY YANEZ QUINTERO, CAMELIA ITZAYANA YANEZ QUINTERO, and J.Y., a minor<br><br>          Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES CUSTOMS AND BORDER PROTECTION OFFICE OF BORDER PATROL, JANET NAPOLITANO, THOMAS S. WINKOWSKI, DAVID AGUILAR, ALAN BERSIN, KEVIN K. McALLEENAN, MICHAEL J. FISHER, PAUL A. BEESON, RICHARD BARLOW, RODNEY S. SCOTT, CHAD MICHAEL NELSON, and DORIAN DIAZ,  and DOES 1 - 50<br><br>          Defendants. | ) Case No. 3:13-cv-01417-WQH (BGS)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  **THIRD AMENDED COMPLAINT**<br>)<br>)<br>)<br>)  **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## THIRD AMENDED COMPLAINT

This lawsuit seeks redress for the death of Jesus Alfredo Yañez Reyes ("Yañez"). Yañez was killed as a result of the United States Border Patrol's so-

1

1   called "Rocking Policy." Pursuant to the Rocking Policy, Border Patrol agents

2   along the nation's southern border deem the throwing of rocks at them by persons

3   of Hispanic descent and presumed Mexican nationality to be per se lethal force to

4   which the agents can legitimately respond with fatal gunfire. Under the Rocking

5   Policy, Border Patrol agents shoot to kill Mexican nationals who allegedly throw

6   rocks at them, regardless of whether the alleged rock-throwing poses an imminent

7   risk of death or serious injury to the agents or anyone else, and regardless of

8   whether other, non-lethal means are available to avert any such risk. In recent

9   years, Border Patrol agents acting pursuant to the Rocking Policy have shot and

10  killed at least thirteen persons and have seriously injured more. The Rocking

11  Policy has the imprimatur of the highest officials of the Department of Homeland

12  Security and the Customs & Border Protection Agency. This institutionalized,

13  systematic use of excessive, lethal force violates the U.S. Constitution, U.S.-

14  ratified treaties, peremptory international norms, and our fundamental national

15  values.

## PARTIES

### A. Plaintiffs

16

17  1.    Plaintiff Maria Del Socorro Quintero Perez is the widow of Jesus

18  Alfredo Yañez Reyes. She brings this action in her individual capacity, on behalf

19  of the estate of Jesus Alfredo Yañez Reyes, and as the next friend of minor child

20  JY. Yañez was a Mexican national of Hispanic descent.

21

22  2.    Plaintiff Camelia Itzayana Yañez Quintero is the daughter of Jesus

23  Yañez Reyes.

24

25  3.    Plaintiff Brianda Aracely Yañez Quintero is the daughter of Jesus

26  Yañez Reyes.

27  4.    Plaintiff J.Y. is the minor child of Jesus Yañez Reyes.

28                                   2

**B. Government Defendants**

5.     Defendant United States of America is a sovereign nation that has waived its sovereign immunity for the claims that Plaintiffs assert against it.  At all relevant times Defendant United States was the government entity that controlled, directed, and otherwise oversaw the Department of Homeland Security ("DHS") and employed the Supervisor Defendants and Agents (identified below), all of whom were acting under color of law and within the purported course and scope of their employment with respect to the conduct about which Plaintiffs complain.  Defendant United States was responsible for the training of these supervisors and agents and for making and implementing policies and practices used by these agents regarding their use of force.  Defendant United States was responsible for authorizing, directing, and implementing the unlawful Rocking Policy that resulted in Yañez's death.

6.     Defendant DHS is a Cabinet-level department that is responsible for the coordination and unification of national security efforts.  DHS has responsibility for and oversight over the training of Border Patrol agents and the policies, procedures, and practices relating to its agents' use of force at the United States/Mexico border, including in the Border Patrol's San Diego Sector.  At all relevant times, supervisors of DHS had specific knowledge of and acquiesced in a pattern and practice of border patrol agents' excessive use of force pursuant to a Rocking Policy as alleged herein, and the failure of DHS to timely conform border agents' use of force to the requirements of law caused the unlawful death of Yañez.

7.     Defendant United States Customs & Border Protection ("CBP") is a federal law enforcement agency and a component of DHS. CBP is responsible for securing the borders of the United States with a stated mission to "safeguard the American homeland at and beyond our borders." *See* http://www.cbp.gov/about

3

1  (last visited September 25, 2014). The agency is supervised by a Commissioner,

2  who has the responsibility for and oversight over policies, procedures, and

3  practices for several offices within the agency—one of which is the Office of

4  Border Patrol.  At all relevant times, supervisors of CBP had specific knowledge

5  of and acquiesced in a pattern and practice of border patrol agents' excessive use

6  of force pursuant to a Rocking Policy as alleged herein, and the failure of CBP to

7  timely conform border agents' use of force to the requirements of law caused the

8  unlawful death of Yañez.

9        8.      Defendant Office of Border Patrol ("Border Patrol") is a law

10  enforcement agency and a component of CBP specifically responsible for

11  patrolling the land and coastal borders of the United States. The Chief of Border

12  Patrol has responsibility for and oversight over the training of all Border Patrol

13  agents and the policies, procedures, and practices relating to agents' use of force.

14  The Chief of Border Patrol has the authority and responsibility to issue directives

15  to all personnel under his or her supervision to ensure agents' practices remain

16  within the limits of the constitution and consistent with the policies of the DHS

17  and CBP. The Chief of Border Patrol is the direct supervisor of, among others,

18  each Chief Patrol Agent among thirteen Border Patrol Sectors. In turn, the Chief

19  Patrol Agent is the direct supervisor of the Border Agent in Charge of each Border

20  Patrol Station within the Sector. Every border patrol agent on duty operates under

21  the direct supervision of a Supervisory Border Patrol Agent. At all relevant times,

22  supervisors of Border Patrol had specific knowledge of and acquiesced in a

23  pattern and practice of border patrol agents' excessive use of force pursuant to a

24  Rocking Policy as alleged herein, and the failure of any relevant supervisor within

25  Border Patrol to timely conform border agents' use of force to the requirements of

26  law caused the unlawful death of Yañez's death.

27

28                                        4

Ex. E - pg 5

9.     Plaintiffs sometimes refer herein to Defendants United States, DHS, CBP, and Border Patrol collectively as the "Government Defendants."

## C. Border Patrol Agent Defendants

10.     Defendant Chad Michael Nelson ("Nelson") is and was at all relevant times employed by the United States, DHS, and CBP as a Border Patrol agent. At all times described in this Complaint, he was acting in his capacity as a sworn law enforcement or peace officer, agent, servant, or employee of the Government Defendants, and under color of legal authority. Plaintiffs sue Defendant Nelson in his individual capacity.

11.     Defendant Dorian Diaz ("Diaz") is and was at all relevant times employed by the United States, DHS, and CBP as a Border Patrol agent. At all times described in this Complaint, he was acting in his capacity as a sworn law enforcement or peace officer, agent, servant, or employee of the Government Defendants, and under color of legal authority. Plaintiffs sue Defendant Diaz in his individual capacity.

12.     Plaintiffs sometimes refer herein to Defendants Nelson and Diaz collectively as the "Agents."

## D. Supervisor Defendants

13.     Defendant Janet Napolitano served as the 3rd Secretary of DHS from January 21, 2009 through September 6, 2013. Defendant Napolitano was a supervisor of the Agents and was responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents were properly trained and obeyed the laws of the United States. As Secretary, Defendant Napolitano, at a minimum, knew of and acquiesced in the unlawful Rocking Policy as defined herein and failed to conform agents' use of

5

1  force to the requirements of law, thereby causing the death of Yañez. Plaintiffs
2  sue Defendant Napolitano in her individual capacity.

3        14.    Defendant Thomas S. Winkowski was the Acting Commissioner of
4  the CBP from March 30, 2013 until March 7, 2014 when current Commissioner
5  Gil Kerlikowske assumed office.   From December 2011 to August 2012
6  Defendant Winkowski served as the Deputy Commissioner of CBP, and before
7  that he was the Assistant Commissioner of CBP in the Office of Field Operations.
8  Defendant Winkowski is and was the commanding officer of the Agents and is
9  and was responsible by law for enforcing the United States Constitution, laws, and
10 regulations and for ensuring that Border Patrol agents are properly trained and
11 obey the laws of the United States.   Upon information and belief, Defendant
12 Winkowski was personally responsible for approving and implementing the
13 specific Border Patrol use-of-force policies, including the Rocking Policy, that
14 resulted in Yañez's death. Plaintiffs sue Defendant Winkowski in his individual
15 capacity.

16       15.    Defendant David Aguilar became Chief of Border Patrol in 2004
17 where he presided over the largest expansion of the Border Patrol in its 88-year
18 history. He then became Deputy Commissioner of CBP in April 2010, serving as
19 Acting Commissioner of CBP in December 2011 until he retired on Feb 8, 2013.
20 Aguilar was a supervisor of the Agents and was responsible by law for enforcing
21 the United States Constitution, laws, and regulations and for ensuring that every
22 Border Patrol agent was properly trained and obeyed the laws of the United States.
23 At all relevant times as supervisor, Defendant Aguilar, at a minimum, knew of and
24 acquiesced in the unlawful Rocking Policy as defined herein and failed to conform
25 agents' use of force to the requirements of law, thereby causing the death of
26 Yañez. Plaintiffs sue Defendant Aguilar in his individual capacity.

27

28                                    6

Third Amended Complaint
13cv1417-WQH (BGS)

Ex. E - pg 7

16.    Defendant Alan Bersin served as the Commissioner of the CBP from March 2010 through December 2011, and is currently the Assistant Secretary of International Affairs and Chief Diplomatic Officer for DHS.   Defendant Bersin was a supervisor responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents were properly trained and obeyed the laws of the United States.   At all relevant times as supervisor, Defendant Bersin, at a minimum, knew of and acquiesced in the unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements of law, thereby causing the death of Yañez. Plaintiffs sue Defendant Bersin in his individual capacity.

17.    Defendant Kevin K. McAleenan has served as Acting Deputy Commissioner of CBP from March 2013 to the present.   When Defendants killed Yañez in June 2011, Defendant McAleenan was the Deputy Assistant Commissioner of CBP in the Office of Field Operations.   Defendant McAleenan is and was the commanding officer of the Agents and is and was responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents are properly trained and obey the laws of the United States.   Upon information and belief, Defendant McAleenan is personally responsible for approving, maintaining, and implementing the specific Border Patrol use-of-force policies, including the Rocking Policy, that resulted in Yañez's death. Plaintiffs sue Defendant McAleenan in his individual capacity.

18.    Defendant Michael J. Fisher has served as the Chief of the Border Patrol from May 2010 to the present.   Defendant Fisher is and was the commanding officer of the Agents and is and was responsible by law for enforcing the Constitution, laws, and regulations of the U.S. and for ensuring that Border Patrol agents are properly trained and obey the laws of the United States. At all relevant times as supervisor, Defendant Fisher, at a minimum, knew of and

7

1  acquiesced in the unlawful Rocking Policy as defined herein and failed to conform

2  agents' use of force to the requirements of law, thereby causing the death of

3  Yañez's death. Plaintiffs sue Defendant Fisher in his individual capacity.

4      19.   Defendant Paul A. Beeson has served as the Chief Patrol Agent of the

5  Border Patrol's San Diego Sector from November 2010 to the present. Defendant

6  Beeson is and was the commanding officer of the Agents and is and was

7  responsible by law for enforcing the United States Constitution, laws, and

8  regulations and for ensuring that Border Patrol agents are properly trained and

9  obey the laws of the United States. Upon information and belief, Defendant

10  Beeson was personally responsible for approving and implementing the specific

11  Border Patrol use-of-force policies, including the Rocking Policy, that resulted in

12  Yañez's death. Defendant Beeson also had direct responsibility for and oversight

13  over the training of Border Patrol agents in the San Diego Sector, including

14  Agents Nelson and Diaz (discussed below). Plaintiffs sue Defendant Beeson in

15  his individual capacity.

16      20.   Defendant Richard Barlow served as the Acting Chief Patrol Agent

17  of the Border Patrol's San Diego Sector from 2009 to November 2010. Defendant

18  Barlow was the commanding officer of the Agents and was responsible by law for

19  enforcing the United States Constitution, laws, and regulations and for ensuring

20  that Border Patrol agents are properly trained and obey the laws of the United

21  States.   Upon information and belief, Defendant Barlow was personally

22  responsible for approving and implementing the specific Border Patrol use-of-

23  force policies, including the Rocking Policy, that resulted in Yañez's death.

24  Defendant Barlow also had direct responsibility for and oversight over the training

25  of Border Patrol agents in the San Diego Sector, including Agents Nelson and

26  Diaz (discussed below).   Plaintiffs sue Defendant Barlow in his individual

27  capacity.

28                                        8

21.    Defendant Rodney S. Scott has served as the Acting Deputy Chief Patrol Agent or the Deputy Chief Patrol Agent of the Border Patrol's San Diego Sector from at least May 2010 to the present.   Defendant Scott is and was the commanding officer of the Agents and is and was responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents are properly trained and obey the laws of the United States.   Upon information and belief, Defendant Scott was personally responsible for approving and implementing the specific Border Patrol use-of-force policies, including the Rocking Policy, that resulted in Yañez's death.   Defendant Scott also had direct responsibility for and oversight over the training of Border Patrol agents in the San Diego Sector, including Agents Nelson and Diaz (discussed below).   Plaintiffs sue Defendant Scott in his individual capacity.

22.    Plaintiffs sometimes refer herein to Defendants Napolitano, Winkowski, Aguilar, Bersin, McAleenan, Fisher, Beeson, Barlow, and Scott as the "Supervisor Defendants."

## JURISDICTION AND VENUE

23.    This Complaint is for compensatory damages and other relief based on civil rights and human rights violations committed by officers and employees of the United States, all of whom were acting under color of law and within the course and scope of their employment and in violation of the Fourth and Fifth Amendments to the U.S. Constitution.   In addition, the Government Defendants' conduct violated the law of nations and applicable treaties between the United States and Mexico, and is thus actionable pursuant to the Alien Tort Statute, 28 U.S.C. § 1350.

24.    This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1350, because Plaintiffs' claims arise under the U.S. Constitution and

9

1  are authorized by *Bivens v. Six Unknown Named Agents of Federal Bureau of*
2  *Narcotics*, 403 U.S. 388 (1971), and properly invoke the law of nations and
3  applicable treaties.

4      25.   To the extent that exhaustion of administrative remedies is required
5  with respect to Plaintiffs' claims pursuant to the Alien Tort Statute, 28 U.S.C. §
6  1350, which Plaintiffs deny, Plaintiffs have exhausted the administrative remedies
7  prescribed by 28 U.S.C. § 2675 by timely presenting their claims to Defendants on
8  August 10, 2011.   As of the date of this Complaint, Defendants have neither
9  admitted nor denied Plaintiffs' administrative claims.   This Complaint is filed
10  more than six months after Plaintiffs presented their administrative claims.

11     26.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2)
12  and 1391(e)(1)(A)&(B), because this is the judicial district in which events and
13  omissions giving rise to the claims occurred and in which a defendant resides.

14

15                                **FACTS**

16

17  **II.   THE AGENTS' KILLING OF YAÑEZ**

18     27.   Border Patrol agents have asserted to various investigators the facts
19  set forth in Paragraphs 27 to 44 below.

20     28.   At dusk on June 21, 2011, Yañez and Jose Ibarra-Murietta
21  ("Murietta") crossed the border from Mexico to the United States together.   Their
22  crossing began in the Castillo neighborhood of Ciudad Tijuana.   The duo
23  squeezed through a small hole in the primary border fence that abutted the Castillo
24  neighborhood, and emerged into a dried-out concrete culvert between the primary
25  border fence (the corrugated solid metal fence closest to Mexico) and the
26  secondary border fence (the high-tech chain link fence closest to the United

27

28                                10

1   States).  The culvert runs north from the primary fence to Stuart's Bridge, which
2   abuts the secondary fence.

3       29.     Murietta led the pair and was the first to traverse the length of the
4   culvert and climb out at Stuart's Bridge.  There, he encountered Border Patrol
5   Agent Nelson.

6       30.     Agent Nelson arrived at Stuart's Bridge in response to Border Patrol
7   Agent Diaz's radio call requesting backup to apprehend Yañez and Murietta.
8   Upon seeing Agent Nelson, Murietta leapt back into the culvert and began scaling
9   a pole up the side of Stuart's Bridge.

10      31.     Agent Nelson, who had chased Murietta into the culvert, yelled to
11  Agent Diaz, who was already at the top of Stuart's Bridge, to cut off Murietta's
12  escape.

13      32.     Murietta saw Agent Diaz above him and descended back into the
14  culvert where Agent Nelson waited.

15      33.     Yañez, who had stayed in the culvert near the primary fence, escaped
16  back to Mexico through the small hole in the fence, fearing for his life.

17      34.     Back on the ground at Stuart's Bridge, Murietta evaded Agent Nelson
18  and ran south toward the primary fence where Yañez had just escaped. Agent
19  Nelson caught Murietta in the culvert close to the primary fence.

20      35.     After grappling for a short time, Murietta escaped Agent Nelson's
21  hold, climbed out of the culvert, and ran east down a dirt road that is parallel to
22  the primary fence but separated from it by a wide swath of grass.  Agent Nelson
23  gave chase, running parallel and to the south of Murietta.

24      36.     Before Agent Nelson could catch him, Murietta tripped and fell to the
25  ground.  When Murietta stood up, Agent Nelson grabbed him by the neck in an
26  attempt to subdue him.

27

28                                    11                        Third Amended Complaint
                                                                13cv1417-WQH (BGS)
    Ex. E - pg 12

37.    Murietta and Agent Nelson began grappling again in the dirt road, and Agent Nelson swept Murietta's legs and wrestled him to the ground. Agent Nelson then admittedly began to strike Murietta while pinning him to the ground.

38.    Meanwhile, Yañez had run parallel to Agent Nelson and Murietta on the southern side of the primary fence. When Murietta fell and Agent Nelson began to subdue him, Yañez, fearful that he might be the next victim of the Agents' aggression, climbed into a tree that leaned against the southern side of the primary fence near the area where Agent Nelson and Murietta were grappling in the road.

39.    At this point, witnesses' versions of the critical events differ sharply. The Agents assert that during Nelson's struggle with Murietta, Yañez threw two rocks (per Agent Nelson) or one or possibly two rocks (per Agent Diaz) at Agent Nelson.  The Agents acknowledge, however, that when Yañez was allegedly throwing the rock(s), he was wedged into the tree on the southern side of the primary fence.  The Agents admit that the rock(s) was somewhere between the size of a golf ball and a baseball. The Agents further acknowledge that the alleged rock(s) did not hit Agent Nelson or anyone else.

40.    The Agents apparently further assert that, while Agent Nelson and Murietta struggled on the ground, Yañez threw a nail-studded board that struck Agent Nelson in the head, glancing off his hat.  Agent Nelson was not injured by this alleged board.

41.    According to Agent Nelson, at about the time that Yañez allegedly threw the board, Diaz arrived to help subdue Murietta.  Agent Diaz allegedly told Yañez to get off the fence, and then began helping Agent Nelson get control of Murietta.

42.    Agent Nelson acknowledges that then, without any warning to Yañez and any further alleged throwing of a rock or a board by Yañez, Agent Nelson

12

1   pulled away from the scuffle with Murietta. Agent Diaz removed his sidearm
2   from its holster, uttered not a single additional word, and shot Yañez in the head.
3   A sufficient amount of time elapsed between Agent Diaz standing up from the
4   scuffle with Murietta and Agent Diaz shooting Yañez for Agent Nelson to
5   intervene and stop the shooting.

6        43.   Agent Nelson conspired with Agent Diaz to unlawfully beat Murietta
7   and unlawfully provoke Yañez to respond to this beating either by throwing
8   objects at Agent Nelson or threatening to record the beating with a cell phone. In
9   commission and in furtherance of that conspiracy, Agent Diaz shot Yañez, a result
10  that Agent Nelson knew, or should have known, would occur.

11       44.   Agent Nelson further unlawfully provoked Yañez to respond to the
12  Agents' beating of Murietta either by throwing objects at Agent Nelson or
13  threatening to record the beating with a cell phone. As a result of that
14  provocation, Agent Diaz shot Yañez, a result that Agent Nelson knew, or should
15  have known, would occur.

16       45.   Agent Diaz likewise acknowledges that, although Yañez had
17  allegedly raised his hand as if to begin a throwing motion, Agent Diaz did not see
18  any rock or anything else in Yañez's hand, which Agent Diaz acknowledges was
19  closed into a fist. Agent Diaz then shot Yañez in the head. Yañez fell out of the
20  tree, dead or dying, on the southern side of the primary fence. Neither Agent
21  Nelson nor Agent Diaz attempted to render any assistance to Yañez.

22       46.   Agent Nelson continued to subdue Murietta, which he was able to do
23  alone, without additional help from Agent Diaz. Two to three minutes later,
24  additional Border Patrol agents arrived and took control of Murietta. Those
25  agents also failed to attempt to render any assistance to Yañez.

26       47.   The only injuries sustained by Agent Nelson were a swollen elbow
27  and a small cut on his hand, neither of which he received from any rock or board

28                                    13

allegedly thrown by Yañez, as well as stinging in his eyes from dirt that he says Murietta threw. Agent Nelson had no visible marks or bleeding from the alleged board. Upon information and belief, Agent Nelson received no medical treatment for a blow to his head from a board or rock.

48.     In the aftermath of Yañez's death, Border Patrol representatives gave false information to the press and the public in order to try to justify the killing. For example, a Border Patrol spokesperson told Fox News Latino that "two men assaulted U.S. agents with a concrete slab." The Agents' statements to investigators include no mention of a concrete slab. Another Border Patrol representative falsely told a San Diego newspaper that the Agents were confronting three men, not two, and misleadingly failed to advise the newspaper that at the time of the killing one of the two men was face down in the dirt road with an agent on top of him, and the other was in a tree on the other side of the primary fence where he was a threat to no one.

49.     Murietta's account of the events that evening differs markedly from those of the Agents with respect to the specific circumstances surrounding Agent Diaz's shooting of Yañez.

50.     Murietta asserts that Yañez never threw anything at Nelson or anyone else. Indeed, the shape and height of the tree, the height of the primary fence, and the distance of the tree and the fence from Agent Nelson made it impossible for Yañez (or any person) to throw rocks or wood at the agents with lethal force or accuracy.

51.     Instead, both Agent Nelson and Agent Diaz had Murietta down on the ground and were beating him. Agents Nelson and Diaz easily outweighed and outmuscled the slight-framed Murietta, who was facedown in the dirt road. In fact, when Murietta was eventually taken away by a cadre of Border Patrol agents, he was disoriented and his mouth was covered with his own blood.

14

52.     While Agents Nelson and Diaz had Murietta on the ground and were beating him, Yañez climbed into the tree on the south side of the primary fence, fearing that he would be next, and tried to dissuade Agents Nelson and Diaz from continuing the beating.

53.     In an apparent effort to stop the attack, Yañez felt compelled to yell that he was going to use his cellphone to take video and pictures of the beating. Upon hearing Yañez's response to the Agents' attack on Murietta, Agent Diaz stopped beating Murietta, stood up, and, without warning to Yañez or without any kind of provocation from Yañez that would justify Agent Diaz's use of deadly force, shot Yañez in the head.

54.     Whichever of these two versions of the shooting the jury believes, the Agents unlawfully used excessive, lethal force against Yañez.

55.     If the jury believes Murietta, then Agents Diaz and Nelson murdered Yañez in an effort to keep him from recording the Agents' beating of Murietta

56.     If Murietta's version of the facts is correct, then: (1) Agent Nelson and Agent Diaz unlawfully conspired to and did actually beat Murietta; (2) by collectively beating Murietta, Agent Nelson and Agent Diaz provoked the violent confrontation between Agent Diaz and Yañez, Yañez's response of threatening to record the Agents' beating of Murietta, and ultimately the fatal shot to Yañez; and (3) Agent Nelson and Agent Diaz unlawfully conspired to cover-up Agent Diaz's murder of Yañez and the Agents' provocation of Yañez by falsifying facts to "justify" the murder.

57.     If the jury believes the Agents, the killing still resulted from their unlawful use of excessive, lethal force.

58.     If the Agents' version of the facts is correct, then (1) Agent Nelson and Agent Diaz conspired to and did actually beat Murietta; and (2) by collectively beating Murietta, Agent Nelson and Agent Diaz provoked the violent

15

Third Amended Complaint
13cv1417-WQH (BGS)

1   confrontation between Agent Diaz and Yañez, Yañez's response to the Agents'

2   beating of Murietta of allegedly throwing rocks or boards, and ultimately the fatal

3   shot to Yañez.

4        59.    Under the Agents' version of events, neither Agent Nelson nor Agent

5   Diaz ever gave Yañez any verbal command to stop throwing rocks or boards.

6   According to Agent Nelson's version, he never gave Yañez any command at all,

7   and all Agent Diaz told Yañez was to get down from the tree.  According to Agent

8   Nelson's own version of events, Agent Diaz's first and only show of force or

9   authority to Yañez was lethal force.

10       60.    Nor did Yañez's conduct, under the Agents' version of the events,

11  create a risk of death or serious injury to Nelson or anyone else.  The Agents

12  acknowledge that Yañez threw only one or two rocks; the rock(s) was as small as

13  a golf ball and no larger than a baseball; the rock(s) did not hit Agent Nelson; the

14  allegedly thrown board glanced off Agent Nelson's head without causing him any

15  injury; Yañez presented no imminent threat of throwing another board; and Agent

16  Diaz did not see a rock or anything else in Yañez's closed fist when Diaz drew his

17  weapon and shot Yañez.

18       61.    Even if Yañez's conduct had somehow caused the Agents to fear for

19  their lives, they had several alternatives to the use of lethal force.  Yañez was on

20  the other side of the primary fence.  If, as the Agents contend, Yañez had thrown a

21  rock(s) or a board at Nelson and they feared that he would throw another rock, the

22  agents could have simply dragged Murietta (who is of slight build) further away

23  from Yañez.  Other, non-lethal alternatives were also available.  Even if these

24  alternatives were not feasible, the Agents could and should have simply let

25  Murietta go – he posed no imminent risk of death or serious injury to the Agents

26  or anyone else, and apprehending him was simply not worth the cost of a human

27  life.

28                                          16

62.    Further, in either version of events, both Agent Diaz and Agent Nelson are liable for Yañez's constitutional deprivations.  In one version of the events, Yañez threw a rock and a board at Agent Nelson to try to get him to stop the beating, and Agent Diaz shot Yañez to stop him from stopping the beating.  In another version, Yañez did not throw any board or rock, and Agent Diaz shot Yañez to prevent him from videotaping the beating.  In either version, Agent Nelson precipitated the events by beating Murietta.   And even in the rock-throwing version Agent Nelson did not simply drag Murietta further away from the border fence, as he easily could have done.  As the instigator of the beating, Agent Nelson plainly shares responsibility for Agent Diaz's shooting, the purpose of which was to allow the beating to continue and/or to keep it from being recorded.

## III.  THE ROCKING POLICY

63.    The Agents' use of excessive, lethal force against Yañez did not spring from their spontaneous acts.  Instead, they were acting pursuant to, and implementing, a Rocking Policy that has the imprimatur of the highest-ranking DHS and CBP officials.

64.    Pursuant to this unlawful Rocking Policy, Border Patrol agents along the southern border regularly use excessive, lethal force against persons of perceived Hispanic descent and Mexican nationality.  At all relevant times, all of the Government Defendants and Supervisor Defendants knew, or reasonably should have known, that Border Patrol agents along the southern border:

a.    had a regular pattern and practice deeming others' throwing of rocks at them to be per se lethal force that justified the agents' shooting to kill the alleged rock-throwers;

17

b.   had a pattern and practice of using excessive, lethal force along the United States border by shooting at people suspected of throwing rocks despite those agents having the ability to take cover, move out of range, or employ less lethal weapons or alternatives;

c.   understood that their supervisors had, at a minimum, tacitly approved Border Patrol agents' shootings along the border so long as the agents claimed a rock was thrown;

d.   had a pattern and practice of taking advantage of the existence of the Rocking Policy to justify the unlawful use of excessive force by falsely asserting that they were in mortal danger from rocks being thrown at them.

65.   Pursuant to this unlawful Rocking Policy, Border Patrol agents along the southern border regularly used excessive, lethal force against persons of perceived Hispanic descent and Mexican nationality.

## IV.  SUPERVISOR DEFENDANTS' KNOWLEDGE OF AND APPROVAL OF THE ROCKING POLICY

66.   Firing live bullets in response to thrown rocks is, absent highly unusual circumstances not present here, grossly excessive force.  The National Law Enforcement Officers Memorial Fund has gathered records on all police officers killed in the line of duty since the first U.S. patrolman was killed in 1792. In those 200+ years, exactly one police officer (in 1942) was killed by a thrown rock.  Most police departments teach their cadets that a rock is not deadly beyond 50 feet.  Unless they are performing a particularly important mission, like aiding a wounded colleague, officers facing thrown rocks should simply retreat beyond that perimeter.

67.   Despite actual knowledge of the patently unlawful Rocking Policy, the Supervisor Defendants failed and refused to repudiate it publicly or through the chain of command; failed and refused to issue, publicly or through the chain of

18

1   command, a lawful policy regarding the use of force in response to alleged rock-
2   throwing; failed and refused to provide adequate training to agents regarding
3   lawful responses to alleged throwing of rocks; and failed and refused to
4   appropriately discipline agents who act unlawfully pursuant to the Rocking
5   Policy.

6       68.   The Supervisor Defendants were at all relevant times personally
7   responsible for developing, authorizing, supervising, and/or implementing the
8   policies, patterns, or practices governing the Border Patrol agents' use of lethal
9   force. Each Supervisor Defendant in fact knew of, approved, and implemented
10  the unlawful Rocking Policy. That knowledge and approval is demonstrated by a
11  host of evidence, including (1) the Supervisor Defendants' knowledge of and
12  acquiescence in a whole series of unlawful Border Patrol killings; (2) the
13  Supervisor Defendants' knowledge of and acquiescence in public statements by
14  Border Patrol agents' representatives that throwing rocks is per se lethal force
15  justifying an agent's shooting to kill; (3) the Supervisor Defendants' knowledge of
16  and acquiescence in the U.S. Department of Justice's conclusion that an agent's
17  shooting of an unarmed and unthreatening teenager was consistent with Border
18  Patrol policy and training; (4) the Supervisor Defendants' consistent rejection of
19  repeated entreaties from numerous national and international human rights
20  organizations deploring the Rocking Policy and requesting remedial action; (5) the
21  findings of a Police Executive Research Forum ("PERF") report, which
22  Defendants themselves had commissioned, which concluded that the Rocking
23  Policy was unlawful and should be eliminated; and (6) admissions by a high-
24  ranking CBP internal affairs official that Defendants knew of and condoned
25  Border Patrol agents' unlawful use of excessive force.

26      69.   Despite each Supervisor Defendant's actual knowledge, none of them
27  objected to or demanded a stop to the systematic use of unlawful lethal force

28                         19

Third Amended Complaint
13cv1417-WQH (BGS)

along the southern border. Because of the lack of objection, intervention, or clarification by any Supervisor Defendant, Border Patrol agents along the southern border considered the Rocking Policy to be approved all the way up the chain of command. When Defendants Nelson and Diaz killed Yañez on that night of June 21, 2011, they did so knowing that the Supervisor Defendants had for years known of, acquiesced in, and condoned other similar killings.

### A. Supervisor Defendants' Knowledge of and Acquiescence in Numerous Prior Border Patrol Killings Under the Rocking Policy.

70.     The CBP at all relevant times had a protocol that required the filing of a Significant Incident Report after every encounter in which a Border Patrol agent applied use of force. Once completed, every such Report was emailed to every supervisor at every level of the agency on a daily basis. At minimum, each Supervisor Defendant knew of the facts underlying each incident described herein through receipt of that email. Defendant Napolitano knew of each of these incidents because they resulted in the death of the victim. When questioned about her knowledge and reaction to previous deaths of Mexican nationals caused by border patrol agents, Defendant Napolitano stated at a congressional hearing: "With respect to use of force, an appropriate use of force, we examine each and every case in which there is a death, to evaluate what happened, and whether or not the agent or agents involved should be subject to some sort of disciplinary measure." *Hearings Before a Subcommittee of the Committee On Appropriations House of Representatives*, 133-82380, at pg 76 (April 11, 2013) (statement of Secretary Napolitano).

71.     Prior to Yañez's death in June 2011, Supervisor Defendants were aware of the following killings by Border Agents acting pursuant to the Rocking Policy:

Third Amended Complaint
13cv1417-WQH (BGS)

Ex. E - pg 21

a.   In 2003, Border Patrol agents killed Ricardo Olivares Martinez by shooting him five times as he attempted to flee. Agents alleged he was throwing rocks.

b.   In 2005, Border Patrol agents in San Diego shot and killed Guillermo Martinez Rodriguez as he attempted to flee back into Mexico. The agents alleged he was simultaneously throwing rocks and running away.

c.   In 2006, Border Patrol agents near the Andrade Port of Entry in California were apprehending a suspect who was swimming across the Colorado River when, they contend, a group of Mexican nationals began throwing rocks from the bank on the Mexican side of the river. The agents opened fire into the group, killing one man.

d.   In 2007, a Border Patrol agent shot and killed José Alejandro Ortiz-Castillo as he was attempting to illegally enter the United States. The agent claimed that Ortiz-Castillo provoked the shooting by threatening an agent with a rock.

e.   In 2007, a Border Patrol agent shot and killed Francisco Dominguez, falsely claiming that Dominguez was about to hit him in the head with a rock.

f.   In 2007, a Border Patrol agent in Calexico, California shot an unidentified Mexican who was in a raft in the All-American Canal. The agent claimed that the man, who had turned the raft back towards Mexico when he saw the agent, was attempting to throw a rock.

g.   In 2008, Border Patrol agents in San Diego shot and killed Edgar Israel Ortega Chavez while he was across the border in Mexico. Agents alleged he was throwing rocks.

h.   In 2010, a Border Patrol agent shot and killed 15-year-old Sergio Hernandez, whom a U.S. Department of Justice investigation later confirmed was unarmed and had not thrown any rocks at the agent.

i.   In 2011, a Border Patrol agent shot and killed 17-year-old Ramses Barron Torres. Even though Torres was climbing the

21

Third Amended Complaint
13cv1417-WQH (BGS)

1
2
border fence at the time he was shot, agents alleged he was simultaneously throwing rocks.

3
4
5
j.    In 2011, a Border Patrol agent shot and killed Carlos La Madrid. Even though La Madrid was climbing the border fence at the time he was shot, Border Patrol agents alleged he was simultaneously throwing rocks.

6
7
8
72.    After Yañez's death, Border Agents continued to shoot to kill pursuant to the Rocking Policy, all with Supervisor Defendants' knowledge and acquiescence. For example:

9
10
11
12
a.    In July 2012, Border Patrol agents shot and killed Juan Pablo Santillan. At the time of the shooting Santillan was at the bank of the Rio Grande, but agents claimed that others were throwing rocks, prompting them to shoot and kill Santillan across the river and in Mexico.

13
14
15
16
17
18
19
20
b.    In August 2012, a Border Patrol agent shot and killed Guillermo Arevalo Pedraza, who was picnicking in a riverside park with family members on the Mexican side of the Rio Grande near Laredo, Texas. Border Patrol agents in a motorboat began aggressively circling a man who was attempting to swim across the river, and people in the park began to shout that the man was drowning. The agents opened fire on the crowd in the park, and later asserted that they had been "subjected to rock throwing from the Mexican side." Cellphone video of the incident shows no rocks being thrown by the victim or anyone else.

21
22
23
24
25
26
27
c.    In October 2012, near Nogales, Arizona, two alleged smugglers were attempting to climb the fence back into Mexico, while Border Patrol agents ordered them down. The agents assert that someone on the Mexico side of the fence began throwing rocks over the fence at them. A Border Patrol agent went to the fence and indiscriminately opened fire into a nearby street in Mexico, fatally shooting Jose Antonio Elena Rodriguez seven times. Rodriguez, a 16-year-old boy who was merely walking by in the street, was an entirely innocent bystander.

28

22

73.    Each of these killings was well known among the Supervisor Defendants. Each Supervisor Defendant knew that these killings, individually and collectively, reflected a pattern and practice of Border Patrol agents treating the throwing of rocks at them as per se lethal force to which CBP and DHS policy allowed them to respond with deadly force. The Supervisor Defendants' failure and refusal to discipline the agents who fired the fatal shots in these incidents, and/or to promulgate a lawful policy regarding appropriate responses to rock-throwers, reinforced Border Patrol agents' belief that the Rocking Policy was appropriate and lawful.

74.    In response to the unlawful pattern and practice, the Government of Mexico sought to voice its concern about the Rocking Policy to those responsible for its implementation and continuance.

75.    After the death of Sergio Hernandez, the Ambassador of Mexico wrote to specifically to Defendant Napolitano, with copies to Defendants Aguilar, and Fisher, stating that Mexico "reiterates" its concerns about the Rocking Policy. The letter states that "the Government of Mexico is convinced that the use of lethal force by any authority to counter the throwing of rocks is clearly, by any standard, a disproportionate use of force."   It nevertheless stated that it has "witnessed a worrisome and increased trend" of such incidents resulting in the death of its citizens and a "large majority of the investigations have not led to prosecution nor have adequate disciplinary measures nor have adequate disciplinary measures been adopted despite the seriousness of these tragic outcomes." The letter is attached hereto as Exhibit A.

76.    In response to the death of Perez Santillan, the Government of Mexico again wrote specifically to Defendant Napolitano, with a copy to Defendant Aguilar, to "urge you once again to adopt all measures necessary to prevent the recurrent loss of lives" and to "reiterate[] its unwavering and emphatic

23

1   appeal to the United States to abide by bilateral and international human rights

2   standards." It stated that "investigations of cases similar to this one have not led

3   to prosecution nor have adequate disciplinary measures been adopted despite the

4   seriousness of these tragic outcomes." The letter is attached hereto as Exhibit B.

5        77.   In response to the death of Guillermo Arevalo Pedraza the

6   Government of Mexico wrote yet again to Defendants Napolitano and Aguilar,

7   stating that it "continues to observe what has become an alarming trend of

8   incidents in which the excessive use of force by Border Patrol (BP) and Customs

9   and Border Protection (CBP) agents has resulted in the death of Mexican nationals

10  at the border." The letter continued: "The Government of Mexico has repeatedly

11  recognized that there have been various incidents in which Border Patrol agents

12  have been injured by stone-throwing from our side of the border and that Mexico

13  has a responsibility in seeking to deter the use of violence against U.S. Federal

14  agents from Mexican soil." The Government of Mexico further noted that

15  Defendant Aguilar had responded "to a letter regarding a similar case" and simply

16  "refer[ed] to the 'Department of Homeland Security Policy on the Use of Deadly

17  Force' and CBP's 'Use of Force Policy Handbook' that are used for training and

18  operational purposes." But the Government of Mexico stated that those policies

19  were the problem, not the answer: "the lack of prosecution or adequate

20  disciplinary measures in similar cases with these tragic outcomes creates – albeit

21  unwillingly – a tacit message of permissiveness and lack of accountability for

22  those who engage in the use of excessive force. This pattern and every single

23  incident of disproportionate use of force are unacceptable." The letter is attached

24  hereto as Exhibit C.

25        78.   And yet again, in response to the death of Ramses Barron Torres, the

26  Government of Mexico wrote specifically to Napolitano, with copies to

27  Defendants Fisher and Winkowski, reiterating the same message it has been

28                                    24
                                                        Third Amended Complaint
                                                        13cv1417-WQH (BGS)
Ex. E - pg 25

1  making and demanding that "prosecutorial and judicial measures should be

2  enforced to deter the disproportionate use of force." The letter is attached hereto

3  as Exhibit D.

4    79.    Between January 2010 to October 2012 alone, border patrol agents

5  responded to an alleged thrown rock with deadly force at least 29 times. Not a

6  single one of those agents was ever disciplined by the Supervisor Defendants; nor

7  was there ever an attempt by Defendants Napolitano, Bersin, Fisher, Aguilar, or

8  any other Supervisor Defendants to respond to the concerns of the Government of

9  Mexico by bringing the unlawful Rocking Policy into compliance with the law.

10   **B. Supervisor Defendants' Knowledge of and Acquiescence in**
11   **Numerous Public Statements that the Rocking Policy Was**
12   **Appropriate.**

13    80.    Representatives of Border Patrol agents had regularly and publicly

14  stated that agents were justified in treating the throwing of rocks at them as per se

15  lethal force, regardless of whether the alleged rock-throwing posed an imminent

16  risk of death or serious injury to the agents or anyone else, and regardless of

17  whether the agents had available other, non-lethal alternatives. Upon information

18  and belief, agents reiterated this same understanding of their justifiable use of

19  lethal force to their superiors through the chain of command.

20    81.    For example, after border agents killed Guillermo Martinez

21  Rodriguez in 2005, claiming he was throwing rocks while simultaneously running

22  away, an official spokesperson for the Border Patrol publicly justified the

23  shooting, stating: "If I was put in the same shoes of this agent, that's exactly what

24  we'd have to do." *Shooting condemned by Mexico*, San Diego Union-Tribune,

25  Jan. 3, 2006.

26    82.    On June 10, 2010, Lou Patch, another official spokesperson for the

27  Border Patrol, was shown on primetime national television as making the

28                                    25

following statement: "All along our river area, we've got rock throwing incidents. Unfortunately, when they escalate to using force or deadly force *in this case rocks or bricks, or things of that nature*, things change and the game is changed then from cat and mouse to *life and death*." (emphasis added).

83.    And just the day before Lou Patch's official statement from Border Patrol, the National Border Patrol Council of the American Federation of Government Employees ("NBPC") issued a nationwide press release that succinctly stated the Rocking Policy.  The NBPC represents more than 17,000 Border Patrol agents and support staff.

84.    The heading of the NBPC press release stated bluntly, "Rock Assaults are Deadly Force."  The statement continued, "Since biblical times rocks have been used as a crude but effective weapon to injure and kill humans."  The statement made unmistakably clear that the Rocking Policy treats rock-throwing as per se lethal force to which agents are justified in responding with lethal force: "Rocks are weapons and constitute deadly force.  If an agent is confronted with deadly force they will respond in kind."

85.    During that same month, T.J. Bonner, president of the NBPC, reiterated the Rocking Policy to the Associated Press in response to a Border Patrol agent's fatal shooting of a Mexican teenager who was standing unarmed and unthreatening across the border near El Paso, Texas.   Three separate videotapes of the incident conclusively show that the murdered teenager had not thrown any rock or anything else at the agent.  The videotapes further appear to show that only one person, who was nowhere near the murdered teenager, had thrown a rock at the agent.  And they conclusively show that the agent's first show of any force was the use of lethal force; that if the agent somehow felt threatened, he could easily have retreated further away from the border area; and that if he still somehow felt threatened he could simply have released the person he was

26

Third Amended Complaint
13cv1417-WQH (BGS)

1    detaining near the border.  Despite these facts, Mr. Bonner stated on behalf of

2    17,000 Border Patrol agents whom he represents that the agent was justified in

3    killing the teenager: "It is a deadly force encounter.  One that justifies the use of

4    deadly force."

5        86.    In a further statement to the NBC Nightly News, Bonner crystalized

6    the per se nature of the Rocking Policy, i.e., that it purports to justify agents' use

7    of deadly force in response to alleged rock-throwing, regardless of whether it

8    poses an imminent risk of death or serious injury to the agents or anyone else, and

9    regardless of whether other, non-lethal means are available to avert any such risk.

10   Mr. Bonner stated that "[w]hen you pick up a rock and throw it at a police officer

11   you should expect to have deadly force directed back toward you."

12       87.    Other representatives of the agents have continually reiterated the

13   same per se Rocking Policy.  For example, the Vice-President of the NBPC,

14   Shawn Moran, told the Christian Science Monitor in April 2011, "When rocks are

15   thrown at us, that is considered deadly force."

16       88.    On a different occasion, in response to an agent's killing of another

17   Mexican teenager who was also an innocent bystander to someone else's alleged

18   rock-throwing, a Border Patrol spokesperson asserted flatly that "rocks are

19   considered deadly weapons."

20       89.    Each Supervisor Defendant had actual knowledge of these repeated

21   public statements by Border Patrol spokespersons and union representatives.

22   Despite this knowledge, none of the Supervisor Defendants countermanded any of

23   the statements either publicly or through the chain of command.  The Supervisor

24   Defendants' failure and refusal to countermand these public statements of the

25   Rocking Policy reinforced Border Patrol agents' belief that the Rocking Policy

26   was appropriate and lawful.

27

28                                           27                  Third Amended Complaint
                                                                13cv1417-WQH (BGS)
     Ex. E - pg 28

### C. Supervisor Defendants' Failure and Refusal to Change the Rocking Policy After the Death of an Unarmed, Unthreatening Teenager.

90.     In June 2010 a Border Patrol agent at the border near El Paso, Texas shot across the border and killed 15-year-old Sergio Hernandez.   The agent asserted to FBI investigators that he was "surrounded" by rock-throwers and that the victim was throwing a rock when the agent shot him.   Fortunately, a passerby caught the incident on a cellphone video, and two other videotapes – one taken by the Border Patrol itself, and another by a nearby landowner – also later surfaced. Those videos conclusively show that the agent was not surrounded; the agent was not under attack from rocks or anything else; the victim had not thrown and was not throwing any rocks; and the agent had many non-lethal alternatives available to him if he somehow felt threatened, including simply backing up further away from the border.

91.     After the shooting of Sergio Hernandez, the Interior Secretary of Mexico, Fernando Gómez Mont, personally called Defendant Napolitano, protesting the killing of Hernandez as well as the killing of another Mexican man on the California-Mexico border two weeks before the Hernandez killing.  Gómez Mont demanded from Defendant Napolitano that the U.S. and Mexico carry out a joint review of protocols on the use of force by US Border Patrol, stating the "unjustified use of force against our population is unacceptable to the Government of Mexico."

92.     Some Mexican politicians even demanded that the United States detain and extradite the shooter to Mexico to stand trial.

93.     Mexican President Felipe Calderon said he and his government are "worried" about what he called "this surge of violence against Mexicans" along the border.

Third Amended Complaint
13cv1417-WQH (BGS)

1    94.    In response to the public uproar, Defendant Bersin traveled to El

2    Paso after the shooting and stated to the media that an investigation into

3    Hernandez's shooting would be "transparent and fair." "We cannot and should

4    not jump to conclusions," Bersin said.

5    95.    Several rank-and-file Border Patrol agents told The Washington

6    Times that they were waiting to see what support the agent involved in the El Paso

7    shooting will get from the agency's leadership.

8    96.    The U.S. Department of Justice conducted an investigation of the

9    incident and concluded that Sergio Hernandez had not thrown any rock at the

10   agent.   But the DOJ nevertheless refused to pursue criminal charges against the

11   agent because his conduct conformed to CBP policy.

12   97.    The three videos show that Hernandez had not thrown any rock, that

13   the agent's first show of any force was the use of lethal force, that if the agent

14   somehow felt threatened he could easily have retreated further away from the

15   border area, and that if he still somehow felt threatened he could simply have let

16   the detainee go.   The DOJ concluded that the Border Patrol's Rocking Policy

17   permitted the use of lethal force in these circumstances: "the agent did not act

18   inconsistently with [Border Patrol] policy or training regarding use of force."

19   Press Release, Federal Officials Close Investigation into the Death of Sergio

20   Hernandez-Guereca, Department of Justice, (April 27, 2012).

21   98.    The Supervisor Defendants were keenly aware that CBP policy

22   permitted the agent to shoot to kill Sergio Hernandez even though he was not

23   throwing and had not thrown any rock; even though neither the agent nor anyone

24   else was in imminent danger of death or serious bodily injury (except from the

25   danger that the agent posed); and even though the agent had readily available

26   alternatives to the use of deadly force.   And they had no intention of changing the

27   policy.

28

29

99.    In September 2010, human rights organizations across the country met with CBP and DHS officials in Washington, D.C. to discuss CBP's training guidelines and criteria for use of force.  When specifically confronted about the case of Sergio Hernandez, Defendant Bersin stated how Hernandez's death "was not an accident."  Defendant Bersin claimed Hernandez's shooting was justified because someone else allegedly threw a rock at the agent.  Bersin reached that conclusion, and made those statements, despite knowing that the agent could easily have backed up away from the alleged rock-thrower or used less-than-lethal force.

100.    Defendants Bersin, Aguilar, Napolitano failed and refused to modify or abandon the Rocking Policy in the face of now several patently unlawful killings.

101.    Instead, Defendant Bersin personally signed and issued CBP's amended use of force policy in October 2010 with no attempt to address what he and the other Supervisor Defendants knew or reasonably should have known was a pattern and practice of border agents unjustifiably using deadly force in response to alleged rock throwers.  Defendant Napolitano, as Secretary of DHS, personally approved CBP's patently unlawful October 2010 use of force policy handbook despite having knowledge of the facts surrounding previous killings, and having been specifically told by Mexican officials, human rights organizations, and others of such unlawful practices by border agents.

102.    Neither Napolitano, Aguilar, Bersin, Fisher nor any Supervisor Defendant ever publicly reprimanded or disciplined any agent for shooting at a Mexican so long as the Agent alleged a rock was thrown.  Accordingly, Border Patrol agents knew that the existing use of force policy would allow them to continue to use lethal force in such situations.

30

**D. Supervisor Defendants' Failure and Refusal to Change the Rocking Policy Despite Repeated Pleas from National and International Human Rights Organizations.**

103. Before and after the killing of Yañez, national and international organizations had condemned the Border Patrol's routine use of excessive, lethal force along the southern border. For example:

   a. In 2006, the Border Network for Human Rights reported to the United Nations that Border Patrol agents' killing of alleged rock-throwers constitutes "the use of excessive force by authorities which has arbitrarily taken the life of immigrants" in violation of binding international norms. U.S./Mexico Border Report to the United Nations Human Rights Committee Regarding the United States' Compliance with the International Covenant on Civil and Political Rights, *Behind Every Abuse Is a Community* (June 2006), at 9, http://www.bnhr.org/wp-content/uploads/2010/01/BNHR-UN-Report3.pdf.

   b. In 2008, the executive director of the American Civil Liberties Union of San Diego wrote to members of Congress about Border Patrol's acquiescence in agents' shooting of rock throwers, stating: "Simply put, it is not acceptable to use lethal force when confronted with rock throwers in … border protection situations." *See* https://www.aclusandiego.org/wp-content/uploads/article/Kennedy%20%20Lofgren%20letter%2008-15-08.pdf; *see also* ACLU, *U.S. Border Patrol Should Stop Using Lethal Force Against Rock Throwers* (Aug. 2008), https://www.aclusandiego.org/u-s-border-patrol-should-stop-using-lethal-force-against-rock-throwers-say-human-rights-groups-call-for-congressional-investigations-into-disproportionate-use-of-force-incidents-2/.

   c. That same year, the U.N. Committee on the Elimination of Racial Discrimination expressed concerns "about allegations of brutality and use of excessive or deadly force by law enforcement officials against persons belonging to racial, ethnic or national minorities, in particular Latino and African American persons and undocumented migrants crossing the

31

1
2
3
4
5
6
7
8

U.S.-Mexico border." U.N. Committee on the Elimination of Racial Discrimination, *Consideration of Reports Submitted by States Parties Under Article 9 of the Convention: Concluding observations of the Committee on the Elimination of Racial Discrimination: United States of America*, U.N. Doc. CERD/C/USA/CO/6 (May 2008). The Committee recommended that the U.S. increase "significantly its efforts to eliminate police brutality and excessive use of force" against such persons "by establishing adequate systems for monitoring police abuses and developing further training opportunities for law enforcement officials." *Id.*

9
10
11
12
13
14
15
16
17
18
19
20
21
22

d.   In response to the killing of Sergio Hernandez near El Paso, Texas in 2010 (referred to above), the United Nation's Office of the High Commissioner for Human Rights noted that the Commissioner "had indeed received further allegations of excessive use of force by US Border Patrol agents while enforcing immigration laws" and that "OHCHR also urged the United States authorities to ensure that all the actions of the US Border Patrol were fully ascribed to the international standards applicable to officials responsible for enforcing the law." Highlights of Regular Briefing by the Information Service (May 29, 2012), http://www.unog.ch/unog/ website/news_media.nsf/(httpNewsByYear_en)/768DA52D9D 3C583FC1257A0D004C8F42?OpenDocument. The High Commissioner later reiterated that "[t]here have been very many young people, teenagers, who have been killed at the border," and that "[t]he reports reaching me are that there has been excessive use of force by the U.S. border patrols while they are enforcing the immigration laws." Stephanie Nebehay, *U.S. uses excessive force along Mexican border: U.N.*, (Oct. 18, 2012), www.reuters.com/article/2012/10/18/us-mexico-us-un-rights-idUSBRE89H13F20121018.

23
24
25
26
27

e.   In June 2010, Mexico's Foreign Relations Department said specifically to Defendant Napolitano that it "energetically condemn[ed]" the Border Patrol's killing of Sergio Hernandez, noting particularly that "according to international standards, lethal force must be used only when the lives of people are in immediate danger and not as a dissuasive measure." Laura

28

32

Third Amended Complaint
13cv1417-WQH (BGS)

1
2

Carlsen, *Lethal Force on the Border*, Huffington Post, June 18, 2010.

3
4
5
6
7
8
9
10
11

f.  That same month, Amnesty International issued a statement concluding that "[t]his shooting across the border appears to have been a grossly disproportionate response and flies in the face of international standards that compel police to use firearms only as a last resort, in response to an immediate, deadly threat that cannot be contained through lesser means." *Mexican teenager shot dead by US border police* (June 10, 2013), http://www.amnesty.org/en/news-and-updates/mexican-teenager-shot-dead-us-border-police-2010-06-09;   see   also Amnesty International Annual Report 2011 – United States of America (May 13, 2011) (listing the killing of Sergio Hernandez under civil rights abuse of "excessive use of force").

12
13
14
15
16
17
18
19
20

g.  In June 2010, Jose Miguel Vivanco, the Americas Director at Human Rights Watch warned that "[t]he increasing number of border patrol killings make it clear that an open and thorough US investigation is needed" and that "[a]ny border agents found responsible for using excessive force should be held accountable." See *Deaths of Unarmed Migrants Show Need for Prompt, Thorough Inquiry*, HUMAN RIGHTS WATCH (June 11, 2010), http://www.hrw.org/news/ 2010/06/11/usmexico-investigate-border-killings.   Mr. Vivanco specifically noted that use of excessive, lethal force against alleged rock-throwers violates the United Nations' Basic Principles on the Use of Force and Firearms by Law Enforcement Officials. *Id.*

21
22
23
24
25
26

h.  In December 2010, the Inter-American Commission on Human Rights noted in its report on United States immigration detention "the terrible effects of certain immigration policies along the border and ... the abuses and excesses committed by officers charged with enforcing the law."   Inter-American Commission on Human Rights, Report on Immigration in the United States: Detention and Due Process, OEA/Ser.L/V/II, Doc.     78/10     (December     30,     2010), http://cidh.org/countryrep/USImmigration/TOC.htm.

27
28

33

i.     In June 2011, 60 human rights organizations (including the American Civil Liberties Union of California, the American Friends Service Committee, and Amnesty International USA) yet again reiterated: "To shoot stone throwers is exceptionally disproportionate and inhumane." Letter from American Civil Liberties Union of California, et al., to U.S. Senator Patrick Leahy and U.S. Representative Lamar Smith (June 2011).

j.     In May 2012, 16 members of Congress wrote specifically to Defendant Napolitano and requested an analysis of CBP's use of force policies by the DHS in light of its national and international infamy.

104.   Despite actual knowledge of the Rocking Policy and its open and notorious conflict with fundamental human rights guarantees, each of the Supervisor Defendants failed and refused to modify the Rocking Policy in order to conform it to the requirements of law.

105.   In response to the death of Yañez, the ACLU in San Diego as well as advocacy groups in the four states on the southwestern border, wrote to Defendant Napolitano urging her to tell agents it is "not acceptable" to shoot at rock throwers. But she, along with each of the Supervisor Defendants, did nothing.

**E. PERF's Conclusion that CBP had an Unlawful "Policy and Practice" of Permitting Unjustifiable Deadly Force.**

106.   In 2012, DHS and CBP commissioned the Police Executive Research Forum ("PERF"), a highly respected non-profit organization that advises law enforcement agencies on best practices, to review the then-extant use of lethal force policies for border patrol agents and to review the deadly force incidents from January 2010 through October 2012. The PERF Report confirms that the Supervisor Defendants had permitted a policy and practice within the CBP of allowing Border Patrol agents to unjustifiably use deadly force in response to alleged rock-throwing.

34

1    107.   The report that PERF submitted to DHS and CBP identified two

2    "policy and practice areas" that "need significant change."   One of those two

3    policies and practices was "using deadly force against subjects throwing objects

4    not capable of causing serious physical injury or death to them."   *See*

5    http://www.cbp.gov/sites/default/files/documents/PERFReport.pdf, at p. 2.

6    108.   Of the 67 case files provided to PERF to examine, 29 involved border

7    patrol agents use of deadly force against alleged rock throwers.   An objective

8    review of the facts reported in those 29 case files shows that "[t]oo many cases do

9    not appear to meet the test of objective reasonableness with regard to the use of

10   deadly force." Report at p. 6.

11   109.   The PERF Report specifically concluded and recommended, among

12   other things:

13     a.   "Review of shooting cases involving rock throwers revealed
14       that in some cases agents put themselves in harm's way by
         remaining in close proximity to the rock throwers when
15       moving out of range was a reasonable option." Report at p. 6.

16     b.   "The state[d] CBP policy should be: "Officers/agents are
17       prohibited from using deadly force against subjects throwing
         objects not capable of causing serious physical injury or death
18       to them." *Id.* at 7 (emphasis in original).

19     c.   "While rock throwing can result in injuries or death, there
20       must be clear justification to warrant the use of deadly force.
         CBP needs to train agents to de-escalate these encounters by
21       taking cover, moving out of range and/or using less lethal
22       weapons." *Id.* at 9 (emphasis in original).

23     d.   "Deadly force shall not be used to effect an arrest or prevent
24       the escape of a person unless that individual presents an
         imminent threat of death or serious physical injury to
25       officers/agents or others." *Id.* at 10.

26     e.   "When sufficient time exists officers/agents should seek cover
27       and/or move out of range. Such action may be especially

28            35

1
2
3

viable when the attack is coming from the other side of the border. Officers/agents are prohibited from using deadly force against subjects throwing objects not capable of causing serious physical injury or death to them" *Id.* at 12.

4   110.   On November 5, 2013, Defendant Fisher announced that the agencies

5   had decided to reject the expert, objective recommendations that CBP had

6   commissioned PERF to provide, and instead to reaffirm yet again the unlawful

7   Rocking Policy. *See Associated Press Exclusive: Border Patrol Rejects Curbs on*

8   *Force* (November 5, 2013) http://bigstory.ap.org/article/ap-exclusive-border-

9   patrol-rejects-curbs-force.

10   111.   On March 7, 2014, at the insistence of the newly installed Secretary

11   of Homeland Security, Jeh Johnson, Defendant Fisher then amended (in his words

12   "clarified") the policy.   In a memorandum to agents he stated for the first time that

13   agents should, among other things:

14
15

   a.   "avoid placing themselves in positions where they have no alternative to using deadly force;"

16
17
18
19

   b.   "not discharge firearms in response to thrown or hurled projectiles unless the agent has a reasonable belief, based on the totality of the circumstances, to include the size and nature of the projectiles, that the subject of such force poses an imminent danger of death or serious injury;" and

20
21

   c.   first "seek[] cover or distanc[e] themselves from the immediate area of danger."

22   112.   In May 2014—after Defendants Napolitano, Bersin, and Aguilar had

23   stepped down from their supervisor roles at DHS and CBP—CBP finally revised

24   its Use of Force Policy Handbook.[1] The Policy stated for the first time, among

25   other things, that:

26

27   [1] *See* http://www.cbp.gov/sites/default/files/documents/UseofForcePolicyHandbook.pdf.

28                                           36

> Authorized Officers/Agents shall not discharge their firearms in response to thrown or launched projectiles unless the officer/agent has a reasonable belief, based on the totality of circumstances (to include the size and nature of the projectiles), that the subject of such force poses an imminent danger of serious physical injury or death to the officer/agent or to another person.
>
> Officers/agents may be able to obtain a tactical advantage in these situations, through measures such as seeking cover or distancing themselves from the immediate area of danger.

113. This change in policy, while potentially welcome (assuming it is adequately implemented), came too late to protect Plaintiffs from the wholly unnecessary loss of their husband and father.

### F. Officials' Statements Regarding the Existence and Unlawfulness of the Rocking Policy.

114. James F. Tomsheck, the former Assistant Commissioner for Internal Affairs at CBP has recently acknowledged the existence and unlawfulness of the Rocking Policy.[2] Among other things, Tomsheck admitted:

> a. Border Patrol Agents actively and consistently tried to distort the narratives around fatal shootings to cover up wrongdoing by border agents. Tomsheck stated that at least seven Border Patrol shooting deaths since just 2010 were "highly suspect." Yet in none of those instances did the Supervisor Defendants take any disciplinary action against the shooter or amend the Rocking Policy.
>
> b. Rather than respond to the shootings appropriately, Border Patrol officials intentionally thwarted the internal affairs agency's investigation. "In nearly every instance, there was an

---

[2] See Andrew Becker, Ousted Chief Accuses Border Agency of Shooting Cover-Ups, Corruption (Aug. 14, 2014), https://beta.cironline.org/reports/ousted-chief-accuses-border-agency-of-shooting-cover-ups-corruption/ (last visited September 24, 2014)

Third Amended Complaint
13cv1417-WQH (BGS)

Ex. E - pg 38

effort by Border Patrol leadership to make a case to justify the shooting versus during a genuine, appropriate review of the information and the facts at hand."

c.   Top officials at DHS and CBP intentionally turned a blind eye to the consistent pattern of unjustified killings. "There were certainly many cases where border patrol agents or certainly CBP officers engaged in excessive use of force or abuse of migrants at the border that should have resulted in discipline where it did not." *See* Anna Werner, *order Patrol Killings Face Renewed Scrutiny* (Aug. 19, 2014), http://www.cbsnews.com/news/investigating-unresolved-deaths-on-the-border/.

d.   Top agency officials intentionally created a culture and atmosphere that promoted the excessive use of force. "The Border Patrol has a self-identity of a paramilitary border security force and not that of a law enforcement agency." *Id.*

e.   Accordingly to published reports, Tomsheck said that "senior officials at Customs and Border Protection and elsewhere in the Department of Homeland Security interfered with, delayed or hindered his office from being more aggressive in rooting out corruption, abuse and other misconduct, including civil rights violations, by telling internal affairs to stand down or back off." Andrew Becker, *Ousted Chief Accuses Border Agency of Shooting Cover-Ups, Corruption* (Aug. 14, 2014), https://beta.cironline.org/reports/ousted-chief-accuses-border-agency-of-shooting-cover-ups-corruption/?utm_source=CIR&utm_medium=social_media&utm_campaign=twitter.

f.   Tomsheck places much of the blame on Defendant Aguilar, who directed that Border Patrol management take control of deadly force investigations before the internal affairs department could review them. According to reports, Tomsheck said with respect to use of excessive force that "Allegations of wrongdoing he believed needed to be investigated instead would go to Border Patrol management for review and discipline. Those inquiries went nowhere or were inadequate." *Id.* Tomsheck and other internal affairs

38

investigators were then required to "fall in line" behind the Aguilar-directed conclusions.

115.   Despite knowing or having reason to know of the widespread use of excessive, lethal force, the Supervisor Defendants failed to take timely and effective measures to prohibit, prevent, and punish such practices and to discipline the perpetrators and responsible commanders, who were all under Supervisor Defendants' actual or effective command.   Supervisor Defendants had an actual opportunity and a legal duty to prevent abuses by their subordinates before Yañez was killed, yet failed to take the necessary and required action. The Supervisor Defendants' failures constituted a willful tolerance of and deliberate indifference to conditions that they knew and had reason to know would lead to the use of excessive, lethal force.   As a direct and foreseeable result of this failure, the Agents unlawfully killed Yañez.

116.   The highest-ranking DHS officials knew long before Yañez was killed that the Rocking Policy:  (a) permits Border Patrol agents to use lethal force when it clearly is not necessary; and (b) encourages Border Patrol agents to falsely assert that persons whom they shoot and kill were throwing rocks. Despite actual knowledge of the Rocking Policy and its open and notorious conflict with fundamental human rights guarantees, each of the Supervisor Defendants failed and refused to modify the Rocking Policy in order to conform it to the requirements of law.

## V.   THE SUPERVISOR DEFENDANTS' FAILURE AND REFUSAL TO ADEQUATELY TRAIN THE AGENTS.

117.   The Government Defendants and Supervisor Defendants also failed to provide proper training to agents who may encounter rock throwing, including

1   Agents Nelson and Diaz.  During the time that Agents Nelson and Diaz were

2   trained, CBP systematically failed and refused to, among other things:

3       a.   Train new agents at CBP's basic academies on all less-lethal
             options;
4
5       b.   Sufficiently train new agents at CBP's basic academies on
             high-risk situations, specifically including rock throwing;
6
7       c.   Train agents in tactics to de-escalate use of force situations in
             order to prevent them from becoming deadly force incidents;
8
9       d.   Ensure that agents understood and followed a proper use of
             force policy;
10
11      e.   Provide scenario-based training to give agents the opportunity
             to practice real-life use of force situations;
12
        f.   Provide training in low-light conditions;
13
        g.   Provide agents the full number of required training hours;
14
15      h.   Give written tests during less-lethal force recertification
             training; and
16
        i.   Standardize use of force policies across the CBP.
17
18      118.  The Government Defendants and Supervisor Defendants knew and

19  had reason to know that the lack of training created a permissive environment in

20  which their subordinates believed that the Rocking Policy and the use of

21  excessive, lethal force would be tolerated or approved.   The Government

22  Defendants' and Supervisor Defendants' failures constituted a willful tolerance of

23  and deliberate indifference to conditions that they knew and had reason to know

24  would lead to the use of excessive, lethal force.

25      119.  Despite knowing or having reason to know of the widespread use of

26  excessive, lethal force, the Government Defendants and Supervisor Defendants

27  failed to take timely and effective measures to prohibit, prevent, and punish such

28                              40
                                              Third Amended Complaint
                                              13cv1417-WQH (BGS)
    Ex. E - pg 41

1  practices and to punish or discipline the perpetrators and responsible commanders,

2  who were all under the Government Defendants' and Supervisor Defendants'

3  actual or effective command.   The Government Defendants and Supervisor

4  Defendants had an actual opportunity and a legal duty to prevent abuses by their

5  subordinates before Yañez was killed, yet failed to take the necessary and required

6  action. As a direct and foreseeable result of this failure, the Agents unlawfully

7  killed Yañez.

**VI.  INTERNATIONAL AND DOMESTIC STRICTURES ON EXCESSIVE, LETHAL FORCE.**

120.  Extrajudicial killing is universally prohibited by the laws of all

civilized societies.   The prohibitions against use of excessive, lethal force are

absolute, non-discretionary, and subject to no exception. They are designed to

safeguard the security, dignity, and life of every human being.   The prohibition

against extrajudicial killing is a peremptory, *jus cogens* norm – a specific,

universal, and obligatory norm from which no nation may lawfully depart.   It is

universally recognized and binding on all persons under all circumstances.   The

Rocking Policy flagrantly violates this peremptory international norm.

121.  The international law provisions forbidding extrajudicial killing

include Article 6(1) of the International Covenant on Civil and Political Rights

("ICCPR"), S. Exec. E, 95-2, 999 U.N.T.S. 171, 1966 U.S.T. LEXIS 521 (opened

for signature Dec. 16, 1966, entered into force Mar. 23, 1976, ratified by Mexico

Mar. 23, 1981, ratified by U.S. June 8, 1992).   That Article provides that "[n]o one

shall be arbitrarily deprived of his life."  *See also id.* at art. 9(1) ("Everyone has

the right to liberty and security of person . . . . No one shall be deprived of his

liberty except on such grounds and in accordance with such procedure as are

established by law.").   The *jus cogens* norm against extrajudicial killings is

41

1    universally   recognized   by   all   civilized   nations.   *See,   e.g.,*   the

2    Universal Declaration of Human   Rights,   Dec.10,   1948,   art.   3,   G.A.   Res.

3    217A(III), U.N. Doc. A/810; American Declaration of the Rights and Duties of

4    Man,   art.   I,   O.A.S.   Res.   XXX   (May   2,   1948),   http://www.cidh.org

5    /Basicos/English/Basic2.American%20Declaration.htm;   Restatement   (Third)   of

6    Foreign Relations § 702 cmt. f, n (1987).

7        122.   U.S. courts have recognized that extrajudicial killing is among the

8    gravest violations of the law of nations. *See, e.g., Chavez v. Carranza*, 559 F.3d

9    486, 491 (6th Cir. 2009); *Sarei v. Rio Tinto, PLC*, 456 F.3d 1069, 1091 (9th Cir.

10   2006) (en banc); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir.

11   2005); *Kadic v. Karadzic*, 70 F.3d 232, 243-44 (2d Cir. 1995); *In re Estate of*

12   *Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994);

13   *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1179 (C.D. Cal.

14   2005); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1153-54 (E.D. Cal. 2004); *Forti v.*

15   *Suarez-Mason*, 672 F. Supp. 1531, 1542 (N.D. Cal. 1987), amended, 694 F. Supp.

16   707, 710-11 (N.D. Cal. 1989);

17       123.   The   peremptory   norm   against   extrajudicial   killing   includes   a

18   prohibition on police use of excessive, lethal force.  Police use of excessive, lethal

19   force is one of the core forms of "extrajudicial killings" defined by international

20   law.   Specifically, "intentional lethal use of firearms [by police] may only be

21   made when strictly unavoidable in order to protect life."  Eighth United Nations

22   Congress on the Prevention of Crime and the Treatment of Offenders, Aug. 27-

23   Sept. 7, 1990, Havana, Cuba, Basic Principles on the Use of Force and Firearms

24   by Law Enforcement Officials, art. 9 (1990).  Again, this *jus cogens* norm is

25   recognized   by   all   civilized   societies.   *See, e.g.,*   Code   of   Conduct   for   Law

26   Enforcement Officials, G.A. Res. 34/169, U.N. Doc. A/RES/34/169, Annex I, art.

27

28                                        42                          Third Amended Complaint
                                                                      13cv1417-WQH (BGS)
     Ex. E - pg 43

3 (Dec. 17, 1979); Principles on the Prevention of Human Rights Violations Committed with Small Arms, Sub-Com. Res. 2006/22, Annex, U.N. Doc. A/HRC/Sub.1/58/L.11/Add.1 at 6 (Aug. 24, 2006), U.N. Special Rapporteur on extrajudicial, summary or arbitrary executions, Report to General Assembly, ¶¶33-45, U.N. Doc. A/61/311 (Sept. 5, 2006); U.N. Human Rights Committee, General Comment 6, 16th Sess., art. 6 (1982).

124. These binding standards are incorporated into standard training manuals for police the world over. *See, e.g.*, Commonwealth Secretariat, Commonwealth Manual on Human Rights Training for Police 65 (2006) ("Unnecessary and unlawful use of deadly force by a police officer would therefore constitute a violation of the right to life"); Organization for Security and Cooperation in Europe, Guidebook on Democratic Policing 23 (2d ed. 2008) ("Intentional lethal use of firearms may only be made when strictly unavoidable in order to protect life."); International Committee for the Red Cross, Human Rights and Humanitarian Law in Professional Policing Concepts 22 (2002) ("The intentional lethal use of firearms is allowed only when strictly unavoidable to protect life.").

125. For decades, the U.S. Department of State has insisted that the international norm against extrajudicial killings includes "deliberate, illegal, and excessive use of lethal force by the police, security forces, or other agents of the State whether against criminal suspects, detainees, prisoners, or others." U.S. Dep't of State, Country Report on Human Rights Practices 1995, Appendix A: Notes on the Preparation of the Reports (March 1996); *see also id.* ("lethal use of excessive force by security forces ... is herein defined as a form of extrajudicial killing"); U.S. Department of State Country Report on Human Rights Practices 1997 - Papua New Guinea (police's unreasonable killing of innocent bystander is extrajudicial killing). The State Department also acknowledges that this *jus*

43

*cogens* norm prohibits police from responding with lethal force to alleged rock-throwers. *See, e.g.*, Country Reports on Human Rights Practices-2010: India, United States Department of State Bureau of Democracy, Human Rights and Labor, April 2011, http://www.state.gov/j/drl/rls/hrrpt/2010/sca/154480.htm ("[P]rotesters threw stones and rocks at security forces, and security forces retaliated with excessive or deadly force."); Country Reports on Human Rights Practices – 2002: Israel and the Occupied Territories, United States Department of State Bureau of Democracy, Human Rights and Labor, March 2003, http://www.state.gov/j/drl/rls/hrrpt/2010/nea/154463.htm ("The use of lethal force against a rock-thrower, in this instance and in many others like it, was excessive."); Country Reports on Human Rights Practices – 2004: Tanzania, United States Department of State Bureau of Democracy, Human Rights and Labor, February 2005, http://www.state.gov/j/drl/rls/hrrpt/2004/41630.htm. ("During the year, the use of excessive force by security forces resulted in at least two deaths ... [including one where] a member of a paramilitary unit fired into a crowd, killing a 16-year-old student and seriously wounding two other persons" who had been part of "a mob [that] had thrown stones at members of the paramilitary unit.").

126.   The United States incorporates into its domestic law the peremptory international norm against extrajudicial killing by police use of excessive, lethal force.   As the Executive Branch advised the Senate, with few exceptions not relevant here, "the substantive provisions of [the ICCPR] are entirely consistent with the letter and spirit of the United States Constitution and laws." Letter of Transmittal from the President to the Senate, 1966 U.S.T. LEXIS 521, at *2 (Feb. 23, 1978).   For example, the Supreme Court has held that police use of deadly force is permissible only when "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer

44

1  or others. . . ." *Tennessee v. Garner*, 471 U.S. 1, 3 (U.S. 1985). Domestic law
2  makes this peremptory norm specifically applicable to the use of lethal force by
3  U.S. Border Patrol agents. 8 C.F.R. § 287.8(a)(2)(ii) ("Deadly force may be used
4  only when a designated immigration officer. . . has reasonable grounds to believe
5  that such force is necessary to protect the designated immigration officer or other
6  persons from the imminent danger of death or serious physical injury").

7
8  **VII. APPLICABLE TREATIES.**

9      127.   The Rocking Policy also violates the sovereignty of Mexico by
10  permitting Border Patrol agents to fire their weapons into Mexico's sovereign
11  territory.  Article V of the Treaty of Guadalupe Hidalgo establishes the border
12  between the United States and Mexico and provides that the border "shall be
13  religiously respected by each of the two republics."  Treaty of Peace, Friendship,
14  Limits, and Settlement with the Republic of Mexico, 9 Stat. 922, art. IX (1850);
15  *see also id.* at art. I ("There shall be firm and universal peace between the United
16  States of America and the Mexican republic"); Gadsden Treaty Relating to the
17  Boundaries of 1853, 10 Stat. 1035, art. I.  Likewise, the Charter of the United
18  Nations, Ch. 1, art. 2 (1945), provides that "[a]ll Members shall refrain in their
19  international relations from the threat or use of force against the territorial
20  integrity or political independence of any state, or in any other manner
21  inconsistent with the Purposes of the United Nations."

22      128.   The Rocking Policy permits Border Patrol agents to fire their
23  weapons into the sovereign territory of Mexico. For example, the teenagers killed
24  near El Paso and Nogales were clearly within Mexican territory when Border
25  Patrol agents shot them.   Yet the U.S. Department of Justice concluded with
26  respect to the El Paso killing, for example, that "the agent did not act
27
28                              45

1  inconsistently with [Border Patrol] policy or training."   Border Patrol
2  spokespersons have confirmed that Border Patrol policy allows agents to fire their
3  weapons into Mexico's territory.

4      129.   The Border Patrol's policy of permitting agents to fire lethal shots
5  into the territory of Mexico violates that nation's sovereignty.  The Government of
6  Mexico has asserted with respect to the El Paso killing, for example, that "[a]n
7  invasion of Mexico's sovereignty occurred when Agent Mesa shot his gun across
8  the border at Sergio Hernández."   Brief for the Government of the United
9  Mexican States as Amicus Curiae in Support of Appellants in No. 12-50217, U.S.
10  Ct. App. Fifth Circuit, No. 11-50792, filed July 2, 2012, at 15.

11      130.   It is mere happenstance that Yañez was killed within U.S. territory
12  (see below at Para. 108).   The Rocking Policy permits agents to fire lethal shots
13  into the sovereign territory of Mexico.   And Agent Diaz fired the fatal shot at
14  Yañez without regard to Mexico's sovereign boundary and without regard to
15  whether Yañez was within Mexico.  The Rocking Policy and the killing of Yañez
16  violated Mexico's sovereignty.

17      131.   Moreover, bilateral agreements between the United States and
18  Mexico imposed on Defendants an unequivocal obligation to respect Yañez's
19  fundamental right to life regardless of whether he was in Mexico or the United
20  States.  *See, e.g.*, Convention Between the United States of America and other
21  American Republics Regarding the Status of Aliens, 46 Stat. 2753, art. V
22  (1928) ("States should extend to foreigners, domiciled or in transit through their
23  territory, all individual guarantees extended to their own nationals, in the
24  enjoyment of essential civil rights without detriment, as regards to foreigners, to
25  legal provisions governing the scope of and usages for the exercise of said rights
26  and guarantees"); Convention on the Rights and Duties of States, Dec. 26, 1933,
27  art. IX, 165 L.N.T.S. 19, *reprinted in* 28 Am. J. Int'l 75 (Supp. 1934) ("Nationals

28                   46

1 and foreigners are under the same protection of the law and the national
2 authorities and the foreigners may not claim rights other or more extensive than
3 those of the nationals").

4

5 **VIII. INTENTIONAL DISCRIMINATION.**

6     132.   The Rocking Policy reflects intentional discrimination against Yañez
7 and others on the basis of their Hispanic descent and perceived Mexican origin,
8 thus violating their substantive due process rights guaranteed under the United
9 States Constitution.   The Rocking Policy authorizes the use of excessive force
10 against them based solely on their race, ethnicity, and/or perceived national origin.
11 The Rocking Policy is one part of a broader U.S. effort to "get tough" on
12 unauthorized immigration by persons of Hispanic descent and Mexican
13 nationality.   The Policy is an integral ingredient of a rancid brew of racial, ethnic,
14 and nationalist animus, and it would not exist but for this animus against persons
15 of Hispanic descent and Mexican origin.

16     133.   Recent studies have confirmed that this and other mistreatment of
17 migrants at the border is the result of an institutional culture of abuse within the
18 CBP, rather than the actions of a few rogue agents.   Daniel E. Martinez, Jeremy
19 Slack, and Josiah Heyman, Bordering on Criminal Part I: Migrant Mistreatment
20 while in U.S. Custody, Immigration Policy Center, December 2013, at 2.   This
21 culture could have developed only through the active encouragement or deliberate
22 indifference of the Government Defendants and Supervisor Defendants.

23     134.   Government Defendants and Supervisor Defendants failed to take
24 any steps to reform the CBP, despite complaints from watchdog groups and the
25 highly publicized incidents of unprovoked border shootings discussed elsewhere
26 in this complaint.   *See, e.g.*, Scott Phillips, Nestor Rodriguez, and Jacqueline

27

28                                        47

Hagan, Brutality at the Border: Use of Force in the Arrest of Immigrants in the United States, International Journal of Sociology and the Law 30, no. 4, Dec. 2002, at 285-306; Scott Phillips, Jacqueline Maria Hagan, and Nestor Rodriguez, Brutal Borders? Examining the Treatment of Deportees during Arrest and Detention, Social Forces 85, no. 1, Sept. 2006, at 93-109.

135. Despite this notice, the Government Defendants and Supervisor Defendants failed to make any attempts to prevent further mistreatment and discrimination. This inaction by Government Defendants and Supervisor Defendants indicates either tacit approval of or deliberate indifference to the widespread institutional culture of discrimination and abuse within the CBP.

136. No other law enforcement agency in the country, whether local, state, or national, permits its officers to treat the throwing of rocks at them as per se lethal force that the officers can legitimately counter with fatal gunfire. Nor does the Border Patrol condone or implement a similar policy of systematic, institutionalized use of excessive, lethal force with respect to encounters between Border Patrol agents and foreign civilians at the nation's northern border, or with respect to any other ethnic or national group. The Government Defendants and Supervisor Defendants would not condone or authorize the systematic, institutionalized use of excessive, lethal force against Canadians or Caucasians. The Government Defendants and Supervisor Defendants condone, authorize, and implement the Rocking Policy solely because its victims are persons of Hispanic descent and Mexican nationality – a group against whom a significant portion of the United States population has a virulent racial, ethnic, and national animus.

48

## IX. DEFENDANTS' CAPACITY.

137.   Each of the Defendants caused injury and damage to Plaintiffs by personally participating in the unlawful conduct, or acting jointly or conspiring with others to act; authorizing or allowing, explicitly or implicitly, policies, plans, customs, practices, actions, or omissions that led to the unlawful conduct; failing to take action to prevent the unlawful conduct; failing or refusing to initiate and maintain adequate training or supervision; being deliberately indifferent to Yañez's rights; and ratifying the unlawful conduct that occurred by agents under their direction and control, including failing to take remedial or disciplinary action.

138.   At all relevant times, Defendants were the agents, employees, servants, joint ventures, partners and/or coconspirators of the other Defendants named in this Complaint; and each of the Defendants was acting within the purported course and scope of that relationship with the other Defendants. At all relevant times, the Defendants were acting under color of the law and under color of their legal authority.


### CAUSES OF ACTION

#### First Claim for Relief:
#### Violation of the Law of Nations
#### (Against the Government Defendants)

139.   Plaintiffs repeat and reallege, in each of their claims for relief, all of the allegations set forth above.

140.   The Rocking Policy and the Government Defendants' acts and omissions described herein violate the law of nations, which prohibits extrajudicial killing.

49

1    141.   The Government Defendants' actions and omissions were the direct

2    and proximate cause of Yañez's death and give rise to a cause of action for a tort

3    in violation of the law of nations.

4    142.   The Government Defendants had effective command and control of

5    the Agents who intentionally and knowingly used excessive, unlawful force to kill

6    Yañez, which is prohibited by the law of nations.

7    143.   In addition to their liability for the unlawful use of excessive, lethal

8    force caused by their affirmative orders and authorizations, the Government

9    Defendants are also liable on the independent ground that they violated their legal

10   duty to prevent and prohibit the use of excessive, lethal force by subordinates

11   when the Government Defendants knew and had reason to know of it.   Despite

12   numerous credible reports of use of excessive, lethal force—indeed, despite

13   incontrovertible video evidence of such unlawful use of force—the Government

14   Defendants failed to take the reasonable, necessary, timely, or adequate measures

15   against subordinates to prohibit and prevent such excessive, lethal force as

16   required by law.   To this day, none of the key command officials responsible for

17   this widespread and systemic unlawful use of force have been disciplined.   The

18   Government Defendants have acted with deliberate indifference to and in

19   conscious disregard of the high likelihood that people such as Yañez, would die as

20   a result of Border Patrol agents' use of excessive, lethal force.

21   144.   The Government Defendants issued orders, adopted policies, and

22   granted authorizations that foreseeably led to the widespread use of excessive,

23   lethal force, including against Yañez.   In doing so, the Government Defendants

24   authorized a deviation from longstanding international and domestic law

25   prohibiting the use of excessive, lethal force.   The Government Defendants also

26   failed to take action to stop and prevent the use of excessive, lethal force after they

27   had knowledge that their officers and agents were committing or permitting such

28                                     50

1   unlawful use of force.  Through their actions and derelictions, the Government
2   Defendants expressly permitted the use of excessive, lethal force.  The
3   Government Defendants permitted such unlawful force whether the victims were
4   within the United States or Mexico.

5      145.  The Government Defendants are liable for Yañez's death under the
6   law of nations, because those Defendants formulated, authorized, approved,
7   directed, and ratified the Rocking Policy.

8      146.  In addition, the Government Defendants are liable because their
9   officers and agents intentionally and systematically used excessive, lethal force
10  while acting under the Government Defendants' effective command and control,
11  and the Government Defendants knew and had reason to know of their officers'
12  and agents' actions but failed to prevent or punish them.

13     147.  Defendants' deliberate killing of Yañez was not authorized by the
14  doctrine of self-defense.

15     148.  Defendants' deliberate killing of Yañez was not authorized by a
16  lawful judgment pronounced by a regularly constituted court affording all the
17  judicial guarantees which are recognized as indispensable by civilized peoples.

18     149.  Government Defendants' conduct caused grave and foreseeable
19  injury (namely death) to Yañez.

20     150.  Government Defendants are liable for their conduct that led to the
21  extrajudicial killing of Yañez.

22     151.  Government Defendants are liable for the harm caused to Yañez's
23  family members.  The family members were forced to suffer—and continue to
24  suffer—severe physical and psychological abuse and agony as a result of the
25  extrajudicial killing.

26     152.  The Government Defendants are liable for money damages to
27  Plaintiffs in an amount to be determined at trial.

28                                  51

153.   The Government Defendants' violations of Yañez's rights were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**Second Claim for Relief:**
**Fifth Amendment Due Process**
**(Against Supervisor Defendants)**

154.   Although Yañez was shot while he was on the southern side of the primary fence, he was within the territorial jurisdiction of the United States. The international boundary passes just a few feet south of where Yañez was located when the fatal bullet struck him; the primary fence and the tree in which Yañez was standing are located just to the north of the international boundary.

155.   If facts currently unknown to Plaintiffs later establish that Yañez was shot while within the territorial jurisdiction of Mexico, the U.S. Constitution nevertheless applies extraterritorially to provide relief to Plaintiffs on the facts alleged here.

156.   The Supervisor Defendants' actions described herein violated Yañez's substantive and procedural due process rights under the Fifth Amendment to the U.S. Constitution. The Government Defendants and Supervisor Defendants violated Yañez's Fifth Amendment due process rights by personally developing, authorizing, and conspiring to effect, and permitting and directing their subordinates to implement, the Rocking Policy. The Supervisor Defendants also violated Yañez's Fifth Amendment due process rights by failing to establish adequate procedures to train the Border Patrol agents, failing to establish adequate disciplinary procedures and adequate procedures to investigate agents' misconduct, and acting and failing to act in disregard of previous allegations of Border Patrol agents' use of excessive, lethal force.

52

157. As a foreseeable result of the Supervisor Defendants' acts and omissions, the Agents used lethal force against Yañez in the circumstances described above. The Supervisor Defendants were aware of the danger and risk of serious harm or death that Yañez and others faced as a result of the Rocking Policy. The Supervisor Defendants nevertheless personally took affirmative steps that created and/or increased this danger and risk, which did, in fact, result in Yañez's death. Yañez's death was a foreseeable result of the Supervisor Defendants' actions and omissions.

158. Each of the Supervisor Defendants had actual or constructive knowledge that its, his, or her acts and omissions with respect to Yañez violated his due process rights, and each had actual or constructive knowledge that its, his, or her actions, orders, or omissions would lead to such violations.

159. Each of the Supervisor Defendants acted under color of official authority and with deliberate, reckless, or callous indifference to Yañez's due process rights.

160. The Supervisor Defendants are liable for money damages to Plaintiffs in an amount to be determined at trial.

161. The Supervisor Defendants' violations of Yañez's due process rights were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### Third Claim for Relief
### Fifth Amendment Due Process
### (Against Agents)

162. The Agents' actions described herein violated Yañez's substantive and procedural due process rights under the Fifth Amendment to the Constitution.

53

1  The Agents violated Yañez's Fifth Amendment due process rights by using lethal
2  force against him in the circumstances described above.

3      163.   As set forth in detail above, Agent Diaz used excessive force against
4  Yañez, and Agent Diaz's conduct in committing these acts was not reasonable in
5  light of all the circumstances.

6      164.   Agent Nelson is also liable for this constitutional violation because
7  he witnessed Agent Diaz's excessive use of force against Yañez in violation of his
8  Fifth Amendment rights but took no action to protect Yañez, ratified Agent Diaz's
9  excessive use of force against Yañez in violation of his Fifth Amendment rights
10  after it had occurred, and conspired with Agent Diaz to commit and/or cover-up
11  this excessive use of force against Yañez in violation of his Fifth Amendment
12  rights.

13      165.   Agent Nelson and Agent Diaz knowingly, intentionally, and/or with
14  actual malice, combined, conspired and confederated together to deprive Yañez of
15  his clearly established Fifth Amendment constitutional rights.

16      166.   The Agents were aware of the danger and risk of serious harm or
17  death that Yañez faced as a result of the Agents' use of excessive force.  The
18  Agents nevertheless personally took affirmative steps that created and/or
19  increased this danger and risk, which did, in fact, result in Yañez's death. Yañez's
20  death was a foreseeable result of the Agents' actions and omissions.

21      167.   Each of the Agents had actual or constructive knowledge that his
22  conduct toward Yañez violated his due process rights, and each had actual or
23  constructive knowledge that his actions or omissions would lead to such
24  violations.

25      168.   Each of the Agents acted under color of official authority and with
26  deliberate, reckless, or callous indifference to Yañez's due process rights.

27

28                                    54
                                                        Third Amended Complaint
                                                        13cv1417-WQH (BGS)

1    169.   The Agents are liable for money damages to Plaintiffs in an amount
2    to be determined at trial.

3    170.   The Agents' violations of Yañez's due process rights were deliberate,
4    willful, intentional, wanton, malicious, and oppressive, and should be punished by
5    an award of punitive damages in an amount to be determined at trial.

**Fourth Claim for Relief**
**Fourth Amendment Unreasonable Seizure**
**(Against Supervisor Defendants)**

171.   The Supervisor Defendants' actions described herein violated Yañez's right to be free from unreasonable seizure under the Fourth Amendment to the U.S. Constitution.   The Supervisor Defendants violated Yañez's Fourth Amendment rights by personally developing, authorizing, and conspiring to effect, and permitting and directing their subordinates to implement, the Rocking Policy. The Supervisor Defendants also violated Yañez's Fourth Amendment rights by failing to establish adequate procedures to train the Border Patrol agents, failing to establish adequate disciplinary procedures and adequate procedures to investigate agents' misconduct, and acting and failing to act in disregard of previous allegations of Border Patrol agents' use of excessive, lethal force.

172.   As a foreseeable result of the Supervisor Defendants' acts and omissions, the Agents used lethal force against Yañez in the circumstances described above. The Supervisor Defendants were aware of the danger and risk of serious harm or death that Yañez and others faced as a result of the Rocking Policy.  The Supervisor Defendants nevertheless personally took affirmative steps that created and/or increased this danger and risk, which did, in fact, result in Yañez's death. Yañez's death was a foreseeable result of the Supervisor Defendants' actions and omissions.

55

173.   Each of the Supervisor Defendants had actual or constructive knowledge that its, his, or her acts or omissions with respect to Yañez violated his right to be free from unreasonable seizure, and each had actual or constructive knowledge that its, his, or her actions, orders, or omissions would lead to such violations.

174.   Each of the Supervisor Defendants acted under color of official authority and with deliberate, reckless, or callous indifference to Yañez's rights.

175.   The Supervisor Defendants are liable for money damages to Plaintiffs in an amount to be determined at trial.

176.   The Supervisor Defendants' violations of Yañez's right to be free from unreasonable seizure were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### Fifth Claim for Relief
**Fourth Amendment Unreasonable Seizure**
**(Against Agents)**

177.   The Agents' actions described herein violated Yañez's right to be free from unreasonable seizure under the Fourth Amendment to the U.S. Constitution.   The Agents violated Yañez's Fourth Amendment rights by using lethal force against him in the circumstances described above.

178.   As set forth in detail above, Agent Diaz used excessive force against Yañez, and Agent Diaz's conduct in committing these acts was not reasonable in light of all the circumstances.

179.   Agent Nelson is also liable for this constitutional violation because he witnessed Agent Diaz's excessive use of force against Yañez in violation of his Fourth Amendment rights but took no action to protect Yañez, ratified Agent

Third Amended Complaint
13cv1417-WQH (BGS)

Diaz's Agent Diaz's excessive use of force against Yañez in violation of his Fourth Amendment rights after it had occurred, and/or conspired with Agent Diaz to commit and/or cover-up this excessive use of force against Yañez in violation of his Fourth Amendment rights.

180.   Agent Nelson and Agent Diaz knowingly, intentionally, and/or with actual malice, combined, conspired and confederated together to deprive Yañez of his clearly established Fourth Amendment constitutional rights.

181.   The Agents were aware of the danger and risk of serious harm or death that Yañez and others faced as a result of their use of excessive force.   The Agents nevertheless personally took affirmative steps that created and/or increased this danger and risk, which did, in fact, result in Yañez's death.   Yañez's death was a foreseeable result of the Agents' actions and omissions.

182.   Additionally, both Agent Diaz and Agent Nelson intentionally and/or recklessly provoked a violent confrontation between themselves and Yañez. Agent Diaz is liable for his unreasonable, lethal use of force against Yañez.   Agent Nelson is liable because his unconstitutional beating of Murietta, a Fourth Amendment violation in and of itself, created the circumstances in which Agent Diaz fired the fatal shot.   Agent Nelson's unconstitutional use of excessive force against Murietta provoked Yañez to respond either by throwing objects at Agent Nelson or threatening to record the beating with a cell phone.   Agent Diaz used deadly force against Yañez based on his response to the beating that Agent Nelson administered to Murietta.   Agent Nelson's use of excessive force against Murietta was therefore a proximate cause of Yañez's death.

183.   Each of the Agents had actual or constructive knowledge that his conduct toward Yañez violated his right to be free from unreasonable seizure, and each had actual or constructive knowledge that his actions, orders, or omissions would lead to such violations.

184.   Each of the Agents acted under color of official authority and with deliberate, reckless, or callous indifference to Yañez's rights.

185.   The Agents are liable for money damages to Plaintiffs in an amount to be determined at trial.

186.   The Agents' violations of Yañez's right to be free from unreasonable seizure were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### Sixth Claim for Relief:
### Fifth Amendment Equal Protection
### (Against Supervisor Defendants)

187.   Yañez had a constitutionally protected right under the Fifth Amendment to the United States Constitution to be free from intentional discrimination against him on the basis of his race, ethnicity, and national origin.

188.   The Supervisor Defendants acted under color of law with a discriminatory purpose and treated Yañez and others differently because of their race, ethnicity, and national origin.   The Supervisor Defendants intentionally discriminated against Yañez and others on the basis of their Hispanic descent and Mexican origin by authorizing the use of excessive force against them solely on the basis of their race, ethnicity, and/or perceived national origin.

189.   Each of the Supervisor Defendants had actual or constructive knowledge that its, his, or her conduct toward Yañez violated his right to be free from such discrimination, and each had actual or constructive knowledge that its, his, or her actions, orders, or omissions would lead to such violations.

190.   Each of the Supervisor Defendants acted under color of official authority and with deliberate, reckless, or callous indifference to Yañez's rights.

58

191.   The Supervisor Defendants are liable for money damages to Plaintiffs in an amount to be determined at trial.

192.   The Supervisor Defendants' violations of Yañez's right to be free from discrimination based on race, ethnicity, or national origin were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## Seventh Claim for Relief:
## Fifth Amendment Equal Protection
## (Against Agents)

193.   Yañez had a constitutionally protected right under the Fifth Amendment to the United States Constitution to be free from intentional discrimination against him on the basis of his race, ethnicity, and national origin.

194.   The Agents acted under color of law with a discriminatory purpose and treated Yañez differently because of his race, ethnicity, and national origin. The Agents intentionally discriminated against Yañez on the basis of his Hispanic descent and Mexican origin by using excessive force against him solely on the basis of his race, ethnicity, and/or perceived national origin.

195.   The Agents had actual or constructive knowledge that their conduct toward Yañez violated his right to be free from such discrimination, and each of the Agents had actual or constructive knowledge that his actions or omissions would lead to such violations.

196.   The Agents acted under color of official authority and with deliberate, reckless, or callous indifference to Yañez's rights.

197.   The Agents are liable for money damages to Plaintiffs in an amount to be determined at trial.

1    198.   The   Agents'   violations   of   Yañez's   right   to   be   free   from

2    discrimination based on race, ethnicity, or national origin were deliberate, willful,

3    intentional, wanton, malicious, and oppressive, and should be punished by an

4    award of punitive damages in an amount to be determined at trial.

5

6                                    **REQUEST FOR RELIEF**

7    WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment

8    including:

9

10            a.    Compensatory damages against all Defendants in an amount to

11                  be proven at trial;

12            b.    Punitive damages against all Defendants in an amount to be

13                  determined at trial;

14            c.    Reasonable attorneys' fees and costs of suit;

15            d.    Such other relief as the Court deems just and reasonable.

16

17                                  **DEMAND FOR JURY TRIAL**

18    Plaintiffs demand a trial by jury as to each and every cause of action against each

19    and every defendant.

20

21                                          SINGLETON LAW FIRM, APC
                                            HILLIARD MUNOZ GONZALES, LLP
22                                          HILLIARD & SHADOWEN, LLP

23

24    Dated: December 22, 2015          By:      _/s/ Gerald Singleton_
                                            GERALD SINGLETON
25                                          ROBERT C. HILLIARD
                                            STEVE SHADOWEN
26                                          *Attorneys for Plaintiffs*

27

28                                    60                    Third Amended Complaint
                                                              13cv1417-WQH (BGS)
      Ex. E - pg 61

# Exhibit A

EMBAJADA DE MÉXICO

Washington, DC
April 27, 2012

The Honorable Janet Napolitano
Secretary
Department of Homeland Security
3801 Nebraska Ave. NW
Washington, DC 20016

Dear Secretary Napolitano,

   The Government of Mexico deeply regrets and strongly rejects the decision announced today by the U.S. Department of Justice not to prosecute the Border Patrol agent who shot and killed Mexican minor Sergio Adrián Hernández Güereca across the Mexico-U.S. border in an incident along the Ciudad Juarez border area, on June 7, 2010, while he was standing on Mexican soil.

   The Government of Mexico recognizes that there have been various incidents in which Border Patrol agents have been injured and that Mexico has a responsibility in seeking to deter rocking —or the use of violence against U.S. Federal agents— from Mexican soil. Nonetheless, Mexico has recently witnessed a worrisome and increasing trend of incidents in which the excessive use of force by Border Patrol and Customs and Border Protection agents has resulted in the death of Mexican nationals during immigration enforcement activities at the border. A large majority of recent investigations have not led to prosecution nor have adequate disciplinary measures been adopted despite the seriousness of these tragic outcomes. This trend and every single incident of disproportionate use of force are unacceptable. In this regard, the Government of Mexico is convinced that the use of lethal force by any authority to counter the throwing of rocks is clearly, by any standard, a disproportionate use of force. We therefore urge you to adopt all measures necessary to prevent this pattern, which has increasingly led to the recurrent loss of lives along our common border.

   The Government of Mexico reiterates that only joint and coordinated efforts on both sides of the Mexico-U.S. border will provide better security and well-being to border communities, with full respect to human rights in on both nations. The Joint Declaration on the Prevention of Violence in the Border Region that we are strongly committed to, as well as the Bilateral Protocols on Border Violence, should be fully implemented in order to prevent future incidents.

Ex. E - pg 63

EMBAJADA DE MÉXICO

The Government of Mexico will redouble its efforts to continue implementing those bilateral initiatives and reiterates its request to the United States Government to proceed accordingly. Mexico reiterates its unwavering and emphatic appeal to the United States to abide by bilateral and international human rights standards.

I take this opportunity to renew to you the assurances of my high esteem and consideration.

Sincerely,

Arturo Sarukhan
Ambassador of Mexico

Cc      David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection.
        Michael J. Fisher, Chief, U.S. Border Patrol.

# Exhibit B

.

EMBAJADA DE MÉXICO

Washington, DC
July 13, 2012

The Honorable Janet Napolitano
Secretary
Department of Homeland Security
3801 Nebraska Ave. NW
Washington, DC 20016

Dear Secretary Napolitano,

Mexico has witnessed a worrisome and increasing trend of incidents in which the excessive use of force by Border Patrol and Customs and Border Protection agents has resulted in the death of Mexican nationals during immigration enforcement activities at the border. In this regard, the Government of Mexico strongly condemns the most recent disproportionate use of such force by Border Patrol Agents that, according to all available accounts, led to the death of the Mexican national Juan Pablo Pérez Santillán. The information gathered by Mexican officials indicates that Border Patrol agents shot their fire arms across the Rio Grande in the Matamoros-Brownsville border area, on July 7, 2012, and hit Mr. Pérez Santillán while he was standing unarmed on Mexican soil.

The Government of Mexico recognizes that there have been various incidents in which Border Patrol agents have been injured and that Mexico has a responsibility in seeking to deter the use of violence against U.S. Federal agents from Mexican soil. However, recent investigations of cases similar to this one have not led to prosecution nor have adequate disciplinary measures been adopted despite the seriousness of these tragic outcomes. This pattern and every single incident of disproportionate use of force are unacceptable. We therefore urge you once again to adopt all measures necessary to prevent the recurrent loss of lives as a consequence of immigration control activities. We also call for action within your legal authority to discipline agents involved in this type of incidents and to bring them to justice swiftly in instances of wrongdoing.

The Government of Mexico reiterates that only joint and coordinated efforts on both sides of our common border will provide better security and well-being to border communities, with full respect to human rights in both nations. We remain strongly committed to bilateral agreements such as the Joint Declaration on the Prevention of Violence in the Border Region and the Bilateral Protocols on Border Violence, which should be fully implemented in order to prevent this type of regrettable incidents.

Mexico reiterates its unwavering and emphatic appeal to the United States to abide by bilateral and international human rights standards. The Government of Mexico will redouble its efforts to continue implementing those bilateral initiatives and reiterates its request to the United States Government to proceed accordingly.

I take this opportunity to renew to you the assurances of my high esteem and consideration.

Sincerely,

Arturo Sarukhan
Ambassador of Mexico

Cc David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection

Ex. E - pg 66

# Exhibit C

EMBAJADA DE MÉXICO

Washington, DC
September 10, 2012

The Honorable Janet Napolitano
Secretary
Department of Homeland Security
3801 Nebraska Ave. NW
Washington, DC 20016

Dear Secretary Napolitano,

México continues to observe what has become an alarming trend of incidents in which the excessive use of force by Border Patrol (BP) and Customs and Border Protection (CBP) agents has resulted in the death of Mexican nationals at the border. In this regard, the Government of Mexico strongly condemns the most recent disproportionate use of such force by Border Patrol Agents that, according to witnesses, led to the death of the Mexican national Guillermo Arévalo Pedraza. The available information indicates that Border Patrol agents shot their firearms across the Rio Grande in the Nuevo Laredo-Laredo border area, on September 3, 2012, and hit Mr. Arévalo Pedraza while he was standing unarmed on Mexican soil and without having being involved in any activity that could constitute, or be perceived as, a threat to the agents involved.

The Government of Mexico has repeatedly recognized that there have been various incidents in which Border Patrol agents have been injured by stone-throwing from our side of the border and that Mexico has a responsibility in seeking to deter the use of violence against U.S. Federal agents from Mexican soil. However, the lack of prosecution or adequate disciplinary measures in similar cases with these tragic outcomes creates – albeit unwillingly – a tacit message of permissiveness and lack of accountability for those who engage in the use of excessive force. This pattern and every single incident of disproportionate use of force are unacceptable.

In the most recent DHS reply to a letter regarding a similar case, CBP Acting Commissioner refers to the "Department of Homeland Security Policy on the Use of Deadly Force" and CBP's "Use of Force Policy Handbook" that are used for training and operational purposes. It is worrisome that while DHS has clear guidelines on the use of force, its agents on the ground apparently continue to make excessive use of force with appalling consequences for Mexican nationals and their families. A video of this particular incident (available at: http://goo.gl/gUjHg), shows Mr. Arévalo Pedraza and a group of people and children posing no threat to BP agents on the margins of the Rio

EMBAJADA DE MÉXICO

Grande River nor throwing rocks. We therefore urge you once again to adopt all measures necessary to prevent the recurrent loss of lives as a consequence of immigration control activities. We also call for action within your legal authority to discipline agents involved in this and in any type of incidents and to bring them to justice swiftly in instances of wrongdoing.

The Government of Mexico reiterates that only joint and coordinated efforts on both sides of our common border will provide better security and well-being to border communities, with full respect to human rights in both nations. We remain strongly committed to bilateral agreements such as the Joint Declaration on the Prevention of Violence in the Border Region and the Bilateral Protocols on Border Violence, which should be fully implemented in order to prevent this type of regrettable incidents.

Mexico reiterates its unwavering and emphatic appeal to the United States to abide by bilateral and international human rights standards. The Government of Mexico will redouble its efforts to continue implementing those bilateral initiatives and reiterates its request to the United States Government to proceed accordingly.

I take this opportunity to renew to you the assurances of my high esteem and consideration.

Sincerely,

Best wishes,

Arturo Sarukhan
Ambassador of Mexico

Cc  David V. Aguilar, Acting Commissioner, U S  Customs and Border Protection

Ex. E - pg 69

π

# Exhibit D

EMBAJADA DE MÉXICO

Washington, DC
September 4, 2013

The Honorable Janet Napolitano
Secretary
Department of Homeland Security
3801 Nebraska Ave. NW
Washington, DC 20016

Dear Secretary Napolitano,

The Government of Mexico is deeply concerned and strongly rejects the decision by the Department of Justice of the United States not to file federal criminal civil rights or other federal criminal charges against the Border Patrol agent who shot and killed Mexican teenager Ramses Barron Torres in an incident at the Nogales border area on January 5, 2011, while he was standing on Mexican soil.

The Government of Mexico recognizes that there have been various incidents in which Border Patrol agents have been injured and that Mexico has a responsibility in seeking to deter rocking —or the use of violence against U.S. Federal agents— from Mexican soil. Nonetheless, in the last few years Mexico has witnessed a worrisome trend of incidents in which the excessive use of force by Border Patrol and Customs and Border Protection agents has resulted in the death of Mexican nationals during immigration enforcement activities at the border. A large majority of recent investigations have not led to prosecution nor have adequate disciplinary measures been adopted despite the seriousness of these tragic outcomes. This trend and every single incident involving trans-boundary shootings or the disproportionate use of force continue to be unacceptable.

The Government of Mexico is convinced that the use of lethal force by any authority to counter the throwing of rocks is clearly and by any standard, a disproportionate use of force.

Mexico and the United States agreed at a high level meeting on January 24, 2013 and through subsequent technical exchanges, to continue to work bilaterally in order to

EMBAJADA DE MÉXICO

adopt all measures necessary to prevent this pattern, which has increasingly led to the recurrent loss of lives along our common border.

The Government of Mexico reiterates that only joint and coordinated efforts on both sides of our common border will provide better security and well-being to border communities, with full respect to human rights in both nations. The Joint Declaration on the Prevention of Violence in the Border Region that we are strongly committed to, as well as the Bilateral Protocols on Border Violence, should be not only fully implemented in order to prevent future incidents, but prosecutorial and judicial measures should be enforced to deter the disproportionate use of force.

The Government of Mexico will redouble its efforts to continue implementing those bilateral initiatives and reiterates its request to the United States Government to proceed accordingly. Mexico reiterates its unwavering and emphatic appeal to the United States to abide by bilateral and international human rights standards.

I take this opportunity to renew to you the assurances of my high esteem and consideration.

Sincerely,

Eduardo Medina Mora Icaza
Ambassador of Mexico

Cc.    Thomas S. Winkowski, Acting Commissioner, U.S. Customs and Border Protection.
       Michael J. Fisher, Chief, U.S. Border Patrol.

# DECLARATION OF SERVICE

*Perez, et al. v. USA, et al.*; Case No. 3:13-cv-01417-H-WMC

I am employed in the County of San Diego; I am over the age of eighteen years and not a party to the within entitled action. My business address is 115 W. Plaza St Solana Beach, CA 92075.

On today's date, I filed a true and correct copy of

## THIRD AMENDED COMPLAINT

## EXHIBITS A-D

through this Court's Electronic Filing System (ECF).

By virtue of the ECF system, all parties were served electronically on their counsel upon the filing of this document as follows:

U S Attorney CV Efile.dkt.civ@usdoj.gov

Daniel M. Gonzales
daniel@hilliardshadowenlaw.com, matt@hilliardshadowenlaw.com

Dianne Schweiner
Dianne.Schweiner@usdoj.gov, efile.dkt.civ@usdoj.gov,sandra.huston@usdoj.gov

MarionM.Reilly
marion@hmglawfirm.com, emily@hmglawfirm.com,grace@hmglawfirm.com, lauren@hmglawfirm.com

RobertC.Hilliard  bobh@hmglawfirm.com, emily@hmglawfirm.com,grace@hmglawfirm.com, lauren@hmglawfirm.com

Siegmund F. Fuchs
siegmund.f.fuchs@usdoj.gov, angela.m.russo@usdoj.gov

SteveShadowen
steve@hilliardshadowenlaw.com, daniela@hilliardshadowenlaw.com

1
DECLARATION OF SERVICE

Ex. E - pg 73

1    I declare under penalty of perjury under the laws of the United States of
America and the State of California that the foregoing is true and correct.

2

3        Executed on December 22, 2015, at San Diego, California.

4                            */s/ Gerald Singleton*
5                            Gerald Singleton, Esq.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit F

# Department of Homeland Security
# Office of Inspector General

## CBP Use of Force Training and Actions To Address Use of Force Incidents

## (Redacted)



**OIG-13-114 (Revised)**

**September 2013**



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

September 12, 2013

MEMORANDUM FOR:     Thomas S. Winkowski
                                         Deputy Commissioner
                                         Performing the duties of the Commissioner of CBP
                                         U.S. Customs and Border Protection

FROM:                           Charles K. Edwards
                                         Deputy Inspector General

SUBJECT:                      *CBP Use of Force Training and Actions To Address Use of Force
                                         Incidents – Redacted (Revised)*

Attached for your action is our revised final report, *CBP Use of Force Training and Actions To
Address Use of Force Incidents – Redacted (Revised), OIG-13-114.*  We incorporated the
formal comments from U.S. Customs and Border Protection in the final report.  This revised
version is redacted due to deliberative material.

The report contains three recommendations aimed at improving the U.S. Customs and
Border Protection Office of Training and Development and the Office of Internal Affairs.
Your office concurred with all of the recommendations.  Based on information provided in
your response to the draft report, we consider the three recommendations resolved.  Once
your office has fully implemented each recommendation, please submit a formal closeout
letter to us within 30 days so that we may close the recommendation.  The memorandum
should be accompanied by evidence of completion of agreed-upon corrective actions.

Please email a signed PDF copy of all responses and closeout requests to
OIGInspectionsFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we are providing copies
of our report to appropriate congressional committees with oversight and appropriation
responsibility over the Department of Homeland Security.  We will post a redacted version
of the report on our website.

Please call me with any questions, or your staff may contact Deborah Outten-Mills, Acting
Assistant Inspector General for Inspections, at (202) 254-4015.

Attachment

 **OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

| OIG | Office of Inspector General |
| OPR | Office of Professional Responsibility |
| OTD | Office of Training and Development |
| PBS | Public Broadcasting Service |
| PERF | Police Executive Research Forum |
| UFPD | Use of Force Policy Division |
| UFRS | Use of Force Reporting System |



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Background

In April 2012, the Public Broadcasting Service (PBS) aired a report regarding the death of a person while in the custody of CBP in May 2010. This incident and others raised concerns regarding use of force training and accountability within DHS and CBP. U.S. Senator Robert Menendez and 15 members of Congress requested that we review the use of force within CBP.

### Use of Force

CBP's policies and procedures for use of force describe the amount of force that is reasonable and necessary for a law enforcement agent or officer to use when compelling an unwilling subject to comply with lawful commands. Reasonable means there are objective reasons that justify the level of force used in a given situation, up to and including deadly force. Necessary means that some force is required in the situation to carry out law enforcement duties. Force would be deemed excessive if it were later determined to have been either unnecessary or unreasonably forceful.

The CBP Use of Force Continuum describes the levels of force an agent or officer may need to use to gain control over a subject. At the lowest level on the continuum, officer presence and spoken commands are sufficient when a subject is cooperative. If a subject does not comply with spoken commands or is passively resisting, the agent or officer may need to use physical contact techniques, such as strategic positioning or pressure point stimulation, to gain compliance. If a subject actively resists an agent's efforts to gain control or assaults or displays a willingness to assault an agent or officer, the agent or officer would use escalating, less-lethal force options to compel compliance. For example, agents and officers could use oleoresin capsicum (pepper spray) or an electronic control device, or taser, against an actively resistant subject and could also use a collapsible straight baton (baton) if the subject becomes assaultive. An agent or officer is authorized to use the highest level, deadly force, only when the agent or officer believes the subject poses an imminent danger of death or serious physical injury to the agent or officer or another person, and the subject has the opportunity, ability, and intent to do so.

In determining the appropriate level of force, CBP trains its law enforcement officers to consider the totality of the circumstances in each situation. This training includes: the level of training, mental attitude, strength, age, and size of the officer; size of the subject; the subject's actions; weapons involved; presence of other officers; number of subjects present; bystanders; and environmental conditions. Generally, the officer should use the lowest level of force necessary to control the situation. Because of unique circumstances and individual differences in every potential confrontation,



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

2012, they used firearms 6 percent of the time and less-lethal force options 94 percent of the time.  Within OBP, agents used firearms 7 percent of the time in FY 2011 and 7 percent of the time in FY 2012, less-lethal force devices 84 percent and 82 percent of the time, respectively, and other force 9 percent and 12 percent of the time, respectively.  For OFO, officers used firearms 7 percent and 2 percent of the time, respectively, in FY 2011 and FY 2012, less-lethal force devices 78 percent and 96 percent of the time, and other force 15 percent and 2 percent of the time.  Less-lethal force devices include baton, pepper spray, taser, and other devices.  Other force includes physical force without a weapon and the use of vehicles and canines.  Figure 4 compares the types of force used by OBP and OFO during FY 2011 and FY 2012.



Source: CBP OTD UFPD.

Analysis of use of force data from UFRS provides UFPD with valuable information regarding the effectiveness of use of force policies, training, equipment, and tactics.  However, including data from assaults on Federal agents that do not result in a use of force would provide additional valuable information.  For example, rock attacks were the most frequent type of assault on agents in FY 2011 and the second most frequent type of assault in FY 2012.  Of 339 reported rock assaults in FY 2011, agents did not respond with force to 188 (or 55 percent), responded with a firearm to 33 (or 10 percent), and used less-lethal force in response to 118 (or 35 percent) of the rocking assaults, respectively.  Of 185 rocking assaults in FY 2012, agents did not use force to respond to 121 (or 65



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

percent), responded with a firearm to 22 (or 12 percent), and used less-lethal force in response to 42 (or 23 percent). Reviewing when force was used to respond to assaults as well as when agents did not respond with force could inform UFPD policy, guidance, equipment, and tactics regarding use of force in response to rocking or other types of assaults.

All uses of force must be reported by the employee or a supervisor in the UFRS, and all assaults on Federal agents must be reported in the e3 Assault Module. If an agent is assaulted and responds using any type of force, the incident would be reported in both systems. However, assaults that do not lead to a use of force response would be reported only in the e3 Assault Module. Knowing when agents do not respond with force when assaulted and which types of force are used in response to different types of assaults, in addition to use of force information from UFRS, would provide a clearer operational picture for CBP management. In addition, it could identify best practices, especially regarding de-escalation of potential use of force situations and provide insight into specific types of threats, such as rockings, that place agents in potential use of force situations. Also, UFPD would have additional information to improve training, tactics, equipment, and policies involving use of force. UFPD should develop a process to incorporate information regarding assaults on agents that do not result in the use of force into its analysis of use of force incidents.

In addition, when an assault on an agent results in the use of force and must be reported in both UFRS and the e3 Assault Module, similar information is collected about the assault in both systems. A CBP official suggested creating a link between the two systems to facilitate entering the information and ensure reports are made in both systems when necessary. Developing a link between the systems could remind agents to complete reports in both places when appropriate and could ensure that assault information required by both systems is entered consistently. Also, it could facilitate the incorporation of non-response assault data into use of force incident analysis.

**Recommendation**

We recommend that U.S. Customs and Border Protection:

**Recommendation #2:**

Develop a process to incorporate information regarding assaults on agents that did not result in agents using force into its analysis of use of force incidents.

ADDITIONAL INFORMATION AND COPIES

To obtain additional copies of this document, please call us at (202) 254-4100, fax your request to (202) 254-4305, or e-mail your request to our Office of Inspector General (OIG) Office of Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.

For additional information, visit our website at: www.oig.dhs.gov, or follow us on Twitter at: @dhsoig.

OIG HOTLINE

To expedite the reporting of alleged fraud, waste, abuse or mismanagement, or any other kinds of criminal or noncriminal misconduct relative to Department of Homeland Security (DHS) programs and operations, please visit our website at www.oig.dhs.gov and click on the red tab titled "Hotline" to report. You will be directed to complete and submit an automated DHS OIG Investigative Referral Submission Form. Submission through our website ensures that your complaint will be promptly received and reviewed by DHS OIG.

Should you be unable to access our website, you may submit your complaint in writing to:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Office of Investigations Hotline
> 245 Murray Drive, SW
> Washington, DC  20528-0305

You may also call 1(800) 323-8603 or fax the complaint directly to us at (202) 254-4297.

The OIG seeks to protect the identity of each writer and caller.

Exhibit G



11 Boswell Road
Chula Vista, CA 91914-3519

SDC 50/2.5-C

**U.S. Customs and Border Protection**

JUL 2 3 2007

Luis Cabrera Cuaron
Cónsul General of México
1549 India Street
San Diego, California 92101

Dear Consul General Cabrera:

I am in receipt of your letter dated July 16, 2007, regarding the assault on a Border Patrol agent assigned to the Imperial Beach Station. The assault took place at the south end of Smugglers Canyon following a vehicle bailout. At the time of the incident agents had just apprehended four individuals out of approximately 30 that were observed fleeing back over the border to Mexico. Once across the border, numerous individuals began rocking the agents on the ground. In self defense, one of the officers fired one round from his weapon.

We were able to contact Mexican Law Enforcement through C-4. Officers from the Tijuana Municipal Police Department and Grupo Beta immediately responded to our call for assistance. It is my understanding that they detained several persons and that none of them sustained injuries.

Based on the information I have to date, this shooting appears to be within Agency guidelines. Should this change, I will immediately notify you of my findings.

If I can be of further assistance, please do not hesitate to contact me at your convenience.

Sincerely,

_for_ Michael J. Fisher
Chief Patrol Agent
San Diego Sector

SDC/SHQ: ACPA: Sandoval
7/24/07

**FILE**

Deft-1104

Ex. G - pg 1

CONSULATE GENERAL OF MÉXICO IN SAN DIEGO

**SDI-:**   002561



SECRETARÍA DE
RELACIONES EXTERIORES

**SRE**

San Diego, California., July 16th, 2007.

Mr. Michael Fisher
Chief Patrol Agent
CBP Border Patrol
San Diego Sector

Dear Chief Fisher:

On Friday July 13th, we learned about an incident that took place on the same day around 6:30 p.m. at the border in the area of Smugglers' Gulch by Imperial Bleach, in which apparently a group of persons from the Mexican side assaulted a Border Patrol agent throwing him rocks. According to the preliminary information we received, the BP Agent fired his gun.

We were also informed that your agency is conducting an investigation and I would appreciate if your office can provide us with information regarding this incident.

Sincerely,

Luis Cabrera
Consul General.

1549 India Street, San Diego, California, 92101
Tel (619) 231-6634
(619) 231-3847

Deft-1105

Ex. G - pg 2



Consulado General de México en San Diego

**003793**

San Diego, California, August 1st, 2011

**US DEPARTMENT OF HOMELAND SECURITY**
**OFFICE OF INSPECTOR GENERAL**
**SAN DIEGO FIELD OFFICE**
**701 "B" Street, suite 560**
**San Diego, CA., 92101**

I would like to make reference to the case regarding *Jose Alfredo Yáñez Reyes*, a Mexican national that was shot to death by U.S. agents, on past June 21st, while he was at the Mexican side of the area located by W-5, close to Dairy Mart Road on the U.S. side.

As you may know, according to Vienna Convention on Consular Relations (VCCR), to which México and the United States are part of, one of our foremost duties is to protect the rights of our nationals.

Based on that, and according to the information provided to us by the Border Patrol, in the sense that we may direct any questions to your office in relation to the investigation of Mr. Yáñez Reyes' death (case # 201110014), I would like to kindly request from you the updated information about the status of the aforementioned case.

I thank you in advance for your attention to this letter.

Sincerely,

Remedios Gomez Arnau
Consul General

1549 India Street, San Diego, CA., 92113 Tel 619-3089926

Deft-144



Consulate General of Mexico
1549 India Street
San Diego, CA 92101

CERTIFIED MAIL

7009 0820 0002 2666 3993

US DEPARMENT OF HOMELAND SECURITY
OFFICE OF INSPECTOR GENERAL
SAN DIEGO FIELD OFFICE
701 B Street, Suite 560
San Diego, CA, 92101

UNITED STATES POSTAGE
PITNEY BOWES
$ 005.590
02 1P
0003101905   AUG 01 2011
MAILED FROM ZIP CODE 92101

Ex. G - pg 4

Deft-145

Exhibit H

*Office of the General Counsel*
**U.S. Department of Homeland Security**
Washington, DC 20528



December 29, 2015

<u>Via electronic transmission</u>
Matthew C. Weiner
Hillard & Shadowen LLP
919 Congress Avenue, Suite 1325
Austin, TX 78701

Re:    Letter of Objection to Deposing the DHS General Counsel in *Perez v. Fisher, et. al.*, Civ. Action No. 13-cv-1417-WQH (BGS)

Dear Mr. Weiner:

The Department of Homeland Security (DHS or Department) received by personal service on December 11, 2015 a subpoena for The Honorable Stevan Bunnell, General Counsel for the Department, to testify on January 13, 2015 and a subpoena for him to also produce documents by January 7, 2015 (I assume both dates are meant to reflect 2016) related to the above-named action.

This letter serves as the responses and objections to the subpoenas. Except as noted, each objection stated below applies to the subpoenaed testimony, requests for documents, and the related subpoena exhibits. A party seeking information from DHS, through testimony or otherwise, must set forth in writing with as much specificity as possible, the nature and relevance of the official information sought. Where documents or other materials are the subject of a request, the party must describe sufficiently the particular records sought. Department employees may only produce, disclose, release, comment upon, or testify concerning those matters that were specified in writing and properly approved by the appropriate Department official. 6 C.F.R. § 5.45. DHS has broad discretion to determine whether it will provide documents or testimony in cases, such as this one, in which DHS is not a party to the litigation. *See* 6 C.F.R. §§ 5.41, *et seq.*; *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951); *Boron Oil Col. v. Downie*, 873 F.2d 67, 70 (4th Cir. 1989). In determining whether to comply with a demand or request, DHS considers, among many other pertinent factors, the following:

(1) Whether such compliance would be unduly burdensome or otherwise inappropriate under the applicable rules of discovery or the rules of procedure governing the case or matter in which the demand arose;
(2) Whether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information;
(3) The public interest;
(4) The need to conserve the time of Department employees for the conduct of official business;

Letter to Matthew C. Weiner
Letter of Objection to Deposing the DHS General Counsel in *Perez v. Fisher, et. al.,* Civ. Action
No. 13-cv-1417-WQH (BGS)

　　　(5) The need to avoid spending the time and money of the United States for private purposes;
　　　(6) The need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated;
　　　(7) Whether compliance would have an adverse effect on performance by the Department of its mission and duties; and
　　　(8) The need to avoid involving the Department in controversial issues not related to its mission.

6 C.F.R. § 5.48(a). In addition, DHS will not ordinarily comply with demands or requests where compliance would violate a statute, rule of procedure, regulation, or Executive order; reveal information properly classified in the interest of national security; reveal confidential commercial or financial information or trade secrets without the owner's consent; reveal the internal deliberative processes of the Executive Branch; or potentially impede or prejudice an on-going law enforcement investigation. 6 C.F.R. § 5.48(b).

Whether an agency agrees to comply with a third-party subpoena is a policy decision. *See Puerto Rico v. United States,* 490 F.3d 50, 61 (1st Cir. 2007); *Derby v. Dept. of Homeland Security,* 688 F.Supp.2d 1103, 1110 (S.D. Cal. 2009). Once an agency decides against providing testimony when it is not a party to the litigation, "a court should not order testimony to be given …without the showing of a compelling interest." *Alex v. Jasper Wyman & Son,* 115 F.R.D. 156, 157 (D.Me. 1986); *see also Akal Sec., Inc. v. U.S. Immigration and Customs Enforcement,* No. 09-CV-2277WNLS, 2010 WL 2731649, at 4 (S.D. Cal. Jul. 9, 2010).

## I. Objection to Subpoenaing a Senior DHS Official

　　　The Department objects to subpoenaing a DHS high-ranking official because of the substantial burden that would result on Stevan Bunnell and on DHS operations. You have provided no indication that his deposition is required due to an existent exigency, that he possesses information essential to the case that is not otherwise available from another source, or that he has "unique first-hand knowledge related to the litigated claims or that the … information cannot be obtained through other, less burdensome or intrusive means." *Lederman v. New York City Dept. of Parks & Recreation,* 731 F.3d 199, 203 (2d Cir. N.Y. 2013); *Avalos v. Baca,* No. CV0507602DDPSHX, 2006 WL 6220447, at *1 (C.D. Cal. Oct. 16, 2006) (stating, "heads of agencies and other top government executives are normally not subject to deposition") (internal citations omitted).

　　　Mr. Bunnell is a high-ranking government official. He was appointed by the President of the United States and confirmed by the Senate to serve as the DHS General Counsel. As General Counsel, Mr. Bunnell is in the line of succession to lead DHS.[1] He is responsible for managing 1,800 attorneys across the Department and its components and must be accessible at all times to provide high-level legal advice to the Secretary of DHS as well as the Department's senior

---

[1] Executive Order 13442.

2

Letter to Matthew C. Weiner
Letter of Objection to Deposing the DHS General Counsel in *Perez v. Fisher, et. al.,* Civ. Action
No. 13-cv-1417-WQH (BGS)

leadership. In his capacity as the chief legal officer at DHS,[2] Mr. Bunnell must be available to
advise on all significant legal, policy, and operational issues. Forcing Mr. Bunnell to be deposed
would force the Department to expend a large and indeterminate amount of time for purposes
other than official business. *See* 6 C.F.R. § 5.48(a)(4).

## II. Objection to Subpoenaing a Federal Department General Counsel.

The Department objects to subpoenaing the deposition of the Department of Homeland
Security's General Counsel on the ground that any information that he might possess would have
been obtained because of his position as the Department's General Counsel, and therefore would
be privileged pursuant to the attorney client privilege, attorney work-product privilege,
deliberative process privilege, as well as the law enforcement investigatory privilege and Privacy
Act privilege. You have failed to show that the General Counsel possesses any non-privileged
information relevant to the case at hand. The General Counsel is not a fact witness, and Mr.
Bunnell did not become the General Counsel until October 2013, nearly two years after the
alleged incident. Furthermore, you have not shown that no other means exist to obtain the
desired evidence or that the information is crucial to the preparation of your case. *See Desert
Orchid Partners, L.L.C. v Transaction Sys. Architects, Inc.,* 237 F.R.D 215, 220 (2006); 6 CFR
5.48(a)(2).

In addition to the above objections, the Department will not make the General Counsel
available because there is a need to conserve the time of Department officials, and granting live
testimony by the General Counsel in this case may create a precedent of providing the General
Counsel's, or other high level officials' testimony on other matters or other DHS policies
throughout the United States.

## III. Objection to Serving DHS for Customs and Border Protection (CBP) documents.

A subpoena must be directed toward the entity from which the documents or information are
sought. Fed.R.Civ.P. 45(a)(4) (requiring a subpoena be "served on the person to whom it is
directed"). First, requests for CBP's information are governed by CBP's Touhy regulations at 19
C.F.R. §§ 103.21-27, and the CBP Chief Counsel has authority to approve testimony of CBP
officials for litigation in which the United States is not a party. *See* 19 C.F.R. § 22(a). Second,
the DHS General Counsel is not a records custodian for any CBP documents. Third, the
subpoenas, which are already overbroad, burdensome, and lacking relevance, become even more
so by placing the responsibility on the shoulders of the Department's General Counsel. 6 C.F.R.
§ 5.48(a)(1). Therefore, the Department will not make the General Counsel available for
deposition, or make the Department produce documents more properly sought from CBP.

---

[2] Under 6 U.S.C. § 113(a)(1), as the General Counsel, Mr. Bunnell is the chief legal officer of the Department.

Letter to Matthew C. Weiner
Letter of Objection to Deposing the DHS General Counsel in *Perez v. Fisher, et. al.,* Civ. Action
No. 13-cv-1417-WQH (BGS)


## IV. Objection to Seeking 30(b)(6) Witnesses.

The Department objects to your attempt to depose Fed.R.Civ.P. 30(b)(6) witnesses from both the Department and CBP. Under Fed.R.Civ.P. 30(b)(6), a notice of subpoena directed to an organization must name the organization rather than an individual, and that organization must be served notice of the subpoena pursuant to Fed.R.Civ.P. 4. This was not done as the subpoena to testify and to produce documents named Mr. Bunnell and not the Department or CBP.

Furthermore, your attempt to demand 30(b)(6) witnesses by attaching it to Mr. Bunnell's subpoena to testify is defective, as Fed.R.Civ.P. 45 limits a subpoena only to requiring a deponent to testify, produce documents, or permit the inspection of premises. *See* Fed.R.Civ.P. 45(A)(2)(A)(iii). Nowhere does Rule 45 allow a party to seek a 30(b)(6) witness by attaching the demand to a testimonial subpoena.

As discussed in Part V. below, the overly broad requests and failure to describe with any reasonable particularity the documents or testimony expected would make it impossible to prepare any 30(b)(6) witness for testimony.

Additionally, you have not shown that these depositions are relevant to your clients' claims as virtually the entire Exhibit B, which applies to the testimony subpoena and also appears to apply to the document subpoena, asks for information that would be privileged from release as attorney work product and attorney client communications (Exhibit B, item 2: "The steps taken to comply with this Subpoena,....").

Finally, it is a federal agency policy decision whether to provide a witness for litigation matters in which the United States is not a party. *See infra.*, p. 2. You have not provided any indication why the Department should undertake the unwanted burden of preparing 30(b)(6) witnesses for testimony or the even more burdensome task of searching for and compiling responsive documents.


## V. DHS *Touhy* Objections

The subpoenas of the General Counsel for testimony and production of documents, including Exhibits A, B, and C, do not comply with the Department's *Touhy* regulations, as the subpoenas do not describe the relevance of the information sought in relation to your claims or the remaining defendants in the *Perez v. Fisher* matter. The case involves constitutional tort allegations against three DHS personnel in their individual capacities. The Department is not a defendant in this action and you have not provided any indication as to how the requested information is relevant to your clients' claims. As a result, the Department will not comply with the subpoenas due to your failure to establish the relevancy of any information that the Department may possess. 6 C.F.R. § 5.45(a).

Without waiving the Department's aforementioned objections to the subpoenas, the Department also has assessed your specific requests for information in connection with the

Letter to Matthew C. Weiner
Letter of Objection to Deposing the DHS General Counsel in *Perez v. Fisher, et. al.,* Civ. Action
No. 13-cv-1417-WQH (BGS)

considerations set forth at 6 C.F.R. §§ 5.45 – 6.48 and cannot comply with your requests because of the following additional objections.

1. The Department cannot comply with your requests and objects to the entirety of the subpoenas and exhibits on the ground that they are vague, ambiguous, overly broad, unduly burdensome, and irrelevant, and unlikely to lead to the discovery of admissible evidence. *See* 6 C.F.R. §§5.45(a), 5.48. The subpoena exhibits are replete with phrases such as "all", "any", "any and all", and "without limitation." Without the required specificity, Department personnel would need to spend countless hours locating, compiling, and reviewing information. This would require extraordinary efforts to search emails, file cabinets, an unknown number of computers, and to interview a similarly unknown number of employees. Likewise, the overly broad requests that incorporate the entirety of Exhibits A, B, and C fail to describe the topics of the proposed depositions with "reasonable particularity" as required by Fed.R.Civ.P. 30(b)(6). The over breadth of the request would make it impossible for any witness, including 30(b)(6) witnesses, to prepare for a deposition over such matters.

2. In seeking information from the General Counsel of the Department of Homeland Security (one of the largest federal departments in the Executive Branch), the Department cannot comply with the subpoenas as any information he may possess would be subject to the attorney work product doctrine or attorney-client privilege, as discussed above. *See* 6 C.F.R. § 6.48(a)(2).

3. In addition to the attorney-client privilege and attorney work product doctrine discussed above, much if not all of the information being requested likely would be subject to numerous other privileges, including the internal deliberative process privilege of the Executive Branch (6 C.F.R. §§ 5.48(a)(2), 5.48(b)(5)); the law enforcement privilege and the investigatory files privilege, or the privilege that protect against impeding or prejudicing on-going law enforcement investigations (6 C.F.R. § 5.48(b)(6)); information classified in the interest of national security (6 C.F.R. § 6.48(b)(3); information protected by the Privacy Act (5 U.S.C. § 552a); or any other appropriate statutory privilege. To the extent the requests seek such privileged or protected information, they are denied. *See* 6 C.F.R. § 5.48(b); Fed. R. Civ. P. 45(d)(3(A)(iii).

DHS reserves the right to assert additional objections in the future.

Based on the foregoing, the Department declines to comply with your request to depose Mr. Bunnell, have him produce documents, or for the Department and CBP to produce

Letter to Matthew C. Weiner
Letter of Objection to Deposing the DHS General Counsel in *Perez v. Fisher, et. al.*, Civ. Action
No. 13-cv-1417-WQH (BGS)

30(b)(6) witnesses as requested in the subpoena exhibits. I trust that this information clarifies the
Department's requirements concerning the release of information in third-party litigation.

Sincerely,

Neal J. Swartz
Associate General Counsel for General Law
Office of the General Counsel

CC:

Gerald Singleton, Esq.: Gerald@geraldsingleton.com

# Exhibit I

# HILLIARD│SHADOWEN LLP

February 2, 2016

**BY E-MAIL**

Matthew C. Weiner
O.  (855) 344-3298
C.  (845) 323-8036
matt@hilliardshadowenlaw.com

Hilliard & Shadowen LLP
919 Congress, Suite 1325
Austin, Texas 78701
www.hilliardshadowenlaw.com

Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington, DC 20528
Email: Leo.Boucher@hq.dhs.gov

> **Re:** **DHS/CBP Subpoenas Issued in *Perez v. Fisher, et al.*, 13-cv-1417-WQH (BGS) (S.D. Cal.)**

Dear Mr. Boucher:

I write on behalf of Plaintiffs in the above referenced matter regarding Plaintiffs' subpoenas (and accompanying Exhibits A-C) for production of documents and to testify at a deposition, both of which are dated December 8, 2015 and served on December 11, 2015. Reference is further made to the Department of Homeland Security's ("DHS") subpoena response dated December 29, 2015, received that same day from you via email (hereinafter the "Response"). Reference is further made to our meet and confer communications from January 22 through January 29, 2016.

As discussed, this letter serves to provide further clarification as to the scope of Plaintiffs' subpoenas and the relevance of the information sought therein, in an effort to assist the DHS/CBP's processing thereof. 6 C.F.R. §§ 5.3, 5.45.

***Background.*** Plaintiffs enclose the operative Complaint in the above referenced matter as Exhibit 1. As is relevant here, Plaintiffs seek redress against Defendant Michael Fisher for violating the civil rights of their husband/father Jesus Alfredo Yañez Reyes ("Yañez"). As alleged, on June 21, 2011, Yañez was shot and killed near San Diego, California by United States Border Patrol agents acting consistent with an unlawful pattern and practice, which Plaintiffs refer to in shorthand as the "Rocking

Letter to Mr. Boucher
DHS/CBP Subpoenas Issued in *Perez v. Fisher*
February 2, 2016

Policy."[1]   Pursuant to the Rocking Policy, Border Patrol agents deemed a suspect's throwing of a rock as lethal force, which enabled agents to respond with a firearm—regardless of whether doing so was unnecessary and objectively unreasonable under the circumstances. Defendant Fisher condoned and perpetuated the Rocking Policy during his tenure as Chief Patrol Agent of San Diego Sector (2008-2010) and Chief of Border Patrol (2010-2015), thereby causing the agents—his subordinates at all relevant times—to "justify" shooting and killing Yañez by claiming Yañez had thrown a rock (which Plaintiffs deny).

A supervisor who, at a minimum, knows of and acquiesces to a pattern and practice of subordinates using excessive force may be held liable under the Fourth Amendment for injury caused by a subordinate acting pursuant to that unconstitutional practice. *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).   Plaintiffs' lawsuit against Defendant Fisher accordingly brings claims for violating Yañez's right to be free from excessive use of force under Fourth Amendment to the United States Constitution, as made actionable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

After denying Defendant Fisher's motions to dismiss,[2] the district court permitted discovery relating to Defendant Fisher on the following topics:
   (1) Whether the Rocking Policy existed;
   (2) Whether Fisher knew of the Rocking Policy;
   (3) Fisher's responsibilities to prevent the continuance of the Rocking Policy;
   (4) Whether Fisher's failure to prevent the continuance of the Rocking Policy caused Yañez's death.

Plaintiffs have since served on Defendant Fisher two sets of requests for production of documents, to which Defendant Fisher has mostly refused to comply. His position is largely premised on the assertion that Plaintiffs may only obtain the requested documents by serving a subpoena on the United States government.   Defendant Fisher

---

[1] As you know, the Office of Border Patrol is an operational component of United States Customs and Border Protection Agency, which is a uniformed law enforcement arm within DHS.

[2] The district court has twice denied Defendant Fisher's motions to dismiss Plaintiffs' complaint. *Perez v. United States*, 103 F. Supp. 3d 1180, 1212 (S.D. Cal. 2015) (denying Defendant Fisher qualified immunity and holding applicable standard of supervisor liability clearly established at the time of Yañez's death); *Perez v. United States*, 2014 WL 4385473, at *11-12 (S.D. Cal. Sept. 3, 2014) (holding Plaintiffs' complaint adequately alleges facts establishing Defendant Fisher's personal responsibility for causing the death of Yañez).

---

2

Ex. 1 - pg 2

Letter to Mr. Boucher
DHS/CBP Subpoenas Issued in *Perez v. Fisher*
February 2, 2016

also asserts he is unable to obtain any documents because he has since retired on November 30, 2015. As such, Plaintiffs currently have very few documents relating to incidents in which Border Patrol agents used force in response to rock throwing—information necessary to this lawsuit to which Plaintiffs are entitled.

Accordingly, Plaintiffs issued the two aforementioned subpoenas from the United States District Court for the Southern District of California pursuant to Federal Rule of Civil Procedure 45. Plaintiffs document subpoena demands "that DHS and/or the CBP produce all documents responsive to Plaintiffs' requests," which generally seek documents relating to (i) other use of force incidents in which Border Patrol agents applied deadly force against an alleged rock thrower or (ii) Fisher's awareness of the Rocking Policy. *See* Subpoena Exhibit A. Plaintiffs deposition subpoena demands pursuant to Federal Rule of Civil Procedure 30(b)(6) "that DHS and/or CBP ... designate and prepare a witness or witnesses to testify regarding" the authenticity of any document produced, and the steps taken to comply with the subpoena, including the source/location of the documents, the document retention/destruction policies, the basis for withholding any documents from production, and whether all producible documents have been produced. *See* Subpoena Exhibit B. Finally, the subpoenas set out instructions and definitions as a reference to aid in interpreting, producing, or otherwise complying with either subpoena. *See* Subpoena Exhibit C.

According to the Response, DHS has refused to comply with any request for production or to produce any witness for a deposition. The Response provided the following bases: (I) an "Objection to Subpoenaing a Senior DHS Official," (II) an "Objection to Subpoenaing a Federal Department General Counsel," (III) an "Objection to Serving DHS for [CBP] documents," (IV) an "Objection to Seeking 30(b)(6) Witnesses," and (V) "DHS Touhy Objections."

Plaintiffs disagree with many of the objections raised in the Response, which fail to provide a sufficient basis under the Federal Rules of Civil Procedure for withholding of *all* documents.[3] As such, Plaintiffs began the process of preparing to file a motion to compel in the District Court for the District of Columbia—the district in which compliance is sought. *See* FRCP 45(d)(2)(B)(i). Pursuant to the District Court for the District of Columbia's Local Rule 7(m) and Federal Rule of Civil Procedure 37(a)(1), I had initiated a meet and confer with you in attempt to resolve the outstanding issues. Pursuant to this meet and confer, I agreed to provide you further information regarding

---

[3] Plaintiffs also note that DHS failed to provide objections to the subpoenas within 14 days of service, as required under the Federal Rule of Civil Procedure 45(d)(2)(B) ("The objection must be served before ... 14 days after the subpoena is served.").

---

3

Letter to Mr. Boucher
DHS/CBP Subpoenas Issued in *Perez v. Fisher*
February 2, 2016

the scope and relevance of Plaintiffs' subpoenas in a good faith effort to avoid involving the court.

 ***Scope of Subpoenas.*** At the outset, Plaintiffs note that much of the concern underlying the Response is obviated simply by clarifying the scope and purpose of the subpoenas.

 First, the purpose of the subpoenas is to obtain and authenticate documents. Plaintiffs are not interested in deposing any senior DHS official or DHS's General Counsel. Plaintiffs are even willing to forego any deposition testimony pursuant to these subpoenas, provided that DHS/CBP will provide the documents and a mutually agreeable alternative to authenticate them (e.g., affidavit).

 Second, Plaintiffs are only seeking documents from DHS/CBP. To the extent Plaintiffs' subpoenas were not clear enough, please use this letter as confirmation that the subpoenas are directed to any relevant custodian of records within DHS/CBP; Plaintiffs provided Mr. Stevan Bunnell's name and official address on the subpoena because he is the general counsel of DHS. *See* 6 C.F.R. § 5.43 ("only the Office of the General Counsel is authorized to receive and accept subpoenas, or other demands or requests directed to the Secretary, the Department, or any component thereof…").

 ***Relevance of Information Sought.*** The Response states that DHS has "broad discretion," under its Touhy regulations, to reject discovery requests from cases in which it is not a party. Response at 1. The Response further states under Objection V that DHS will not comply with the subpoenas because Plaintiffs failed to establish the relevancy of any information that DHS may possess as required under DHS's Touhy regulations. Response at 4 (citing 6 C.F.R. § 5.45).

 As a preliminary matter, Plaintiffs note that the Touhy regulations do not "authorize[] federal agencies to refuse to comply with proper discovery requests." *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 780 (9th Cir. 1994). Rather, "the federal rules of discovery" govern "discovery requests made against government agencies, whether or not the United States is a party to the underlying action." *Id.* And no federal rules of discovery require that Plaintiffs describe the relevance of the document requests to the satisfaction of DHS as a condition to obtaining documents in its possession, custody, and control.

 Nevertheless, to facilitate the speedy resolution of the outstanding issues without the need to file and litigate a motion to compel, Plaintiffs provide the following information to aid in the internal processing of Plaintiffs' requests for production.

<div align="center">4</div>

Letter to Mr. Boucher
DHS/CBP Subpoenas Issued in *Perez v. Fisher*
February 2, 2016

As a general matter, every subpoena request seeks discoverable documents known to exist that relate to the Rocking Policy—that is, information regarding each shooting (fatal or otherwise) by a Border Patrol agent responding to an alleged rock thrower—and/or Fisher's knowledge thereof.  They are plainly within the scope of permissible discovery in this lawsuit.

Indeed, after the subpoenas were served, Plaintiffs obtained an affidavit by the former Assistant Commissioner of CBP Internal Affairs ("IA"), James F. Tomsheck. Plaintiffs enclose the affidavit hereto as Exhibit 2. The affidavit describes the relevance of Plaintiffs' document requests as made in Plaintiffs' Request for Production Set 2 propounded on Defendant Fisher ("RFP 2"), which are included among the requests propounded on DHS/CBP in Plaintiffs' document subpoena. Mr. Tomsheck states that all the requests "capture documents that affirm the Border Patrol practices, procedures, and policies that encouraged Border Patrol Agents to utilize lethal force in response to rock throwing." Aff. ¶3.  In addition, all the requests capture documents that "affirm that the practice of using lethal force against rock throwers was well-known by Fisher, his subordinates, and other officials within CBP." Aff. ¶4.  Plaintiffs next provide the details of the subpoena requests below.

Request No. 1 seeks the document(s) entitled "Review of CBP Use of Deadly Force" (or of a similar title).  This document was first authored by Mr. Tomsheck at around October 2012 with the purpose of "captur[ing] in a condensed manner (i) the salient facts of each fatal incident as we within CBP knew them to exist at that time and (ii) the status of each incident in terms of prosecution." Aff. ¶15. The document describes more than 27 fatal incidents, many of which involved use of deadly force in response to rock throwing.  *Id.* It was provided to the Commissioner of CBP, Defendant Fisher, and others throughout CBP. *Id.*

Request Nos. 2-4 relate to the Report by the Police Executive Research Forum ("PERF"), and documents PERF claimed DHS/CBP provided to PERF to conduct its review.[4]  PERF reviewed 67 "case files" involving use of deadly force by border patrol agents between January 2010 and October 2012—almost half of which were cases involving use of a firearm in response to rock throwing.  These documents will show the then-extant use of force policy permitted agents to use of deadly force whenever a rock was thrown—as was also found by the PERF Report.  As a reference, Plaintiffs enclose the PERF Report hereto as Exhibit 3.

---

[4] Plaintiffs also issued a subpoena to PERF for such documents.  According to PERF, they no longer possess the documents the government provided them for their review.

Letter to Mr. Boucher
DHS/CBP Subpoenas Issued in *Perez v. Fisher*
February 2, 2016

Request No. 5 relates to documents generated for the Commissioner's Morning Brief. The Commissioner's Morning Brief is a daily meeting attended by a representative of every office within CBP. Aff. ¶ 8. Fisher, as Chief of Border Patrol, frequently served as Border Patrol's representative, and Mr. Tomsheck frequently served as Internal Affair's. Aff. ¶ 8.     Whenever there was a use of force incident by a Border Patrol agent, the next morning, and sometimes for a week thereafter, the incident was discussed during the (non-classified) portion of the Commissioner's Daily Brief dedicated to CBP operations. Aff. ¶ 9. Tomsheck states that every morning he would have an IA Summary briefed to him in a daily document with the title of "IA Daily Brief," *id.*, which Plaintiffs also define in subpoena Exhibit C.   The IA Daily brief would capture what IA would come to know of the shooting incident. *Id.* Border Patrol would generate a daily briefing document as well. *Id.* Fisher and Tomsheck (or a representative from their respective offices) took extensive notes during this portion of the meeting. Mr. Tomsheck states that "[s]tarting in 2006, I would consistently witness during the Commissioner's Morning Brief the then-Chief of Border Patrol David Aguilar consistently describe any shooting incident of a rock thrower as a 'good shoot'" and that when "Fisher became Chief of Border Patrol in 2010, he continued this practice of defending and encouraging the use of deadly force against rock throwers." Aff ¶ 10. Thus documents generated during or for this meeting are highly probative to Plaintiffs' case. Plaintiffs have also come to understand that responsive documents generated within Border Patrol may be called "Issue Papers," or an "Evolving Situation Report," or the like. To further assist DHS/CBP's efforts to comply with Request number 5, Plaintiffs have received in discovery one such report (regarding the incident occurring on October 10, 2012), which Plaintiffs enclose hereto as Exhibit 4.

Request Nos. 6-8 refer to "Reports, Investigations, and Administrative Reviews" (each defined in the definitions contained  within Exhibit C) concerning rocking cases involving deadly force that occurred over a specific course of time. At all relevant times, whenever there was an incident involving use of deadly force—especially when such force resulted in the death of an individual—DHS Office of Inspector General (OIG) would typically be the investigative entity (among others) charged with conducting an internal investigation, resulting in a document called "Report of Investigation" (or "ROI") Plaintiffs enclose hereto as Exhibit 5 a sample of pages taken from the one Report of Investigation they have received to date via discovery. In addition, Defendant Fisher also stated that, for many or all fatal use of force incidents, he received for his review a short (likely 1 page) document that includes summary information relating to the incident's investigation and key investigative facts. That type of document is also responsive to these requests, and an example is enclosed hereto as Exhibit 6.

Request No. 9 is self explanatory—it seeks documents relating to whether, and to what extent, Border Patrol agents were disciplined for their use of deadly force. This may

Letter to Mr. Boucher
DHS/CBP Subpoenas Issued in *Perez v. Fisher*
February 2, 2016

come from information contained in CBP Office of Human Resources, but based on recent discovery, Plaintiffs understand that if there were any disciplinary measure taken against an agent, DHS OIG's records will likely reflect that. Enclosed hereto as Exhibit 7 is an example of DHS OIG communicating to CBP's Office of Professional Responsibility, stating should "you take any administrative action in response to our [Report of Investigation], please inform this office so we can update our records." Exhibit 7.

Request Nos. 10 and 11 relate to three "Leadership Conferences" as defined in the definitions section of Exhibit C. According to Mr. Tomsheck, he and Defendant Fisher attended those three conferences, which were recorded. Aff. ¶12. He further states that they are relevant insofar as they establish Fisher and others' promotion of "military rules of engagement that are inconsistent with U.S. Law Enforcement rules of engagement. There are many statements made during those conferences that reveal an effort to militarize the Border Patrol—from the way Border Patrol agents are hired to the operational tactics Border Patrol agents were encouraged to take to the field." Aff. ¶12.

Request No. 12 relates to the Harper's Ferry Meeting, as defined in the subpoena Exhibit C. According to Mr. Tomsheck: "Fisher, all the Border Patrol sector chiefs, and I personally attended [the meeting]. The Commissioner of CBP summoned the meeting in light of a Los Angeles Times article that addressed a large number of fatal incidents caused by Border Patrol agents. During the Harper's Ferry Meeting I gave a presentation to Border Patrol leadership discussing the fatal shootings by Border Patrol agents and the constitutional restraints that are placed on all law enforcement officers. I was interrupted during that presentation and told 'We're not cops, we don't have to respond like they do.' Border patrol leadership also claimed during that meeting that 'We're now the premier paramilitary homeland security agency.'" Aff. ¶ 14.

Request No. 13 seeks documents relating to Mr. Tomsheck's filing with the Office of Special Counsel. According to Mr. Tomsheck, "[d]ocuments responsive to this request will show a concerted effort on behalf of Border Patrol leadership to engage in a pattern and practice of distorting use of force incidents to make them appear to be justified." Aff. ¶ 16.

Request Nos. 14, 15, 16, and 17, are self-explanatory. Requests 14, 16, and 17 seek communications by or to Fisher relating to use of force against rock throwers by or to specific people; whereas Document 15 seeks communications concerning CBP Internal Affairs's efforts to revise CBP's use of force policy. According to Mr. Tomsheck, documents response to Request 15 "should reflect Border Patrol management's control over practices, procedures, and policies that prevented IA from conducting a genuine, appropriate review of the information and the facts at hand, effectively enabling Border

---

7

Letter to Mr. Boucher
DHS/CBP Subpoenas Issued in *Perez v. Fisher*
February 2, 2016

Patrol agents to continue using lethal force in response to rock throwing without any meaningful disciplinary repercussions." Aff. ¶ 18.

Request No. 18 seeks documents relating to communications to or from the Government of Mexico regarding any rocking case in which an agent used deadly force. Examples of these documents are the letters sent to former Secretary Napolitano that are attached as exhibits to Plaintiffs' Complaint, which is enclosed here as Exhibit 1.

I trust that this information is helpful in DHS/CBP's efforts to process Plaintiffs' subpoenas. As always, please feel free to contact me by phone or email if you have any questions. I look forward to discussing this matter with you at our upcoming meet and confer, scheduled for Friday, February 5, 2016 at 2:00pm.


Sincerely,


Matthew C. Weiner

Attached
   1) Third Amended Complaint
   2) Tomsheck Affidavit
   3) PERF Report
   4) Example of Border Patrol Issue Paper
   5) Sample pages taken from a Report of Investigation
   6) Example of Fisher incident review document
   7) Evidence of DHS OIG Records containing information regarding relevant disciplinary action

Exhibit J

**From:** **Boucher, Leo** Leo Boucher@hq dhs gov
**Subject:** RE: Yanez Subpoenas
**Date:** April 14, 2016 at 10:49 AM
   **To:** Matthew C. Weiner matt@hilliardshadowenlaw com
   **Cc:** Thebes, Molly (OCC) Molly Thebes@chp.dhs gov

Hi Matt
I am close to getting a few more things out related to DHS communications with the Govt of Mexico (within a day) and just received more information from our OIG related to the same that I haven t gone through yet, so that is further from being ready to produce  I suspect there will be Privacy Act issues with the OIG material that could require a PO

Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington, DC 20528
Telephone (202) 447-3623  Cell (202) 779-2314

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information  If you are not the intended recipient, any dissemination, distribution, use or copying of this message and any attachment is strictly prohibited  If you received this message in error, please reply immediately and delete the message  Thank you

**From:** Matthew C. Weiner [mailto matt@hilliardshadowenlaw com]
**Sent:** Thursday, April 14, 2016 10:51 AM
**To:** Boucher, Leo
**Cc:** Thebes, Molly (OCC)
**Subject:** Re: Yanez Subpoenas

Chip and Molly,

I have not received any documents by yesterday's deadline  Are they in the mail?  If not, we'll be filing a motion to compel

Matthew C  Weiner

Hilliard & Shadowen LLP

919 Congress Ave., Suite 1325
Austin, TX  78701
Phone  1-855-344-3298
Cell  1-845-323-8036
Email  matt@hilliardshadowenlaw.com
Web  www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN LLP

On Apr 6, 2016, at 3 17 PM, Matthew C  Weiner <matt@hilliardshadowenlaw com> wrote

Understood  Thanks Chip

Matthew C  Weiner

Hilliard & Shadowen LLP

919 Congress Ave., Suite 1325
Austin, TX  78701
Phone  1-855-344-3298
Cell: 1-845-323-8036
Email  matt@hilliardshadowenlaw.com
Web  www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN LLP

On Apr 6, 2016, at 3 12 PM, Boucher, Leo <Leo Boucher@hq dhs gov > wrote

Thank you Matt
On a slightly different matter you asked if DHS sees a need for a protective order  I said no  not that I see yet, but should clarify that with regard to the OIG material, what OIG provided is all CBP generated information, and CBP may need a PO  for potentially Privacy Act or law enforcement sensitive information

Chip Boucher
Assistant General Counsel, Administrative Law Division
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington  DC 20528
Telephone (202) 447-3623  Cell (202) 779-2314

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information  If you are not the intended recipient, any dissemination, distribution, use or copying of this message and any attachment is strictly prohibited  If you received this message in error, please reply immediately and delete the message  Thank you

**From:** Matthew C. Weiner [mailto:matt@hilliardshadowenlaw.com]
**Sent:** Wednesday, April 06, 2016 3:44 PM
**To:** Boucher, Leo
**Cc:** Thebes, Molly (OCC)
**Subject:** Re: Yanez Subpoenas

Chip, thanks for the call. As a follow up, attached is the Mexico letter to OIG that I referred to. I also forgot to mention, I compiled a list of all incidents I'm aware of in which an agent used a firearm in response to a thrown rock. Obviously this is not every instance, but hopefully it can help.

| Incident Date | Victim Name | Victim Injury | Agent Name |
|---|---|---|---|
| 12/30/05 | Guillermo Martinez Rodriguez | Death | |
| 8/24/06 | Antonio Perez Ramirez | Death | |
| 1/17/07 | Francisco Javier Dominguez | Death | Corbett |
| 1/26/07 | Ramiro Acosta Suarez | Death | |
| 6/30/07 | Uknown | Uknown | |
| 7/13/07 | Uknown | None | |
| 7/21/07 | Uknown | None | |
| 8/6/07 | Jose Alejandro Ortiz Castillo | Death | |
| 10/1/07 | Uknown | None | |
| 8/11/08 | Edgar Israel Ortega | Shot - hospitalized | |
| 9/23/08 | Uknown | None | |
| 9/29/09 | Uknown | None | |
| 11/21/09 | Uknown | Uknown | |
| 12/7/09 | Uknown | Uknown | |
| 12/15/09 | Uknown | Uknown | |
| 12/21/09 | Uknown | Uknown | |
| 1/4/10 | Jorge A. Sol.- Palma | Death | Miguel Torres Vasquez |
| 1/18/10 | Uknown | None | |
| 2/8/10 | Uknown | Uknown | |
| 2/19/10 | Uknown | Uknown | |
| 3/31/10 | Uknown | Uknown | |
| 5/4/10 | Uknown | No | |
| 5/21/10 | Uknown | Shot in Arm | |
| 5/31/10 | Uknown | Uknown | |
| 6/5/10 | Uknown | Uknown | |
| 6/7/10 | Sergio Adrian Hernandez Guereca | Death | Mesa |
| 6/18/10 | Uknown | Uknown | |

Ex. J - pg 2

| | | | |
|---|---|---|---|
| 6/31/10 | Unknown | Unknown | |
| 11/5/10 | Unknown | Uknown | |
| 11/8/10 | Unknown | Uknown | |
| 11/16/10 | Uknown | Shot/Hospitalized | |
| 1/5/11 | Ramses Barron Torres | Death | |
| 2/8/11 | Unknown | Uknown | |
| 2/15/11 | Unknown | Uknown | |
| 2/21/11 | Carlos La Madrid | Death | Lucas Tidwell |
| 5/1/11 | Unknown | Unknown | |
| 6/21/11 | **Jose Alfredo Yanez Reyes** | **Death** | **Diaz** |
| 8/24/11 | Uknown | Unknown | |
| 10/27/11 | Uknown | Unknown | |
| 12/19/11 | Uknown | Unknown | |
| 1/30/12 | Uknown | Unknown | |
| 3/5/12 | Uknown | Unknown | |
| 3/26/12 | Uknown | Unknown | |
| 4/4/12 | Uknown | Unknown | |
| 5/5/12 | Uknown | Unknown | |
| 5/7/12 | Uknown | Unknown | |
| 7/7/12 | Juan Pablo Santillan | Death | |
| 8/5/12 | Uknown | Uknown | |
| 9/3/12 | Guillermo Arevalo Pedroza | Death | Boatwright |
| 10/10/12 | Jose Antonio Elena Rodriguez | Death | Lonnie Swartz |
| 10/17/12 | Uknown | Uknown | |
| 12/2/12 | Margarito Lopez Morelos | Death | |
| 5/3/13 | Uknown | Uknown | |
| 6/10/13 | Uknown | Uknown | |
| 7/31/13 | Uknown | Uknown | |
| 2/18/14 | Jesus Flores Cruz | Death | |
| 10/2/14 | Uknown | Uknown | |
| 10/22/14 | Uknown | Uknown | |
| 12/6/14 | Uknown | Uknown | |
| 4/11/15 | Uknown | Uknown | |

4/11/15        Unknown        Unknown

Matthew C. Weiner

Hilliard & Shadowen LLP

919 Congress Ave., Suite 1325
Austin, TX 78701
Phone. 1-855-344-3298
Cell. 1-845-323-8036
Email. matt@hilliardshadowenlaw.com
Web  www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN LLP

On Apr 6, 2016, at 1 57 PM, Matthew C Weiner <matt@hilliardshadowenlaw.com> wrote

OK confirmed for 3

Agenda w/t/t DHS
1) letters to/from Mexico
2) OIG source documents

Number 877-336-1829
Access 5632513#

Matthew C. Weiner

Hilliard & Shadowen LLP

919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web  www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN LLP

On Apr 6, 2016, at 1 32 PM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote

I am getting done now so would like to keep it at 3

Leo "Chip" Boucher
Assistant General Counsel
Administrative Law
Office of the General Counsel
Department of Homeland Security
Washington DC 20528
Work phone (202)447-3623
Cell phone (202)779-2314

**From:** Matthew C. Weiner
**Sent:** Wednesday, April 06, 2016 2.16 45 PM
**To:** Thebes, Molly (OCC)
**Cc:** Boucher, Leo
**Subject:** Re: Yanez Subpoenas

Thanks Molly and Chip  Perhaps push the call back an hour or two?  Let me know  I otherwise won't be available the rest of the week

Matthew C. Weiner

Hilliard & Shadowen LLP

919 Congress Ave., Suite 1325
Austin, TX 78701
Phone. 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web. www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN LLP

On Apr 6, 2016, at 1 04 PM, Thebes, Molly (OCC) <Molly.Thebes@cbp.dhs.gov> wrote

Matt,

Thanks for the email  I have a meeting scheduled at 3 00 that I likely will have to attend, but will keep you updated if I am able to call in to the phone conference  Chip relayed to me your discussions from last week.

Thank you,

Molly

Molly Thebes
Attorney (Enforcement)
Office of Chief Counsel
U.S  Customs and Border Protection
Desk  (202) 344-1329

This document, and any attachment(s), may contain information which is law enforcement sensitive, attorney-client privileged, attorney work-product, or U S  Government information  It is not for release, review, retransmission, dissemination or use by anyone other than the intended recipient  Please, consult with the CBP Office of Chief Counsel before disclosing any information contained in this message or any attachment(s)

**From:** Boucher, Leo
**Sent:** Wednesday, April 06, 2016 1:13 PM
**To:** Matthew C  Weiner, Thebes, Molly (OCC)
**Subject:** RE: Yanez Subpoenas

Matt
I hope to be available at 3  I'm in a 1 30 – 3 meeting, if it goes long and I can't get out, I will email you

Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington  DC 20528
Telephone  (202) 447-3623, Cell  (202) 779-2314

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information  If you are not the intended recipient,  any dissemination, distribution, use or copying of this message and any attachment is strictly prohibited  If you received this message in error, please reply immediately and delete the message  Thank you

**From:** Matthew C  Weiner [mailto:matt.matt@hilliardshadowenlaw.com]
**Sent:** Tuesday, April 05, 2016 3:39 PM
**To:** Thebes, Molly (OCC)
**Cc:** Boucher, Leo
**Subject:** Re: Yanez Subpoenas

Molly/Chip,

Are we confirmed for tomorrow April 6 at 3 00 EST?

Matthew C  Weiner

Hilliard & Shadowen LLP

919 Congress Ave., Suite 1325
Austin, TX  78701
Phone  1-855-344-3298
Cell:  1-845-323-8036
Email  matt@hilliardshadowenlaw.com
Web  www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN LLP

On Apr 1, 2016, at 5 17 PM, Matthew C  Weiner <matt@hilliardshadowenlaw.com> wrote

Chip, It was a pleasure speaking with you today  Molly, sorry you couldn't join  Chip/Molly, here's a recap

1) Plaintiffs need all documents the government intends to produce under either subpoena by **April 13, 2016**

2) Chip is in the process of reviewing a communication flow chart document and OIG's "source documents" relating to OIG's Use of Force Report  He will look into whether there are DHS/Mexico communications regarding use of force incidents  He intends to have all production substantially complete soon  At this point, no documents appear to warrant the need of a protective order

3) Plaintiffs agree in principle that CBP's production can be governed by a blanket protective

order

4) With regards to not redacting any names, that only concerns names of victims, witnesses, or DHS/CBP employees, for now, you can redact names of government employees outside DHS/CBP (e.g., FBI agents) if it would otherwise require you to first obtain permission from an outside agency

5) Chip and I tentatively scheduled a call for Wednesday April 6 at 3:00pm EST

Thanks and have a good weekend

Matthew C. Weiner

Hilliard & Shadowen LLP

919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web: www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN LLP

On Apr 1, 2016, at 1:10 PM, Matthew C. Weiner <matt@hilliardshadowenlaw.com> wrote

My apologies, I just gave the wrong dial-in, it's

877-336-1829
5632513#

Matthew C. Weiner

Hilliard & Shadowen LLP

919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web: www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN LLP

On Apr 1, 2016, at 1:04 PM, Matthew C. Weiner <matt@hilliardshadowenlaw.com> wrote

Molly and Chip, reminder that we have a call now. Same call-in

Number: 1-888-363-4735
Access: 6002166

Matthew C. Weiner

Hilliard & Shadowen LLP

919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web: www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN LLP

On Mar 30, 2016, at 3:44 PM, Matthew C. Weiner <matt@hilliardshadowenlaw.com> wrote

Yes Friday 2:00pm EST works. Thanks

On Mar 30, 2016, at 3:15 PM, Thebes, Molly (OCC) <Molly.Thebes@cbp.dhs.gov> wrote

I am available then. Should we plan on Friday at 2:00?

**From:** Matthew C. Weiner
[mailto:matt@hilliardshadowenlaw.com]
**Sent:** Wednesday, March 30, 2016 3:12 PM

**To:** Thebes, Molly (OCC)
**Cc:** Boucher, Leo
**Subject:** Re: Yanez Subpoenas

That's fine. I'm free tomorrow and Friday.
Do you want to do Friday at our usually
time of 2:00 EST? Also, please send the
proposed PO when you get the chance.
Thanks

> On Mar 30, 2016, at 1:59 PM,
> Thebes, Molly (OCC)
> <Molly.Thebes@xbp.dhs.gov>
> wrote
>
> Matt,
>
> We are still trying to coordinate
> schedules so it might be better if
> we postpone. Do you have
> availability this week?
>
> Thanks
>
> **From:** Matthew C. Weiner
> [mailto:matt@hilliardshadowenla
> w.com]
> **Sent:** Wednesday, March 30, 2016
> 2 48 PM
> **To:** Thebes, Molly (OCC)
> **Cc:** Boucher, Leo
> **Subject:** Re: Yanez Subpoenas
>
> Molly,
>
> Are we still confirmed for our
> call today for 3 00 EST?
>
> Call in  877-336-1829
> 5632513#
>
> > On Mar 28, 2016, at
> > 2 11 PM, Matthew
> > C  Weiner
> > <matt@hilliardshad
> > owenlaw.com>
> > wrote
> >
> > Molly,
> >
> > Thank you for the
> > call last Friday. I
> > would like to
> > confirm a few
> > things we
> > discussed
> > > • We have a
> > >   call
> > >   tentatively
> > >   scheduled
> > >   again this
> > >   Wednesday,
> > >   March 30, at
> > >   3 00 EST
> > >   You'll
> > >   confirm
> > >   whether that
> > >   time is OK
> > >   for everyone
> > >   else
> > > • Before our
> > >   Wednesday
> > >   call you'll
> > >   also work to
> > >   get a draft PO
> > >   over to me
> > >   for review
> > > • You're also
> > >   finishing up
> > >   your review
> > >   of the
> > >   "Review of

CBP Use of Deadly Force" document (request #5), with a goal of also producing that before our call on Wednesday

Below is my understanding regarding CBP's status, per category of documents. Please correct me if I'm wrong

- **SIR Emails** you have a request put in for relevant emails sent to the situation room
- **Incident Update Emails** Search underway
- **BP/IA Daily Briefs** You received responsive Issue Papers and IA Daily Briefs and are now reviewing for production
- **Incident Summaries** Search is still underway Note these are the "1 pagers" Fisher stated he received after the incident (apparently months after) that summarizes the status of the Incident Investigation and sets out Investigative Key Facts
- **Hernandez Incident Videos** Inquiry underway for all 3 videos
- **PERF Documents** Point of contact established, waiting for response
- **Harper's Ferry Meeting** There should be one or more presentations regarding use of force, emails regarding the meeting and

meeting, and
notes, which
you'll look
into
obtaining
- **Leadership
  Conferences:**
  unclear - I
  will follow
  up on
  Wednesday
- **Meetings
  regarding
  Rockings**
  unclear - I
  will follow
  up on
  Wednesday
- **Fisher
  Statements
  regarding
  Rockings**
  unclear - I
  will follow
  up on
  Wednesday

Matthew C  Weiner

Hilliard &
Shadowen LLP
919 Congress
Ave., Suite 1325
Austin, TX  78701
Phone. 1-855-344-
3298
Cell·  1-845-323-
8036
Email:
matt@hilliardshado
wenlaw.com
Web
 www.hilliardshado
wenlaw.com


&lt;image001.jpg&gt;

From: **Matthew C. Weiner** matt@hilliardshadowenlaw.com
Subject: Yanez Subpoenas
Date: March 28, 2016 at 2:11 PM
To: Thebes, Molly (OCC) Molly.Thebes@cbp.dhs.gov
Cc: Boucher, Leo Leo.Boucher@hq.dhs.gov

Molly,

Thank you for the call last Friday.  I would like to confirm a few things we discussed.

- We have a call tentatively scheduled again this Wednesday, March 30, at 3 00 EST.  You'll confirm whether that time is OK for everyone else.
- Before our Wednesday call you'll also work to get a draft PO over to me for review.
- You're also finishing up your review of the "Review of CBP Use of Deadly Force" document (request #5), with a goal of also producing that before our call on Wednesday.

Below is my understanding regarding CBP's status, per category of documents.  Please correct me if I'm wrong.

- **SIR Emails**  you have a request put in for relevant emails sent to the situation room.
- **Incident Update Emails**: Search underway.
- **BP/IA Daily Briefs**: You received responsive Issue Papers and IA Daily Briefs and are now reviewing for production.
- **Incident Summaries**.  Search is still underway.  Note these are the "1 pagers" Fisher stated he received after the incident (apparently months after) that summarizes the status of the Incident Investigation and sets out Investigative Key Facts.
- **Hernandez Incident Videos**: Inquiry underway for all 3 videos.
- **PERF Documents**: Point of contact established, waiting for response.
- **Harper's Ferry Meeting**: There should be one or more presentations regarding use of force, emails regarding the meeting, and notes, which you'll look into obtaining.
- **Leadership Conferences;**  unclear - I will follow up on Wednesday.
- **Meetings regarding Rockings**: unclear - I will follow up on Wednesday.
- **Fisher Statements regarding Rockings**  unclear - I will follow up on Wednesday.


Matthew C. Weiner

Hᴵʟʟᴵᴬᴿᴰ & Sʜᴬᴅᴏᴡᴇɴ ʟʟᴘ
919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN ʟʟᴘ

From: **Matthew C. Weiner** matt@hilliardshadowenlaw.com
Subject: Re. Emailing: Perez Documents DHS 001- DHS 0042.pdf
Date: March 25, 2016 at 11.43 AM
To: Thebes, Molly (OCC) Molly.Thebes@cbp.dhs.gov
Cc: Boucher, Leo Leo.Boucher@hq.dhs.gov, FLOOD, SOFIA (OCC) SOFIA.FLOOD@CBP.DHS.GOV, DOWNS, BRYAN L (OCC) BRYAN.L.DOWNS@cbp.dhs.gov

Thanks Molly. Let's still do the call today at 2 to discuss (1) status of CBP production and (2) further details about the PO, as mentioned in Chip's email.

Call in

Number 1-877-336-1829
Access. 5632513#


Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web: www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN LLP




On Mar 25, 2016, at 11.38 AM, Thebes, Molly (OCC) <Molly.Thebes@cbp.dhs.gov> wrote.

Matt,

Chip is out of the office today. I believe he will be back on Tuesday if you would like to reschedule the call for Tuesday (perhaps at 2 again). Otherwise, I am available today at 2.

Thanks,

Molly


Molly Thebes
Attorney (Enforcement)
Office of Chief Counsel
U.S. Customs and Border Protection
Desk: (202) 344-1329

This document, and any attachment(s), may contain information which is law enforcement sensitive, attorney-client privileged, attorney work-product, or U.S. Government information. It is not for release, review retransmission dissemination or use by anyone other than the intended recipient. Please

review, retransmission, dissemination or use by anyone other than the intended recipient. Please consult with the CBP Office of Chief Counsel before disclosing any information contained in this message or any attachment(s).


**From:** Matthew C. Weiner [mailto:matt@hilliardshadowenlaw.com]
**Sent:** Friday, March 25, 2016 12:33 PM
**To:** Boucher, Leo
**Cc:** FLOOD, SOFIA (OCC); Thebes, Molly (OCC)
**Subject:** Re: Emailing: Perez Documents DHS 001- DHS 0042.pdf

It looks like Chip isn't in today.  Molly are you still available to discuss today?

Matthew C. Weiner

HILLIARD & SHADOWEN LLP

919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com

<image002.jpg>




On Mar 25, 2016, at 10:25 AM, Matthew C. Weiner <matt@hilliardshadowenlaw.com> wrote:

Thank you, Chip.  With regards to the PO, let's discuss on our call today at 2 ET.

Matthew C. Weiner

HILLIARD & SHADOWEN LLP

919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com

On Mar 25, 2016, at 5:56 AM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote:

Matt:
Attached are documents that are responsive to the subpoena you issued in December on the General Counsel, as organized below related to official communications from, and to the Govt. of Mexico and DHS.

DHS 001 - DSH 0034 are documents produced by the DHS Office of the Executive Secretary.
DHS 0035- DHS 0042 are documents produced by the DHS Office of Policy, Mexico Desk.

I will continue to update the response if I get further documents.  We do have another document that is in the process of being redacted with some attorney work product and client privilege.  The document, which is a printout of a  'workflow', is not a communication with the govt. of Mexico, but captures the work process in responding to the 4/27/2012 request from the Govt. of Mexico that was resolved telephonically.   There is also a briefing memo related to a meeting with representatives of the Mexican government.  I am still tracking down what the meeting was about.

As we begin to produce documents, there may be response documents that have a variety of non-disclosure privileges.  Will you agree to rely on a blanket protective order for those matters?  CBP may have more detail.

Thank you.

Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington, DC 20528
Telephone: (202) 447-3623; Cell: (202) 779-2314

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information.  If you are not the intended recipient,  any dissemination, distribution, use or copying of this message and any attachment is strictly prohibited.  If you received this message in error, please reply immediately and delete the message.  Thank you.

<Parez Documents DHS 001  DHS 0042 pdf>

\<Perez Documents DHS 001- DHS 0042.pdf\>

From: **Matthew C. Weiner** matt@hilliardshadowenlaw.com
Subject: Re: Perez v Fisher. DHS Response to Subpoenas issued to the DHS General Counsel
Date: March 29, 2016 at 11:30 AM
To: Thebes, Molly (OCC) Molly.Thebes@cbp.dhs.gov

Thanks Molly.  Yes.  The Sergio Hernandez incident occurred on June 7, 2010.

Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com

# HILLIARD | SHADOWEN LLP

On Mar 29, 2016, at 11:24 AM, Thebes, Molly (OCC) <Molly.Thebes@cbp.dhs.gov> wrote:

Thank you, sir.  To confirm, are you referring to the June 7, 2010 shooting?

Also, I have reached out to my colleagues regarding Wednesday's meeting, and I am waiting to hear back.  I'll update you as soon as I have more information.


Thanks,

Molly


Molly Thebes
Attorney (Enforcement)
Office of Chief Counsel
U.S. Customs and Border Protection
Desk: (202) 344-1329

This document, and any attachment(s), may contain information which is law enforcement sensitive, attorney-client privileged, attorney work-product, or U.S. Government information.  It is not for release, review, retransmission, dissemination or use by anyone other than the intended recipient.  Please consult with the CBP Office of Chief Counsel before disclosing any information contained in this message or any attachment(s).

**From:** Matthew C. Weiner [mailto:matt@hilliardshadowenlaw.com]
**Sent:** Friday, March 18, 2016 3:35 PM
**To:** Thebes, Molly (OCC)
**Subject:** Re: Perez v Fisher: DHS Response to Subpoenas issued to the DHS General Counsel

Molly,

With regards to the Hernandez shooting incident, my co-counsel informed me that CBP has 3 videos, not just 1.  Apologies for the miscommunication on my part.  And if you need to me to re-iterate or clarify any other documents we're looking for, feel free to let me know.  Thanks and have a good weekend.

Matthew C. Weiner

HILLIARD & SHADOWEN LLP

919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com

<image001.jpg>

On Mar 18, 2016, at 12:38 PM, Matthew C. Weiner <matt@hilliardshadowenlaw.com> wrote:

Agenda for today's call at 2:00pm EST:

1) December 2015 Subpoena
a) DHS progress on Requests 6-8 (OIG Documents - what are they / what date range)
b) Request 18 - (Government letters - progress)

2) March 1, 2016 Subpoena
a) searches performed / what will CBP be producing and by when
b) assurance that names will not be redacted / any and all redactions are catalogued
c) form of production

Call in number:

Number: 1-877-336-1829
Access: 5632513#

Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com


\<image001.jpg\>

On Mar 15, 2016, at 11:21 AM, Matthew C. Weiner <matt@hilliardshadowenlaw.com> wrote:

Agenda for today's call at 2:00 EST:

1) December 2015 Subpoena
a) DHS progress on Requests 6-7, and 17
b) DHS position on Requests 8 and 18
c) CBP position on 8-9, 17-18

2) March 1, 2016 Subpoena
a) Subpoena compliance due tomorrow / documents expected / searches performed
b) assurance that names will not be redacted / any and all redactions are catalogued
c) form of production

Matthew C. Weiner

HILLIARD & SHADOWEN LLP

919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com


\<image001.jpg\>

On Mar 11, 2016, at 1:38 PM, Thebes, Molly (OCC) <Molly.Thebes@cbp.dhs.gov> wrote:

Matt,

That time works for me.  I'm also cc'ing one of my colleagues at CBP on this email.

Thanks,

Molly

This document, and any attachment(s), may contain information which is law enforcement sensitive, attorney-client privileged, attorney work-product, and/or U.S. Government information.  It is not for release, review, retransmission, dissemination or use by anyone other than the intended recipient. Please consult with the CBP Office of the Chief Counsel before disclosing any information contained in this message or any attachment(s).

**From:** Matthew C. Weiner [mailto:matt@hilliardshadowenlaw.com]
**Sent:** Friday, March 11, 2016 11:14 AM
**To:** Boucher, Leo
**Cc:** Thebes, Molly (OCC)
**Subject:** Re: Perez v Fisher: DHS Response to Subpoenas issued to the DHS General Counsel

Chip and Molly:

I'm unable to do the call today.  Can we re-schedule the call for next Tuesday March 15 at 2 EST?
Thanks

On Mar 4, 2016, at 3:04 PM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote:

Matt
Here is molly's email link.
Chip



Leo "Chip" Boucher
Assistant General Counsel
Administrative Law
Office of the General Counsel
Department of Homeland Security
Washington DC 20528
Work phone (202)447-3623
Cell phone (202)779-2314

**From:** Matthew C. Weiner
**Sent:** Friday, March 04, 2016 3:55:16 PM
**To:** Boucher, Leo
**Subject:** Re: Perez v Fisher: DHS Response to Subpoenas issued to the DHS General Counsel

Chip,

When you get a chance, please send Molly's email.  Thanks much

Matthew C. Weiner

HILLIARD & SHADOWEN LLP


919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web: www.hilliardshadowenlaw.com

<image002.jpg>




On Mar 4, 2016, at 12:47 PM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote:

Matt:
Yes, we'll be on the call.

Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington, DC 20528
Telephone: (202) 447-3623; Cell: (202) 779-2314

This communication, along with any attachments, is covered by federal and state law
governing electronic communications and may contain confidential and legally privileged
information.  If you are not the intended recipient, any dissemination, distribution, use or
copying of this message and any attachment is strictly prohibited.  If you received this
message in error, please reply immediately and delete the message.  Thank you.

**From:** Matthew C. Weiner [mailto:matt@hilliardshadowenlaw.com]
**Sent:** Friday, March 04, 2016 11:18 AM
**To:** Boucher, Leo
**Subject:** Re: Perez v Fisher: DHS Response to Subpoenas issued to the DHS General Counsel

Chip,

I would like to confirm our call today at 2 EST. We can use the below call-in number. Are you able to coordinate with general counsel for CBP? I don't have her email, but as discussed last week, I'd like to include her on the call as well. Thanks.

Number: 1-877-336-1829
Access: 5632513#

Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web: www.hilliardshadowenlaw.com

<image002.jpg>

On Mar 1, 2016, at 3:48 PM, Matthew C. Weiner <matt@hilliardshadowenlaw.com> wrote:

Thanks Chip. I would like the Department's position on 8 and 18 based on Plaintiffs' offers to compromise below:

**Number 8**
States: *During the time in which Fisher was Deputy Chief Patrol Agent or Chief Patrol Agent for San Diego Sector (2006-2009), all Reports, Investigations, and Administrative Reviews relating to any and all incidents involving an Agent in San Diego Sector using deadly force.*

Plaintiffs' Position: I'll represent to you that the court has already indicated that it will permit discovery on rocking cases that occurred in San Diego Sector while Fisher was deputy or chief patrol agent in San Diego sector (2006-2009). These documents exist within DHS, are clearly relevant, non-cumulative, and very important. Recognizing that the request seeks all use of force incidents, as well as

very comprehensive reports of investigation, as a compromise, plaintiffs are willing to narrow the scope of this request to

1. Rocking cases, that is, cases where a firearm was used and the agent reported a rock assault.

2. For each responsive case, documents sufficient to show:

a. Allegation narratives (which should exist for every incident and I believe it's only 1 page)

b. reports of investigation <u>without</u> any exhibits (assuming a report was done, this shouldn't be more than 10 pages per case).

c. the administrative action taken

**Number 18**
States: *All documents reflecting an official communication by or to the Government of Mexico regarding any rocking case in which an agent used deadly force.* [The instructions narrow this to the time period of January 2006 to present.]

Plaintiffs' Position:  You had mentioned on the call that you were looking for these documents, but only those that Fisher received. Fisher might not have signed letters or directly received these letters (although apparently he's CC'ed much of the time), he testified that before sending a response, DHS would send it down to CBP and FIsher's staff would "actually get the facts as we knew them the best we could" and send it back to the Secretary, see attached deposition pages 158 and 159. So as a compromise, plaintiffs are further willing to limit the request to

1. all Mexico/DHS letters that were received by DHS and also replied to - situations where Fisher's office would have been involved.

2. the time period of January 2010 through November 2015 - when Fisher was Chief.


Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com

On Mar 1, 2016, at 1:00 PM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote:

Hi Matt
Sorry on the delayed response.  As a correction to your email below, DHS HQ is not looking for anything related to # 8 , Attachment A of the December subpoenas.  We are making inquiries at DHS HQ into  # 17, communications with the National Border Patrol Council of AFGE.

Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington, DC 20528
Telephone: (202) 447-3623; Cell: (202) 779-2314

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information.  If you are not the intended recipient,  any dissemination, distribution, use or copying of this message and any attachment is strictly prohibited.  If you received this message in error, please reply immediately and delete the message.  Thank you.

**From:** Matthew C. Weiner [mailto:matt@hilliardshadowenlaw.com]
**Sent:** Friday, February 26, 2016 5:12 PM
**To:** Boucher, Leo
**Subject:** Re: Perez v Fisher: DHS Response to Subpoenas issued to the DHS General Counsel

Chip,

Thanks for the call.  To sum up. It's my impression you have DHS offices searching to determine what's in their possession with regards to requests 6, 7, 8, and 18.  As to the rest, you have forwarded to CBP General Counsel for them to search for responsive documents in any of their office's possession.  You'll also work to get CBP general counsel on our call next week at the same time.

You mentioned that if I can provide further information to assist, that will also be considered, which I'll do here for requests 6 and 7.

You stated DHS OIG is still undergoing a word search of their databases for words such as "rock" or "use of force" etc. (As a reminder you'll also confirm that they will search for any information they received regarding administrative action taken in a rocking case that they've investigated.)

To help the effort, it is my understanding, based on a 2013 report they've done, which I'm attaching here, that they have already isolated rocking cases involving use of deadly force.  Their report at page 14 says they identified 33 use of force incidents in FY 2011 where an agent used a firearm to respond to a rock thrower, and 22 in FY 2012.  If OIG is able to provide information for all those incidents, which are clearly all relevant, as a compromise, Plaintiffs might be willing to find that sufficient to satisfy requests 6 and 7 - depending on what that information is.


Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com

<image002.jpg>


On Feb 26, 2016, at 11:05 AM, Matthew C. Weiner <matt@hilliardshadowenlaw.com> wrote:

Chip,

Yes thanks.  Talk to you at 2.  Same call in

Number: 1-877-336-1829
Access: 5632513#

Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com

On Feb 26, 2016, at 10:36 AM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote:

Hi Matt:

I assume we'll be talking about this order? I'm still good for a 2 pm call.

Chip


Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington, DC 20528
Telephone: (202) 447-3623; Cell: (202) 779-2314

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If you are not the intended recipient, any dissemination, distribution, use or copying of this message and any attachment is strictly prohibited. If you received this message in error, please reply immediately and delete the message. Thank you.

**From:** Matthew C. Weiner [mailto:matt@hilliardshadowenlaw.com]
**Sent:** Friday, February 12, 2016 6:40 PM
**To:** Boucher, Leo
**Subject:** Re: Perez v Fisher: DHS Response to Subpoenas issued to the DHS General Counsel

Chip,

Thanks for the follow up, and again, I appreciate your efforts to resolve everything.

It's understood that DHS is not waiving any objections.

And in the same sense, Plaintiffs don't want to give the impression that they are waiving their right to seek production of Requests No. 19 and 20 in the event we file a motion to compel. Those requests are plainly relevant to this lawsuit, as both seek information only as it relates to this lawsuit and the remaining defendants—and I don't see how any of those documents are otherwise privileged. If the department chooses to not further address 19 and 20, Plaintiffs will not insist otherwise, but only for the purpose of resolving the remaining issues without the need to involve the

courts.

In addition, I want to follow up on the relevance of information concerning discovery on other incidents that occurred after the death of Yanez (in June 2011). I will represent to you that the court has allowed discovery regarding, among other things, incidents that occurred while Fisher was Chief of Border Patrol, regardless of when those incidents occurred. Such information is relevant to establishing the existence of a pattern of practice, and it also is relevant to establishing Fisher's knowledge and intent, as well as other probative facts. *See, e.g., Groark v. Timek*, 989 F. Supp. 2d 378, 398 (D.N.J. 2013) ("Events after a disputed incident often shed light both on the intent of participants, and on institutional or individual patterns of behavior."); *Montalvo v. Hutchinson*, 837 F.Supp. 576, 581 (S.D.N.Y. 1993) (finding files concerning subsequent occurrences of alleged police misconduct relevant).

I hope you find this information useful. Per our discussion, I look forward to hearing from you soon. I also have our next call scheduled for Friday February 26 at 2ET. Thanks and have a good weekend.


Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web: www.hilliardshadowenlaw.com

<image002.jpg>


On Feb 12, 2016, at 1:39 PM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote:

Matt:
I want to clarify one point, and I have a couple of questions that I forgot to ask.

1. I don't want to leave the impression that the Department is waiving any objections it has to the issued subpoenas. The purpose of our phone call was to let you know that we are looking into the items in order to conduct a review of the requests pursuant to our Touhy regulations.

2. On the Attachment A to the subpoenas, your follow on letter did not address items 19 or 20. I will assume, then, that the Department does not have to consider these

items.

Thank you.

Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington, DC 20528
Telephone: (202) 447-3623; Cell: (202) 779-2314

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If you are not the intended recipient, any dissemination, distribution, use or copying of this message and any attachment is strictly prohibited. If you received this message in error, please reply immediately and delete the message. Thank you.

**From:** Matthew C. Weiner [mailto:matt@hilliardshadowenlaw.com]
**Sent:** Friday, February 12, 2016 11:29 AM
**To:** Boucher, Leo
**Subject:** Re: Perez v Fisher: DHS Response to Subpoenas issued to the DHS General Counsel

Chip,

I'm writing to confirm our call today at 2pm ET at the below call-in number. Thanks.

Number: 1-877-336-1829
Access: 5632513#


Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web: www.hilliardshadowenlaw.com

On Feb 5, 2016, at 1:01 PM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote:

Sounds good.

Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington, DC 20528
Telephone: (202) 447-3623; Cell: (202) 779-2314

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If you are not the intended recipient, any dissemination, distribution, use or copying of this message and any attachment is strictly prohibited. If you received this message in error, please reply immediately and delete the message. Thank you.

**From:** Matthew C. Weiner [mailto:matt@hilliardshadowenlaw.com]
**Sent:** Friday, February 05, 2016 2:00 PM
**To:** Boucher, Leo
**Subject:** Re: Perez v Fisher: DHS Response to Subpoenas issued to the DHS General Counsel

Thanks Chip.  Next Friday Feb12 at 2pm EST works.  Same call-in number.

Matthew C. Weiner

HILLIARD & SHADOWEN LLP

919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com

On Feb 5, 2016, at 12:55 PM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote:

Matt:
Thank you for the email today. I do confirm that we received your email on Tuesday evening, 2/2/16. We have not yet completed a review of that email and its attachments. Let's reschedule the telephone call for next Friday at 2.

Thanks.

Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington, DC 20528
Telephone: (202) 447-3623; Cell: (202) 779-2314

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If you are not the intended recipient, any dissemination, distribution, use or copying of this message and any attachment is strictly prohibited. If you received this message in error, please reply immediately and delete the message. Thank you.

**From:** Matthew C. Weiner [mailto:matt@hilliardshadowenlaw.com]
**Sent:** Friday, February 05, 2016 12:25 PM
**To:** Boucher, Leo
**Subject:** Re: Perez v Fisher: DHS Response to Subpoenas issued to the DHS General Counsel

Chip,

Just want to confirm you received the letter and still available for the call today at 2pm EST. Thanks.

Number: 1-877-336-1829
Access: 5632513#

Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web: www.hilliardshadowenlaw.com

On Feb 2, 2016, at 4:13 PM, Matthew C. Weiner <matt@hilliardshadowenlaw.com> wrote:

Chip,

As promised, attached is Plaintiffs' letter and accompanying exhibits referenced therein.   Talk to you this Friday.   Thanks.

Matthew C. Weiner

HILLIARD & SHADOWEN LLP

919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com

<image002.jpg>

On Jan 29, 2016, at 1:41 PM, Matthew C. Weiner <matt@hilliardshadowenlaw.com> wrote:

Chip,

It was a pleasure speaking with you today.  I'm writing to confirm that I will provide to you by Tuesday (at the latest) a letter explaining the relevance of the documents we seek in DHS's possession custody and control.

We'll talk again next Friday, February 5, at 2 EST, at the same call in number:

Number: 1-877-336-1829
Access: 5632513#

Thanks, and have a good weekend.

Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web: www.hilliardshadowenlaw.com

<image001>&lt;image002.jpg&gt;</image001>

On Jan 28, 2016, at 3:59 PM, Matthew C. Weiner <matt@hilliardshadowenlaw.com>
wrote:

Thanks Chip.  Tomorrow at 2 EST works.  We can use the following dial-in:

1-877-336-1829
5632513#

Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX 78701
Phone: 1-855-344-3298
Cell: 1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web: www.hilliardshadowenlaw.com

&lt;image002.jpg&gt;

On Jan 28, 2016, at 3:49 PM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote:

On Jan 28, 2016, at 5:49 PM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote:

Matthew:
Sorry for the delay in responding.  I'm available tomorrow afternoon at  2pm, or
alternatively any time Monday after 10 am ET to discuss this by phone.  Please let
me know if either of these times work for you.

Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington, DC 20528
Telephone: (202) 447-3623; Cell: (202) 779-2314

This communication, along with any attachments, is covered by federal and state law
governing electronic communications and may contain confidential and legally privileged
information.  If you are not the intended recipient,  any dissemination, distribution, use or
copying of this message and any attachment is strictly prohibited.  If you received this
message in error, please reply immediately and delete the message.  Thank you.

**From:** Matthew C. Weiner [mailto:matt@hilliardshadowenlaw.com]
**Sent:** Friday, January 22, 2016 5:54 PM
**To:** Boucher, Leo
**Subject:** Re: Perez v Fisher: DHS Response to Subpoenas issued to the DHS General Counsel

Chip,

I would like to meet and confer to discuss the attached December 29, 2015 response
by DHS.  After review, we believe that DHS's responses are deficient in a number of
ways, and that we are entitled to the documents requested in DHS's custody and
control as well as a 30(b)(6) custodian of records to testify as to the documents'
authenticity.

Please let me know at your earliest convenience a date and time early next week (Jan
25 - 29) that works for you or someone else in your office to discuss.  Hopefully we
can find a solution that works for both of us without having to involve a court.
Thank you.

Matthew C. Weiner

HILLIARD & SHADOWEN LLP
919 Congress Ave., Suite 1325
Austin, TX  78701
Phone: 1-855-344-3298
Cell:  1-845-323-8036
Email: matt@hilliardshadowenlaw.com
Web:  www.hilliardshadowenlaw.com

On Dec 29, 2015, at 11:41 AM, Boucher, Leo <Leo.Boucher@hq.dhs.gov> wrote:

Mr. Weiner:

Attached is the DHS response to the testimony and production subpoenas that you recently served on the Dept. of Homeland Security.


Chip Boucher
Assistant General Counsel, Administrative Law Branch
General Law Division
Office of the General Counsel
Department of Homeland Security
Washington, DC 20528
Telephone: (202) 447-3623; Cell: (202) 779-2314

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information.  If you are not the intended recipient,  any dissemination, distribution, use or copying of this message and any attachment is strictly prohibited.  If you received this message in error, please reply immediately and delete the message.  Thank you.

<DHS Touhy Response Perez v Fisher.pdf>


<Ex 1.pdf>
<Ex 2.pdf>
<Ex 3.pdf>
<Ex 4.pdf>
<Ex 5.pdf>
<Ex 6.pdf>
<Ex 7.pdf>
<Yanez Ltr to DHS 02-02-16.pdf>

<133-ORDER Granting In Part And Denying In Part 114 (2).pdf>
<Fisher Deposition-Mini-excerpt.pdf>

# Exhibit K

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MARIA DEL SOCORRO QUINTERO          )
PEREZ, CY, a Minor, and BY, a       )
Minor,                              )
                                    )
          Plaintiffs,               )
                                    ) Case No.
     vs.                            ) 3:13-cv-01417-WQH(BGS)
                                    )
UNITED STATES OF AMERICA,           )
et al.,                             )
                                    )
          Defendants.               )
_____)

VIDEOTAPED DEPOSITION OF MICHAEL FISHER

Friday, January 15, 2016

501 West Broadway, Suite 1000

San Diego, California

Reported by:

Vivian R. Weiss

CSR No. 12380

Michael Fisher                                                    January 15, 2016

| | |
|---|---|

1  APPEARANCES
2
3  FOR PLAINTIFFS
4      HILLIARD | SHADOWEN, LLP
       BY  STEVE D  SHADOWEN, ESQ
5          MATTHEW C  WEINER, ESQ
       919 Congress Avenue, Suite 1325
6      Austin, Texas 78701
       P 512 993 3078
7      F 512 233 2824
       steve@hilliardshadowenlaw.com
8      matt@hilliardshadowenlaw.com
9
10 FOR DEFENDANTS
11     UNITED STATES DEPARTMENT OF JUSTICE
       BY  DIANNE SCHWEINER, ASSISTANT U S  ATTORNEY
12         ERNEST CORDERO, JR , ASSISTANT U S  ATTORNEY
       880 Front Street, Room 6293
13     San Diego, California 92101
       P 619 546 7654
14     F 619 556 7751
       dianne schweiner@usdoj gov
15     Ernest cordero@usdoj gov
16
17 ALSO PRESENT
18     Chad Nelson
19     Dorian Diaz
20     Sofia Flood, Esq
       U S  Customs and Border Protection
21
       Anthony Martinez, Videographer
22
23
24
25

Page 2

1           I N D E X
2  WITNESS
3  MICHAEL FISHER
4
5  EXAMINATION BY                           PAGE
6  Mr  Shadowen                             7, 195
7  Ms  Schweiner                            185
8
9           E X H I B I T S
10 EXHIBIT NO       DESCRIPTION           PAGE
11 (All exhibits are photocopies
    unless otherwise indicated )
12
13   1   3/7/14 Memorandum from Michael J     44
         Fisher to All Personnel, Bates Nos
14       00131-YANEZ-REYES to -134 (4 pages)
15   2   September 2013 CBP Use of Force      52
         Training and Actions to Address Use
16       of Force Incidents (34 pages)
17   3   October 2010 Use of Force Policy     73
         Handbook, Bates Nos
18       00002-YANEZ-REYES to -109
         (108 pages)
19   4   May 2014 Use of Force Policy,        74
         Guidelines and Procedures Handbook
20       (117 pages)
21   5   6/21/11 Fatal Shooting Report, Bates 101
         No  Deft-1100 (1 page)
22
23   6   February 2013 U S  Customs and       115
         Border Protection Use of Force
24       Review, Cases and Policies conducted
         by the Police Executive Research
25       Forum, Bates Nos  00110-YANEZ-REYES
         to -130 (21 pages)

Page 3

1           E X H I B I T S
2           (continued)
3  EXHIBIT NO       DESCRIPTION           PAGE
4    7   11/5/13 The Associated Press news    141
         article titled "Border Patrol agents
5        will continue to use deadly force
         against rock throwers" (4 pages)
6
     8   Homeland Security Advisory Council   148
7        Interim Report of the CBP Integrity
         Advisory Panel (40 pages)
8
9    9   5/22/10 Email string between Jeffrey 151
         Caine, Mike J  Fisher, Ronald D
10       Vitiello, Bates Nos  Deft-1049 to
         -50 (2 pages)
11  10   8/31/10 Email string between Ronald  152
         D  Vitiello, Mike J  Fisher, Jeffrey
12       Caine, Luke Lopez, Bates Nos
         Deft-1045 to -1046 (2 pages)
13
    11   8/6/07 Letter from Michael Fisher to 154
14       Luis Cabrera with a 7/25/97 letter
         from Luis Cabrera to Michael Fisher,
15       Bates Nos  Deft-1106 to 1108
         (3 pages)
16
    12   4/27/12 Letter from Arturo Sarukhan  155
17       to Janet Napolitano, Bates Nos
         01169-YANEZ-REYES to -1170 (2 pages)
18
    13   9/4/13 Letter from Eduardo Medina    157
19       Mora Icaza to Janet Napolitano,
         Bates Nos  01177-YANEZ-REYES to
20       -1178 (2 pages)
21  14   10/18/12 Reuters news article titled 162
         "US uses excess force along
22       Mexican border U N "  Bates Nos
         01253-YANEZ-REYES to -1254 (2 pages)
23
    15   6/9/10 Amnesty International press   164
24       release titled "Mexican Teenager
         Shot Dead by US Border Police,"
25       Bates Nos  01271-YANEZ-REYES to

Page 4

1           E X H I B I T S
2           (continued)
3  EXHIBIT NO.      DESCRIPTION           PAGE
4   16   Summary spreadsheet of disciplinary  170
         action, Bates Nos  Deft-1155 to
5        -1157 (3 pages)
6   17   Document prepared by Jim Tomsheck    173
7   18   10/11/12 Email between Felix Chavez, 178
         Mike J  Fisher, Ronald D  Vitiello,
8        with attachments, Bates Nos
         Deft-1054 through -1089 (36 pages)
9                  * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

2 (Pages 2 to 5)

1  SAN DIEGO, CA; FRIDAY, JANUARY 15, 2016; 10:09 A.M.
2
3       THE VIDEOGRAPHER: Good morning. Here
4  begins Media No. 1 in the deposition of Michael
5  Fisher in the matter of Yanez versus United States
6  of America. The case is in the United States
7  District Court, Southern District of California.
8  The case number is 13-cv-1417. Today's date is
9  January 15th, 2016. The deposition is taking place
10 at 501 West Broadway, Tenth Floor, San Diego,
11 California 92101. The legal videographer is Anthony
12 Martinez, and the court reporter is Vivian Weiss,
13 here on behalf of Thorsnes Litigation Services.
14      Counsel, be aware. Your microphones are
15 sensitive and may pick up whispers, private
16 conversations, and cellular interference, which may
17 be captured on the video, as well as taken down by
18 the court reporter as part of these proceedings.
19      Would counsel please identify yourselves
20 and state whom you represent.
21      MR. SHADOWEN: Steve Shadowen on behalf of
22 plaintiffs.
23      MR. WEINER: Matthew Weiner on behalf of
24 plaintiffs.
25      MS. SCHWEINER: Dianne Schweiner on behalf

Page 6

1  of defendants.
2       And agency counsel here, Sofia Flood.
3       THE VIDEOGRAPHER: Thank you.
4       Would the reporter please swear in the
5  witness, and we can proceed.
6       MR. SHADOWEN: Pardon me. Also note the
7  presence of other people in the room, please, the
8  gentlemen at the end.
9       MS. SCHWEINER: Oh, I'm sorry. Chad Nelson
10 and Dorian Diaz, agents with CBP are here.
11      THE VIDEOGRAPHER: Thank you.
12      Would the reporter please swear in the
13 witness, and we can proceed.
14
15      MICHAEL FISHER,
16 having been administered an oath, was examined and
17 testified as follows:
18
19      EXAMINATION
20 BY MR. SHADOWEN:
21      Q. State your name, please.
22      A. My name is Michael Fisher.
23      Q. Mr. Fisher, how do you prefer that I refer
24 to you, Chief Fisher, Mr. Fisher, or something else?
25      A. Chief Fisher is fine. Thank you.

Page 7

1       Q. Chief Fisher, am I correct that you entered
2  on duty with the U.S. Border Patrol in June 1987?
3       A. Yes, sir.
4       Q. What was your first assignment?
5       A. My first assignment was a border patrol
6  agent assigned to the Douglas station, which is in
7  the Tucson sector.
8       Q. How long were you there?
9       A. Approximately 7 1/2 years.
10      Q. So sometime in '94?
11      A. Yes, sir.
12      Q. I take it at some point you served as
13 deputy chief patrol agent in Detroit sector; is that
14 right?
15      A. Yes, sir.
16      Q. When did that happen?
17      A. I believe that was in 1998, 1999.
18      Q. What were you doing from '94 to '98?
19      A. I was assigned as a field operation
20 supervisor for the border patrol tactical unit,
21 assigned Biggs Army Airfield in El Paso, Texas.
22      THE REPORTER: I'm sorry. What airfield?
23      THE WITNESS: Biggs.
24      THE REPORTER: Thank you.
25      THE WITNESS: B-i-g-g-s.

Page 8

1  BY MR. SHADOWEN:
2       Q. And then where were you assigned starting
3  in '99?
4       A. Well, in 2000, I entered on duty as an
5  assistant chief patrol agent in the Tucson sector in
6  Arizona.
7       Q. How long were you in that position?
8       A. Approximately -- I did an assignment as the
9  deputy director for the Office of Antiterrorism
10 sometime towards the end of 2003, into 2004.
11 Although my -- I was on paper still assigned as an
12 assistant chief, I was reassigned in the capacity of
13 the deputy director in Washington, D.C.
14      Q. And that was from 2000 to 2004?
15      A. Yes. So from 2000 to about 2003 I was an
16 assistant chief. Went up to Washington, D.C. And
17 then I was selected for a position in Washington,
18 D.C., in around -- towards the end of 2004,
19 beginning of 2005.
20      Q. And then you returned to San Diego in 2006?
21      A. I did, sir, as the deputy chief patrol
22 agent.
23      Q. And you then were promoted to chief patrol
24 agent in June 2007?
25      A. That sounds about right, sir, yes.

Page 9

3 (Pages 6 to 9)

1      Q. Okay. And then you were named acting chief
2  of border patrol back to Washington in January 2010?
3      A. That is correct.
4      Q. And then became -- you lost the acting
5  title and became chief of border patrol in May 2010?
6      A. Yes, sir.
7      Q. From May 2010 -- well, then when did you
8  leave service?
9      A. 30 November 2015.
10     Q. From May 2010 to November 2015, were there
11 any changes in your job responsibilities or
12 authority?
13         MS. SCHWEINER: Overbroad.
14         THE WITNESS: From a job standpoint, yes.
15 It was evolving in terms of the threat and how we,
16 as an organization, we're going to respond to the
17 threat. Not so much in the authority. The
18 authorities, as I recall, would remain the same from
19 when I had started as a chief in 2010 until I left.
20         There was one change towards the end where
21 I was asked by the commissioner at the time to kind
22 of -- the secretary of Homeland Security had
23 required the heads of each of the agencies and/or
24 their seconds to be in the national capitol region
25 at all times. Because of the breadth and scope of

Page 10

1  the mission of CBP and given the fact that the
2  commissioner and the deputy commissioner traveled
3  extensively to include overseas travel, the
4  secretary allowed the commissioner to kind of pick a
5  number three to rotate in that -- in that role. The
6  commissioner selected me to do that. So it wasn't
7  necessarily increased authority. It was different
8  in terms of the previous chief responsibilities that
9  I had up until that point.
10 BY MR. SHADOWEN:
11     Q. Okay. And for what period of time did you
12 have this increased or different role, the number --
13     A. It was probably in early to mid-2014. It
14 wasn't that long. It may even have been early 2015
15 because we're in '16 now. So -- they changed my
16 responsibilities in 2015.
17     Q. So is it in early 2015 that you had this
18 additional responsibility as the number three man?
19     A. I wouldn't call it the number three. It
20 was I had to stay back to be able to take care of
21 anything that the deputy or the commissioner would
22 have had to take care of had they been in the
23 office.
24     Q. Got you.
25     A. But, again, it wasn't any increased

Page 11

1  authority to my chief position because of that.
2      Q. And during that period of time, the number
3  three period, was that -- you were just -- had to be
4  in Washington in case --
5      A. Something happened.
6      Q. -- the chief was unable to -- to perform
7  his duties? Is that the idea?
8      A. Well, the idea, primarily, in the absence
9  of the commissioner or deputy commissioner. I'll
10 give you one example. There's continuity of
11 operations. So in the event something happened
12 within the national capitol region, God forbid
13 another terrorist event, there's certain protocols
14 that go into place in devolution of authorities
15 and -- which is the reason presumably the secretary
16 wanted to have leads of those agencies within the
17 national capitol region at any time. Because
18 there's different protocols that go into place in
19 the event that we have to exercise some of those
20 protocols during a national incident, which did not
21 happen, by the way, during that short tenure.
22     Q. Got you. Chief Fisher, am I correct that
23 since at least October of 2010 you had the authority
24 to direct CPAs to identify high-risk zones in their
25 sectors?

Page 12

1      A. Yes, sir.
2      Q. And am I correct that since at least -- and
3  I'm going, obviously, only up until the time you
4  resigned in November 2015. So from the period
5  October 2010 through November 2015, did you have
6  authority to direct CPAs to develop operational
7  plans to minimize the use of deadly force?
8      A. I would say that I had the authority and I
9  did exercise that authority to have border patrol
10 agents at the leadership level to be able to develop
11 plans. We did that on an ongoing basis. It wasn't
12 primarily for any specific reason other than to
13 respond to a dynamic threat environment in which we
14 faced.
15     Q. And am I correct also, again during that
16 period of time, through at least October '10 --
17 October 2010 through November 2015, you had the
18 authority to assess the need for changes in
19 policies, tactics, training, and equipment with
20 respect to the use of force?
21         MS. SCHWEINER: Overbroad. Vague and
22 ambiguous.
23         THE WITNESS: That is correct to a certain
24 extent. I did not have the authority, for instance,
25 to change policy or change training just because I

Page 13

1    BY MR. SHADOWEN:
2        Q. Is it true that since at least October 2010
3    you were responsible for all aspects of CBP use of
4    force policy for border patrol agents?
5        MS. SCHWEINER: Objection. Asked and
6    answered. Compound. Vague and ambiguous.
7    Overbroad.
8        THE WITNESS: Not exclusively.
9    BY MR. SHADOWEN:
10       Q. Okay. What do you mean by that?
11       A. Well, as the chief of the border patrol,
12   the use of force policy within CBP was broad and
13   overarching. There were things like implementations
14   of that policy that clearly I had the authority and
15   did exercise within just the office of border
16   patrol. But broadly, I would not have that
17   authority.
18       Q. Did you have from at least October 2010
19   through November 2015 responsibility for ensuring
20   compliance by all border patrol agents with the CBP
21   use of force policy?
22       MS. SCHWEINER: Overbroad. Vague and
23   ambiguous.
24       THE WITNESS: Yes, sir.
25   ///

Page 22

1    BY MR. SHADOWEN:
2        Q. Did you have responsibility from at least
3    October 2010 through November 2015 for reviewing all
4    final investigative reports of use of deadly force
5    by border patrol agents?
6        A. No, sir, I did not.
7        Q. What authority or responsibility, if any,
8    did you have for reviewing investigative reports of
9    use of deadly force by border patrol agents?
10       A. Very little responsibility for that.
11       Q. What did you do? I'll start with that.
12   Leave aside responsibility.
13       A. Certainly.
14       Q. What was your routine when there was
15   reports -- investigative reports by OIG, by the FBI,
16   by IA or by whomever or by local police authorities?
17   What was your practice in terms of reviewing those
18   reports for deadly force incidents?
19       A. So I think it's a good point. I could
20   maybe walk you through the scenario in terms of
21   how -- typically those situations would be done in
22   terms of fact-finding and subsequent investigations.
23       Q. Okay.
24       A. Generally, on a use of force incident,
25   among others, there is one report which I have

Page 23

1    received --
2        Q. I'm sorry to interrupt.
3        A. Certainly.
4        Q. Is this all use of force or is this deadly
5    force or --
6        A. Let me broaden it a little bit in terms of
7    the process. That may be helpful. I'll
8    characterize it as a significant incident report.
9    So a significant incident report within CBP were
10   reports that needed to be completed by the field to
11   higher headquarters in Washington D.C. And I'll
12   give you an example of a significant incident
13   report. It could have been a vehicle accident with
14   fatalities. It could have been an encounter, a
15   contentious encounter at a checkpoint with a border
16   patrol agent. It could have, in fact, included a
17   less lethal event which may have risen to media
18   interest. It would certainly include a discharge of
19   a firearm, whether it was to euthanize a rabid dog
20   during a patrol, on an agent's patrol, and it would
21   include those types of significant incidents. That
22   was the first level of reporting that would be done.
23       It basically happened in two stages. The
24   first stage would be an oral call from the field to
25   the commissioner's situation room in Washington,

Page 24

1    D.C. And so within that first hour, when
2    practicable, obviously, the agents and typically
3    maybe a supervisor would make the call, basically
4    putting the leadership on notice that an event took
5    place.
6        Subsequent to that initial call, there
7    would be generally within the first three or four
8    hours -- again, there would be no hard-and-fast rule
9    but it was somewhat immediately after that would be
10   a written report that was done to the commissioner's
11   situation room. Very -- as you can imagine, after
12   incidents rising to the level of a significant
13   incident report, it would just be basically who,
14   what, when, where, and why. It would be a very
15   quick statement of what had transpired. So that
16   would be the first level of notice that I and others
17   within the leadership of CBP would be on notice.
18       Q. All right. May I interrupt you right
19   there?
20       A. Please.
21       Q. So a report comes into the commissioner's
22   situation room. Does that include you and the
23   copying of that when that comes in? Are you part of
24   the situation room? Explain that to me.
25       A. Okay. I'm not part of the situation room.

Page 25

7 (Pages 22 to 25)

1    There are border patrol agents, CBP officers that
2    man that situation room 24/7.  So when they receive
3    the call and when they receive the first initial
4    report from the field, they take that information,
5    put it into a format, and they have a distribution
6    list that they know that they're supposed to send
7    that to.  I was on that distribution list.
8        Q.  You were on that?
9        A.  Yes, sir.
10       Q.  All right.  Who was else was on that list?
11           MS. SCHWEINER:  Lack of foundation.
12           THE WITNESS:  Typically, it would be the
13   commissioner, deputy commissioner, and
14   operational -- so it would be the assistant
15   commissioner for field operations, chief of the
16   border patrol, the assistant commissioner for
17   air-marine operations.  There may be some others.
18   I'm not real familiar.  I mean, it's a pretty
19   exhaustive list.  I just can't name them all.
20   BY MR. SHADOWEN:
21       Q.  Okay.  All right.  I'm sorry.  Go ahead,
22   then.  So a report comes into the situation room;
23   they distribute it.
24       A.  Right.  So that's -- I'll call it that's
25   the blast, the first report that something had

                                        Page 26

1    transpired.
2            Our operational tempo, if you will, in the
3    building was every morning at 9:00 o'clock the
4    assistant commissioners -- well, let me be specific.
5    The commissioner would hold his 9:00 o'clock
6    meeting.  In that meeting you would have -- and not
7    all the time, mind you, depending upon travel.  But
8    typically you would have the commissioner, deputy
9    commissioner.  You would have the assistant
10   commissioner for field operations, the chief of the
11   border patrol, the assistant commissioner for field
12   operations.  You would have the director for
13   intelligence.  You would have the assistant
14   commissioner for international affairs, and the
15   assistant commissioner for the Office of Information
16   Technology.  We would sit in a --
17       Q.  Did you mean to say internal affairs?  You
18   said "international affairs."
19       A.  I meant to say both.  I missed the Office
20   of Internal Affairs.  They were represented as well.
21       Q.  Uh-huh.
22       A.  Then you had sundry backbenchers staffing
23   that.
24           The purpose of that 9:00 o'clock meeting
25   first and foremost was to receive the last 24-hour

                                        Page 27

1    intelligence update from the director of our Office
2    of Intelligence.
3            After the intelligence update, the
4    commissioner would ask each of us sitting around the
5    main table to provide any updates since the previous
6    day.  So typically I would have however -- whatever
7    the situation -- or the significant incident
8    reports.  If they rose to the level of the
9    commissioners or that particular meeting, I would
10   give him not just -- because I knew he would have
11   received probably the same quick paragraph blurb.
12   But any information that I would have received
13   subsequent to that initial incident report I would
14   provide to the commissioner.
15           It would typically -- again, because it was
16   only a little more -- a few hours later than the
17   incident report, but during that time I would be
18   able to provide for him, say, for instance, the
19   agents that were involved, how long they had been --
20   a little bit of background information about the
21   agents, any other information that we, as an
22   organization, would have learned subsequent to the
23   initial reporting on the significant incident
24   report.
25           Then I would -- there would be other things

                                        Page 28

1    that I would tell him, you know, hey, you know, for
2    instance, by the way, I have a meeting with the
3    National Security Council this afternoon at 2:00
4    o'clock.  Here's the -- you know, here's what we're
5    going to be discussing.  So it wouldn't just be
6    incidents.  It would be intel, tell me what
7    happened, and then things that the commissioner
8    wanted to know from his leadership.  And so that was
9    the typical way that we would receive information at
10   the leadership and -- on incidents like that.
11       Q.  Let's stop right there.  So you mentioned
12   that you would brief the commissioner on any
13   additional information that came in overnight, sort
14   of filling out the picture a little bit for him.
15           Where would you get that information, let's
16   say in a use of force incident?
17       A.  Okay.  The information would be gathered
18   from border patrol agents on the ground.  So these
19   would be border patrol agents, who typically would
20   have been either first responders, and the
21   supervisors who would have maintained site security
22   for the lead investigative agency on a use of deadly
23   force event.  That was a significant incident.
24           They would be on-site and then be able --
25   either with the investigative agency on the ground

                                        Page 29

Michael Fisher

January 15, 2016

1 be able to provide at least, hey, did the border
2 patrol agent do a walk-through, for instance? Did
3 the border patrol agent give a statement? Not what
4 the statement was, but was there a statement made
5 over the past ten hours or so.
6     Q. Right.
7     A. So it would be that type of information
8 that the leadership on the ground would know about
9 that they would pass up to my operations division in
10 Washington. And they would prepare for me any
11 additional information that I would require to be
12 able to take to the meeting in the event that there
13 were questions about the incident.
14     Q. And what form did information take when it
15 came from your operational people to you? Was there
16 a binder of material, or was it less formal than
17 that? What was it?
18     A. When I first got there in 2010, it was very
19 less formal. Soon, sometime in late -- I believe it
20 was 2011 we realized as a staff that just trying to
21 do it ad hoc probably wasn't a good idea. So we
22 just basically just came up with a format, generally
23 no more than one page where we were able to, you
24 know, stick up in the upper right-hand corner just
25 a -- kind of a map, a display of where along the

Page 30

1 border it took place.
2         And then we would have kind of like an
3 introduction or just a quick background, kind of
4 what we call the BLUF, "the bottom line up front"
5 kind of section. And then there would be a little
6 bit more just initial -- more information than the
7 significant incident report. And we would do that
8 typically once after the original significant
9 incident report.
10         That report would also contain generally
11 within the first 24 and certainly within the 48-hour
12 period from the incident we would know on the ground
13 who the lead investigative agency was that was going
14 to take the case. So then once that was
15 established, I would let the commissioner know that
16 the FBI, for instance, is taking the lead or a local
17 sheriff, whatever that happened to be. At that
18 point we stopped our reporting because it was no
19 longer an incident. It was now an investigation.
20 So we wanted to keep those two reportings separate.
21     Q. Okay. The material that was provided to
22 you for your -- by your operational people, does
23 that have a name? Did you have -- was that called
24 your briefing book? Was it something else? If I
25 wanted to ask for that document, what would I ask

Page 31

1 for?
2     A. I think it was generally referred to as an
3 issue paper.
4     Q. Okay.
5     A. And then following those, it -- it would
6 have been -- in some cases it would then turn into
7 the issue paper. And then we'd talk -- we also
8 called it an evolving situation report. If it was
9 something that was going to go beyond -- for
10 instance, if the significant incident report didn't
11 involve an investigation necessarily but it was
12 still ongoing beyond that, we would then call it an
13 evolving situation report, and then just provide,
14 you know, updates for maybe two or three days,
15 depending upon when we decided that it was no longer
16 needed to be reported.
17     Q. Got you. Okay. So let's -- let's focus --
18 well, is that sort of it for the general background
19 of how a significant incident is reported to you?
20     A. It is.
21     Q. All right. So now let's take an example of
22 a use of deadly force incident. And then let's say
23 it's already come to a significant incident report,
24 you've seen the issue paper on it, what happens
25 next? And then if what happens next varies

Page 32

1 depending upon which department or agency is taking
2 control, let us know that as well.
3     A. Okay.
4     Q. But walk us through what happens next from
5 your perspective.
6     A. Okay.
7         MS. SCHWEINER: Vague and ambiguous.
8 Overbroad.
9         THE WITNESS: So once there was a
10 determination made that there has been a lead
11 investigative agency identified, we would stop our
12 reporting on that. Generally, I would not as the
13 chief receive any additional information on that
14 investigation for quite some time. It could be
15 months. In some cases it could be years.
16         And sitting around the table, for instance,
17 every now and then, the Office of Internal Affairs
18 may have some information about the investigation,
19 although up until recently and certainly 2010 until
20 I believe somewhere around 2015, during that period
21 internal affairs was not receiving information
22 relative to the investigation. There's a host of
23 reasons for that, but -- so -- if there was any
24 other information available subsequent on a use of
25 force or use of deadly force incident, if there was

Page 33

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1  any information that may have been provided either
2  formally or informally to the Office of Internal
3  Affairs, that would typically be shared with just
4  the commissioner.
5       Every now and then there would be some
6  information. There wasn't any report that I can
7  recall. It was generally the assistant commissioner
8  at the time, Mr. Tomsheck, who would talk about,
9  hey, you know, on this particular case, this is what
10  we may -- this is what we're hearing about the case.
11  But, generally, there was not information brought to
12  the leadership in CBP during that time because we
13  were not part of the investigative team as an
14  organization.
15  BY MR. SHADOWEN:
16      **Q. So let's say OIG is taking the lead on the**
17  **investigation together with, say, a local police**
18  **agency, when they conclude their report, what**
19  **happens then? Let's say they decide there's not**
20  **going to be a prosecution of the agent, what happens**
21  **next?**
22      MS. SCHWEINER: Lack of foundation.
23  Overbroad.
24      THE WITNESS: I'm not really sure only
25  because I -- I don't know where that report would

1  Professional Responsibility. It would not come to
2  me as the chief of the border patrol. And, again,
3  depending upon the time of year, in around 2000 and
4  I don't remember the exact date, I believe it was
5  Commissioner Bersin, when he was the commissioner,
6  there was a disciplinary review board established.
7       So there's the criminal process. Then
8  there's a potential administrative process. But
9  those files specifically, either from OIG or from
10  OPR, never came directly back to me. And presumably
11  they didn't go back to the assistant commissioner
12  for the Office of Field Operations either. There
13  were other entities within the Department of
14  Homeland Security established by directives and
15  protocols and policies of who had what
16  responsibility within the Department of Homeland
17  Security to do those types of investigations and how
18  that flow of responsibility would work.
19  BY MR. SHADOWEN:
20      **Q. Now, leave aside any criminal**
21  **responsibility or any formal disciplinary action**
22  **against the agents, what, if any, review of a deadly**
23  **force incident would you conduct or direct to be**
24  **conducted to determine whether or not that**
25  **particular shooting was within policy?**

1  have gone. I didn't receive, as the chief of the
2  border patrol, for instance, from OIG a complete
3  investigative file on a case that they would have
4  been investigating border patrol agents, for
5  instance. So I don't know.
6       Procedurally, as things had -- over the
7  years, it would make sense that they would turn that
8  file over either to the Office of Professional
9  Responsibility within ICE, Immigration and Customs
10  Enforcement, to make a determination one way or the
11  other if OIG -- this is just kind of some of the
12  different processes that may have taken place
13  because I honestly don't know.
14       If OIG had completed the criminal
15  investigation, if they were the lead for that, they
16  would then want to pass that on to another entity to
17  establish if, in fact, there was any misconduct, you
18  know, policy violations, things of that nature. One
19  avenue they could have sent the case to would have
20  been the Office of Professional Responsibility
21  within ICE to make that determination.
22       At some point, either the criminal
23  investigation would be sent over perhaps to the
24  commissioner or a finding from an administrative
25  process would come over from the Office of

1  A. I wouldn't need to because those
2  determinations and that -- that -- that process was
3  a CBP process. It wasn't specific to the individual
4  components.
5       So, for instance, if there was a review,
6  for instance, the Office of Training and
7  Development -- as a matter of fact, as we evolved
8  within U.S. Customs and Border Protection, that's
9  how it works now. So you would have -- for
10  instance, the Office of Training and Development
11  would be part of a group that would look at, is
12  there some trainings that we -- some training that
13  we should do? There would be a look from the
14  disciplinary review board to see if, in fact, there
15  was any violation of policy.
16       So there's -- so the components themselves
17  didn't have the independent authority to make all of
18  those reviews. When you think about it, the three
19  operational components and working with two or three
20  different unions, it would be very difficult to try
21  to across the board standardize the manner in which
22  we were reviewing and taking any subsequent action.
23  So putting it all under one CBP in terms of who had
24  what responsibility within the various offices
25  was -- was the transition that we do now.

1  relinquish, you know, the day-to-day assignments
2  that I would give them because, you know -- for
3  instance, the assistant commissioner for training
4  and development would come and say, Hey, Chief, I'm
5  looking for a couple of your good agents to help me
6  out in the use of force center. We're going to be
7  taking a look at, you know, some new equipment or
8  whatever. Could you assign -- detail them over to
9  my office, you know, for the next six months, and I
10 would say yes. So technically, they were border
11 patrol agents, but they fell under the command and
12 control of the assistant commissioner for training
13 and development. So I wouldn't, nor would I expect
14 others that came to border patrol. Their direct
15 supervision and chain of command would change when
16 that would happen.
17 BY MR. SHADOWEN:
18      Q.  Who, if anyone, within CBP was looking for
19 patterns, a pattern that may have developed among
20 the line agents failing to seek cover and distance
21 themselves from rocking when it was safe to do so?
22      MS. SCHWEINER: Calls for speculation.
23 Lack of foundation. Overbroad. Vague and
24 ambiguous.
25      THE WITNESS: Again, I'm not aware that

Page 98

1  that -- that responsibility rests with one
2  individual. It starts first and foremost at the
3  field level, whether it's ATVs, are we seeing an
4  increase in accidents in one location, whether it's
5  use of force, how they're going about -- that's a
6  day-to-day assessment that first-line supervisors
7  are doing when they've working with frontline agents
8  and making assignments and trying to assess where to
9  put border patrol agents, for instance.
10      The agent in charge of that station, the
11 sector chiefs, I mean, there's a layer. I think all
12 of us share responsibility in terms of are we seeing
13 more and is it just one location. As a matter of
14 fact, that's a constant, you know, assessment in
15 terms of the organization.
16      So to your point, just to be clear, there
17 was not one person that was assigned to see if
18 border patrol agents were properly using cover or if
19 they were distancing themselves from threats.
20 That's a broad responsibility that directly or
21 indirectly starts with fellow officers but formally
22 would start at the first-line supervisor level and
23 then go through the organization.
24 BY MR. SHADOWEN:
25      Q.  Is it fair to say it's your ultimate

Page 99

1  responsibility?
2      MS. SCHWEINER: Misstates testimony. Lack
3  of foundation. Overbroad. And vague and ambiguous.
4      THE WITNESS: As the chief of the border
5  patrol, I had two overarching responsibilities.
6  First and foremost was the completion of the
7  mission, which quite simply was protecting the
8  country against those that would do us harm. So
9  that's one piece. And the second was to make sure
10 that the agents were safe. That's a very broad
11 overgeneralization. And that's how I carved out
12 predominantly my time as the chief of the border
13 patrol.
14 BY MR. SHADOWEN:
15      Q.  And when you say you were responsible for
16 the safety of the agents, did you give equal
17 consideration to the safety of people who came into
18 contact with the agents?
19      MS. SCHWEINER: Overbroad. Vague and
20 ambiguous.
21      THE WITNESS: Yes. And as I said as an
22 overgeneralization, matter of fact, I even talked --
23 I believe the memo talked about the safety of the
24 agents and the public. I mean, it wasn't -- saying
25 that just now wasn't to discount everybody else.

Page 100

1      MR. SHADOWEN: So let's stop for lunch.
2      THE VIDEOGRAPHER: Going off the record.
3  The time is 12:32 p.m.
4      (Recess taken.)
5      THE VIDEOGRAPHER: We are back on the
6  record. The time is 1:24 p.m.
7      (Exhibit 5 marked for identification.)
8  BY MR. SHADOWEN:
9      Q.  I'll mark as Exhibit 5 a one-page document,
10 Bates No. Deft-1100.
11      Chief Fisher, do you know what this
12 document is?
13      A.  It appears it be a summary report of the
14 Border Patrol Agent Dorian Diaz shooting on 21 June
15 2011.
16      Q.  Is this something that you received when
17 you were chief of the border patrol?
18      A.  I do not recall.
19      Q.  You don't recall one way or the other?
20      A.  I don't, no.
21      Q.  Okay. I'll represent to you that this was
22 produced to us by your counsel in this litigation.
23      Do you know whether this was in your files?
24      A.  I don't know.
25      Q.  Did you customarily receive summary reports

Page 101

26 (Pages 98 to 101)

1  such as Exhibit 5 for deadly force incidents during
2  the time that you were chief of border patrol?
3      A. I did.
4      Q. For each deadly force incident, would you
5  receive a summary report such as Exhibit 5?
6      A. Not -- not necessarily, no.
7      Q. About how many -- what percentage of the
8  time would you receive a report like this for a
9  deadly force incident?
10     A. The majority of the time I probably would
11  have. I just don't know if I got them for every
12  one.
13     Q. Okay. What was the purpose of your
14  receiving this summary report?
15     MS. SCHWEINER: Calls for speculation.
16     THE WITNESS: I just think this would be
17  information that would have been provided to CBP on
18  the case, who investigated the case. And,
19  obviously, looking at the bullets, some
20  investigative key points. I think it would be a
21  summary of just that.
22  BY MR. SHADOWEN:
23     Q. Who prepared these reports?
24     MS. SCHWEINER: Calls for speculation.
25     THE WITNESS: I don't know who prepared

Page 102

1  this report, to be honest.
2  BY MR. SHADOWEN:
3      Q. When you received these reports, did you
4  read them?
5      MS. SCHWEINER: Overbroad. Vague and
6  ambiguous.
7      THE WITNESS: I would receive reports on
8  fatal shootings that were given to me from my staff,
9  yes.
10  BY MR. SHADOWEN:
11     Q. I believe your prior testimony was that you
12  rarely received complete reports, was the language
13  you used, complete investigative reports.
14     Were there occasions when you received
15  portions of investigative reports from OIG or the
16  FBI or from IA?
17     A. I can't recall receiving any incomplete or
18  partial reports from any of those investigative
19  agencies you mentioned.
20     Q. On the occasions when you reviewed summary
21  reports such as Exhibit 5, what was your purpose in
22  reviewing them?
23     A. I think one to -- a couple of things. One
24  is to figure out where the investigation was. I
25  mean, was it still an open investigation, was it a

Page 103

1  closed investigation. So the timing was helpful for
2  me to figure out what -- where the investigation
3  was.
4      And then just a synopsis. You know, as I
5  look at these -- this particular sheet, the bullets
6  were helpful because this would be an overview of
7  the investigation. So it would be of interest to
8  me, not having received the investigative report
9  from those agencies, to be able to just take a look
10  at some of the summary conclusions. So this report,
11  as I look at it, would be helpful, because it would
12  be probably, in most cases, the information that I
13  would receive I wouldn't have received from an
14  investigative agency.
15     Q. You mentioned before that you thought that,
16  in connection with your issuing the directive, your
17  March 2014 memorandum, that you thought there was
18  misinformation among the media and other places.
19     Do you recall that testimony?
20     A. I do.
21     Q. Do you think that they were misinformed
22  about the factual circumstances under which these
23  shootings occurred?
24     MS. SCHWEINER: Overbroad.
25     THE WITNESS: I don't recall specifically.

Page 104

1  I think the general perception, as I'm thinking back
2  on the genesis of writing that for an external
3  audience, really had to do with not understanding
4  law enforcement generally and then border patrol
5  specific about when and how and under what
6  circumstances can border patrol use deadly force.
7      And my sense at the time was that there's a
8  perception that border patrol agents shoot all the
9  time, in particular. So that was one of the -- you
10  know, as I was reading and listening to the news,
11  there was just a general lack of understanding about
12  the organization, the environment in which the
13  border patrol agents operated, and general guidance
14  for use of force. I can't recall anything specific
15  about what it was that -- about any particular case.
16  It was just -- just broad.
17  BY MR. SHADOWEN:
18     Q. Do you think there would be legitimate
19  calls for public concern if it turned out to be the
20  case that agents used deadly force 10 percent of the
21  times that they were rocked?
22     MS. SCHWEINER: Objection. That calls for
23  speculation. Lack of foundation. Incomplete
24  hypothetical.
25     THE WITNESS: It would be hard -- it would

Page 105

27 (Pages 102 to 105)

1  instance, as a hypothetical, a rock came over and
2  hit my partner in the head and my partner was
3  bleeding, and the immediate threat at the time
4  appeared, because I'm not able to see all the way
5  into Mexico because of the fence, had dissipated. I
6  can't assume that that scene is going to be secure
7  while we wait for our supervisor to set the inner
8  and outer perimeter and do those things. So what I
9  may need to be able to do is in the lapse where
10  there is no more threat present is to be able to
11  move further away for cover and concealment
12  purposes. And because it's dark out and I know that
13  that rock that I can see with my flashlight has
14  blood on it, I know that's going to be evidence, I
15  can mark it and then pull that back with me. Under
16  those circumstances I just described, I can see in
17  some cases where it would be reasonable that those
18  border patrol agents are moving that for a stated
19  purpose.
20       If, however, same circumstances but I just
21  decided, you know what? I'm just going to take this
22  rock, and I'm going to throw it back, you know, and
23  see if I can hit those guys over the fence. You
24  know, that would -- that recognition of that may be
25  evidence when they said I don't want, you know, the

Page 138

1  investigative agents to see this rock, for whatever
2  reason. I can't imagine why. And then just
3  destroy -- the intent is different in terms of why
4  they would move it. That's why it really depends.
5  I would need more information to be able to give you
6  further.
7  BY MR. SHADOWEN:
8       Q. Are you familiar with an incident that
9  occurred on the border in El Paso in which a
10  teenager named Sergio Hernandez was shot and killed?
11       A. Vaguely. Do you have some more facts?
12       Q. It was a 15-year-old boy standing on the
13  Mexican side of the Rio Grande. I think it was
14  September 2010, thereabouts -- June, June 2010. The
15  criminal division of the DOJ civil rights department
16  had looked into it and closed the file. The U.N.
17  High Commission on Civil Rights, Human Rights,
18  lodged a protest against the closing of the
19  investigation. The Mexican government was upset.
20  There's a civil lawsuit pending with respect to it.
21       Does that jog your memory at all?
22       MS. SCHWEINER: Assumes facts not in
23  evidence. Misstates the evidence. Calls for
24  speculation.
25       THE WITNESS: Vaguely familiar.

Page 139

1  BY MR. SHADOWEN:
2       Q. Okay. It turned out that there were three
3  videotapes of that incident.
4       Have you seen any of the videotapes?
5       A. I may have seen one videotape if it's the
6  same incident you're describing. But I can't be
7  100 percent sure it's the same case. I remember it
8  was in El Paso.
9       Q. From your view of that videotape, did it
10  appear that that was a justified use of deadly
11  force?
12       MS. SCHWEINER: Calls for a legal
13  conclusion. Incomplete hypothetical. Calls for
14  speculation.
15       THE WITNESS: There would be no way for me
16  to determine looking at just the video to make that
17  determination.
18  BY MR. SHADOWEN:
19       Q. Did you ever make a determination in your
20  own mind as to whether or not that was a legitimate
21  shooting?
22       A. I did not because I never recall having
23  seen any investigative facts on that case from that
24  investigative agency that had done that
25  investigation.

Page 140

1       MR. SHADOWEN: Why don't we take a break
2  now. He needs to change the videotape.
3       THE VIDEOGRAPHER: This marks the end of
4  Media No. 2 in the deposition of Michael Fisher. We
5  are off the record at 2:20 p.m.
6       (Recess taken.)
7       THE VIDEOGRAPHER: We are back on the
8  record. The time is 2:32 p.m. This marks the
9  beginning of Media No. 3 in the deposition of
10  Michael Fisher.
11       (Exhibit 7 marked for identification.)
12  BY MR. SHADOWEN:
13       Q. Chief Fisher, I'll hand you what we'll mark
14  as Exhibit 7. This appears to be a news article
15  from The Associated Press dated November 5, 2013.
16  This appears to be an AP news story, and I have a
17  couple of questions for you.
18       First of all, did you give -- did you give
19  an interview to the AP, or was there a news
20  conference with respect to the release of the --
21  your reaction to the PERF report, or was it
22  something else?
23       A. And that's what I'm looking at. I did talk
24  to -- I believe the reporter's name was Elliot
25  Spagat, but I don't see his name on here. So for

Page 141

36 (Pages 138 to 141)

1    Chief, in that first paragraph toward the bottom.
2         MS. SCHWEINER: Can you point so I can see
3    as well, Counsel?
4         MR. SHADOWEN: Sure. Right here, page 21.
5    BY MR. SHADOWEN:
6         Q. It says, Thus, the CBP's border patrol
7    field element at the sector level investigated and
8    determined whether discipline was warranted. And,
9    again, they're talking about use of deadly force
10   here.
11        Is that an accurate statement, that in use
12   of deadly force incidents, the border patrol field
13   element at the sector level investigated and
14   determined whether discipline was warranted?
15        MS. SCHWEINER: I'm sorry, Counsel. I
16   can't even find the sentence that you're referring
17   to, so you're going to have to point it to me first.
18        So what is your question to the witness?
19        MR. SHADOWEN: Whether that's true.
20        MS. SCHWEINER: That calls for speculation.
21   Incomplete hypothetical. And it's a lack of
22   foundation.
23        THE WITNESS: I don't know that to be true.
24   BY MR. SHADOWEN:
25        Q. You don't know it one way or the other, or

Page 150

1    do you think it's not true?
2         MS. SCHWEINER: Incomplete hypothetical.
3    Vague and ambiguous. Overbroad. Lack of
4    foundation. Calls for speculation.
5         THE WITNESS: I don't know that to be fact,
6    in part or in whole.
7    BY MR. SHADOWEN:
8         Q. You just don't know?
9         A. I don't.
10        MS. SCHWEINER: Same objections.
11        (Exhibit 9 marked for identification.)
12   BY MR. SHADOWEN:
13        Q. Mark as Exhibit 9 a two-page document.
14   Appears to be an email from Jeffrey Caine to Chief
15   Fisher, among others, dated May 22, 2010, Bates
16   Nos. Defendant 1049 and -50.
17        Chief, is this an example of a significant
18   incident report?
19        MS. SCHWEINER: Calls for speculation.
20        THE WITNESS: It appears to be an update of
21   an earlier significant incident report. It appears
22   to be an update on a previous significant incident
23   report.
24   BY MR. SHADOWEN:
25        Q. Got you.

Page 151

1         A. Same subject but just updated information.
2         Q. Okay. And you would have received this in
3    the ordinary course of business?
4         A. It appears that it was sent to me by
5    Jeffrey Caine.
6         Q. Right.
7         (Exhibit 10 marked for identification.)
8    BY MR. SHADOWEN:
9         Q. Mark as Exhibit 10 a two-page document from
10   Ronald Vitiello, dated August 31, 2010, to Chief
11   Fisher and others.
12        Just a general question. What is
13   Exhibit 10? Is this another example of an update on
14   an SIR?
15        A. That's what I was looking at, the timing.
16   This appears to be an email in advance of the
17   significant incident report, right. So oftentimes,
18   only because if you look at the last sentence, the
19   situation room has been notified and a significant
20   incident report is being generated.
21        So I think sometimes what would happen,
22   when they know that these would be the types of
23   incidents we want to know about, even though the
24   situation room would have received the initial call,
25   the supervisors, in this case I think Raleigh

Page 152

1    Leonard, would have been more than a first-line
2    supervisor to notify somebody on my command staff in
3    headquarters via this email. So this is just even
4    letting the headquarters know even before the
5    situation room sends them the initial report.
6         Q. Got you.
7         A. That's what this appears to be.
8         Q. Okay. But it would be routine for you to
9    receive emails like this. Either contemporaneously
10   with an SIR or an advance or an update on a SIR,
11   people would send you emails updating you?
12        A. Not necessarily. As it looks, the only
13   reason why I got this one was my deputy, Ron
14   Vitiello, would have included me because this
15   information would have come up through the chain of
16   command, so I wouldn't have received this but for my
17   deputy letting me know that he is sending it to Jeff
18   Caine. He's giving me a sense of, you know, what
19   information is coming forward in terms of a
20   significant incident.
21        He's also letting me know that he's
22   including individuals I think at the time were on
23   the commissioner's staff. So when I look at this,
24   it's from my deputy, and he's sending it to me for
25   information, and he's already put me on notice that

Page 153

Michael Fisher                                                                          January 15, 2016

1 he's already sent this forward to the commissioner.
2 So just be prepared if I get a call from the
3 commissioner because it's possible that he would
4 have received this as well.
5     Q. Okay.
6     A. But it's -- generally we wouldn't get
7 detailed -- we wouldn't get information from an
8 incident in advance of the SIR. This one just
9 happens to be that.
10     Q. Got you. But the sort of the information
11 that's included in the initial email is the sort of
12 information that if you didn't get it through means
13 like this, through email, you would see it the next
14 morning in the SIR or whenever the SIR was prepared?
15     A. Well, I would see it in an email either way
16 because the SIRs, I would get those electronically.
17     Q. Got you.
18     A. Yes.
19     Q. All right. I'm just noticing in the
20 subject matter here, it says "Shots Fired SON."
21     What does "SON" mean?
22     A. SON is three letter designator for the
23 Sonoita station in Tucson sector.
24     (Exhibit 11 marked for identification.)
25     ///

Page 154

1     BY MR. SHADOWEN:
2     Q. Mark as Exhibit 11 two documents,
3 Defendant's Bates No. Deft-1106 to 1108.
4     You mentioned before that during the period
5 of time in which you were the chief patrol agent you
6 would occasionally get inquiries from officials
7 either in Mexico or on behalf of Mexico about
8 incidents.
9     Is Exhibit 11 an example of a receipt of
10 such an inquiry and then your initial response?
11     A. So the first letter from -- from the -- it
12 looks like the cónsul general of Mexico to -- or my
13 letter back to the cónsul was in response to his
14 letter. So on certainly the use of force with a
15 fatality, the cónsul, they would send basically form
16 letters every time about really just wanting -- you
17 know, the government of Mexico was outraged. They
18 demand an investigation, and it's kind of the same
19 thing.
20     So what I would do on this particular case,
21 it looks like I'm responding to one of those letters
22 that he had sent me.
23     Q. And do you recall this particular incident?
24     A. I do not.
25     (Exhibit 12 marked for identification.)

Page 155

1     BY MR. SHADOWEN:
2     Q. Mark as Exhibit 12 a two-page document, a
3 letter to Secretary Napolitano from the ambassador
4 of Mexico dated April 27, 2012. And I see on the
5 second page it shows a carbon copy to Acting
6 Commissioner Aguilar and to you.
7     Do you see that?
8     A. I do see that.
9     Q. Do you recall receiving this letter in or
10 about April 27, 2012?
11     A. I do not recall receiving the letter.
12     Q. You referred a little while ago to the
13 receipt of what are essentially form letters from
14 Mexican officials related to use of force incidents.
15     Would you characterize Exhibit 12 as an
16 example of a form letter?
17     A. I would not, no.
18     Q. This letter went to -- apparently to
19 Secretary Napolitano.
20     Did you have a discussion with her about
21 this letter or its subject matter?
22     A. I don't recall that I did.
23     Q. Did you have a discussion with Mr. Aguilar
24 about it?
25     A. I don't recall that I did.

Page 156

1     Q. What, if anything, did you do in response
2 to Exhibit 12?
3     A. I do not know what, if any, response I
4 would have done after receiving this letter.
5     (Exhibit 13 marked for identification.)
6     BY MR. SHADOWEN:
7     Q. All right. Mark as Exhibit 13 a two-page
8 document/letter from the Ambassador of Mexico to
9 Secretary Napolitano dated September 4, 2013.
10     Do you recall receiving Exhibit 13 in or
11 about September 2013?
12     A. I don't recall receiving it.
13     Q. I see that you're -- it shows a carbon copy
14 to you on the second page.
15     Do you see that?
16     A. I do see that.
17     Q. Do you recall having a discussion with
18 Secretary Napolitano about this letter or its
19 subject matter?
20     A. I do not recall having a meeting with the
21 Secretary about this letter, no.
22     Q. What about the Acting Commissioner
23 Winkowski?
24     A. I do not recall having a discussion with
25 Acting Commissioner Winkowski.

Page 157

40 (Pages 154 to 157)

1      **Q. Since you don't recall receiving the**
2  **letter, I take it you don't recall doing anything in**
3  **response to it?**
4      A. I do not. However, with this letter and
5  the previous letter, one, I would not be responsive
6  either specifically to Ambassador Medina Mora or
7  the -- I guess these are both from Ambassador Medina
8  Mora. And I have met with the ambassador on other
9  occasions to include use of force.
10      The protocol on letters like this when they
11  would come from the Secretary, typically the
12  Department of Homeland Security would send it down
13  to U.S. Customs and Border Protection. I would -- I
14  would -- in my in-box or within my staff would get a
15  copy because we were cc'd if it came -- if we got a
16  copy from CBP. So I don't know whether I received
17  the letter or not.
18      Generally what would happen, the Office of
19  International Affairs, working with all of the
20  operational components, would prepare a response
21  letter back for the Secretary's signature. So I
22  wouldn't necessarily do that.
23      U.S. Customs and Border Protection, about
24  62,000 employees, is broken down into 20-some
25  different functions and offices. So as -- you know,

1  I think the term we were talking about before,
2  responsible, you know, officers, all of us would
3  have -- would have specific duties and
4  responsibilities within the confines of a letter
5  like this. So it would not surprise me -- in other
6  words, I would not take independent action outside
7  of CBP in either responding to the letter or taking
8  affirmative action in going directly to the
9  government of Mexico or at the local level without
10  CBP's knowledge, because it would have been, one, at
11  least duplication of effort, if not confusing, if it
12  was being worked at different levels.
13      Certainly this would have been coordinated,
14  any response letter or actions as a result of the
15  request of information from the government of
16  Mexico. My staff would have been involved in that.
17  Quite frequently what would happen is we would
18  actually get the facts as we knew them the best we
19  could, because oftentimes the premise of the
20  letters, either to the Secretary or to the
21  commissioner or the ones even when I was a sector
22  chief, the facts that were in the letter were
23  contrary to the facts that we knew at the time and
24  wanted to make sure that we gave the government of
25  Mexico the facts that we had, just to let them know

1  there is a dispute in terms of what they either have
2  been told or -- and based on what we knew at the
3  time.
4      So I guess the point is, because I either
5  didn't personally respond to the letter, even
6  thought I had a cc, or taken direct action, that
7  doesn't necessarily mean nothing was done as a
8  result of it.
9      **Q. You mentioned a meeting with the**
10  **ambassador.**
11      **Did you meet with the ambassador of Mexico**
12  **at any time to discuss, among other things, use of**
13  **force along the border?**
14      A. I believe I did, although it wasn't
15  specifically for that reason. I had met with the
16  ambassador infrequently while I was the chief of the
17  border patrol, and it was either an off-site I
18  believe on one, perhaps two occasions. It was in
19  the embassy. But it was a host of agenda items and
20  one of which was just general just use of force
21  along the border. I do recall one in particular we
22  did discuss that.
23      **Q. Do you recall approximately when that**
24  **occurred?**
25      A. I do not know. I don't know specifically

1  when that meeting occurred.
2      **Q. The general time frame? What year?**
3      A. My best estimate would be in 2012 or 2013.
4      **Q. Okay. And on the subject of use of force,**
5  **would I be safe in assuming that the substance of**
6  **what the ambassador wanted to talk about is**
7  **essentially what he would put in these letters, that**
8  **Mexico was concerned about use of force along the**
9  **southern border?**
10      MS. SCHWEINER: That calls for speculation.
11  Overbroad.
12      THE WITNESS: I don't know specifically.
13  But one -- in one discussion I do remember at the
14  embassy, there was a broad -- there was a discussion
15  between myself and the ambassador and our respective
16  staffs about understanding that the countries look
17  at the use of deadly force differently with respect
18  to proportionality. And I think, you know, the
19  ambassador -- and you can read through the other
20  letters too -- they look at and train use of force
21  differently in their country than we do in ours.
22  It's a difference in jurisprudence. It's a
23  difference in a whole host of things.
24      So there's a fundamental difference in
25  terms of, from their standpoint, disproportionality

1    about the reasons why he was leaving?
2        A.  I don't believe I talked to David Aguilar
3    before he had left and the reasons for that, no.  I
4    don't recall a conversation with him.
5        Q.  Were you and he personal friends at all?
6        A.  I would say yes.  We didn't always agree on
7    everything, obviously, but I would consider him a
8    personal friend, yes.
9        Q.  Are you still in touch with him now?
10       A.  Infrequently.
11       Q.  But you had no discussion with him at all
12   as to the reasons why he was leaving his position?
13       MS. SCHWEINER:  Asked and answered.
14       THE WITNESS:  I don't recall having a
15   discussion with him regarding that subject, no.
16       (Exhibit 18 marked for identification.)
17   BY MR. SHADOWEN:
18       Q.  Mark as Exhibit 18 a multipage document,
19   Bates-marked Deft-1054 through -89.
20       Can you identify Exhibit 18?
21       A.  It appears to be a series of email
22   information on what appears to be evolving situation
23   reports or issue papers, along with other evolving
24   situation reports and significant incident reports.
25   And lastly, it appears to be a report of an incident

                                        Page 178

1    from the joint field command in Arizona.  And
2    lastly, a map of some sort.
3        MS. SCHWEINER:  I'm going to object.  The
4    document speaks for itself.
5    BY MR. SHADOWEN:
6        Q.  Okay.  Was it routine for you to receive
7    documents such as the significant incident report
8    that begins on the Bates page 1060?
9        MS. SCHWEINER:  Object.  Misstates
10   evidence.  And vague and ambiguous as to whether
11   this is a significant incident report.
12       THE WITNESS:  I'm not sure exactly.  This
13   looks like a title page for -- a title page and a
14   table of contents for information.  So I don't
15   believe this would be something that I would
16   specifically get.
17   BY MR. SHADOWEN:
18       Q.  All right.  On page 1063, a couple of pages
19   in, begins a document entitled "Evolving Situation
20   Report."
21       Do you see that?
22       A.  Yes.
23       Q.  Is that the sort of document you would get
24   routinely with respect to deadly use of force
25   incidents?

                                        Page 179

1        A.  Yes, it does.
2        Q.  On page Bates 1071, it starts with what
3    appears to be an 11-page document titled
4    "Significant Incident Report."
5        Do you see that?
6        A.  I do see that.
7        Q.  Is that the sort of document you would get
8    routinely with respect to use of deadly force
9    incidents?
10       A.  No.
11       Q.  How did you come to get -- why did you get
12   it in this instance?
13       MS. SCHWEINER:  Calls for speculation.
14       THE WITNESS:  I don't -- I don't recall.
15   This was dated in 2012.  There may have been an
16   inquiry where I needed to be prepared to talk about
17   it in a meeting.  And so frequently I would ask for,
18   you know, a significant incident report, and my
19   staff would email it to me.  But significant
20   incident reports on all SIRs at this length, I would
21   not generally receive those as a matter of course.
22   BY MR. SHADOWEN:
23       Q.  Your staff had access to them and could get
24   them for you if wanted -- you had a specific need
25   for it?

                                        Page 180

1        MS. SCHWEINER:  Vague and ambiguous as to
2    which documents we're talking about.  And calls for
3    speculation.  Overbroad.
4        THE WITNESS:  My staff had access.  If I
5    had requested a significant incident report, they
6    would have access or the ability to get that report
7    from different sources, I would assume.  But I would
8    receive it.
9    BY MR. SHADOWEN:
10       Q.  Okay.  Directing your attention back to the
11   first page of Exhibit 18, the first thing I noticed
12   is that it appears the very first entry -- it
13   appears that this whole set of documents that is
14   Exhibit 18, you're emailing from yourself, I assume,
15   from at work to yourself at a Gmail account.
16       Do I have that right?
17       A.  It appears so, yes.
18       Q.  Is that something you would do frequently,
19   to email stuff to yourself so you could look at it
20   at home or for some other reason?
21       A.  I would do that if -- for instance, at the
22   time I think in 2012, I probably would still have
23   had a BlackBerry device.  And when I would receive
24   like an evolving situation report with a lot of
25   information and bullets, it was easier for me to put

                                        Page 181

Michael Fisher                                                                January 15, 2016

1  it on a pad so that I could look at it in a broader
2  context. So I would have -- and, typically, this I
3  would have -- I would have done because I didn't
4  have -- it was just easier for me to look at it, the
5  email, in sending it to myself, yes.
6      Q. Okay. And then down below that, the email
7  appears to be from Felix Chavez to you and others.
8  Then in the text of the email he says, Chiefs, Below
9  is the BB friendly version of the IP provided to the
10 4th floor prior to COB today.
11      What is -- what is the reference to "BB"?
12      MS. SCHWEINER: Calls for speculation.
13      THE WITNESS: I believe BB stands for
14 BlackBerry.
15 BY MR. SHADOWEN:
16      Q. BlackBerry friendly version of the IP?
17      A. Issue paper.
18      Q. Issue paper, okay.
19      Do you recall whether you formed a view as
20 to whether or not the shooting that is the subject
21 of Exhibit 18 was a justified use of force?
22      MS. SCHWEINER: Overbroad. Vague and
23 ambiguous. Calls for a legal conclusion.
24      THE WITNESS: I don't recall specifically.
25 But given the fact that the -- when you look at the

Page 182

1  current situation, the first bullet, it says, The
2  FBI is continuing to investigate the assault on a
3  federal officer.
4      The fact that this is an incident report
5  update, not necessarily an investigation of the
6  facts of the incident itself, I separate those two
7  specifically because I generally wouldn't make an
8  impression one way or the other unless and until the
9  investigation had concluded. So I wouldn't, just
10 based on this, make a determination whether the use
11 of force was reasonable or not.
12      MR. SHADOWEN: Let's take a five-minute
13 break. I can review my notes. I may be finished.
14      THE VIDEOGRAPHER: Going off the record.
15 The time is 3:44 p.m.
16      (Recess taken.)
17      THE VIDEOGRAPHER: We are back on the
18 record. The time is 3:51 p.m.
19 BY MR. SHADOWEN:
20      Q. Chief Fisher, you testified that you didn't
21 have any discussions with Mr. Aguilar as to why he
22 left.
23      Did you have discussions with anyone else
24 at CBP as to why he left?
25      A. I don't recall specifically if I talked to

Page 183

1  anybody about the reason why David Aguilar left.
2  I'm sure I had discussions with my deputy who is
3  also -- was also good friends with -- with David
4  Aguilar and others. I just don't recall
5  specifically what those conversations would have
6  been.
7      Q. What was your understanding as to why he
8  left?
9      MS. SCHWEINER: Asked and answered. Calls
10 for speculation.
11      THE WITNESS: I don't know because I never
12 talked to him specifically about why he left, so I
13 can't comment on why that was.
14 BY MR. SHADOWEN:
15      Q. You said you didn't -- you don't recall
16 specifically what your deputy or others may have
17 said. Do you have a general understanding from any
18 source as to why he left?
19      MS. SCHWEINER: Calls for speculation.
20      THE WITNESS: I don't have -- I don't
21 recall asking or being told by anybody that --
22 explaining why or what the reasons why David Aguilar
23 left. I just don't recall that.
24      MR. SHADOWEN: All right. No further
25 questions.

Page 184

1      EXAMINATION
2  BY MS. SCHWEINER:
3      Q. I have a couple of clarification questions,
4  Chief Fisher. Can you pull out Exhibit 3 sitting in
5  front of you there? This is the October 2010 Use of
6  Force Policy. Turn to page 10.
7      Can you recall being questioned by Counsel
8  about this page here regarding ROs or responsible
9  officials?
10      A. I do.
11      Q. Was it your understanding under this policy
12 that each and every one of these ROs listed in
13 paragraph 4 were to independently investigate each
14 use of deadly force?
15      A. No. That would not be my understanding.
16      Q. Can you explain what you did understand
17 this to mean?
18      A. Well, the responsible officials, all of us,
19 each had various duties and responsibilities under
20 that title. And quite frequently there wasn't just
21 one person who was responsible. As I was explaining
22 earlier in terms of the way that the -- the
23 information came up, whether it was from OIG, there
24 was generally multiple offices in CBP working
25 together in concert to fulfill the broad

Page 185

47 (Pages 182 to 185)

# Exhibit L

From:    KUHN, ERIC J on behalf of SITROOM
Sent:    April 1, 2010 1:57 AM
To:      OIOC—SIT SHOTS FIRED NO INJURY—DEATH
Cc:      SITROOM
Subject:        Shot Fired — Initial Telephonic — BP Rio Grande Valley
Sector — McAllen Station

This is an initial telephonic report from the field.

On April 1, 2010, Border Patrol agents assigned to the McAllen, Texas
Station reported that an on duty
agent discharged a Service issued M—4 rifle at an unidentified number
of individuals who were throwing
rocks at the agent.  At the time of the incident the agent was working
narcotics traffic.  No injuries were
reported. UPDATE TO FOLLOW

SIR # 10—MCAMCS—040110000082

# Exhibit M

| | |
|---|---|
| **From:** | FISHER, MIKE J |
| **Sent:** | Thursday, October 11, 2012 2:37 PM |
| **To:** | 'mjaf20@gmail.com' |
| **Subject:** | Fw: Nogales Shooting 10.10.2012.pdf |
| **Attachments:** | Nogales Shooting 10.10.2012.pdf |

----- Original Message -----
From: CHAVEZ, FELIX
Sent: Thursday, October 11, 2012 05:35 PM
To: FISHER, MIKE J; VITIELLO, RONALD D
Cc: HOFFMAN, DAVID R; OAKS, KEVIN W; ORTIZ, RAUL L; CHAVEZ, FELIX
Subject: FW: Nogales Shooting 10.10.2012.pdf

Chiefs,

Below is the BB friendly version of the IP provided to the 4th floor prior to COB today....Attached is the packet that was also provided to them.

We are still working with TCA to get a copy of the RVSS video from the scene.

ISSUE / BRIEFING TOPIC:

•     One subject is confirmed deceased in Mexico as the result of shots fired by a Border Patrol Agent. The shots fired were the result of an Assault on a Federal Officer (rocking) of three Border Patrol agents and two Nogales police Officers.

CURRENT SITUATION:

•     The FBI is continuing to investigate the Assault on a Federal Officer by narcotics smugglers in Nogales, Arizona.

•     Secretaria Seguridad Publica is investigating the death of an adult male on the Mexico side of the border in Nogales, Sonora.  At this time, they have cleared the scene.

UPDATE 10/11/20121 – 3:30 pm (EST) – CIT report from the scene

•     At approximately 1:00 am (MST) Tucson Sector Critical Incident Team (CIT) agents arrived and processed the scene with FBI ███████████████. As the body of the deceased had previously been removed by Mexican EMS, CIT Agents photographed what was believed to be a pool of blood left by the subject through the International Boundary Fence.

•     CIT personnel collected sixteen expended .40 caliber cartridge casings and seven large rocks. These items in addition to BPA ████████████, two magazines, and nine .40 caliber rounds were turned over to the FBI for processing.

1

Ex. M - pg 1

Deft-1054

• Two bundles of what is believed to be marijuana were recovered near the incident scene. CIT agents removed the top layer of cellophane wrapping and it will be turned over to the FBI for processing.

• CIT personnel are in the process of collecting any video evidence, Tucson Sector Radio transcripts, memoranda, I-44s and photos taken by agents on scene.

• BPA ▮▮▮▮▮will be interviewed by FBI personnel at a time and date to be determined.

UPDATE 10/11/12 – 1:19 am (EST)

• Media statement approved by OPA and DHS  - see Media Events and Messaging


UPDATE 10/11/12 – 12:18 pm (EST)

• A total of 22.9 lbs. of marijuana was seized and processed by the Tucson Sector Critical Incident Team.

• The FBI, Tucson Field Office, is the lead investigative agency.

• Sector International Liaison Unit (ILU) agents are en route to Nogales, Sonora to liaison with Government of Mexico investigators

UPDATE 10/11/12 – 10:15 am (EST)

• Incident is being reported via open source Mexican media outlets.  See Media Events and Messaging

• JFC Joint Information Center has a statement prepared in the event of media inquiries.  See Media Events and Messaging

UPDATE 10/11/12  - 9:15 am (EST)

• BPA ▮▮▮▮▮firearm was taken as evidence by CIT, who later transferred custody of the firearm to the FBI.

• Video footage from camera 24 and camera 27 has been requested from OIT.

• Peer Support, responded to ▮▮▮▮▮ residence to offer any assistance he may need or request.

• US Embassy CBPMX Attaché ▮▮▮▮▮ was notified of the incident at approx. 6:05 am (EST), the Ambassador is on travel but was notified via e-mail. The Mexico Embassy SRE Attaches ▮▮▮▮▮ and ▮▮▮▮ ▮▮▮▮▮were notified at approx. 7:05 am (EST).

BACKGROUND: all times are Mountain Standard Time

• On October 10, 2012, at approximately 11:27 pm, Nogales Radio notified agents of two individuals carrying bundles moving north from the International Boundary Fence (IBF) approximately .25 miles west of the DeConcini Port of Entry. Nogales agents ▮▮▮▮▮, and ▮▮▮▮along with Nogales Police Department (NPD) Officers ▮▮▮▮and ▮▮▮▮▮responded.

• While agents and officers were enroute, two subjects were observed running south from the area, and climbed to the top of the IBF. Two additional subjects in Mexico began throwing multiple rocks over the fence, striking Officer ▮▮▮▮▮canine partner, ▮▮▮▮▮

2

Ex. M - pg 2

- Agent ███████ gave verbal commands to the subjects to stop throwing the rocks.  The subjects did not comply and continued to assault the agents with rocks.

o     Fearing for his life and that of his fellow agents and officers,
o     Agent ██████ discharged his service issued handgun striking at least one subject.  Agent ██████ immediately reported the incident over the radio.
o     No injuries to agents or officers were sustained, as agents sought cover, they observed one male subject on the south side of the IBF lying motionless.  The three remaining subjects retreated into the interior of Mexico.

- SBPA ████████████ asked Agent █████ the required eight firearms questions.  Agent █████ could not remember the exact number of rounds he discharged from his weapon but did state that he emptied his 12 round magazine and reloaded to resume firing.

- Agents recovered two bundles of contraband, the weight of which will be determined once the crime scene is cleared by the FBI.

- Footage of the drug activity was captured on RVSS camera 24 and the shooting was captured on camera 27.


FEDERAL/INTERNATIONAL AGENCY/COMPONENT NOTIFICATIONS:

- Federal Bureau of Investigation, responded
- Tucson Sector, Critical Incident Team
- CISEN- Centro de Investigación y Seguridad Nacional
- Secretaria Seguridad Publica, Supervisor ██████████████████
- Department of Homeland Security, Office of the Inspector General
- Immigration and Customs Enforcement, Office of professional Responsibility
- Customs and Border Protection, Office of Internal Affairs
- Customs and Border Protection, Office of Air & Marine, Omaha 43L
- Nogales Station International Liaison Unit
- Tucson Sector Peer Support
- Sector Public Affairs Branch


LOCAL AGENCY NOTIFICATIONS:

- Nogales Police Department

SUSPECT INFORMATION:

- The identity of the subject is unknown at this time:
- male subject
- approximately 20-25 years
- deceased with multiple gun-shot wounds to the head (front and left side)
- no identification
- medium complexion
- short black hair
- black jeans, gray t-shirt, and black and gray shoes.

3

Deft-1056

CONTRABAND:

• 22.9 lbs. or marijuana, seized by the CIT. The outer packaging was turned over to the FBI for processing.

AGENT INFORMATION:



Weapon information:
H&K P2000
Serial number: ▉▉▉▉▉▉

WITNESSES

• BPA ▉▉▉▉▉▉▉, Nogales Station
• BPA ▉▉▉▉▉▉▉, Nogales Station
• Officer ▉▉▉▉▉▉▉▉▉ Nogales Police Department, K-9 Tesko
• Officer ▉▉▉▉▉▉▉▉ Nogales Police Department


MEDIA EVENTS and MESSAGING:

• Incident is being reported via open source Mexican media outlets.

o http://www.eldiariodesonora.com.mx/nota.php?nota=2103

• JFC Joint Information Center has a statement prepared in the event of media inquiries.

• Media statement approved by OPA and DHS

o On October 10, 2012, U.S. Border Patrol agents in Nogales, Ariz., responded to reports of two suspected narcotics smugglers near West International Street and Hereford Drive at approx. 11:30 PM MT. Preliminary reports indicate the agents observed the smugglers drop a narcotics load on the U.S. side of the international boundary and flee back to Mexico. Subjects at the scene then began assaulting the agents with rocks. After verbal commands from agents to cease were ignored, one agent then discharged his service firearm. One of the subjects appeared to have been hit. Agents notified the Government of Mexico (GOM) and secured the scene. U.S. Customs and Border Protection is fully cooperating with the FBI-led investigation.

TIMELINE OF EVENTS: all times are Mountain Standard Time

• At 2330 hours C4 was contacted. Supervisor ▉▉▉▉▉▉▉▉▉▉▉▉ provided report ▉▉▉▉▉▉

• At 2332 hours, CISEN was contacted. Operator ▉▉ issued report ▉▉▉▉

4

Deft-1057

- At 2332 hours, SSP was contacted via Nextel and spoke with Inspector ⬛⬛who indicated that he would be dispatching officers to the scene.   Officers arrived to the scene at approximately 2335 hours.

- At 2333 hours, Nogales Police Department responded to the scene and issued report #0112003531.

- At 2336 hours, a Command Post was set up on West International and West Street by SBPA⬛⬛⬛.  All traffic was blocked off on Hereford and West International.

- At 2337 hours, Supervisory Border Patrol Agent⬛⬛⬛⬛⬛⬛⬛responded to the scene and spoke with SSP Supervisor⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛.  Officer ⬛⬛⬛confirmed that one male subject, approximately 20-25 years of age was in fact deceased with multiple gun-shot wounds to the head (front and left side).  The subject did not have any identification on him and was described as having a medium complexion, short black hair, and wearing black jeans, gray t-shirt, and black and gray shoes. Officer ⬛⬛⬛indicated that there were two witnesses to the incident in Mexico.  The names of the witnesses have not been provided at this time.

- At 2339 hours, ⬛⬛⬛⬛⬛⬛responded to the scene.

- At 2341 hours, ⬛⬛⬛⬛was dispatched to the scene and arrived on the scene at 1217.

- Agents recovered two bundles of contraband the weight of which will be determined once the crime scene is cleared by the Federal Bureau of Investigation.

- At 2345 hours, CIT was notified and SBPA ⬛⬛⬛⬛⬛ advised that he would notify FBI, OIG, OPR, and IA. Agents ⬛⬛⬛⬛⬛⬛ were enroute to the scene at 2355 hours.  SBPA ⬛⬛⬛⬛reported that FBI, OIG, and IA would be responding and that OPR would not be responding.

- At 2346 hours, Nogales Station International Liaison Unit was notified.

- At 0008 hours, JIOC notified hours and issued SIR # 13-TCANGL-101112000012.

- Sector Public Affairs Branch Chief⬛⬛⬛⬛⬛ was contacted 1222 hours due to national and international media likely to arrive in the area.

- At 0019 hours, the body of the deceased subject was recovered by⬛⬛⬛⬛⬛

- At 0046 hours, All Mexican Authorities cleared the scene.
- At 0052 hours, EAP and Peer Support were offered to⬛⬛⬛⬛⬛.  Peer Support Coordinator Brandon Felty was contacted. Peer Support Agent ⬛⬛⬛⬛⬛is responding to the scene at 0115 hours.

- At 0100 hours, CIT arrived on the scene.

- At 0100 hours, CIT Agents ⬛⬛⬛⬛) and⬛⬛⬛⬛) arrived on scene.

- At 0120 hours, Agent ⬛⬛⬛⬛z of OIG arrived at the Command Center.

- At 0152 hours, Special Agent⬛⬛⬛⬛⬛ of the FBI arrived at the Command Center.

- CIT Agents arrive on scene and begin processing the scene with FBI S/A⬛⬛⬛⬛⬛⬛.

- CIT Agents observed and photographed (through the IBF) what was believed to be a pool of blood left by the subject on the Mexican side of the IBF. The identity of the decedent is unknown at this time.

5

- CIT personnel collected sixteen expended .40 caliber cartridge casings and seven large rocks, these items are turned over to S/A Terwilliger.

- At 0220, CBPIA Agent ▮▮▮▮▮and CIT Agent ▮▮▮▮▮▮ arrived on scene at the Command Center.

- Following the incident, two bundles of narcotics were recovered nearby by BPA ▮▮▮▮and BPA ▮▮▮▮▮.
o    The two bundles were initially transported to the Command Center.
o    At 0310 hours, CIT directed that the bundles of narcotics to be moved to the Nogales Border Patrol Station until an evidence collection team can respond and gather samples from them.
o    The narcotics will not be processed until the evidence collection team responds.
o    The narcotics are being stored in the Nogales Border Patrol Station evidence vault.
o    The approximate weight of the unprocessed narcotics is 20-30 pounds.

- At 0355 hours, Nogales ILU SBPA ▮▮▮▮▮was contacted and advised that ILU made contact with SSP and they stated there were no additional arrests or seizures in Mexico.

- SSP stated that the body of the unidentified deceased subject was taken to the morgue for an autopsy and the Sonora, Mexico State Police will be conducting an investigation.

- At 0426 hours, SBPA ▮▮▮▮who took over as Incident Commander, advised that the Command Center was discontinued and all units have cleared the area.

- Border Patrol Agents in the area of the incident are at a heightened state of alert but otherwise operating as normal.

- Footage of the drug activity was captured on RVSS camera 24 and the incident was captured on camera 27.

6

Deft-1059

**U.S. Department of Homeland Security**
Customs and Border Protection
Office of Border Patrol

**Operations Division**
1300 Pennsylvania Avenue, NW
Suite 6.5E
Washington, DC 20229

# SIR NUMBER: 13-TCANGL-101112000012
# Date of Incident: 10/10/2012

Deft-1060

# Table of Contents

Issue Paper  1

Significant Incident Report  2

JFC Arizona Report  3

Map of Incident  4

News Articles  5

6

7

8

9

10

Deft-1061

Ex. M - pg 8

# Tab 1

Deft-1062

Evolving Situation Report
Tucson Sector – Nogales Station
Assault on a Federal Officer – Shooting Incident
Date of Incident: October 10, 2012

## ISSUE / BRIEFING TOPIC:

- One subject is confirmed deceased in Mexico as the result of shots fired by a Border Patrol Agent. The shots fired were the result of an Assault on a Federal Officer (rocking) of three Border Patrol agents and two Nogales police Officers.

## CURRENT SITUATION:

- The FBI is continuing to investigate the Assault on a Federal Officer by narcotics smugglers in Nogales, Arizona.

- Secretaria Seguridad Publica is investigating the death of an adult male on the Mexico side of the border in Nogales, Sonora. At this time, they have cleared the scene.

### *UPDATE 10/11/20121 – 3:30 pm (EST)* – *CIT report from the scene*

- At approximately 1:00 am (MST) Tucson Sector Critical Incident Team (CIT) agents arrived and processed the scene with FBI S/A ███████████████. As the body of the deceased had previously been removed by Mexican EMS, CIT Agents photographed what was believed to be a pool of blood left by the subject through the International Boundary Fence.

- CIT personnel collected sixteen expended .40 caliber cartridge casings and seven large rocks. These items in addition to BPA ██████ pistol, two magazines, and nine .40 caliber rounds were turned over to the FBI for processing.

- Two bundles of what is believed to be marijuana were recovered near the incident scene. CIT agents removed the top layer of cellophane wrapping and it will be turned over to the FBI for processing.

- CIT personnel are in the process of collecting any video evidence, Tucson Sector Radio transcripts, memoranda, I-44s and photos taken by agents on scene.

- BPA ███████ will be interviewed by FBI personnel at a time and date to be determined.

### *UPDATE 10/11/12 – 1:19 am (EST)*

- Media statement approved by OPA and DHS - *see Media Events and Messaging*

1

Evolving Situation Report
Tucson Sector – Nogales Station
Assault on a Federal Officer – Shooting Incident
Date of Incident: October 10, 2012

### *UPDATE 10/11/12 – 12:18 pm (EST)*

- A total of 22.9 lbs. of marijuana was seized and processed by the Tucson Sector Critical Incident Team.

- The FBI, Tucson Field Office, is the lead investigative agency.

- Sector International Liaison Unit (ILU) agents are en route to Nogales, Sonora to liaison with Government of Mexico investigators

### *UPDATE 10/11/12 – 10:15 am (EST)*

- Incident is being reported via open source Mexican media outlets. *See Media Events and Messaging*

- JFC Joint Information Center has a statement prepared in the event of media inquiries. *See Media Events and Messaging*

### *UPDATE 10/11/12 - 9:15 am (EST)*

- BPA ████████ firearm was taken as evidence by CIT, who later transferred custody of the firearm to the FBI.

- Video footage from camera 24 and camera 27 has been requested from OIT.

- Peer Support, responded to Schwatrz' residence to offer any assistance he may need or request.

- US Embassy CBPMX Attaché ████████████ was notified of the incident at approx. 6:05 am (EST), the Ambassador is on travel but was notified via e-mail. The Mexico Embassy SRE Attaches ████████████ and ████████████ were notified at approx. 7:05 am (EST).

### BACKGROUND: *all times are Mountain Standard Time*

- On October 10, 2012, at approximately 11:27 pm, Nogales Radio notified agents of two individuals carrying bundles moving north from the International Boundary Fence (IBF) approximately .25 miles west of the DeConcini Port of Entry.  Nogales agents ████, ████, and ████ along with Nogales Police Department (NPD) Officers ████ and ████ responded.

- While agents and officers were enroute, two subjects were observed running south from the area, and climbed to the top of the IBF. Two additional subjects in Mexico

2

Deft-1064

Evolving Situation Report
Tucson Sector – Nogales Station
Assault on a Federal Officer – Shooting Incident
Date of Incident: October 10, 2012

began throwing multiple rocks over the fence, striking Officer ██████'s canine partner, ██████.

- Agent ██████ gave verbal commands to the subjects to stop throwing the rocks. The subjects did not comply and continued to assault the agents with rocks.

  o Fearing for his life and that of his fellow agents and officers,
  o Agent ██████ discharged his service issued handgun striking at least one subject. Agent ██████ immediately reported the incident over the radio.
  o No injuries to agents or officers were sustained, as agents sought cover, they observed one male subject on the south side of the IBF lying motionless. The three remaining subjects retreated into the interior of Mexico.

- SBPA ██████ asked Agent ██████ the required eight firearms questions. Agent ██████ could not remember the exact number of rounds he discharged from his weapon but did state that he emptied his 12 round magazine and reloaded to resume firing.

- Agents recovered two bundles of contraband, the weight of which will be determined once the crime scene is cleared by the FBI.

- Footage of the drug activity was captured on RVSS camera 24 and the shooting was captured on camera 27.


## FEDERAL/INTERNATIONAL AGENCY/COMPONENT NOTIFICATIONS:

- Federal Bureau of Investigation, responded
- Tucson Sector, Critical Incident Team
- CISEN- Centro de Investigación y Seguridad Nacional
- Secretaria Seguridad Publica, Supervisor ██████████████████
- Department of Homeland Security, Office of the Inspector General
- Immigration and Customs Enforcement, Office of professional Responsibility
- Customs and Border Protection, Office of Internal Affairs
- Customs and Border Protection, Office of Air & Marine, Omaha 43L
- Nogales Station International Liaison Unit
- Tucson Sector Peer Support
- Sector Public Affairs Branch

Deft-1065

Evolving Situation Report
Tucson Sector – Nogales Station
Assault on a Federal Officer – Shooting Incident
Date of Incident: October 10, 2012

## LOCAL AGENCY NOTIFICATIONS:

- Nogales Police Department

## SUSPECT INFORMATION:

- The identity of the subject is unknown at this time:
    - male subject
    - approximately 20-25 years
    - deceased with multiple gun-shot wounds to the head (front and left side)
    - no identification
    - medium complexion
    - short black hair
    - black jeans, gray t-shirt, and black and gray shoes.

## CONTRABAND:

- 22.9 lbs. or marijuana, seized by the CIT. The outer packaging was turned over to the FBI for processing.

## AGENT INFORMATION:



## WITNESSES

- BPA ████████████, Nogales Station
- BPA ████████████, Nogales Station
- Officer ████████████ Nogales Police Department, K-9 Tesko
- Officer ████████████ Nogales Police Department

4

Evolving Situation Report
Tucson Sector – Nogales Station
Assault on a Federal Officer – Shooting Incident
Date of Incident: October 10, 2012

## MEDIA EVENTS and MESSAGING:

- Incident is being reported via open source Mexican media outlets.

    o   http://www.eldiariodesonora.com.mx/nota.php?nota=2103

- JFC Joint Information Center has a statement prepared in the event of media inquiries.

- Media statement approved by OPA and DHS

    o   On October 10, 2012, U.S. Border Patrol agents in Nogales, Ariz., responded to reports of two suspected narcotics smugglers near West International Street and Hereford Drive at approx. 11:30 PM MT. Preliminary reports indicate the agents observed the smugglers drop a narcotics load on the U.S. side of the international boundary and flee back to Mexico. Subjects at the scene then began assaulting the agents with rocks. After verbal commands from agents to cease were ignored, one agent then discharged his service firearm. One of the subjects appeared to have been hit. Agents notified the Government of Mexico (GOM) and secured the scene. U.S. Customs and Border Protection is fully cooperating with the FBI-led investigation.

## TIMELINE OF EVENTS: all times are Mountain Standard Time

- At 2330 hours C4 was contacted. Supervisor ███████████████████ provided report ███████████.

- At 2332 hours, CISEN was contacted. Operator #12 issued report ███████.

- At 2332 hours, SSP was contacted via Nextel and spoke with Inspector ████ who indicated that he would be dispatching officers to the scene.   Officers arrived to the scene at approximately 2335 hours.

- At 2333 hours, Nogales Police Department responded to the scene and issued report ████████████.

- At 2336 hours, a Command Post was set up on West International and West Street by SBPA Marr. All traffic was blocked off on Hereford and West International.

- At 2337 hours, Supervisory Border Patrol Agent, ██████████████████, responded to the scene and spoke with SSP S███████████████████████████████████. Officer ████████ confirmed that one male subject, approximately 20-25 years of age was in fact deceased with multiple gun-shot wounds to the head (front and left side).

5

Deft-1067

Evolving Situation Report
Tucson Sector – Nogales Station
Assault on a Federal Officer – Shooting Incident
Date of Incident: October 10, 2012

The subject did not have any identification on him and was described as having a medium complexion, short black hair, and wearing black jeans, gray t-shirt, and black and gray shoes. Officer Silveira indicated that there were two witnesses to the incident in Mexico. The names of the witnesses have not been provided at this time.

- At 2339 hours, ███████████ responded to the scene.

- At 2341 hours, Omaha 43L was dispatched to the scene and arrived on the scene at 1217.

- Agents recovered two bundles of contraband the weight of which will be determined once the crime scene is cleared by the Federal Bureau of Investigation.

- At 2345 hours, CIT was notified and SBPA ██████████████ advised that he would notify FBI, OIG, OPR, and IA. Agents ████████████████ were enroute to the scene at 2355 hours. SBPA ██████████ reported that FBI, OIG, and IA would be responding and that OPR would not be responding.

- At 2346 hours, Nogales Station International Liaison Unit was notified.

- At 0008 hours, JIOC notified hours and issued SIR # 13-TCANGL-101112000012.

- Sector Public Affairs Branch Chief ██████████ was contacted 1222 hours due to national and international media likely to arrive in the area.

- At 0019 hours, the body of the deceased subject was recovered by ██████████.

- At 0046 hours, All Mexican Authorities cleared the scene.
- At 0052 hours, EAP and Peer Support were offered to Agent ██████. Peer Support Coordinator Brandon Felty was contacted. Peer Support ██████████████ is responding to the scene at 0115 hours.

- At 0100 hours, CIT arrived on the scene.

- At 0100 hours, CIT Agents ██████████ and ██████████ arrived on scene.

- At 0120 hours, Agent ██████████ of OIG arrived at the Command Center.

- At 0152 hours, Special Agent ████████████████ of the FBI arrived at the Command Center.

6

Deft-1068

Evolving Situation Report
Tucson Sector – Nogales Station
Assault on a Federal Officer – Shooting Incident
Date of Incident: October 10, 2012

- CIT Agents arrive on scene and begin processing the scene with FBI S/A ▓▓▓▓▓
▓▓▓▓▓▓▓▓

- CIT Agents observed and photographed (through the IBF) what was believed to be a pool of blood left by the subject on the Mexican side of the IBF. The identity of the decedent is unknown at this time.
- CIT personnel collected sixteen expended .40 caliber cartridge casings and seven large rocks, these items are turned over to S/A ▓▓▓▓▓▓▓

- At 0220, CBPIA Agent ▓▓▓▓lo and CIT Agent ▓▓▓▓▓▓▓z arrived on scene at the Command Center.

- Following the incident, two bundles of narcotics were recovered nearby by BPA ▓▓▓▓ and BPA ▓▓▓▓▓▓▓
  - o The two bundles were initially transported to the Command Center.
  - o At 0310 hours, CIT directed that the bundles of narcotics to be moved to the Nogales Border Patrol Station until an evidence collection team can respond and gather samples from them.
  - o The narcotics will not be processed until the evidence collection team responds.
  - o The narcotics are being stored in the Nogales Border Patrol Station evidence vault.
  - o The approximate weight of the unprocessed narcotics is 20-30 pounds.

- At 0355 hours, Nogales ILU SBPA ▓▓▓▓▓▓▓was contacted and advised that ILU made contact with SSP and they stated there were no additional arrests or seizures in Mexico.

- SSP stated that the body of the unidentified deceased subject was taken to the morgue for an autopsy and the Sonora, Mexico State Police will be conducting an investigation.

- At 0426 hours, SBPA▓▓▓▓▓ who took over as Incident Commander, advised that the Command Center was discontinued and all units have cleared the area.

- Border Patrol Agents in the area of the incident are at a heightened state of alert but otherwise operating as normal.

- Footage of the drug activity was captured on RVSS camera 24 and the incident was captured on camera 27.

7

Deft-1069

# Tab 2

Deft-1070

# U.S. DEPARTMENT OF HOMELAND SECURITY
## U.S. Customs and Border Protection
### SIGNIFICANT INCIDENT REPORT
CBP Directive 3340-025C

| 1. DATE OF INCIDENT: 10/10/2012 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 11:27 PM | Nogales, AZ | 13-TCANGL-101112000012(1) |

REPORTED TO COMMISSIONER'S SITUATION ROOM VIA PHONE ON:
DATE:   10/11/2012          TIME:      3:35 AM          TO: ▓▓▓▓▓

| 2. REPORTING OFFICE: Office of Border Patrol | DFO/SECTOR: Tucson Sector | POE/STATION: Nogales Station |
|---|---|---|

PERSON MAKING REPORT: ▓▓▓▓▓

| OFFICE PHONE: ▓▓▓ | CELL PHONE: ▓▓▓ | FAX NUMBER: ▓▓▓ |
|---|---|---|

POINT OF CONTACT: ▓▓▓

| OFFICE PHONE: ▓▓▓ | CELL PHONE: ▓▓▓ | FAX NUMBER: |
|---|---|---|

**3. Type of Incident:**  ☑ ON DUTY   ☐ OFF DUTY

| | | | |
|---|---|---|---|
| ☐ Terrorist Related | ☑ Shots Fired at or by an Employee | ☐ Significant Agricultural Event | ☐ Suicide Attempt |
| ☐ Employee Arrested | ☐ Canine Incident | ☐ Conveyance/Aircraft Incident | ☐ Media Interest |
| ☐ Employee Assaulted | ☐ Significant Seizure | ☐ Foreign Military/Police Incursion | ☐ Crew Deserters |
| ☐ Employee Death | ☐ Significant Arrest/Detention | ☐ Bomb Threat | ☐ Escape |
| ☐ Employee Injury | ☑ Non-Employee Injury/Death | ☐ Facility Disruptions | ☐ Other |
| ☐ Radiation Detection Event | ☐ Rescue | ☐ Technology Disruptions | |

**4. SYNOPSIS: (USE CONTINUATION SHEET IF NECESSARY)**

See Attached Continuation

| SEIZURE TYPE: | QUANTITY: | | VALUE: |
|---|---|---|---|
| NUMBER OF ARRESTS: | MALE: | FEMALE: | CITIZENSHIP: |

**5. NOTIFICATIONS MADE:**

| 1. | TELEPHONIC REPORT TO COMMISSIONER'S SITUATION ROOM | ▓▓▓ | 10/11/2012 3:35 AM |
|---|---|---|---|
| 2. | | | |
| 3. | | | |

**6. INJURIES/FATALITIES:**

| NAME AND EXTENT OF INJURY: | AGENT | EAP ADVISED |
|---|---|---|
| 1. | | |
| 2. | | |

NAME OF FATALITIES:
1.
2.

**7. ACTION TAKEN:**
All required actions were taken

**8. MEDIA INTEREST EXPECTED:**
Media interest is expected

CBP FORM 6 (01/05)

# SIGNIFICANT INCIDENT REPORT
## Continuation Sheet

| DATE OF INCIDENT: 10/10/2012 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 11:27 PM | Nogales, AZ | 13-TCANGL-101112000012 (1) |

---

**Synopsis: (cont.):**

On October 10, 2012 at approximately 2327 hours MST, Nogales Radio (965) notified field agents that they had observed through the Remote Video Surveillance System (RVSS); approximately two individuals carrying bundles moving north from the International Boundary Fence (IBF), along West International Street (in an area referred to as the Camera Pole) in Nogales, AZ. This area is approximately .25 miles west of the DeConcini Port of Entry. Nogales Border Patrol Agents ▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨ and ▨▨▨▨▨▨▨; along with Nogales Police Department ▨▨▨▨▨ ▨▨▨▨ with his canine partner, ▨▨▨▨ and Officer (▨▨▨▨▨▨▨▨▨▨▨▨▨) responded to the location.

Camera operators guided agents in on the last location of the suspected bundles. As agents responded

to the location, two subjects were seen running south from the area. The subjects successfully climbed

the IBF and remained at the top of the fence. Two additional subjects located in Mexico began throwing

multiple rocks over the fence, striking Officer ▨▨▨▨ canine partner, ▨▨▨▨ Agent ▨▨▨▨ gave verbal commands to the subjects to stop throwing the rocks. The subjects did not comply to verbal commands and continued to assault the agents and officers with rocks. At this point, Agent ▨▨▨▨ fearing for his life and that of his fellow agents, discharged his service issued handgun striking at least

one subject  Agent ▨▨▨▨ immediately reported the incident over the radio. The subject that was shot

was on the ground and although there were two subjects on the IBF and two on the ground, it is unknown which subject was shot. No injuries to agents or officers were sustained. As agents sought

cover, they observed one male subject on the south side of the IBF lying motionless. The other three

subjects retreated into the interior of Mexico.

The NPD canine, ▨▨▨▨ was struck on the hind legs  Officer ▨▨▨▨ stated that ▨▨▨▨ appeared to be uninjured, however, he would continue to evaluate him overnight and will seek medical treatment if necessary.

### SIGNIFICANT INCIDENT REPORT
#### Continuation Sheet

| DATE OF INCIDENT: 10/10/2012 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 11:27 PM | Nogales, AZ | 13-TCANGL-101112000012 (1) |

SEPA ██████████ asked Agent ██████ the eight firearms questions. Agent ██████ could not remember the exact number of rounds he discharged from his weapon, however he did state that he emptied his 12 round magazine and reloaded to resume firing.

There were four witnesses to the shooting:

BPA ██████████

BPA ██████████

NPD O██████████████

NPD O██████████████

Additional agents heard the gun shots and immediately responded to the scene:

BPA ██████████

BPA ██████████ (assigned to southbound operations at DeConcini POE)

Agent involved in the shooting.

██████████ .

CBP FORM 6 (01/05) cont

## SIGNIFICANT INCIDENT REPORT
### Continuation Sheet

Page 4 of 11

| DATE OF INCIDENT: 10/10/2012 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 11:27 PM | Nogales, AZ | 13-TCANGL-101112000012 (1) |

EOD: 9/6/10

Class #: 9XX

Assigned to southbound operations at DeConcini POE

Weapon information:

H&K P2000

Serial number: 123-068XXX

At 2330 hours, C4 was contacted. Supervisor ▮▮▮▮▮▮▮▮▮▮ provided report #▮▮▮▮▮▮▮▮

At 2332 hours, CISEN was contacted. Operator #12 issued report ▮▮▮▮

At 2332 hours, SSP was contacted via Nextel and spoke with Inspector ▮▮▮▮ who indicated that he would be dispatching officers to the scene. Officers arrived to the scene at approximately 2335 hours.

At 2333 hours, Nogales Police Department responded to the scene and issued report ▮▮▮▮▮▮▮▮.

CBP FORM 6 (01/05) cont

Deft-1074
10/11/2012

Case 1:16-mc-00939-JDB   Document 1   Filed 04/29/16   Page 287 of 337

Page 5 of 11

## SIGNIFICANT INCIDENT REPORT
### Continuation Sheet

Page 5 of 11

| DATE OF INCIDENT: 10/10/2012 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 11:27 PM | Nogales, AZ | 13-TCANGL-101112000012 (1) |

At 2336, a Command Post was set up on West International and West Street by SBPA ███ All traffic was blocked off on Hereford and West International.

At 2337 hours, Supervisory Border Patrol Agent, ███████████, responded to the scene and spoke with SSP Supervisor ████████████████. Officer ████████a confirmed through verbal confirmation that one male subject, approximately 20-25 years of age was in fact deceased with multiple gun shot wounds to the head (front and left side). The subject did not have any identification on him and was described as having a medium complexion, short black hair, and wearing black jeans, gray t-shirt, and black and gray shoes. Officer Silveira indicated that there were two witnesses to the incident in Mexico. The names of the witnesses have not been provided at this time.

At 2339 hours, ██████████████ responded to the scene.

At 2341 hours, Omaha 43L was dispatched to the scene and arrived on the scene at 0017.

At 2345 hours, CIT was notified and SBPA ████████████ advised that he would notify FBI, OIG, OPR, and IA. Agent ████████a and █████r were enroute to the scene at 2355 hours. SBPA███████ reported that FBI, OIG, and IA would be responding and that OPR would not be responding.

SIR FORM 6 (01/05) cont

http://bpets2.cbp.dhs.gov/SIR/PrntPrvw.aspx?id=138455          10/11/2012

Deft-1075

EXPMF - pg 22

## SIGNIFICANT INCIDENT REPORT
### Continuation Sheet

| DATE OF INCIDENT: 10/10/2012 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 11:27 PM | Nogales, AZ | 13-TCANGL-101112000012 (1) |

At 2346 hours, Nogales Station International Liaison Unit was notified.

At 0008 hours, JIOC notified and issued SIR # 13-TCANGL-101112000012

At 0019 hours, the body of the deceased subject was recovered by ▓▓▓▓ .

At 0022 hours, Sector Public Affairs Branch Chief ▓▓▓▓▓ was contacted due to national and international media likely to arrive in the area.

At 0046 hours, all Mexican Authorities cleared the scene.

At 0052 hours, EAP and Peer Support were offered to Agent ▓▓▓▓ Peer Support Coordinator ▓▓▓▓▓ was contacted, Peer Support Agent ▓▓▓▓▓ is responding to the scene at 0115 hours.

At 0100 hours, CIT Agents ▓▓▓▓▓ and ▓▓▓▓▓ arrived on scene.

CBP FORM 6 (01/05) cont

SIGNIFICANT INCIDENT REPORT
Continuation Sheet

| DATE OF INCIDENT: 10/10/2012 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 11:27 PM | Nogales. AZ | 13-TCANGL-101112000012 (1) |

At 0120 hours, Agent ██████ z of OIG arrived at the Command Center.

At 0152 hours, Agent ████████████ of the FBI arrived at the Command Center.

At 0220, CBPIA Agent ██████ and CIT Agent ███████ arrived on scene at the Command Center.

Following the incident, two bundles of narcotics were recovered nearby by BPA ████ and BPA ████████ The two bundles were initially transported to the Command Center. At 0310 hours, CIT directed that the bundles of narcotics to be moved to the Nogales Border Patrol Station until an evidence collection team can respond and gather samples from them. The narcotics will not be processed until the evidence collection team responds. The narcotics are being stored in the Nogales Border Patrol evidence vault. The approximate weight of the unprocessed narcotics is 20-30 pounds.

At 0155 hours, Nogales ILU SBPA ██████ was contacted and advised that ILU made contact with SSP and they stated there were no additional arrests or seizures in Mexico. SSP stated that the body of the unidentified deceased subject was taken to the morgue for an autopsy and the Sonora. Mexico State Police will be conducting an investigation.

CBP FORM 8-01-85 (x44

Ex M - pg 24

## SIGNIFICANT INCIDENT REPORT
### Continuation Sheet

Page 8 of 11

| DATE OF INCIDENT: 10/10/2012 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 11:27 PM | Nogales, AZ | 13-TCANGL-101112000012 (1) |

At 0426 hours, SBP█ ██████ who took over as Incident Commander, advised that the Command Center was discontinued and all units have cleared the area. Border Patrol Agents in the area of the incident

are at a heightened state of alert but otherwise operating as normal.

Footage of the drug activity was captured on RVSS camera 24 and the incident was captured on camera 27.

Assault Report: NGL 11 10000244

CBP-318 Use of Force Report: UFB20121010004

TCAD Ticket #1789.

Zone 21

Grid 16E

GPS Coordinates: N31.332847, W 110.9467299

CBP Form 6 (01/05) cont

## SIGNIFICANT INCIDENT REPORT
### Continuation Sheet

| DATE OF INCIDENT: 10/10/2012 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 11:27 PM | Nogales, AZ | 13-TCANGL-101112000012 (1) |

Prepared approved by ████████████

UPDATES TO FOLLOW.

Notifications:

WC ████████ - in person

(A)DPAIC ████████ - telephonically

DPAIC ████████ - telephonically

PAIC ████████ - electronically

XO ████████ - electronically

DC of Opa ████████ electronically

JIOC NOTIFICATIONS:

0008 hours - JIOC was notified of the shooting

0023 hours - Chief Watch Commander ████████ was notified telephonically by Watch Commander

CBP FORM 6 (01/05) cont

## SIGNIFICANT INCIDENT REPORT
### Continuation Sheet

| DATE OF INCIDENT:  10/10/2012 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT:  11:27 PM | Nogales, AZ | 13-TCANGL-101112000012 (1) |

▓▓▓▓▓▓▓▓

0025 hours · JIOC placed a tactical call to Port of DeConcini advising officers of the situation

JFC and Other Agency Involvement:

JFC · See Narrative

TCA · See Narrative

YUM · None

TFO   None

TAB ? See Narrative

YAB · None

GcM · See Narrative

OA ? See Narrative

The 1st quarter JIOC password will open the attachment.

·*·**ADDENDUM**·*·*

CBP FORM 6 (01/05) cont

# SIGNIFICANT INCIDENT REPORT
## Continuation Sheet

| DATE OF INCIDENT: 10/10/2012 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 11:27 PM | Nogales, AZ | 13-TCANGL-101112000012 (1) |

BPA ████████ service issued firearm (serial ███████████ was taken as evidence by CIT, who later transferred custody of the firearm to the FBI .

Video footage from camera 24 and camera 27 has been requested from OIT.

BPA ████████ n, from Peer Support, responded to ████████ residence to offer any assistance he may need or request.

Approved by FOS ████████

CBP FORM 6 (01/05) cont

Deft-1081
10/11/2012

# Tab 3

Deft-1082

LIMITED DISTRIBUTION - FOR OFFICIAL USE ONLY

## Joint Field Command - Arizona
## Shooting Incident
## Nogales, AZ
## Date of Incident: 10/10/12

**Synopsis:** A Nogales Border Patrol agent discharged his service weapon at individuals in Mexico who were in the process of assaulting the agents and a Nogales Police Department officer with rocks. One subject in Mexico was struck and killed as a result of the shooting, per Government of Mexico officials.

**Details:** On October 10, 2012 at approximately 2327 hours, Nogales Radio notified field agents that they had observed through the Remote Video Surveillance System (RVSS) approximately two individuals carrying bundles moving north from the International Boundary Fence (IBF) along West International Street in Nogales, AZ in an area referred to as the Camera Pole. This area is approximately .25 miles west of the DeConcini Port of Entry. Nogales Border Patrol Agents ███████, ███████ along with Nogales Police Department (NPD) Officers J███████ and his canine partner, ███ and Officer █████████) responded to the location. Camera operators put agents in on the last location of the suspected bundles. As agents responded to the location, two subjects were seen running south from the area. The subjects successfully climbed the IBF and remained at the top of the fence. Two additional subjects located in Mexico began throwing multiple rocks over the fence, striking Officer ████'s canine partner, ████. Agent ████ gave verbal commands to the subjects to stop throwing the rocks. The subjects did not comply and continued to throw rocks at the agents and officers. At this point, Agent ████, fearing for his life and that of his fellow agents, discharged his service issued handgun striking at least one subject. Agent ████ immediately reported the incident over the radio. No injuries to agents or officers were sustained. As agents sought cover, they observed one male subject on the south side of the IBF lying motionless. The other three subjects retreated into the interior of Mexico.

The NPD canine, ████ was struck on the hind legs. NPD Officer ████ stated that ████ appeared to be uninjured, however, he would continue to evaluate him overnight and will seek medical treatment if necessary.

SBPA ████████ asked Agent ██████ the eight firearms questions. Agent ██████ could not remember the exact number of rounds he discharged from his weapon but did state that he emptied his 12 round magazine and reloaded to resume firing.

There were four witnesses to the shooting:
BPA ███████
BPA J██████
NPD ██████
NPD Officer██████

Additional agents heard the gun shots and immediately responded to the scene:
BPA ███████
BPA ███████ (assigned to southbound operations at DeConcini POE)

Joint Field Command-Arizona
Joint Intelligence and Operations Center
Email: ████
Phone: ████
Deft-1083

Ex. M - pg 30

LIMITED DISTRIBUTION - FOR OFFICIAL USE ONLY

# Joint Field Command - Arizona
## Shooting Incident
## Nogales, AZ
## Date of Incident: 10/10/12

Agent involved in the shooting:

EOD: ███████
Class # ███████
Assigned to southbound operations at DeConcini POE

Weapon information:
███████████████
Serial number: ███████████

At 2330 hours C4 was contacted.  Supervisor ███████████████ Verdugo provided report # ███████.

At 2332 hours, CISEN was contacted.  Operator #12 issued report ████████.

At 2332 hours, SSP was contacted via Nextel and spoke with Inspector ████████ who indicated that he would be dispatching officers to the scene.   Officers arrived to the scene at approximately 2335 hours.

At 2333 hours, Nogales Police Department responded to the scene and issued report ████████████.

At 2239 hours, Mexican ███████████ responded to the scene.

At 2341 hours, Omaha 43L was dispatched to the scene and arrived on the scene at 1217.

At 2337 hours, Supervisory Border Patrol Agent, ███████████████, responded to the scene and spoke with SSP Supervisor ███████████████ (███████████).  Officer ████████ confirmed that one male subject, approximately 20-25 years of age was in fact deceased with multiple gun shot wounds to the head (front and left side).  The subject did not have any identification on him and was described as having a medium complexion, short black hair, and wearing black jeans, gray t-shirt, and black and gray shoes.  Officer ████████ indicated that there were two witnesses to the incident in Mexico.  The names of the witnesses have not been provided at this time.

Agents recovered two bundles of contraband the weight of which will be determined once the crime scene is cleared by the Federal Bureau of Investigation.

At 2336 hours, a Command Post was set up on West International and West Street by SBPA ████████  All traffic was blocked off on Hereford and West International.

Joint Field Command-Arizona
Joint Intelligence and Operations Center
Email: ████████████████
Phone: ████████████
Deft-1084

LIMITED DISTRIBUTION - FOR OFFICIAL USE ONLY

# Joint Field Command - Arizona
## Shooting Incident
## Nogales, AZ
## Date of Incident: 10/10/12

At 2345 hours, CIT was notified and SBPA ⬛⬛⬛⬛⬛ advised that he would notify FBI, OIG, OPR, and IA. Agents ⬛⬛⬛ and ⬛⬛⬛ were enroute to the scene at 2355 hours. SBPA ⬛⬛⬛⬛ reported that FBI, OIG, and IA would be responding and that OPR would not be responding.

At 2346 hours, Nogales Station International Liaison Unit was notified.

At 1208 hours, JIOC notified hours and issued SIR # 13-TCANGL-101112000012.

Sector Public Affairs Branch Chief ⬛⬛⬛⬛⬛al was contacted 1222 hours due to national and international media likely to arrive in the area.

At 0100 hours, CIT arrived on the scene.

At 1252 hours, EAP and Peer Support were offered to Agent ⬛⬛⬛ Peer Support Coordinator ⬛⬛⬛⬛⬛ was contacted. Peer Support Agent ⬛⬛⬛⬛⬛ is responding to the scene at 0115 hours.

At 0019 hours, the body of the deceased subject was recovered by ⬛⬛⬛⬛

At 0046 hours, All Mexican Authorities cleared the scene at approximately.

Footage of the drug activity was captured on RVSS camera 24 and the incident was captured on camera 27.

Assault Report: NGL 13 10000244

CBP-318 Use of Force Report: UFB20121010004

ICAD Ticket #1789.

Zone 21
Grid 16E
GPS Coordinates: N31.33517, W 110.94685

3

Joint Field Command-Arizona
Joint Intelligence and Operations Center
Email: ⬛⬛⬛⬛⬛
Phone: ⬛⬛⬛⬛⬛
Deft-1085

# Tab 4

Deft-1086



U.S. Customs and Border Protection

Nogales Shooting, 10.11

SIR # 13.11 - Ex. 1011120

Ex. M - pg 34

# Tab 5

Deft-1088



www.eldiariodesonora.com.mx

# el Diario
### DE SONORA
**NOGALES**

**DEL LADO MEXICANO**

# Mata Border a hombre

» Éste junto a tres personas más **introducía a Estados Unidos paquetes con droga y al verse descubiertos arrojaron piedras** a los agentes y estos dispararon





## Aprueba Cabildo reestructurar deuda



**'LEVANTADOS' EN LA COLOSIO**

**11A JUSTICIA**







**Su opinión es importante.**


Deft-1089

Exhibit N

| | |
|---|---|
| From: | VITIELLO, RONALD D |
| Sent: | Sunday, May 01, 2011 7:42 AM |
| To: | SKERO, AUSTIN L; CHAVEZ, FELIX |
| Cc: | ODDEN, ERIC M; FISHER, MIKE J |
| Subject: | Re: Shots fired |

Thanks
Ronald D. Vitiello 

----- Original Message -----
From: SKERO, AUSTIN L
To: CHAVEZ, FELIX; VITIELLO, RONALD D
Cc: ODDEN, ERIC M
Sent: Sun May 01 10:32:48 2011
Subject: Fw: Shots fired

Chiefs,

This morning agents were attempting to arrest an illegal alien near the 410 area west of DeConcini POE.

During the encounter the agents were assaulted by rock throwers and one agent discharged his M4.  No known injuries at this time to either side.

The scene is secure and Mex OA is on the south side.


*Class. 794
*EOD. 7-24-08
*M4 used
*6 to 8 shots fired towards rock throwers through fence ballards at 410

C4 was contacted and they have not received reports of anyone seeking medical assistance throughout Nogales with gunshot wounds.

National Guard RVSS operator, captured the incident on Camera 28. The area has a lot of brush/foliage and the image is not very clear. All subjects appeared to have ran away from the area.

More to follow as it develops.



Austin


Blackberry

1

Deft-1096

----- Original Message -----
From: CERRILLO, RAMIRO S
To: SWB Arizona Corridor; SKERO, AUSTIN L; ODDEN, ERIC M
Sent: Sun May 01 09:37:20 2011
Subject: Re: Shots fired

Just made contact with Joe...no other updates and they will keep us posted with the final sitrep...ram

----- Original Message -----
From: CRUZ, JOSE G
To: CERRILLO, RAMIRO S; HANNA, MATTHEW L.
Cc: SKERO, AUSTIN L
Sent: Sun May 01 09:25:14 2011
Subject: Fw: Shots fired ·

Fyi.

----- Original Message -----
From: CRUZ, JOSE G
To: CHACON, RAUL M
Sent: Sun May 01 09:23:00 2011
Subject: Re: Shots fired

Thanks Raul.

----- Original Message -----
From: CHACON, RAUL M
To: CRUZ, JOSE G; RIOS, MARK R; DIKMAN, SABRI Y; NIEVES, JOHN M
Cc: PADILLA, MANUEL JR; BOOTH, ROBERT A
Sent: Sun May 01 09·18:56 2011
Subject: Re: Shots fired

C4 was contacted and they have not received reports of anyone seeking medical assistance throughout Nogales with gunshot wounds.

After speaking with the National Guard RVSS operator, they captured the incident on Camera 28. The area has a lot of brush/foliage and was told the image is not very clear. All subjects appeared to have ran away from the area. No one was limping or being carried away. I will update with any new information.
Raul
Sent from Blackberry

----- Original Message -----
From: CRUZ, JOSE G
To: RIOS, MARK R; DIKMAN, SABRI Y; NIEVES, JOHN M
Cc: CHACON, RAUL M; PADILLA, MANUEL JR; BOOTH, ROBERT A
Sent: Sun May 01 09:06:17 2011
Subject: Re: Shots fired

Gents,

ILU as contacted at 0532 hrs, and will be working it on the south side through C-4 and their counter parts.

2

Deft-1097

Did this happen within the RVSS view shed.  If so we need to follow the appropriate chain of evidence procedures when the video is pulled.

I have copied Diego and Raul Chacon on this message as well as JFC Chief Booth.

Please keep ILU program director Raul Chacon in the loop as the more he knows the more he can find out. He will get us info if someone shows up at the hospital.

Thanks,

J Cruz

----- Original Message -----
From: RIOS, MARK R
To: CRUZ, JOSE G
Sent: Sun May 01 08:32:20 2011
Subject: Fw: Shots fired

Sir,

As discussed.  This incident occurred at approximately 0510.


Thank you,

Mark R. Rios
███████████████
Sent via Blackberry

----- Original Message -----
From: DIKMAN, SABRI Y
To: RIOS, MARK R
Sent: Sun May 01 08:28:25 2011
Subject: Shots fired

Sir,

This morning agents were attempting to arrest an illegal alien near the 410 area west of DeConcini POE. This area has a section of "old" bollard fencing. During the encounter the agents were assaulted by rock throwers. One agent discharged his M4.  No known injuries at this time to either side.

Contacts:

Mexico OA
CIT
Nogales PD (awareness)

The scene is secure and Mex OA is on the south side.

███████████████
Classs. 794
EOD. 7-24-08

3

Deft-1098

M4   6 to 8 shots fired towards rock throwers through fence ballards at 410

More to follow.


Sabri Dikman
(A) Patrol Agent In Charge
Nogales Station
520-761-2402 Office

Deft-1099

**From:**      CAINE, JEFFREY
**Sent:**      Saturday, May 22, 2010 5:23 AM
**To:**        C1 BULLETS; FISHER, MIKE J; VITIELLO, RONALD D
**Subject:**   Fw: CAG shooting incident


----- Original Message -----
From: VITIELLO, RONALD D
To: FISHER, MIKE J
Cc: CAINE, JEFFREY
Sent: Sat May 22 04:34:41 2010
Subject: Fw: CAG shooting incident

As reported earlier SIR Tucson Sector, Casa Grande ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

-- -- Original Message ----
From: HUDSON, RICHARD M
To: VITIELLO, RONALD D
Sent: Sat May 22 02:50:28 2010
Subject: Fw: CAG shooting incident

Sir,

Update - looks the person shot was a backpacker. 4 bundles found in the aea.

VR

Hudson

---- Original Message   --
From: MARTIN, THOMAS G
To: WAINER, JAMES G; HUDSON, RICHARD M
Cc: CRELIA, MICHAEL S; MCLOUGHLIN, CHARLES B
Sent: Sat May 22 02:01:07 2010
Subject: CAG shooting incident

Update

*******************

This event began when the Alvarez West MSS called out a group of 4 suspected illegal aliens.

Three agents responded to the MSS detection and upon their arrival, 3 subjects immediately absconded from the area

The subject who was shot remained and reportedly threatened the agent with rock in his hand.

Agent ▓▓▓▓ discharged his service issued sidearm at the subject.

1

**FISHER
EXHIBIT 9
1/15/16**
v.weiss, CSR 12380

Deft-1049

The subject suffered a wound to the upper right quadrant of his right arm.

His wound does not appear to be life-threatening.

It was suspected that these subjects were trafficking narcotics as 4 bundles of marijuana were found at the scene.

TOPD has arrived at the scene. All other notifications have been or are in the process of being made.



Deft-1050

# Exhibit O

**BPA DORIAN DIAZ**
**JUNE 21, 2011 FATAL SHOOTING**
**San Ysidro, CA**

Incident Date: June 21, 2011
Decedent: **Jose Alfredo YANEZ-Reyes**
Incident Location: 1.6 miles west Port of San Ysidro, CA

CBP Component: Border Patrol
Employee: **BPA Dorian Diaz** – EOD: 4/07/2008
Incident Type: Firearm – .40 H&K P2000 pistol

**Criminal Investigation:** San Diego Police Department – Case No. 11-024171
**Administrative Investigation:** DHS-OIG – Case No. I11-CBP-SND-00974
**Assault on a Federal Officer:** DOJ-FBI – Closed/Conviction of IBARRA-Murrieta
**Civil Rights Investigation:** DOJ-CRD reviewed the criminal investigation and declined prosecution of BPA Diaz citing lack of evidence that any crime occurred pursuant to 18 USC 242, Deprivation of Rights Under Color of Law.

Investigative Key Points:
- Jose Alfredo YANEZ-Reyes (Deceased) and Silvino IBARRA-Murrieta illegally entered the U.S. and were encountered by BPA Dorian Diaz.
- BPA Chad Nelson arrived to assist BPA Diaz.
- YANEZ ran back toward Mexico and began climbing the border fence.
- BPA Nelson attempted to arrest IBARRA who resisted and fought with BPA Nelson.
- YANEZ threw rocks and a wooden stick at BPA Nelson; BPA Nelson was struck on the head at some point.
- YANEZ again motioned to throw another rock/object when BPA Diaz fired one shot from his .40 H&K P2000 pistol, striking YANEZ in the left eye.
- YANEZ fell off the border fence onto the Mexican side and died as a result of the gunshot.
- IBARRA was charged with 18 USC 111 and taken into custody by FBI agents.
- IBARRA admitted to the FBI to using a small amount of Methamphetamine the day before the incident.
- YANEZ's autopsy report (conducted in Tijuana, Baja California, Mexico) revealed positive results for Methamphetamines and cause of death attributed to a cranium penetrating wound from a firearm projectile.
- Video of the incident did not offer any investigative value.
- Audio of the incident did capture BPA Diaz requesting assistance at Stewarts Bridge and reporting rocks were being thrown at them.
- On August 11, 2011, IBARRA was convicted in U.S. District Court, Southern District of California:    Count 1 – 8 USC 1326 Deported Alien Found in the United States
                  Count 2 – 18 USC 111 Assault of a Federal Officer
- IBARRA was sentenced to 87 months.

**FISHER**
**EXHIBIT 5**
**1/15/16**
v.weiss, CSR 12380

Deft-1100

Exhibit P

PEREZ VS DIAZ

DEPOSITION OF
JAMES TOMSHECK

JANUARY 12, 2016

ART MILLER & ASSOCIATES
PHONE  410-385-1882
FAX  410-385-1883
www.artmiller.com

(Pages 1 to 4)

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

MARIA DEL SOCORRO QUINTERO ) Civil Action No.
PEREZ, et al.,          ) 13CV1417-WQH (BGS)
                        )
       Plaintiffs,)
                        )
   - vs -        )
                        )
DORIAN DIAZ, et al.,     )
                        )
       Defendants.)
- - - - - - - - - - - - - - -

Video deposition of JAMES TOMSHECK was taken on Tuesday, January 12th, 2016, commencing at 10:00 a.m., at the LAW OFFICES OF THE DEPARTMENT OF JUSTICE, 36 South Charles Street, 4th Floor, Baltimore, Maryland, before ADINA BERMAN, Notary Public.

REPORTED BY: Adina Berman, RPR

**Page 2**

APPEARANCES

LAW OFFICES OF HILLIARD & SHADOWEN LLP
BY  STEVE D. SHADOWEN, ESQUIRE
   919 Congress Avenue, Suite 1325
   Austin, Texas 78701
   Phone (512) 993-3078
   E-mail  Steve@hilliardshadowenlaw.com
      Counsel for the Plaintiffs

LAW OFFICES OF HILLIARD & SHADOWEN LLP
BY  MATTHEW C. WEINER, ESQUIRE
   39 West Main Street
   Mechanicsburg, Pennsylvania 17055
   Phone (855) 344-3298
   E-mail· matt@hilliardshadowenlaw.com
      Counsel for the Plaintiffs

LAW OFFICES OF U.S. DEPARTMENT OF JUSTICE
UNITED STATES ATTORNEY'S OFFICE
BY  DIANNE SCHWEINER, ESQUIRE
   880 Front Street, Room 6293
   San Diego, California 92101
   Phone (619) 546-7654
   E-mail  Dianne.schweiner@usdoj.gov
      Counsel for the Defendants

(Continued   )

**Page 3**

LAW OFFICES OF U.S. DEPARTMENT OF JUSTICE
UNITED STATES ATTORNEY'S OFFICE
BY  ERNEST CORDERO, JR., ESQUIRE
   880 Front Street, Room 6293
   San Diego, California 92101
   Phone (619) 546-7654
   E-mail  Ernest.cordero@usdoj.gov
      Counsel for the Defendants

LAW OFFICES OF COBURN & GREENBAUM PLLC
BY  KIMBERLY JANDRAIN, ESQUIRE
   1710 Rhode Island Avenue, Northwest, 2nd Floor
   Washington, D.C. 20036
   Phone (202) 657-5470
   E-mail  Kj@coburngreenbaum.com
      Counsel for the Deponent
            - - -

A L S O   P R E S E N T:
   Adam Nudelman, legal video specialist
   Michael Fisher

**Page 4**

INDEX

| WITNESS | PAGE |
|---|---|
| JAMES TOMSHECK | |
| By: Ms. Schweiner | 6, 308 |
| By: Mr. Shadowen | 298, 311 |

- - -

EXHIBITS

| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| Tomsheck 1 | Subpoena | 315 |
| Tomsheck 2 | Handwritten notes | 315 |
| Tomsheck 3 | Document | 315 |
| Tomsheck 4 | Handwritten notes | 315 |
| Tomsheck 5 | Declaration | 315 |

- - -

**Page 5**

1  VIDEOGRAPHER: We're now on the record in
2  the matter of Maria Del Socorro Quintero Perez, et
3  al. versus Dorian Diaz, et al. in the U.S. District
4  Court for the Southern District of California, case
5  number 13CV1417-WQH open parens, BGS, close parens.
6  Today's date is 1/12/16. The time is
7  10:04 a.m. This is the video recorded deposition of
8  James Tomsheck being held at U.S. Department of
9  Justice in Baltimore, Maryland. My name is Adam
10  Nudelman on behalf of Art Miller located in
11  Timonium, Maryland. The court reporter is Adina
12  Berman from Art Miller as well. Will all attorneys
13  please identify themselves and anyone with them and
14  the parties they represent beginning with the party
15  noticing this proceeding.
16  MS. SCHWEINER: Assistant U.S. Attorney
17  Dianne Schweiner representing the defendants in this
18  case, Michael Fisher, Dorian Diaz, and Chad Nelson.
19  MR. CORDERO: Ernie Cordero on behalf of
20  the same federal defendants.
21  MR. FISHER: Mike Fisher, defendant.
22  MR. SHADOWEN: Steve Shadowen on behalf of
23  the plaintiffs. We noticed the deposition as well.
24  MR. WEINER: Matthew Weiner on behalf of
25  the plaintiffs.

**Page 6**

1  MS. JANDRAIN: Kimberly Jandrain on behalf
2  of the witness Mr. Tomsheck.
3  THE WITNESS: James Tomsheck, the person
4  who is here to be deposed.
5  VIDEOGRAPHER: Can you administer the
6  oath?
7  - - -
8  JAMES TOMSHECK,
9  The Deponent, called for examination by the
10  Defendants, being first duly sworn to tell the
11  truth, the whole truth, and nothing but the truth
12  testified as follows:
13
14  BY MS. SCHWEINER:
15  Q. Good morning, Mr. Tomsheck. As I just
16  introduced myself, I'm representing the defendants
17  in this case. Have you ever had your deposition
18  taken before?
19  A. Not in a civil proceeding.
20  Q. Okay. Have you ever testified under oath
21  in any proceeding?
22  A. I have testified in federal district court
23  on numerous occasions. Testified prior to that in
24  state and local proceedings when I was a police
25  officer for the city of Omaha.

**Page 7**

1  Q. Was that in the capacity of civil lawsuits
2  or criminal?
3  A. All of them as I recall criminal and I'm
4  not aware of my having testified in a civil
5  proceeding before.
6  Q. Were all of those occasions where you were
7  testifying as an officer on the scene or as a
8  witness to whatever the crime was?
9  A. They were all -- the majority of the
10  testimonies were in my role as a special agent with
11  the U.S. Secret Service.
12  Q. So you never testified under oath in any
13  other capacity other than what you have just
14  mentioned?
15  A. Not to my recollection.
16  Q. Okay. So I'm going to explain the process
17  a little bit to you. Obviously I'll be asking you a
18  series of questions today. You'll be answering them
19  under oath and you understand this is the same oath
20  that you would take before a judge or a jury?
21  A. I do.
22  Q. You're doing a good job already. You have
23  given me audible answers yes or no. We want to
24  continue doing that rather than giving me shakes or
25  nods of the head because the court reporter cannot

**Page 8**

1  take those downs. So we need actual words.
2  A. Understood.
3  Q. You want to make sure to let me finish my
4  full question first before you answer even though
5  you may anticipate what I'm asking because the court
6  reporter cannot transcribe what we both say at the
7  same time. So what will happen if you'll have half
8  a question and half an answer. We want to avoid
9  that so we have a clean record. So you want to be
10  patient and I also will let you finish your answer
11  first. Sometimes I may not know you've finished and
12  I may make a mistake, but I'll try to remember to
13  let you answer fully or you let me know if you're
14  not finished, okay? Is that a yes?
15  A. Yes.
16  Q. From time to time your counsel may make
17  objections or any counsel may make objections to my
18  questions. You are still expected to answer the
19  question. The exception to that would be if you're
20  instructed not to answer based on attorney/client
21  privilege. Do you understand that?
22  A. I do.
23  Q. From time to time I may have to ask you
24  for an estimate of something. I don't want you to
25  completely guess at something that you have no

Page 33

1  A. I had both an iPhone device and an iPad
2  device for remote access.
3  Q. You no longer have those devices?
4  A. No.
5  Q. You turned them into CBP upon your
6  retirement?
7  A. Yes. In March of 2015, all of my
8  government property was surrendered to a
9  representative from the U.S. Border Patrol.
10  Q. Other than Coburn & Greenbaum, is there
11  anyone else that you have given any of those e-mails
12  to?
13  A. No.
14  Q. As far as you're aware, Steve Shadowen or
15  Matthew Weiner's firm or any other firm representing
16  the plaintiff would not have copies of those
17  e-mails?
18  A. If they got them, they didn't get them
19  from me.
20  Q. Any other documents other than those that
21  you have described that you took after your
22  reassignment and/or retirement from CBP?
23  A. None; only those that were legitimately
24  provided to me and none other than that I can
25  remember.

Page 34

1  Q. Can you name -- you said that some of the
2  documents dealt with excessive use of force, the
3  documents that you got from either Mark -- you
4  pronounced it -- how do you pronounce his last name?
5  It's not Morgan?
6  A. I believe it's Morogon or Morgan.
7  Q. It's M-O-R-G-A-N, correct?
8  A. Correct. I'm confusing the name with
9  another person that I worked with with the same
10  spelling but a different pronunciation.
11  Q. The documents that you received from him
12  that related to what you believe was excessive
13  force, can you name what incidents those related to?
14  A. The engagement, and again, Mr. Morgan did
15  not provide them to me. He authorized that they
16  would be provided to me by Mr. Matta and Ms.
17  Keverline and Ms. Corraddo, and they assisted in
18  providing them to me. There were communications
19  about what I believe were 27 or 28 use of force
20  incidents. They specifically described 7 or 8
21  incidents that I had characterized as highly
22  suspect.
23  Q. My question is can you name any of those
24  incidents either by the name of the agent involved,
25  the name of the target involved, anything?

Page 35

1  A. They would involve or include Mr. Yanez,
2  the case that we're discussing here today. Seven
3  others, Antonio Elena Rodriguez, Sergio Hernandez,
4  Anastasio Hernandez Rojas, a person's whose last
5  anytime was Pedraza, Monique Tachiquin. These are
6  all individuals who lost their lives as the result
7  of an encounter with the Border Patrol.
8  Q. And these are the ones that you're
9  characterizing as highly suspect, the 7 or 8?
10  A. Yes.
11  Q. Is it the same ones that you listed in the
12  documents you produced to me?
13  A. Yes.
14  Q. So we'll get to those a little bit later.
15  What other documents were included or the incidents
16  included in the 27 or 28 that you mentioned where
17  you believed excessive force was used?
18  A. It is those names that I just mentioned
19  and at least one other that I don't recall at this
20  point that I believe were highly suspect in terms of
21  the circumstances and the fact pattern that led up
22  to the use of lethal force. The other incidents I'm
23  not sure I would describe as highly suspect.
24  Q. Okay.
25  A. A like number, 7 or 8 of the 27 or 28 I

Page 36

1  believe very quickly and legitimately were
2  determined to be an appropriate use of lethal force.
3  Q. I'm sorry. Did you say appropriate or
4  inappropriate?
5  A. Appropriate use of lethal force. Others
6  were cases that had not been resolved and the
7  circumstances were not immediately apparent or
8  strongly indicated by the fact pattern that I was
9  aware of or was provided to me.
10  Q. So these are the documents that you
11  gathered in anticipation of your briefing before the
12  House and the Senate, correct, that you asked IA
13  for?
14  A. Yes. In part, yes.
15  Q. I'm trying to understand whether you're
16  suggesting that all of those are documents or
17  incidents involved some sort of excessive force or
18  just the seven or eight that you listed on the
19  documents that you gave to me in your subpoena.
20  MR. SHADOWEN: Object to the form.
21  BY MS. SCHWEINER:
22  Q. Go ahead.
23  A. My suggestion to many, both at the Office
24  of Special Counsel and to those staffers in the
25  House and Senate briefings was that those seven or

**Page 69**

1   A.  No.
2   Q.  This was a separate incident?
3   A.  Yes.  The seven or eight incidents that I
4   referred to are those that resulted in loss of life,
5   lethal use of force used where loss of life was the
6   outcome.
7   Q.  In this particular instance with Agent
8   Jesus Diaz did not result in a fatality?
9   A.  Did not.  It resulted in permanent
10  physical damage to both shoulders.  What he did was
11  handcuff the person behind his back, grabbed the
12  chains of the handcuffs, and bounce him in a way to
13  cause great physical pain.
14  Q.  I presume Mr. Diaz is now incarcerated?
15  A.  I believe he has been released.  I think
16  he was sentenced a period of approximately two years
17  or slightly less.
18  Q.  So this was an excessive force case that
19  you said we took.  We being IA?
20  A.  Yes.
21  Q.  Okay.  Can you describe for me whether
22  that was a choice that you made or is that a
23  decision OIG made to have IA investigate that case?
24  A.  Again, OIG had declined the case.  ISO-PR
25  initially opened and then declined the case.  IA

**Page 70**

1   took the case believing that we were not required to
2   refer it to Border Patrol management because IA
3   policy or CBP policy was also that IA conduct
4   investigations of misconduct where the likely
5   outcome would be removal.
6   Q.  So were you precluded when you were the
7   Assistant Commissioner from investigating excessive
8   force cases when OIG did want to investigate them?
9   A.  Yes.
10  Q.  And same for ISO-PR?
11  A.  To be perfectly clear, there were
12  instances where DHS-OIG offices solicited the
13  cooperation and participation of CBP Internal
14  Affairs offices and agents, but that was the
15  exception rather than the rule.
16  Q.  So if I understand you correctly, OIG
17  would make a determination whether they wanted to
18  investigate a particular instance of excessive
19  force, correct?
20  A.  Yes.
21  Q.  And I want to make sure that you
22  understand my questioning right now is about
23  excessive force.  I don't want to know about
24  corruption right now.
25  A.  Correct.

**Page 71**

1   Q.  And if they either declined to investigate
2   or sought the assistance of IA, then IA would get
3   involved in a particular investigation; is that
4   accurate?
5   A.  Correct.  An additional description of
6   what frequently occurred was the FBI would sometimes
7   take the case asking for full cooperation of the OIG
8   and IA.
9   Q.  When that would occur either whether the
10  FBI was involved or not, when assistance was
11  requested of IA, would that include actually
12  interviewing agents or interviewing witnesses?
13  A.  In some instances it would involve
14  participation in those interviews and other
15  instances it involved support in the way of locating
16  witnesses, providing information about the
17  operational environment in which the incident
18  occurred but providing support, not leadership in
19  driving the case.
20  Q.  During the time that you were the
21  Assistant Commissioner of IA between 2006 and 2014,
22  can you give me an estimate of how many excessive
23  force cases or allegations of excessive force where
24  a fatality occurred were investigated by the
25  Internal Affairs department?

**Page 72**

1   A.  I'm not sure that I could accurately
2   identify the number of cases, and it would also have
3   to be defined in the degree of involvement, any
4   involvement at all or full participation with the
5   FBI or OIG.  But I don't know that I could identify.
6   Q.  Let's break it down.  Let's talk about
7   first just any investigations that IA handled
8   regarding fatalities.
9   A.  I'm sorry?
10  Q.  Let's just talk about any investigations
11  that IA handled regarding fatalities where OIG was
12  also not involved.
13  A.  Independent?  In other words, where IA had
14  the case on its own?
15  Q.  Right.  IA led the investigation.  Was it
16  more than ten case that you would say whether there
17  were fatalities?
18  A.  Where there were fatalities, none, did IA
19  ever have the responsibility of being the lead
20  investigative agency?
21  Q.  During the time you were the Assistant
22  Commissioner between 2006 and 2014, what is your
23  estimate as to how many fatality investigations IA
24  assisted OIG with or the FBI?
25  A.  I'm not sure I can identify a number.  I

**Page 209**

1 justified using lethal force in response to any rock
2 throwing?
3      MR. SHADOWEN:  Objection; asked and
4      answered.
5 BY MS. SCHWEINER:
6      Q.  Go ahead.
7      A.  No.
8      Q.  In these IA training sessions you
9 referenced where lethal force in response to rocks
10 was mentioned, were there any policy documents that
11 were circulated, meaning CBP or DHS policy documents
12 that mentioned the word "rock"?
13      A.  Within Internal Affairs?
14      Q.  Within these meetings you were talking
15 about, yes.
16      A.  No.
17      Q.  So the constitutional standard that you
18 testified to a few minutes ago for lethal force, how
19 is it that you think the constitutional standard is
20 different for Border Patrol than it is for other law
21 enforcement agencies?
22      A.  I believe Border Patrol's use of lethal
23 force was inconsistent with that standard.  I
24 believe Border Patrol agents not in every instance
25 but in some instances violated that constitutional

**Page 210**

1 standard and resulted to lethal force unnecessarily.
2      Q.  But you're not aware of any written
3 document that states a policy by CBP or DHS with
4 respect to lethal force other than one that
5 articulated the standard as --
6      A.  Correct.
7      Q.  -- imminent death or serious bodily injury
8 to an agent or someone else?
9      A.  Yes.
10      Q.  Do you understand where that standard came
11 from?
12      A.  It is essentially the same standard that
13 exists in every U.S. law enforcement agency derived
14 from statute.
15      Q.  What statute is that?
16      A.  Constitutional standards with regard to
17 use of lethal force.
18      Q.  Can you name that statute?
19      A.  I cannot.
20      Q.  It's the same use of force standard that
21 you followed at the city of Omaha?
22      A.  And in the Secret Service and while
23 working with every other law enforcement agency in
24 the country that I have worked with.
25      Q.  Which of these incidents that you have

**Page 211**

1 listed on Exhibit 2 do you believe present a
2 situation where an agent violated the lethal force
3 use of force policy?
4      MR. SHADOWEN:  I object to the form.
5      THE WITNESS:  I would start with Jose
6 Antonio Elena Rodriguez is what I believe the most
7 egregious is where he fired on a 16-year-old boy who
8 if he had been throwing rocks would not possibly
9 have thrown a rock that would impose a threat or a
10 danger to the Border Patrol agent who shot and
11 killed him.
12 BY MS. SCHWEINER:
13      Q.  Other than the Rodriguez incident listed
14 on Exhibit 2, are there any other incidents on this
15 list where you believe there was unconstitutional
16 use of force used by a Border Patrol agent?
17      A.  The next one I would mention is Sergio
18 Hernandez Guerrero, the incident where the Border
19 Patrol agent fired across the Rio Grande River and
20 struck the Hernandez boy in the head with one round
21 and struck him in the middle of his forehead
22 claiming that rocks were being thrown presenting an
23 injury where videos that I have reviewed very
24 clearly show that Sergio Hernandez was not throwing
25 rocks.

**Page 212**

1      Q.  Any other incident listed on your Exhibit
2 2 where you believe an unconstitutional use of force
3 was used by a Border Patrol agent?
4      A.  I would cite Monique Tachiquin where the
5 Border Patrol agent reengaged with Tachiquin who I
6 also believe was intoxicated with methamphetamine at
7 the time, engaged with her at the front door of an
8 apartment where she denied entry and then reengaged
9 with her as she walked to a vehicle and then chose
10 to jump on the hood of the car as she sped away and
11 fired ten rounds through the windshield.
12      Q.  What fact do you have to suggest that he
13 jumped on the head of the car versus her running
14 over him with her car?
15      A.  Belief that he chose to get on the hood of
16 the car based on information briefed to me at the
17 time the incident occurred.
18      Q.  Who gave you that information?
19      A.  Agents in San Diego.
20      Q.  Anybody else but your employees at IA that
21 gave you any information --
22      A.  Let me -- if I could qualify that.  They
23 did not give that to me correctly.  They gave that
24 information to their IA Investigative Operations
25 Division supervisors who briefed that to me.

**Page 301**

1    MS. SCHWEINER: Compound, vague and
2 ambiguous.
3    THE WITNESS: Yes.
4    MS. SCHWEINER: And lack of foundation.
5 BY MR. SHADOWEN:
6    Q. Was Chief Fisher present at any meetings,
7 discussions, or other communications in which that
8 policy by whatever name was discussed and affirmed?
9    MS. SCHWEINER: Compound, vague, and
10 ambiguous as to policy.
11    THE WITNESS: Frequently discussed at
12 meetings about recommendations in the PERF report.
13 BY MR. SHADOWEN:
14    Q. What about prior to the PERF report, was
15 Chief Fisher -- were you and Chief Fisher both
16 present at meetings where that policy is outlined
17 was discussed and affirmed?
18    MS. SCHWEINER: Vague and ambiguous as to
19 policy, compound, assumes facts not in evidence.
20    THE WITNESS: Yes.
21 BY MR. SHADOWEN:
22    Q. Tell us those types of meetings and how
23 many they were.
24    A. Frequently at those Commissioner's morning
25 reports where incidents that had just occurred or

**Page 302**

1 very recently occurred were discussed and those
2 controversial incidents that are mentioned as the
3 seven or eight highly suspect would be examples of
4 that and incidents that occurred before that.
5    Q. Counsel asked you whether or not it was
6 likely your memory would get better over time and my
7 recollection is you said no. Would your memory get
8 better in the future if, for example, somebody
9 showed you a document that jogged your memory and
10 brought back to you the specific incidents in
11 particular incidents?
12    MS. SCHWEINER: Incomplete hypothetical
13 and calls for speculation and overbroad.
14    THE WITNESS: Yes, and I will add I think
15 it's important to note that most of the information
16 regarding these incidents is a matter of public
17 record and is available, many of the facts and
18 circumstances available in media reports that are
19 online as I'm frequently directed to or personally
20 reviewed myself, but with an opportunity to review
21 official reports of the incidents, I'm sure my
22 recollection of those events, many of them years,
23 ago would be refreshed.
24    MR. SHADOWEN: Counsel, this is -- is this
25 Exhibit 2?

**Page 303**

1    MS. SCHWEINER: Yes.
2 BY MR. SHADOWEN:
3    Q. Counsel had you look at Exhibit 2 your
4 list of highly suspect incidents I think she asked
5 you a question along the lines of which these
6 incidents violated, quote, the policy, but I don't
7 think she defined the policy. So I want you use my
8 definition of the policy, the policy that was
9 actually employed at CBP and was consistently
10 reaffirmed by management including Chief Fisher. It
11 is the policy that you need not back up, you need
12 not take cover, you may treat the throwing of rocks
13 at you as pre se lethal force.
14    With that definition of the policy, did
15 these incidents violate that policy or were they
16 consistent with and taken pursuant to that policy?
17    MS. SCHWEINER: Hang on. Move to strike
18 the entire question. It's compound. Misstates my
19 prior questioning. Misstates the evidence. Assumes
20 fact not in evidence. Overbroad.
21    THE WITNESS: No. The incidents that are
22 in that document would not have constituted a
23 violation of CBP policy. The violation that I
24 referred to was the constitutional restraints
25 regarding use of force policy as is the case

**Page 304**

1 throughout the U.S. law enforcement community.
2 BY MR. SHADOWEN:
3    Q. Are you aware that I'm also counsel for
4 the Hernandez family?
5    A. Sergio Hernandez family?
6    Q. Yes; Sergio.
7    A. Not sure. I think I do remember hearing
8 that from someone else.
9    Q. Are you aware that the agent's counsel in
10 that case has filed a document with the Supreme
11 Court of the United States asserting that Sergio
12 Hernandez threw a rock at the agent? Are you aware
13 of that?
14    A. No.
15    Q. Have you seen the videotapes of the Sergio
16 Hernandez killing?
17    A. Yes.
18    Q. Which videotapes have you seen? There was
19 the cell phone video, there's a CBP video, and like
20 a railroad yard that's nearby. Have you seen --
21 which of any of those have you seen?
22    A. The video --
23    MS. SCHWEINER: I want him to strike all
24 the testimony by counsel and the question as far as
25 the videotapes.

**Page 305**

1  THE WITNESS: The video that I saw was
2  identified both as official CBP video camera.
3  Primarily the video taken from the Union Pacific
4  Railroad bridge is the one that became available to
5  us early on that clearly demonstrated Sergio
6  Hernandez was not throwing rocks at the time he was
7  shot.
8  BY MR. SHADOWEN:
9  Q.  Counsel asked you whether or not you heard
10  Chief Fisher say words to the effect of good shoot
11  or words to the effect of we're not cops and we
12  don't have to abide by the rules that apply to cops.
13  Do you recall that testimony?
14  A.  I do.
15  Q.  Was Chief Fisher present when those
16  statements were made?
17  A.  Absolutely.
18  Q.  Did he object to them in any way?
19  A.  Not that I'm aware of.
20  Q.  After --
21  MS. SCHWEINER: Calls for speculation.
22  BY MR. SHADOWEN:
23  Q.  After becoming Chief, did Mr. Fisher up
24  until after the PERF report change any policies that
25  had existed before he became Chief with respect to

**Page 306**

1  excessive use of force in response to rocking?
2  MS. SCHWEINER: Lacks foundation, calls
3  for speculation, vague and ambiguous, and overbroad.
4  THE WITNESS: Yes.
5  BY MR. SHADOWEN:
6  Q.  Did he change any training with respect to
7  use of force in response to rocking after he became
8  Chief?
9  MS. SCHWEINER: Lack of foundation, calls
10  for speculation, overbroad.
11  THE WITNESS: Not that I'm aware of.
12  BY MR. SHADOWEN:
13  Q.  Did he change investigation techniques or
14  paths or responsibilities once he became Chief?
15  MS. SCHWEINER: Lack of foundation, calls
16  for speculation, compound, overbroad.
17  THE WITNESS: Not that I'm aware of.
18  BY MR. SHADOWEN:
19  Q.  Did he begin imposing discipline on agents
20  after he became Chief --
21  MS. SCHWEINER: Overbroad.
22  BY MR. SHADOWEN:
23  Q.  -- for those circumstances?
24  MS. SCHWEINER: Calls for speculation,
25  overbroad, lack of foundation.

**Page 307**

1  THE WITNESS: No.
2  BY MR. SHADOWEN:
3  Q.  Are you aware, sir, that organizations
4  take on certain cultures for lack a better word?
5  MS. SCHWEINER: Vague and ambiguous,
6  overbroad.
7  THE WITNESS: Yes.
8  BY MR. SHADOWEN:
9  Q.  After becoming Chief, did Mr. Fisher
10  change the culture of the CBP that he had inherited
11  with respect to use of force in response to rocking?
12  MS. SCHWEINER: Compound, vague and
13  ambiguous, lack of foundation, and calls for
14  speculation.
15  THE WITNESS: That would be the culture of
16  the Border Patrol.
17  BY MR. SHADOWEN:
18  Q.  Yes, sir.
19  A.  Not CBP, but no, he did not.
20  Q.  You were asked questions about document
21  request number four in your declaration.
22  A.  Yes.
23  Q.  And you were asked a series of questions
24  about whether or not you could name the names of
25  those documents.  Do you recall that testimony?

**Page 308**

1  A.  I do.
2  Q.  When you were drafting or affirming your
3  declaration with respect to paragraph number four,
4  did you have a copy of the plaintiffs' discovery
5  requests in front of you that identified those
6  documents?
7  A.  Yes.
8  MS. SCHWEINER: Misstates testimony as to
9  whether the witness drafted anything in this
10  document.
11  THE WITNESS: Yes.
12  BY MR. SHADOWEN:
13  Q.  And is paragraph four as drafted accurate
14  to the best of your knowledge and information?
15  A.  Yes.
16  MR. SHADOWEN: I have no further
17  questions.
18  BY MS. SCHWEINER:
19  Q.  Just have a couple follow-up questions.
20  When you were discussing the Sergio Hernandez case,
21  do you have any information as far as what Chief
22  Fisher knows about that case or that incident?
23  A.  No.
24  Q.  Do you have any information about what
25  Agent Diaz knows about the Sergio Hernandez case or

**(Pages 309 to 312)**

**Page 309**

1  incident?
2      A. I'm sorry. Agent Diaz?
3      Q. Do you know who Agent Diaz is?
4      A. In today's --
5      Q. There's a lot of Agent Diaz's. Let me
6  withdraw that.
7      A. At least two different ones.
8      Q. Do you have any information to suggest
9  that the agent involved in the Yanez shooting on
10  June 21st of 2011 has any information about the
11  Sergio Hernandez case?
12      A. No.
13      Q. Do you have any information to suggest
14  that Agent Nelson who was involved in the Yanez case
15  knows anything about the Sergio Hernandez case?
16      A. No, but may I elaborate with regard to
17  both -- the Sergio Hernandez case and the events
18  surrounding it and the outcome of the investigation
19  was something that was widely known throughout all
20  of CBP.
21      Q. When you referenced the fact that Chief
22  Fisher was present at meetings when a policy, a
23  lengthy compound policy that was described during
24  Mr. Shadowen was discussed, you mentioned that was
25  at the Commissioner's morning briefings, correct?

**Page 310**

1      A. Again, which policy are we talking?
2      Q. When he just asked you about this lengthy
3  policy that he defined, the rocking policy, do you
4  recall that?
5      A. Yes.
6      Q. He said was Chief Fisher present during
7  any time when a rocking policy was discussed and you
8  said yes.
9      A. During a discussion of those incidents
10  that involved lethal force being used in response to
11  rocks being thrown, yes.
12      Q. So all of those occurrences what you're
13  talking about when Mr. Fisher was present was in the
14  Commissioner's IA briefings? I'm sorry; the
15  Commissioner's briefings?
16      A. Those are the incidents I recall at this
17  time, that I vividly recall a discussion of the
18  incidents as rock throwing incidents that had
19  resulted in lethal use of force being used being
20  held in those meetings.
21      Q. You're not aware of any other meetings
22  that Chief Fisher ever attended where rock throwing
23  was discussed or lethal force was discussed; is that
24  true?
25      A. I'm sorry?

**Page 311**

1      Q. Are you aware of any other meetings that
2  Mr. Fisher presented -- I'm sorry; was present at
3  other than the Commissioner's morning briefings
4  where a lethal force in response to rock throwing
5  was discussed?
6      A. At the PERF recommendation in the PERF
7  report meetings, yes.
8      Q. In 2013?
9      A. Yes.
10      Q. Any other meetings where you believe he
11  was present when lethal force was discussed with
12  respect to rock throwings?
13      A. Not that I recall at this moment.
14      MS. SCHWEINER: I think I'm done.
15  BY MR. SHADOWEN:
16      Q. During the discussion at which Mr. Fisher
17  was present about the PERF report, do you recall any
18  statements he made about whether he agreed or
19  disagreed with the recommendations regarding the use
20  of force in response to rocks?
21      A. There were many discussions that Chief
22  Fisher disagreed with the recommendations of the
23  PERF report, some of them related to rocks being
24  thrown, many of them related to the vehicle
25  concerns, yes.

**Page 312**

1      MR. SHADOWEN: No further questions.
2  BY MS. SCHWEINER:
3      Q. Okay. I'm going to propose the court
4  reporter be relieved of her duties under the code.
5  Upon completion of the transcript, she is going to
6  send it directly to you, Mr. Tomsheck, at the
7  address of your choice. Would that be your P.O. Box
8  or do you want to give her your address that you
9  want the transcript sent to?
10      A. Would it be by e-mail or paper?
11      Q. It would be by paper in the mail.
12      A. I can give you on the back of the card.
13  I'll give you an address to send it to me.
14      Q. She is going to send you the transcript.
15      MS. SCHWEINER: Would you mind sending him
16  a self-addressed enveloped along with my address on
17  it so he can return the original transcript to me
18  when he is done with it.
19  BY MS. SCHWEINER:
20      Q. And what we're going to have you do, Mr.
21  Tomsheck, is if you have any changes you need to
22  make to the transcript, whether they be typos or any
23  changes whatsoever, if you could not write on the
24  original transcript but write those on a separate
25  piece of paper either an errata sheet that's

(Pages 313 to 316)

**Page 313**

1  provided in the transcript or any paper of your
2  choosing and make the changes on that instead of
3  writing on the original transcript?  Can you give us
4  an audible response to that?
5      A.  Yes.
6      Q.  And would three weeks give you enough time
7  to review the transcript and return it?
8          THE WITNESS:  How many hundred pages?
9          THE REPORTER:  361?
10          THE WITNESS:  I'm not sure.  There are a
11  number of meetings that involve travel that I'm
12  about to participate in.
13  BY MS. SCHWEINER:
14      Q.  Okay.
15      A.  I may be away for two different periods of
16  time that are several days in duration in the next
17  30 days.
18      Q.  The normal time frame would be usually no
19  more than 30 days.  Do you think you could get it
20  done in 30 days?
21      A.  I'll try, but depending -- the duration of
22  some of these trips I'm unaware of or I'm not
23  certain of at this point.
24      Q.  Let's do this.  Let's propose that you
25  return it to me within 30 days of your receipt.  If

**Page 314**

1  you need additional time, why don't you call me and
2  let me know that.
3      A.  Agreed.  How do I call you?
4      Q.  I'll give you my business card before we
5  leave.  So you'll return it in the envelope provided
6  to my office.  I will notify plaintiffs counsel in
7  this case if you made any changes to the transcript
8  within two weeks of my receipt or actually within
9  one week of my receipt of any changes that you have
10  made.  If the original transcript is not available
11  at the time of trial, a certified copy can be used
12  for all purposes.
13          MS. SCHWEINER:  Counsel, do you agree?
14          MR. SHADOWEN:  I agree we're going to
15  abide by the Federal Rules of Civil Procedure.
16          MS. SCHWEINER:  In other words, you're not
17  doing any stipulations whatsoever?
18          MR. SHADOWEN:  Right.  I'd like to get it
19  on Thursday please by e-tran.
20          VIDEOGRAPHER:  We are going off the record
21  at 18:06.  This ends the deposition of James
22  Tomsheck at 18:06.
23          MS. SCHWEINER:  I'm not ordering a rough
24  draft.  I just want to get simultaneously whatever
25  counsel orders.  E-tran.

**Page 315**

1          (Whereupon, Exhibit Tomsheck 1, Tomsheck
2  2, Tomsheck 3, Tomsheck 4, and Tomsheck 5 was
3  marked.)
4          (Whereupon, the deposition was concluded
5  at 6:06 p.m.)

**Page 316**

1          CERTIFICATE FOR READING AND SIGNING
2
3      I hereby certify that I have read and examined
4  the within transcript and the same is a true and
5  accurate record of the testimony given by me.
6
7      Any additions or corrections that I feel are
8  necessary I have listed on the separate ERRATA SHEET
9  enclosed, indicating the page and line number of
10  each correction.
11
12
13      _____
14          NAME
15
16
17      _____
18          DATE
19
20
21
22
23
24
25

Page 317

1   STATE OF MARYLAND      )
                          )SS
2   COUNTY OF BALTIMORE    )
3
4        I, Adina Berman, a Notary Public of the State
5   of Maryland, do hereby certify that the within named
6   Deponent personally appeared before me at the time
7   and place herein set out, and was duly sworn by me.
8        I further declare that the examination was
9   recorded stenographically by me to the best of my
10  abilities, and that this transcript is a true record
11  of the proceedings.
12       I further declare that I am not of counsel to
13  any of the parties, nor an employee of counsel, nor
14  related to any of the parties, nor in any way
15  interested in the outcome of this action as witness
16  my hand this 12TH day of January, 2016.
17
18
19
20        _Adina Bernstein_____
21        ADINA BERMAN
22
23
24
25

# Exhibit Q

## JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE

Friday, April 27, 2012

## Federal Officials Close Investigation into the Death of Sergio Hernandez-Guereca

The Justice Department and the U.S. Attorney's Office for the Western District of Texas announced today that there is insufficient evidence to pursue federal criminal charges against a U.S. Customs and Border Protection (CBP), Office of Border Patrol agent for the fatal shooting of the late Sergio Hernandez-Guereca, a 15-year-old Mexican national shot within a spillway of the Rio Grande River along the United States – Mexico border on June 7, 2010.

The Justice Department conducted a comprehensive and thorough investigation into the shooting, which occurred while smugglers attempting an illegal border crossing hurled rocks from close range at a CBP agent who was attempting to detain a suspect. In conjunction with agents from the FBI and Department of Homeland Security, Office of the Inspector General (DHS-OIG), prosecutors from the Justice Department's Civil Rights Division and the U.S. Attorney's Office interviewed more than 25 law enforcement and civilian witnesses. In addition, they collected, analyzed and reviewed: evidence from the scene of the shooting; civilian and surveillance video; law enforcement radio traffic; 911 recordings; volumes of CBP agent training and use of force materials; and the shooting agent's training, disciplinary records, and personal history. Also, they conducted site visits and analysis and consulted with the International Boundary and Water Commission concerning jurisdictional issues.

The team of experienced prosecutors examined the shooting as a possible violation of U.S. criminal civil rights laws and as a possible violation of federal homicide statutes. With regard to the federal homicide statutes, the team of prosecutors and agents concluded that there is insufficient evidence to pursue prosecution of the CBP agent for a federal homicide offense. This review took into account evidence indicating that the agent's actions constituted a reasonable use of force or would constitute an act of self defense in response to the threat created by a group of smugglers hurling rocks at the agent and his detainee. The investigation also revealed that, on these particular facts, the agent did not act inconsistently with CBP policy or training regarding use of force. Based on a careful review and analysis of all the evidence, the team concluded that evidence would not be sufficient to prove beyond a reasonable doubt that the CBP agent violated the federal homicide laws in the shooting of Hernandez-Guereca.

The Justice Department also concluded that no federal civil rights charges could be pursued in this matter. Under the applicable civil rights statutes, prosecutors must establish, beyond a reasonable doubt, that a law enforcement officer willfully deprived an individual of a constitutional right, meaning with the deliberate and specific intent to do something the law forbids. This is the highest standard of intent imposed by law. Accident, mistake, misperception, negligence and bad judgment are not sufficient to establish a federal criminal civil rights violation. After a careful and thorough review, a team of experienced federal prosecutors and FBI agents determined that the evidence was insufficient to prove, beyond a reasonable doubt, that the CBP agent acted willfully and with the deliberate and

Ex. Q - pg 1

01200-YANEZ-REYES

specific intent to do something the law forbids, as required by the applicable federal criminal civil rights laws. Moreover, a prosecution under the federal criminal civil rights statutes would be barred because the investigation determined that Hernandez-Guereca was neither within the borders of the United States nor present on U.S. property, as required for jurisdiction to exist under the applicable federal civil rights statute.

Accordingly, the investigation into this incident has been closed without prosecution.

The U.S. government regrets the loss of life in this matter, and the Civil Rights Division, the U.S. Attorney's Office for the Western District of Texas, the FBI and DHS devoted significant time and resources into conducting a thorough and complete investigation. The USG commits to continue to work with the Mexican government within existing mechanisms and agreements to prevent future incidents.  The Justice Department is committed to investigating allegations of excessive force by law enforcement officers and will continue to devote the resources required to ensure that all allegations of federal civil rights violations are fully and completely investigated.  The department aggressively prosecutes criminal civil rights violations whenever there is sufficient evidence to do so.

12-553                                                                                          Civil Rights Division

*Updated September 15, 2014*

Ex. Q - pg 2                                                       01201-YANEZ-REYES

# Exhibit R

# U.S. CUSTOMS AND BORDER PROTECTION

# USE OF FORCE REVIEW: CASES AND POLICIES

February 2013

Conducted by

**The Police Executive Research Forum**
1120 Connecticut Ave, NW, #930
Washington DC 20036

U.S. Customs and Border Protection – Use of Force Review
February 2013

**Introduction**

The Police Executive Research Forum (PERF) was commissioned by U.S. Customs and Border Protection (CBP) to conduct a review of the Use of Force by CBP officers and agents. This review included all CBP use of deadly force events from January 2010 through October 2012 and CBP use of force policies, equipment, tactics, and training. Sources of information were government-furnished information, equipment and materials and CBP policy documents.

PERF reviewed Customs and Border Protection Use of Force Policies and 67 case files related to Customs and Border Protection agents' use of deadly force. Case files were sorted in general categories to include: firearm response to subjects armed with firearms; firearm response to rocks thrown on land; firearm response to rocks thrown on water; firearms use against vehicles; and other firearm cases.

Policies included the "Use of Force Policy Handbook" and the following ten directives:

- 4510-020C: U.S. Customs and Border Protection Body Armor Policy
- 4510-026b: Controlled Tire Deflation Device Directive
- 4510-029:  Pepperball Launching System (PLS) Policy
- 4510-029a: Use of Electronic Control Devices
- 4510-031:  FN303 Less Lethal Launcher System Policy
- 4510-032:  Less Lethal Specialty Impact – Chemical Munitions Policy
- 4510-033:  Use of Air Disabling Fire Policy
- 4510-034:  CBP Use Of Force Steering Committee (UFSC)
- 4510-035:  Foreign Attaché Firearms Directive
- 5290-012a: CBP Use Of Force Incident Review Program

The case reviews raise a number of concerns, especially with regard to shots fired at vehicles and shots fired at subjects throwing rocks and other objects at agents. Improvements are also recommended in initial reporting, investigation, incident review, weapons, personal protective equipment, and training. Recommendations for changes in policies flow from these case reviews.

Two policy and practice areas especially need significant change. First, officers/agents should be prohibited from shooting at vehicles unless vehicle occupants are attempting to use deadly force--other than the vehicle--against the agent. Training and tactics should focus on avoiding positions that put agents in the path of a vehicle and getting out of the way of moving vehicles.

Second, officers/agents should be prohibited from using deadly force against subjects throwing objects not capable of causing serious physical injury or death to them. Officers/agents should be trained to specific situations and scenarios that involve subjects throwing such objects. The training should emphasize pre-deployment strategies, the use of cover and concealment, maintaining safe distances, equipping vehicles and boats with protective cages and/or screening, de-escalation strategies, and where reasonable the use of less-lethal devices.

U.S. Customs and Border Protection – Use of Force Review
February 2013

Because these changes are significant departures from current practice CBP will need to craft an implementation strategy for re-orientation and training before new policies go into effect. Consideration should be give to assembling an expert panel to interact with members of CBP from all levels of the organization for discussion about the transition to the new policies and practices.

There are several areas where CBP is engaged in best policing practices. Firearms qualification occurs four times a year. According to policy, exemptions are limited. This practice is critical given the environment in which CBP officers/agents work.

In addition, CBP is to be commended for implementing a new incident mapping software program. This system allows examination of use of force and other incidents at both a highly detailed level and at a more macro level. This system will provide graphic support for leaders to spot trends and make strategic changes.

CBP also has produced a very useful quick-reference guide "Documenting the Use of Force." Policy changes restricting the use of deadly force against vehicles and rock throwers should be incorporated into the guide.

## Case Reviews and Observations

PERF reviewed Border Patrol Use of Force Policies and 67 case files related to Border Patrol agents' use of deadly force. Case files were sorted in general categories to include: firearm response to armed suspect actions; firearm response to rocks thrown at agents on land; firearm response to rocks thrown at agents on water; firearms use against vehicles; and "other."

Case reviews were limited to assessments from the information supplied to PERF. Some case files were incomplete and were missing information. *Case summaries were reviewed to discover overall trends and patterns. The scope of the study asked for general case reviews, but not judgments on individual cases.*

**Overall Observations and Recommendations:**

- Initial Reporting:

    It is believed that rock throwing incidents along the border are likely very frequent; however, only serious cases where deadly force is used are routinely officially reported. One of the causes for this laxity of reporting is believed to be the complexity of report requirements in cases of "Assaults on Federal Officers."

    Recommendation: CBP policy and practice should be changed to require at least an abbreviated report in all cases of attempted assaults against agents. Accurate reporting of all incidents of attempted assaults by rocks or other means is important in order to understand the gravity of the threat and put the threat in perspective for the public and policy makers on both sides of the border.

- Investigations:

    Recommendation: All uses of deadly force should be thoroughly investigated whether injuries occur or not. Lack of diligence was observed in some investigations. It is recognized that the investigation of cases involving an international border can be limited by jurisdictional cooperation, witness availability, and access to the incident scenes. However, it is important that, to the extent possible, a full investigation be conducted of each discharge of deadly force by CBP officers/agents. Based on the somewhat limited records that were provided, it appears that CBP is not as diligent with follow up investigation and evaluations of cases where shots were fired and injuries were not confirmed. This "no harm - no foul" practice can lead to tacit approval of bad practices.

- Incident Reviews:

    Recommendation: It is not clear that CBP consistently and thoroughly reviews all use of deadly force incidents. Individual cases should be uniformly judged by a

single internal process that considers comments from a shooting review board made up of internal subject matter experts who look at policy, agent safety, training, and equipment issues pertaining to each case. The shooting review process should be standardized as part of the Use of Force Incident Review Program described in directive 5290-012A. Additionally, strategic analysis of case trends should be performed on a regular basis. Such analysis may spot trends that suggest actions that require policy or equipment changes, collaboration within or outside of CBP, or problem solving. Information to support such actions is becoming increasingly available. CBP is to be commended for implementing a new incident mapping and analysis software program. This system will provide decision/analytic support for leaders to spot trends and make strategic changes.

- Weapons:

    Border protection along the U.S./Mexico Border is a unique and hazardous assignment. Frequent and dangerous rock attacks and other attacks on agents take place when agents are patrolling or making arrests near the border. In many cases, agents must effect drug seizures and arrests under threat of such attacks. For example, when drug smugglers who are intercepted by agents are attempting to flee and to take bales of drugs back across the border, agents are expected to do what they can to apprehend the suspects and recover the drugs. However, rocks being thrown and the threat of gunfire coming from south of the border create a significant danger justifying defensive action. If agents are only armed with deadly weapons, they are left with few options: retreat, or use their firearms.

    Recommendation:  While it is recognized that agents on foot can only carry so many weapons, less lethal weapons should be made available to all agents assigned to high risk areas.  PERF's review revealed that in most cases when agents used deadly force, specialized less lethal weapons were not been readily available.  In some cases, the use of such less lethal weapons *may* have reduced the risk to agents and prevented the need for deadly force.

    Recommendation: Each field vehicle and boat should be equipped with the best available less lethal weapons, and agents should be required to consider the use of less lethal weapons.  In that regard, it should be noted that, in an effort to acquire the best less lethal equipment, CBP now maintains an arsenal that includes a number of different less lethal weapon systems.  Consolidation of weapons systems would allow for more uniformity of training and operational capability.

U.S. Customs and Border Protection – Use of Force Review
February 2013

- Personal Protective Equipment (PPE):
    Recommendation:  Agents assigned to marine patrol and agents assigned to patrol
    or who respond near the International Border Fence (IBF) are particularly
    vulnerable to rock attacks. All agents assigned to these high risk areas should be
    provided protective equipment to include a helmet with face shield and with
    integrated communications capability, especially for boat patrol.  In addition, all
    boats and patrol vehicles should be equipped with protective cages/screening.

- Training:
    Recommendation:  Policy and skills training is essential to agent safety and
    appropriate deadly force decisions.  Training is especially important to the
    successful implementation of policy changes.  In training, agents should be
    informed about the reason for changes in policy. For example, with regard to
    restrictions on shooting at vehicles, it should be explained that shooting at
    vehicles poses a higher risk to agents and innocent bystanders and should be
    avoided. If the driver is disabled, the vehicle is likely to continue unguided,
    creating a different hazard. Agents should receive regular retraining in deadly
    force policy, use of force decision making, tactical skills and shooting.  Command
    level monitoring of training is particularly important when implementing policy
    changes where resistance is anticipated.

- Shooting at Vehicles:
    Recommendation:  Agents' and the public's safety will be enhanced by policy
    changes related to shooting at vehicles.  CBP should make policy changes that
    restrict agents from shooting at vehicles.  Likewise, agents should be trained to
    get out of the way of oncoming vehicles as opposed to intentionally assuming a
    position in the path of such vehicles.  The policy should mirror the clear and
    unambiguous policies that have been in place and which have proven effective in
    a number of large U.S. jurisdictions for over 40 years.  The CBP policy should
    state **"Agents shall not discharge their firearms at or from a moving vehicle
    unless deadly physical force is being used against the police officer or another
    person present, by means other than a moving vehicle."**

- Shooting at Rock Throwers:
    Recommendation:  Review of shooting cases involving rock throwers revealed
    that in some cases agents put themselves in harm's way by remaining in close
    proximity to the rock throwers when moving out of range was a reasonable
    option.  Too many cases do not appear to meet the test of objective
    reasonableness with regard to the use of deadly force.  In cases where clear

U.S. Customs and Border Protection – Use of Force Review
February 2013

options to the use of deadly force exist and are not utilized in rock-throwing incidents, corrective actions should be taken. CBP should improve and refine tactics and policy that focus on operational safety, prioritization of essential activities near the border fence, and use of specialized less lethal weapons with regard to rock throwing incidents. The state CBP policy should be: **"Officers/agents are prohibited from using deadly force against subjects throwing objects not capable of causing serious physical injury or death to them."**

- Public Education / Relations:
    Recommendation: Customs and Border Protection should mount an effort to capture statistical facts regarding incidents and injuries and develop a public education program to inform the residents of risks and potential consequences of such actions related to rock throwing. It is important that the public, especially residents on both sides of the border, and policy makers understand the risk faced by CBP agents and rock throwers along the border. Transparency through timely media releases about attacks and public dialogue regarding border security issues will not end attacks. But when adversarial incidents occur, better public understanding of the issues will provide the agency examples of proactive preventive efforts and put issues in a broader context.

## Case Summaries by General Category:

### Firearm Use in Response to Armed Suspect Actions
Thirteen such cases were provided.
**Observations:**
Four of the cases involved CBP agents responding to requests for back-up assistance by local or state law enforcement agencies. Two back-up related shootings were in the State of Maine, one was in California and one was in Texas. Additionally, one CBP shooting took place in Afghanistan. All five of these cases involved confrontations with armed suspects who posed an immediate threat to agents and/or officers.

The eight other firearm to firearm cases involved armed confrontations on or near the Mexican/U.S. Border. All eight of these cases appear to be objectively reasonable and within policy.

### Firearm Use in Response to Object Throwing on Water
Four cases involved rocks being thrown at agents who were in boats.
**Observations:**
It is not clear that all shootings by agents on water to counter rock throwers meet the standard of objective reasonableness. The tactics and strategies that agents are using may unnecessarily put them in harm's way. Moving to a safer location when possible is

U.S. Customs and Border Protection – Use of Force Review
February 2013

preferable to using deadly force and such action should be considered as part of objective reasonableness.

### Shooting at Vehicles

Fifteen cases were reviewed where shots were fired at or into vehicles by CBP agents.
**Observations:**

Based on a review of the submitted cases, it appears that CBP practice allows shooting at the driver of any suspect vehicle that comes in the direction of agents. It is suspected that in many vehicle shooting cases, the subject driver was attempting to flee from the agents who intentionally put themselves into the exit path of the vehicle, thereby exposing themselves to additional risk and creating justification for the use of deadly force. In most of these cases, the agents have stated that they were shooting at the driver of a vehicle that was coming at them and posing an imminent threat to their life. In some cases, passengers were struck by agents' gunfire. Little focus has been placed on defensive tactics that could have been used by shooting agents such as getting out of the way. It should be recognized that a ½ ounce (200 grain) bullet is unlikely to stop a 4,000 pound moving vehicle, and if the driver of the approaching vehicle is disabled by a bullet, the vehicle will become a totally unguided threat. Obviously, shooting at a moving vehicle can pose a risk to bystanders including other agents.

The cases suggest that some of the shots at suspect vehicles are taken out of frustration when agents who are on foot have no other way of detaining suspects who are fleeing in a vehicle.

Most reviewed cases involved non-violent suspects who posed no threat other than a moving vehicle.

There is little doubt that the safest course for an agent faced with an oncoming vehicle is to get out of the way of the vehicle.

**CBP policy should be "Agents shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle."** Training and policy changes should be implemented to implement this policy.

### Shooting At Suspects Throwing Rocks at Agents on Land

Twenty five case files were reviewed that involved shots being fired by agents who had been the victim of rock attacks while on land.
**Observations:**

Most of the cases involved enforcement activities that took place near the IBF, while a limited number were in remote mountainous regions miles from the border. Some cases seemed to be a clear cut self-defense reaction to close and serious rock threats or assaults, while other shootings were of more questionable justification. The more questionable cases generally involved shootings that took place through the IBF at subjects who were throwing rocks at agents from Mexico. In some cases, agents shot at suspects who were

U.S. Customs and Border Protection – Use of Force Review
February 2013

attempting to interfere with arrests on the U.S. side of the border fence. In at least one case, rocks were being thrown in an attempt to allow drugs to be taken back over the IBF. In other cases, agents shot at suspects who started throwing rocks over the fence at them after agents stopped when their CBP vehicles had been hit by rocks. As with vehicle shootings, some cases suggest that frustration is a factor motivating agents to shoot at rock throwers. Likewise, it is felt that some of the weapons discharges are actually intended as warning shots. Two or more shooting cases involving rock throwers on land were ruled by CBP as violations of policy.

**It is clear that agents are unnecessarily putting themselves in positions that expose them to higher risk. While rock throwing can result in injuries or death, there must be clear justification to warrant the use of deadly force. CBP needs to train agents to de-escalate these encounters by taking cover, moving out of range and/or using less lethal weapons. Agents should not place themselves into positions where they have no alternative to using deadly force.**

### Other Shooting Cases

Ten cases that were provided were of a more traditional police shooting nature. They were classified as "other". These shootings were justified by facts ranging from struggles during arrest attempts to an attack by a subject armed with a hammer. Each case was reviewed based on the information that was presented.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARIA DEL SOCORRO QUINTERO PEREZ;
BRIANDA ARACELY YANEZ QUINTERO;
CAMELIA ITZAYANA YANEZ QUINTERO;
and J.Y., a minor,
406 5th St. NW, Suite 100
Washington, DC 20001,

Petitioners,

vs.

U.S. DEPARTMENT OF HOMELAND
SECURITY; U.S. CUSTOMS AND BORDER
PROTECTION,
1300 Pennsylvania Ave. NW
Washington, DC 20229,

Respondents.

Misc. Action No. _____

Related to:

Case No. 3:13-cv-1417 (S.D. Cal.)

## PROPOSED ORDER

**UPON CONSIDERATION** of Petitioners' Motion to Compel U.S. Department of Homeland Security and U.S. Customs and Border Protection to Comply with Subpoenas, and for Contempt Sanctions and Incorporated Memorandum of Law, and for good cause shown, **IT IS HEREBY ORDERED** that Petitioners' Motion is **GRANTED.** It is further

**ORDERED**, that United States Department of Homeland Security ("DHS") and United States Customs and Border Protection ("CBP") shall comply with subpoenas served on March 1, 2016 (the "March Subpoenas") and conduct a thorough review of all documents within their possession, custody, or control to determine whether any documents exist that are responsive to Petitioners' request numbers 1-10 and the list of items or categories of items attached to Petitioners' Motion. It is further

**ORDERED**, that DHS and CBP have waived all objections to Petitioners' document subpoenas

1

served on March 1, 2016. It is further

**ORDERED**, that DHS and CBP each respond and produce all responsive documents to the document subpoenas served on March 1, 2016 without redaction and within fourteen (14) days of the date of this order.  It is further

**ORDERED**, that DHS comply with the document subpoena served on December 11, 2015 and conduct a thorough review of all documents within its possession, custody, or control to determine whether any documents exist that are responsive to request numbers 9, 17-20 and the list of items or categories of items attached to Petitioners' Motion.  It is further

**ORDERED**, that DHS respond and produce all responsive documents to the document subpoena served on December 11, 2015 within fourteen (14) days of the date of this order.  It is further

**ORDERED and ADJUDGED**, that DHS and CBP are in contempt for their inexcusable failure to comply with the document subpoenas dated and served on March 1, 2016, and that Petitioners are entitled to an award of reasonable attorney's fees and costs incurred in enforcing DHS and CBP's compliance therewith.  It is further

**ORDERED**, that Petitioner shall submit an affidavit setting forth such attorney's fees and costs incurred in enforcing DHS and CBP's compliance with the subpoenas dated and served on March 1, 2016.

Dated:  _____
Washington, D.C.

_____
United States District Judge